UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| PLUMBERS AND PIPEFITTERS LOCAL UNION NO. 630 PENSION-ANNUITY TRUST FUND, On Behalf of Itself and All Others Similarly Situated, | ) ) ) ) ) | No. 1:09-cv-04726 <br><br> CLASS ACTION <br><br> Judge Ruben Castillo |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| ALLSCRIPTS-MISYS HEALTHCARE SOLUTIONS, INC., et al., | ) ) ) | |
| Defendants. | ) ) ) | |

AMENDED COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ..................................................................................................1

JURISDICTION AND VENUE ...........................................................................................3

PARTIES ...............................................................................................................................3

BACKGROUND TO THE CLASS PERIOD .......................................................................5

MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS
    MADE DURING THE CLASS PERIOD.....................................................................6

THE TRUTH BEGINS TO LEAK INTO THE MARKET....................................................15

SCIENTER AND SCHEME ALLEGATIONS....................................................................25

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET
    DOCTRINE .................................................................................................................30

PLAINTIFF'S CLASS ACTION ALLEGATIONS............................................................31

NO SAFE HARBOR ..........................................................................................................33

LOSS CAUSATION/ECONOMIC HARM ........................................................................43

COUNT I .............................................................................................................................45

    For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All
        Defendants .........................................................................................................45

COUNT II ...........................................................................................................................46

    For Violation of Section 20(a) of the Exchange Act Against Defendant Allscripts,
        Tullman and Davis.............................................................................................46

JURY DEMAND .................................................................................................................47

**NATURE OF THE ACTION**

1. This is a securities class action on behalf of purchasers of Allscripts Healthcare Solutions, Inc. ("Allscripts" or the "Company") common stock during the period from May 8, 2007 to February 13, 2008 (the "Class Period"), against Allscripts (and its successor in interest Allscripts-Misys Healthcare Solutions, Inc.) and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2. Defendant Allscripts develops and sells software applications to healthcare organizations. According to the Company, more than 150,000 physicians, 700 hospitals and nearly 7,000 post-acute and homecare organizations utilize Allscripts software applications. Allscripts products include electronic health records ("EHR") systems, electronic prescribing, revenue cycle management, practice management, document management, medication services, hospital care management, emergency department information systems and homecare automation.

3. During May 2007, the Company went "live" with the newest version of its flagship EHR clinical software, Touchworks, version 11 ("V-11"). V-11 originally scheduled for release in late 2006, was delayed for several months, according to defendants (defined below), due to additional verification of the software at several pilot sites. During 2007, defendants guided analysts and investors to expect the Company to realize $300 million in revenues and earn up to $0.44 per share, based in material part on revenues and profits generated from sales of V-11. Just prior to the May V-11 release, defendants, citing greater "visibility" on several large potential V-11 sales, increased Allscripts sales backlog or "bookings" for clinical software by an additional $20 million, to in excess of $230 million.

4. Unbeknownst to shareholders, by the start of the Class Period, the Company had attempted limited implementation of V-11 but found that the software was riddled with bugs which caused significant functionality and stability issues, and which caused implementation times to

greatly increase delaying the recognition of revenues.  These problems went unresolved by additional development measures, and defendants launched V-11 knowing it was unstable, did not provide the functionality defendants promised and was untested, despite the early substantial difficulties V-11 caused Allscripts and its customers.  Moreover, defendants also knew that the implementation teams were ill-equipped to properly implement and troubleshoot V-11, not having the required experience and training to handle the complicated process V-11 contained.

5.      The truth began to emerge on November 8, 2007, with the Company's release of its third quarter 2007 financial results.  Allscripts reported revenues and earnings significantly below its recently confirmed 2007 earnings guidance.  The Company missed Wall Street consensus earnings by 29% and lowered its 2007 revenue guidance to $288 million.  Indeed, the Company revised lower its FY07 revenue and earnings guidance claiming "near term" impacting of revenue due to resources being devoted to the V-11 ramp-up at Allscripts' largest clients.

6.      Following these announcements, the price of Allscripts common stock fell $4.32, or 19%, closing at $18.68 per share on November 9, 2007.  However, defendants continued to mislead investors by failing to disclose V-11's serious functionality and stability problems, the lengthening implementation times due to the software's defects and the resulting delay in converting the sales backlog to revenue, and the lack of qualified personnel to effectively implement and troubleshoot the software.

7.      Then, on February 13, 2008, Allscripts released its actual 2007 financial results, reporting 2007 revenue of $281.9 million or $18 million below defendants' $300 million guidance confirmed in August 2007 and $5 million short of defendants' November 2007 earnings guidance revision.  During a conference call with investors that same day, defendants finally admitted to V-11 installation delays that were likely to negatively impact sales and earnings well into 2008, and that

the Company had brought in "process expertise" to properly train Allscripts' personnel implementing V-11.

8.      In response to those announcements, the price of Allscripts common shares fell an additional $4.12, or nearly 25%, per share closing at $11.27 on February 14, 2008.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Jurisdiction is conferred by Section 27 of the Exchange Act.

10.      Venue is proper pursuant to Section 27 of the Exchange Act as Allscripts and/or the Individual Defendants (defined below) conduct business in and the wrongful conduct took place in this District, and the Company's principal executive offices are in Chicago, Illinois, where the day-to-day operations of the Company are directed and managed.

## PARTIES

11.      By Court Order dated October 13, 2009, David Robb was appointed the Lead Plaintiff in this action.  Mr. Robb purchased Allscripts common stock during the Class Period as detailed in his Certification filed with the Court on October 5, 2009 in support of his motion to be appointed Lead Plaintiff.  As a result of the defendants' conduct detailed herein, Mr. Robb suffered damages in connection with his purchases of Allscripts securities.

12.      Plaintiff Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Trust Fund purchased Allscripts common stock as detailed in the Certification filed with the Court on August 4, 2009.  As a result of defendants' conduct detailed herein, Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Trust Fund suffered damages in connection with its purchases of Allscripts securities.

13.     Defendant Allscripts develops and sells software applications to the healthcare industry.  The Company's headquarters is located at 222 Merchandise Mart Plaza, Suite 2024, Chicago, Illinois.  As of February 15, 2008, the Company had over 56.9 million shares issued and outstanding that trade on the New York Stock Exchange under the ticker symbol "MDRX."  In October 2008, Allscripts participated in a stock-for-stock merger with Misys Healthcare Systems, LLC, such that Allscripts stock is no longer publicly traded.

14.     Defendant Glen E. Tullman ("Tullman") was at all relevant times, Chief Executive Officer ("CEO") of Allscripts and Chairman of the Board.

15.     Defendant William J. Davis ("Davis") was, at all relevant times, Chief Financial Officer ("CFO") of Allscripts.

16.     Defendant Allscripts-Misys Healthcare Solutions, Inc. ("Allscripts-Misys") is the operative entity formed by the October 2008 merger of Allscripts and Misys Healthcare Systems, LLC, a fully owned division of London-based Misys plc, and is the successor in interest to Allscripts' liability for the acts described herein.

17.     Defendants Tullman and Davis were Allscripts CEO and Chairman, and CFO.  Both of these executives, by virtue of their high-level positions with Allscripts, directly participated in the management of Allscripts, were directly involved in the day-to-day operations of Allscripts at the highest levels and were privy to confidential proprietary information concerning Allscripts and its business, operations, products, growth, financial statements and financial condition and were aware of, or deliberately disregarded, that the false and misleading statements made by and regarding the Company were still alive in the market and causing the Company's stock to trade at inflated prices. Because of their managerial positions with Allscripts, each had access to the adverse undisclosed information about Allscripts' business, financial condition and prospects and knew (or deliberately

disregarded) that the adverse facts alleged herein rendered the positive representations made during the Class Period materially false and misleading.

18.     The individuals named as defendants in ¶¶14-15 are referred to herein as the "Individual Defendants."  They are liable for the false and misleading statements set forth at ¶¶24-31, 34-40, 44-50.

## BACKGROUND TO THE CLASS PERIOD

19.     In the years preceding the Class Period, Allscripts began to enjoy some profitability. In fact, between 2004 and 2006, Allscripts more than quadrupled its net income from $3.1 million to $12.5 million based in no small part to the market's embrace of Allscripts' leading EHR product, Touchworks Version 10.1.1.  This version of Touchworks had been certified by the Commission for Healthcare Information Technology, the private-sector initiative that had been recognized in the industry as the certification authority for EHR products.  Moreover, the 2006 Medical Record Institute's Towards the Electronic Patient Record Awards ranked Version 10.1.1 second among EHR's designed for medium and large practice groups.  Touchworks' reputation and market acceptance gave Allscripts a competitive advantage in the industry.

20.     While Allscripts was finally beginning to enjoy profitability, the long-term growth for the Company was limited.  The EHR market as a whole was expected to continue to grow 20-25% per year for five years, then level off to single digit growth as the adoption of EHR software by medium to large physician practices reached 100%.

21.     Indeed, analysts reported that Allscripts expected the bulk of the 2007 market growth to be in the large practice groups, with 40% growth year over year, and the medium practice groups, with 30-35% growth year over year.  These segments of the market is where Allscripts' sales practices were focused, and where it was selling the Touchworks system, specifically V-11.

22.     The launch of V-11 was greatly anticipated by the market.  On February 13, 2007, defendants announced Allscripts' FY06 results, with record sales – bookings to use the Company's term – of $190.1 million.  Defendants told analysts on the conference call that same day that the surge in sales was "led by our TouchWorks business unit."  Defendants were selling V-11 at a record clip and were under tremendous pressure to deliver a product that performed better than the award winning Version 10.1.1.  In fact, during the February 13, 2007 conference call, defendant Davis likened V-11 to Bloomberg:

> In addition when you talk about Version 11, you see a lot about that coming out of the HIMS show, but we deployed that software to some of the initial users, and we haven't started real full rollout of that, ***but the reception has been very, very positive. Again I use the analogy of kind of the Bloomberg for healthcare.  Again, it's going to provide physicians with all the information, the content and the connectivity that they need to go forward in healthcare the way we all want them to***.

23.     However, as described in ¶¶65-75, V-11 was not what defendants represented it to be but suffered from substantial functionality and operability problems.  Defendants knew that V-11's limited implementation revealed a product that was unstable and did not operate as intended. Defendants, however, in announcing the FY06 results on February 13, 2007, reiterated the revenue and growth guidance they had given the previous October, which was dependant in material part on the successful implementation of V-11, and the conversion of the substantial V-11 sales backlog to revenue.

### MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE DURING THE CLASS PERIOD

24.     On May 8, 2007, Allscripts issued a press release announcing its financial results for the first quarter of fiscal 2007 ended March 31, 2007, entitled "Revenue from Software and Related Services Up 81% Over Prior Year."  The release stated, in relevant part, as follows:

> Total revenue for the three months ended March 31, 2007 was $65.0 million, compared to $42.2 million for the same period last year.  Revenue from software and related services for the three months ended March 31, 2007 was $51.2 million,

- 6 -

compared to $28.3 million for the same period last year, increasing by approximately 81.0%.

Gross margin percentage was 49.6% for the first quarter of 2007, compared to 47.7% during the first quarter of 2006.

Net income for the three-months ended March 31, 2007 was $4.5 million, or $0.08 per diluted share, compared to net income of $1.3 million, or $0.03 per diluted share, for the same period last year.

Defendant Tullman commented on Allscripts' seemingly positive results stating, in pertinent part, as follows:

"Allscripts continued to demonstrate our leadership in the most important segments of the healthcare market, helping our clients to streamline and revitalize their clinical and financial operations and transform healthcare across their communities." . . . "*Our revenue growth, visibility to sales opportunities and solid bottom-line performance give us confidence in our ability to deliver during the remainder of 2007*."[1]

25.     During a conference call with analysts that same day, defendant Tullman announced Allscripts' intention to raise "bookings" guidance for the remainder of fiscal 2007.  As detailed by defendant Davis, the Company stated its "clinical bookings" guidance would "exceed" $230 million, an over $20 million increase over the previous guidance of $210 million and a 40% increase compared to 2006.  The Company's previously issued fiscal 2007 revenues and earnings guidance remained unchanged at $300 million and $0.42 to $0.44 per share, respectively.  *During the call, defendant Tullman also stated that V-11 "is the most tested product in our history"* and that after a release delay of "four to six weeks" would go "live" on May 21, 2007.  Davis further stated that approximately $1 million in deferred Touchworks V-11 revenue stemming from the release delay would be recognized during the second quarter ending June 2007.

26.     During the conference call defendant Tullman also stated:

---

[1]     All emphasis is added unless otherwise noted.

. . . Speaking of delivering, we now have TouchWorks V-11 in controlled release. There comes a point in time when good companies decide whether they want to incrementally improve existing products or create a new product that literally leap frogs the competition.  We chose the latter and this requires the commitment to break away from our traditional approach and the patience to get it right.  We have done that with version 11, just as we did last year with our release of HealthMatics 2006. ***Market validation of V-11 is a transformational product has been overwhelming. V-11 will allow Allscripts to become what I call the Bloomberg of health care***.  It will provide physicians with a product they want to use and need to have.

27.     During the conference call in response to a question from an analyst about the

financial impact the delay in the release of V-11 caused the Company, defendant Davis stated:

<u>Larry Marsh</u>:

And finally just you talked about the V-11 release being pushed back four to six weeks with Steve Badger and his team providing a lot of the quality control of the product, are you suggesting that had any impact in the quarter?  Or will it have any impact in this upcoming quarter?

<u>Bill Davis</u>:

I made reference, explicit reference to that from a revenue perspective.  We saw about a $1 million of production where we were limited to recognizing because it was tied to ultimate delivery of V-11.  Again, in keeping with the expectation that GA is forthcoming we expect that to fall through here in the second quarter.

*        *        *

<u>Bill Davis</u>:

From a booking standpoint, you are right.  There are I think we did see a few agreement that basically said we want to visit.  We want to see it up live and operating before we put pen to paper.  In both ways that delay had an impact.  That said, I couldn't be more pleased with what's coming out from the standpoint of the fact that it's in controlled release and running on GW servers today, and they will probably within about a week and a half of being live will be hosting site visits. ***There is a very substantial amount of pent-up demand***.  We were a little concerned in the fourth quarter that people might hold off and that might impact the fourth quarter.  I think the issue was that we told folks they would be visiting live sites in the first quarter and we were off that by about four to six weeks given the size of the project, given how significant a change it is and capabilities. I think we were still pleased with where it came from.  Interestingly, by the way, ***the delays in the project came not from development.  They came from the fact that we did an awful lot of design work and that actually delayed the start of the development work***.

- 8 -

28.     In response to a question from an analyst about "technology risk" associated with V-11, defendant Tullman stated:

Frank Sparacino:

Hi guys.  Maybe, Glen for you.  I'm curious on the technology risk as you move existing customers to Version 11 and if the live sites (inaudible) – new installations versus migrations or how you look at that.

Glen Tullman:

Well, in terms of again Version 11 we have been working on it for a period of time. We have probably upwards of 15 to 20 difference clients that are in different versions of reviewing the software, getting trained on the software.  We were conducting courses for a period of time.  And again, it's not just GW.  Organizations like Sharp have the software, have run it on their servers.  We have done performance testing. This has been a very open process.  So when we did the performance testing, we did it at labs with clients standing side by side with us.  So we have – *we don't expect issues to come up relative to the actual installation and – or conversion or transition to the 11.  We did a tremendous amount of work on that process to make sure that doesn't happen*.

29.     Analysts reiterated defendants' positive statements about Allscripts' anticipated continued strong performance in 2007 over the next few days.

30.     On May 8, 2007, Deutsche Bank issued a report on Allscripts based on the recent conference call.  The reported stated:

MDRX reiterated guidance it had initially given during its Analyst Day on October 18, 2006, which was reaffirmed during the last earnings announcement.  This guidance includes revenue in excess of $300 million with GAAP EPS of $0.42-0.44 ($0.58-0.60 excluding acquisition-related intangibles and stock-based compensation). However, the company increased bookings guidance for Clinical Software from $210 million to $230 million, with total bookings expected to be $260 million for the year.

31.     On May 9, 2007, William Blair & Company, LLC issued a report on Allscripts based on the recent conference call.  The reported stated:

Management increased the bookings guidance for 2007 and reiterated 2007 revenue and EPS guidance . . . Allscripts now expects $260 million (versus the previous expectation of $240 million) in total bookings for 2007, with $230 million expected to come from clinical software . . . Revenue guidance for 2007 remains $300 million, including $240 million from clinical software . . . .

- 9 -

32.     The positive statements, assurances and forecasts, outlined in ¶¶24-31, made by defendants were materially false and misleading when made and failed to disclose material information concerning Allscripts' business and business practices.  Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)     As more fully described in ¶¶66-72, 74-75, based upon experience in the limited 2006 V-11 implementations, Allscripts' management knew by the beginning of the Class Period that the software was plagued by serious features, functionality and quality problems.  These problems caused Allscripts to experience greatly increased implementation times on V-11 in the 2006 implementations as well as those implementations made during the Class Period, thus delaying the conversion of sales backlog into revenue;

(b)     As more fully described in ¶¶68-69, V-11 was unstable and filled with bugs, some critical, that could jeopardize patient safety.  These problems were so severe that in late 2006, Allscripts delayed the widespread launch of V-11.  Despite the severity of these problems, Allscripts did not conduct the typical "testing program" on V-11 in early 2007 before it was released for widespread launch in May 2007 to ensure that V-11 operated as intended;

(c)     As more fully described in ¶¶68-71, at the time of the V-11 launch in May 2007, the software had approximately 2000 known bugs that made V-11 unstable, and in some cases unusable.  After its launch, several hundred additional bugs were discovered as Allscripts' personnel attempted to implement the software at customer sites;

(d)     As more fully described in ¶¶72-75, Allscripts sent inexperienced and under-trained personnel to implement V-11 even though the software was very complicated, the implementation of which was very complex and for which the Company had no prior experience troubleshooting;

(e)     As a result of all of the foregoing, there was no reasonable basis in fact for the forecasts of revenue of $300 million and earnings of $0.42-$0.44 per share for Allscripts in fiscal year 2007.  In fact, based upon the information then available to them, defendants actually knew that their forecasts were false and misleading when made as there was no reasonable probability that the forecasted levels of revenue and earnings growth would in fact be achieved.

33.     Defendants' statements in May 2007 caused Allscripts stock to trade at artificially inflated prices.

34.     On August 7, 2007, Allscripts issued a press release announcing its financial results for the second quarter of fiscal 2007 ended June 30, 2007, entitled, "Company Posts Record Revenue and Earnings Per Share."  The release stated, in relevant part, as follows:

> Total revenue for the three months ended June 30, 2007 was a record $70.0 million, compared to $60.0 million for the same period last year.  Revenue from software and related services for the three months ended June 30, 2007 was $54.7 million, compared to $46.7 million for the same period last year, increasing by 17%.  Gross margin percentage was 51% for the second quarter of 2007, compared to 52% during the second quarter of 2006.

> Net income for the three months ended June 30, 2007 was $6.0 million, or $0.10 per diluted share, compared to net income of $2.8 million, or $0.05 per diluted share, for the same period last year. Non-GAAP adjusted earnings for the three months ended June 30, 2007 were $7.9 million, or $0.13 per diluted share – a new record for the Company – compared to non-GAAP adjusted earnings of $5.1 million, or $0.09 per diluted share for the same period last year. Non-GAAP adjusted earnings for the three months ended June 30, 2007 and 2006 are comprised of net income giving effect to the add-back of acquisition-related amortization of $1.5 million and $2.0 million, respectively, or $0.02 and $0.04 per diluted share, respectively, net of tax, and total stock-based compensation expense of $0.4 million and $0.3 million, respectively, or $0.01 and $0.00 per diluted share, respectively, net of tax.

Defendant Tullman provided additional comments on Allscripts' results and operations stating, in pertinent part, as follows:

> "Allscripts delivered record results in the second quarter and substantial progress towards our goal of making 2007 our strongest year ever." . . .  "***Having invested in new technology and hired aggressively for future growth, we are in position to capitalize on the significant market opportunity during the second half of the year***, which is traditionally the industry's strongest sales period. We have a clear vision for

- 11 -

integrating software, connectivity and information to transform healthcare, and we continue to demonstrate our ability to deliver on that vision."

35.     During a conference call with analysts that same day, defendant Davis confirmed Allscripts' previously issued fiscal 2007 guidance citing "increased confidence in our ability to close several enterprise deals this year. As such, we continue to expect our total clinical bookings for the year to be in excess of $230 million."  During the call, defendant Davis responded to a specific question concerning what defendants were looking to drive achievement of the $300 million revenue projection:

Alex Alvarez:

I want to start off with the revenue guidance and keeping it where it's at.  Given the first half results, I want to get a sense from you in terms of what drivers you are sort of counting on here to accelerate the ability to convert the backlog into revenue. . . .

Bill Davis:

. . . [T]he perspective on our outlook for the second half of the year is in keeping with our outlook on the bookings in that we have the benefit, one of nice things about Allscripts model we draw very large percentage of our revenues from our reported backlog.  And so *we have clear visibility as to where we expect our revenue to come from.  It is a function of increased productivity in terms of the implementation resources on the Touchworks side* but it's also in recognition that we have identified specific incremental license opportunities with existing customers and the like.  I would think about the relative sequencing, working off the $70 million base. We tend to think about it in that 9 to 12% sequential range.  And again, feel that we have sufficient backlog and sales opportunity to convert that to deliver on the $300 million for the year.

36.     During the August 7, 2007 conference call, defendants also responded to an analyst's question concerning implementation times for V-11:

Jeremy-William Blair – Analyst:

Thanks.  With respect to version 11 or just broader [Touchworks], I'm wondering has there been any change in sort of your implementation times.  Have they changed at all in the quarter or are they roughly consistent in the past?

Bill Davis:

*They roughly consistent with the past*.  We had some I think many on the call are aware.  We had a very concerted effort in and around the George Washington

implementation.  They really played a unique role in aiding us in the quality assurance process.  There was incremental effort associated with that.  *As we had subsequently rolled out additional sites, we seen some consistent trends relative to the deployment requirements on those upgrade processes.*

Jeremy-William Blair – Analyst:

So I guess you hit on just one small extra follow-up which version 11 did you activate other customers in the quarter and maybe you can give us highlights on some of the successes they are seeing.

Glen Tullman:

Yes.  This is Glen.  We did in fact activate a number of other clients in the quarter.  And specifically, we tried to make sure that we had a mixture so folks like Tennessee Oncology, the largest oncology private practice in the country, came up and a number of other as well, we were looking at – GW has on the order of 250 physicians.  We are looking at a few thousand users probably by the end of August.  *That rollout is going very well.*

37.     Analysts reiterated defendants' positive statements about Allscripts' anticipated continued strong performance in 2007 over the next few days.

38.     On August 8, 2007, Caris & Company issued a report on Allscripts based on the recent conference call.  The report stated:

Company reiterates full year guidance of $0.58-0.60 adjusted EPS on north of $300 million.  With a record backlog and some significant enterprise deals in the late stages of negotiation, management exuded confidence in its ability to meet its full year guidance.

39.     On August 8, 2007, William Blair & Company issued a report on Allscripts based on the recent conference call.  The report stated:

. . . management maintained its revenue, adjusted EPS, and GAAP EPS forecasts for 2007. . . .  This EPS guidance reiteration . . . was a repeated point of discussion on the call . . . .

40.     On August 7, 2007, Deutsche Bank issued a report on Allscripts based on the recent conference call.  The report stated:

- The company reiterated Clinical Software bookings for the year at more than $230 million, with total bookings expected to be $260 million.

\*       \*       \*

- The most important aspect of the call was the optimism surrounding the second half of the year.  Management believes that the company is on track to achieve strong second half results and believes that the focus on signing large enterprise-wide deals should start to come to fruition in the third and fourth quarters.

\*       \*       \*

MDRX reiterated guidance from the previous quarter.

41.     During the conference call, Davis also announced that "in the best interest of all of our investors" Allscripts was implementing "a formal quiet period starting at the end of the third quarter. Such quiet period will start on the last day of the quarter and will continue through the day we announce our quarterly results."  The reason for this unusual statement became clear on November 8th.

42.     The positive statements, assurances and forecasts, outlined in ¶¶34-40, made by defendants were materially false and misleading when made and failed to disclose material information concerning Allscripts' business and business practices.  Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)     As more fully described in ¶¶66-72, 74-75, based upon experience in the limited 2006 V-11 implementations, Allscripts' management knew by the beginning of the Class Period that the software was plagued by serious features, functionality and quality problems.  These problems caused Allscripts to experience greatly increased implementation times on V-11 in the 2006 implementations as well as those implementations made during the Class Period, thus delaying the conversion of sales backlog into revenue;

(b)     As more fully described in ¶¶68-69, V-11 was unstable and filled with bugs, some critical, that could jeopardize patient safety.  These problems were so severe that in late 2006, Allscripts delayed the widespread launch of V-11.  Despite the severity of these problems, Allscripts

did not conduct the typical "testing program" on V-11 in early 2007 before it was released for widespread launch in May 2007 to ensure that V-11 operated as intended;

(c)     As more fully described in ¶¶68-71, at the time of the V-11 launch in May 2007, the software had approximately 2000 known bugs that made V-11 unstable and in some cases unusable.  After its launch, several hundred additional bugs were discovered as Allscripts' personnel attempted to implement the software at customer sites;

(d)     As more fully described in ¶¶72-75, Allscripts sent inexperienced and under-trained personnel to implement V-11 even though the software was very complicated, the implementation of which was very complex and for which the Company had no prior experience troubleshooting;

(e)     As a result of all of the foregoing, there was no reasonable basis in fact for the forecasts of revenue of $300 million and earnings of $0.42-$0.44 per share for Allscripts in fiscal year 2007 defendants reiterated to the market on August 8, 2007.  In fact, based upon the information then available to them, defendants actually knew that their forecasts were false and misleading when made as there was no reasonable probability that the forecasted levels of revenue and earnings growth would in fact be achieved.

43.     Defendants' statements in August 2007 caused Allscripts stock to continue to trade at artificially inflated prices.

## THE TRUTH BEGINS TO LEAK INTO THE MARKET

44.     On or about November 8, 2007, after the close of the market, Allscripts reported third quarter 2007 earnings that were below Wall Street estimates. Allscripts also lowered its revenue guidance for the remainder of fiscal 2007.  The Company reported "non-GAAP" earnings of $0.11 per share, 26% below Wall Street consensus earnings of $0.15 per share and lowered its 2007

revenues by more than 4% from $300 million to a range of $288 to $286 million.  The press release

stated, in pertinent part, as follows:

> Total revenue for the three months ended September 30, 2007 was $73.4 million, a record for the company, compared to $62.2 million for the same period last year. Revenue from software and related services for the three months ended September 30, 2007 was $59.0 million, compared to $49.5 million for the same period last year, increasing by 19.1%.

> Gross margin percentage was 50.1% for the third quarter of 2007, compared to 49.1% during the third quarter of 2006.

> Net income for the three months ended September 30, 2007 was $4.1 million, or $0.07 per diluted share, compared to net income of $3.3 million, or $0.06 per diluted share, for the same period last year. . . .

> Non-GAAP adjusted earnings for the three months ended September 30, 2007 were $6.7 million, or $0.11 per diluted share, compared to non-GAAP adjusted earnings of $5.5 million, or $0.10 per diluted share for the same period last year.

> *          *          *

> Allscripts has updated its revenue target for the full year 2007 to a range of $286 million to $288 million. . . .  The Company also updated its GAAP earnings per diluted share outlook to a range of $0.34 to $0.35 . . . and its Non-GAAP adjusted earnings per diluted share outlook to a range of $0.48 to $0.49.

45.     Despite the fact that these results widely missed analysts' expectations, defendant

Tullman continued to tout Allscripts' business achievements and prospects:

> "Allscripts made solid progress in the third quarter with record clinical software sales of $63.2 million, including two of the largest agreements in our history – Columbia University Medical Center, one of the world's most prestigious academic medical centers, and Lahey Clinic, the nation's first multi-specialty group practice," said Glen Tullman, Chief Executive Officer of Allscripts.  "Sales in our clinical software businesses grew 77 percent over last year, confirming both the acceleration in the market and Allscripts continuing leadership."

46.     During a conference call with analysts on November 8, 2007, defendant Davis

addressed the third quarter revenue shortfall reiterating that the Company would meet or exceed the

Company's 2007 revised guidance.  Defendant Davis stated, in pertinent part, as follows:

<u>Bill Davis</u>:

Turning now to the balance of 2007. As I mentioned at the beginning, we are seeing some near-term impact on revenue associated with the ramping up of resources on some of our largest clients. While we believe it's possible to mitigate that exposure with add-on license sales in the fourth quarter, we believe it's appropriate to recalibrate market expectations for the full year. We now expect total revenue for the year to be in the range of $286 million to $288 million, a 25% increase over last year, and GAAP earnings per share of $0.34 to $0.35 per diluted share, a 55% increase over last year. The 2007 GAAP EPS guidance contemplates $0.10 per share tax effected of deal related amortization and $0.04 to $0.05 per share of stock-based compensation also net of tax.

It's important to note that we remain confiden[t] in Allscripts positive outlook. So as we look into 2008, we continue to see a business that is positioned to grow revenue approximately 20% to 25%.

47.    On the conference call, defendant Tullman also tempered the impact of the quarterly results and associated lowering of the Company's 2007 guidance by noting:

Earlier today we announced the signing of one of the most prestigious multi-specialty groups in the country, the Lahey Clinic which was actually the nation's first multi-specialty group practice.  Lahey give us a solid footing in Massachusetts along with our other enterprise client there the UMass Memorial Healthcare Hospital where we are deploying V11 as we speak. ***Columbia and Lahey raise our profile dramatically re-enforce our position as the number one provider for both large enterprise clients and multi-specialty groups, and we are already seeing the impact***.

                                *       *       *

So overall the sales machine is working well and across multiple products and service offerings, however, to build a great company it's necessary to continue to invest in improving processes, improving R&D, and in innovation.  ***We are continuing to invest in systems to drive quality, service delivery and efficiency***. This is being spearheaded by our new Chief Operating Officer, Ben Bulkley who is making great use of his years of experience at GE to take our deployment and client support to the next level of quality.

48.    Analysts asked many questions during the November 8, 2007 conference call concerning the shortage in recognized revenue and the effect implementation cycles were having, and would continue to have, on Allscripts' financial results.  In response to one such analyst's inquiries, defendants stated:

- 17 -

Charles Rhyee:

. . . You guys had an existing backlog as it were and I know that you guys spent a lot of time hiring and training a lot of implementation staff, can you give a sense of their productivity in the third quarter and their ability to draw – pull revenues and margin into the

Bill Davis:

. . . *We actually saw close to about 25% increase in the production of our resources in terms of overall billable hours in the quarter*. We had anticipated that by virtue of a lot of resources being dedicated to Version 11 efforts earlier in the year and the like. So *we absolutely saw a nice improvement in terms of overall productivity*. The challenge is we tried to highlight in terms of that conversion into revenue was where those efforts were focused on in terms of ramp-up of some of our larger customers and given the long duration and the overall number of hours involved in those implementations, what that translated into overall revenue. *So we absolutely are seeing the capability being there in terms of the production capacity to pull the backlog through*, but also recognizing that we were moving large customers into production at the same time.

*        *        *

Glen Tullman:

This is Glen, *let me just add to that because this is really critical*.

The point here is that we are spending resources, we have more resources but those are going in part to support V-11, in part for some of these large clients that we are not yet billing for, and there's one other piece and that is in the sales process as we were working with many new large enterprise clients they are requesting and we are deploying some people presale to do some analysis of implementation and the like and that is also drawing on resources.

*So we have more resources, training was successful*, some of that work that we are doing we will bill for, it's just the timing isn't working for us this quarter, and we are concerned that as we ramp up on some of these larger deals there's going to be a delay.

49.    On the same call, defendant Tullman touted, once again, the strong demand for

Allscripts' V-11 and reiterated that implementation of the product was progressing favorably:

Sean Wieland:

My question is around the reduced outlook in 2008, and Bill, if I understood you correctly it's because of some of these larger deals are taking a little longer to implement. Is this related at all to Version 11 that's being installed in the market? Could you give us an update on early success stories with Version 11, how many

customers are adopting it, is it a longer sale cycle because of that version or because of the nature of the market or something along those lines?

\*     \*     \*

Glen Tullman:

***Relative to Version 11, we continue to see good progress there*** and rolling it out we see very strong demand, and again, in some respects the demand has outstripped what we expected because of the positive response and that means that we have taken our resources and deployed them to Version 11 – to rolling out Version 11, those upgrades are profitable but they aren't as profitable as implementing a new client. So we have seen a number of decisions that are the right decisions for our clients, but that have had timing impacts in terms of revenue recognition and that is yet another one, but we're talking about it's dozens now of Version 11 installs that are underway and that have been completed.

50.     Asked by an analyst from Jefferies & Company, when during the quarter the Company realized that deployment schedules were not going to be met, defendant Davis denied that there was a problem at Allscripts with meeting the deployment schedules but that a conscious business decision to direct deployment assets to certain customers was made:

Richard Close:

Okay, and then with respect to I guess the third quarter revenue, I know everyone we seem to go around and around on this, but I would suspect that you weren't really anticipating much revenue contribution from the Columbia and Lahey wins, so when did you just come to the realization that some of your existing customers weren't going to be deploying on schedule and if you were to break it down, how much do you think it's internally and Allscripts implementation situation or how much the clients are actually putting the brakes on a little bit?

Bill Davis:

I guess I would characterize it a little differently in that it was a conscious decision on our part to redirect resources and/or allow some of these larger ramp-ups to consume those resources as opposed to it being kind of opportunistic by virtue of some of our customers stopping or delaying. We don't mean to convey that sentiment because that's not what's occurring, so that was a consideration.

51.     The positive statements, assurances and forecasts, outlined in ¶¶44-50, made by defendants were materially false and misleading when made and failed to disclose material

- 19 -

information concerning Allscripts' business and business practices.  Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)      As more fully described in ¶¶66-72, 74-75, based upon experience in the limited 2006 V-11 implementations, Allscripts' management knew by the beginning of the Class Period that the software was plagued by serious features, functionality and quality problems.  These problems caused Allscripts to experience greatly increased implementation times on V-11 in the 2006 implementations as well as those implementations made during the Class Period, thus delaying the conversion of sales backlog into revenue;

(b)      As more fully described in ¶¶68-69, V-11 was unstable and filled with bugs, some critical, that could jeopardize patient safety.  These problems were so severe that in late 2006, Allscripts delayed the widespread launch of V-11.  Despite the severity of these problems, Allscripts did not conduct the typical "testing program" on V-11 in early 2007 before it was released for widespread launch in May 2007 to ensure that V-11 operated as intended;

(c)      As more fully described in ¶¶68-71, at the time of the V-11 launch in May 2007, the software had approximately 2000 known bugs that made V-11 unstable and in some cases unusable.  After its launch, several hundred additional bugs were discovered as Allscripts' personnel attempted to implement the software at customer sites;

(d)      As more fully described in ¶¶72-75, Allscripts sent inexperienced and under-trained personnel to implement V-11 even though the software was very complicated, the implementation of which was very complex and for which the Company had no prior experience troubleshooting.  Allscripts' customers refused to pay billings for the increased personnel because the V-11 software, despite the number of people working to implement it, did not operate as intended;

(e)     As more fully described in ¶74, at least one of Allscripts' major customers was reporting that V-11 was unstable and inoperable, that the implementation was riddled with problems and that Allscripts faced legal action if these issues were not remedied;

(f)     As a result of all of the foregoing, there was no reasonable basis in fact for the revised forecasts of revenue of between $286 -288 million and earnings of $0.34 - $0.35 per share for Allscripts in fiscal year 2007.  In fact, based upon the information then available to them, defendants actually knew that their revised forecasts were false and misleading when made as there was no reasonable probability that the revised forecasted levels of revenue and earnings growth would in fact be achieved.

52.     Following the November 8, 2007 announcements, the price of Allscripts common shares fell $6.62 per share in after market trading on November 8, 2007, reaching a low of $16.26 on November 9, 2007, before closing at $18.68 per share, a decline of nearly 19% from the previous day's close on volume of more than 11 million shares.  Defendants, however, continued to conceal the true information about V-11 sales and product problems, and Allscripts stock continued to trade at artificially inflated levels.

53.     Then, on February 13, 2008, Allscripts reported its fiscal year 2007 financial results. Total revenue for the year ended December 31, 2007 was $281.9 million, compared to $228.0 million for 2006.  Net income for the year ended December 31, 2007 was $20.6 million, or $0.35 per diluted share, compared to net income of $11.9 million, or $0.22 per diluted share for 2006. Non-GAAP adjusted earnings for the year ended December 31, 2007 was $29.5 million, or $0.49 per diluted share, compared to adjusted earnings of $19.7 million, or $0.37 per diluted share, for the same period last year.

54.     During a conference call with analysts that same day, ***defendants admitted that Allscripts had no historical basis for estimating implementation times for V-11, or the revenue***

- 21 -

*that the Company could plan to recognize during 2007*.  Defendants stated, in pertinent part, as follows:

Sean Wieland:

. . . A couple questions on Version 11.   What's the average Version 11 implementation time right now?  And then what's the plan to get it down and where do you see it settling?

Bill Davis:

*What I would say is we don't quite yet have an average and part of the challenge, we have Version 11 across the 30 or so clients that we're implementing it. Some are new, some are larger, some are smaller. So, I'm not sure that we have an average time per say, other than saying that to date, it's been larger*, and part of that challenge has been that we may have Version 11 working perfectly at one site and we take it to a different sized site.   And there *are different training requirements, there are different implementation requirements and they may be using it or they may be using it in different specialties in a different fashion because of the flexibility. That's what's made it complex*.  As I mentioned, we have a plan which includes shifting a significant number of resources across the company to focus on both software enhancements and other changes that have been requested by the initial clients, that's number one.  Number two, we brought in some process expertise, some black belts who are helping us focus, teams on how we're going to deploy this in a more standardized fashion which makes it easier for our clients, and also obviously more cost effective for us to deploy.  Now, that said, we are making progress on it's moving in the right direction.  I mentioned 11.1, which is coming out in Q2, and that will address many of these issues, so we feel very confident that while we have an issue, that we also are working the issue very aggressively, and that we've got it to where it's under control.

55.     Defendants also admitted that they knew of the material revenue impact the failing V-11 deployments in *early November 2007*:

Bret Jones:

Good evening.  I was wondering if you could speak a little bit to what really changed in Q4 between the time you gave guidance and it actually transpired.  It seems to me that we're talking about longer deployment cycles and the fact that it they combine the practice management EMR's.  You also potentially delaying Was the shortfall in revenue simply due to bookings?

Bill Davis:

It really was two factors, as I hilted my prepared remarks about, 2 million dollars of the shortfall can be directly attributed to the shortfall in bookings, and that would

have been by virtue of hardware, being in that mix, which you tend – you're able to recognize more immediately. ***But there was an impact further impact beyond what even we expected, kind of in early November, relative to the V-11 expansion of project plans and I attempted to quantify that as about 2 1/2 million dollars in the quarter***, it was the combination of the two. ***The V-11 implications, much greater impact on the bottom line***. The hardware at $2 million would have only contributed about 200 to $300,000 to our operating income. So ***much greater impact from the V-11 in terms of profitability***.

56.     Upon these shocking revelations of the serious problems with Allscripts' business that had been previously misrepresented or concealed, and the fact that its prior assurances and forecasts for FY07 were false, more of the remaining artificial inflation quickly came out of Allscripts stock. The stock price fell sharply – dropping 26.8% – on February 14, 2008 on huge and much higher than normal volume of nearly 15 million shares – the highest volume in the Class Period, damaging earlier purchasers of Allscripts stock during the Class Period.

57.     On February 14, 2008, an article published by the Associated Press Financial Wire summarized the financial market's reaction to the Company's 2007 revenue shortfall. The article stated, in pertinent part, as follows:

> Shares of AllScripts Healthcare Solutions Inc. plunged in premarket trading Thursday, and were on pace to open near a three-year low, after the clinical software provider's fourth-quarter results disappointed investors.

> The Chicago company's adjusted profit matched analyst estimates, but its revenue fell short of expectations. Analysts pinned the miss on problems with the rollout of AllScripts' TouchWorks v11 application, and large contracts that were not completed by the end of the quarter.

> The stock sank $3.29, or 21.4 percent, to $12.10 in premarket trading. Shares have traded between $14.32 and $29.31 in the last year, and finished at $15.39 Wednesday.

> Shares last traded under $12 in February 2005.

> Deutsche Bank analyst Ross Muken pointed to a number of problems, including the contract delays, lower profit margins and disappointing hardware sales, in downgrading the stock to "Hold" from "Buy."

> He added that the difficulties in the debut of TouchWorks v11 could hurt sales over the next 6 months.

"The decrease in margins was due to costs related to the v11 rollout, which continues to have deployment issues," he said. "While the enterprise-wide deals have a strong impact on both revenue and bookings, the continued missteps in executing on these deals is somewhat unnerving."

Muken cut his target price to $15.50 per share from $27, and lowered his 2008 and 2009 profit estimates. He added that AllScripts may be forced to make less profitable deals in the future if key customers for electronic medical records reduce orders.

58. Following the February 13, 2008 announcements, several analysts expressed skepticism that defendants had fully disclosed the problems they were experiencing launching V-11.

59. One analyst questioned whether the Company was being fully truthful about the difficulties being experienced with the V-11 rollout. In a February 18, 2008 report, an analyst from Oppenheimer noted:

> ***The fact to remember, in our view, is that all of these factors were known last quarter when the company revised its 2007 guidance lower***. To miss lowered expectations points decidedly to the fact some of these issues, particularly the v11 upgrade cycle, is going more poorly than the company has expected.
>
> ***Our primary concern here is that the company has yet to really come clean about the difficulties it is experiencing with the upgrade cycle***.

60. The analyst from Needham summed up the market's reaction to defendants' announcement in a February 14, 2008 report noting: "***MDRX has over-promised and under-delivered in two of the past three quarters. Companies that do this earn investor skepticism and lower P/E's***."

61. Little more than a month later, on March 18, 2008, defendants announced that Allscripts had entered into a definitive merger agreement with Misys Healthcare, a wholly-owned subsidiary of British software vendor Misys plc. According to the agreement, Misys shareholders would own a majority interest in the merged entity, Misys would contribute $330 million in cash to Allscripts to be paid to Allscripts' shareholders in the form of a special dividend, and defendants Tullman and Davis would retain their positions as CEO and CFO in the combined company.

62.     This news was met with some skepticism by analysts.  The analyst from William Blair & Company noted in a March 20, 2008 report that, "we believe this deal introduces significant incremental risks at a time when Allscripts' own business is working through execution/product challenges".  The JP Morgan analyst, in a March 18, 2008 report,  blamed V-11 for contributing to the depressed price Allscripts received in the merger, "[w]e have mixed views about the transaction.  The one-time cash dividend is clearly a positive for MDRX holders, in our view.  ***We believe the dividend, however, should have been higher if not for Allscripts Touchworks v11 and sales-related challenges, which have depressed the stock***."

63.     On April 30, 2008, defendants announced Allscripts' results for 1Q08.  Again the Company missed analysts' earnings and revenue expectations, due in large part to the continued V-11 implementation problems.  In fact, defendants indicated on the April 30, 2008 conference call with analysts that, given the 1Q08 performance, there would be "some pressure" to achieve the previously announced 2008 revenue growth estimate of 20-25%.

64.     On October 10, 2008, the Allscripts-Misys merger was closed.  The new combined company began trading its stock on October 13, 2008.

### SCIENTER AND SCHEME ALLEGATIONS

65.     As alleged in the following paragraphs, defendants had actual knowledge of the falsity of the statements they made, or acted in reckless disregard of the truth or falsity of those statements.  In doing so, defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Allscripts stock during the Class Period.

66.     Defendants Tullman and Davis were Allscripts' top executive officers charged with not only developing Allscripts' business strategy, but also overseeing the implementation and execution of that strategy during the Class Period, and communicating those results to investors.

Due to the circumstances described in this Complaint, nothing was more important to defendants than making sure V-11, Allscripts' new version of its flagship Touchworks product, was delivered to the market and implemented successfully. Defendants knew that conversion into revenue of tens of millions of dollars in sales backlog was dependant upon Allscripts' successful delivery of V-11. As such, they consequently monitored, as detailed below, and knew, based on their review of such information, that their alleged Class Period misrepresentations were false or misleading and their FY07 forecasts were made without reasonable basis and were false or misleading.

67.     Defendants knew by at least late 2006 that V-11 was unstable, took much longer than anticipated to implement and was not well-received by Allscripts' customers. Prior to and throughout the Class Period, defendants each participated in monthly conference calls with members of Allscripts' senior management. These conference calls were arranged by either defendant Tullman's executive assistant, or Allscripts' President Lee Shapiro's executive assistant. During these calls, which lasted an hour to an hour and a half, different members of Allscripts' management team would update defendants, and the other senior leaders at Allscripts, on the status of various aspects of Allscripts' business. There were anywhere from 30-40 participants in these monthly conference calls, including defendants Tullman and Davis, President Shapiro, President of Strategic Accounts Laurie McGraw, Chief Technology Officer Stanley Crane, Vice President of Development John Pacione and Vice President of Client Support John Nevergall, among others. No minutes were kept of the discussions on these calls, nor were the participants given any written materials associated with the conference calls.

68.     Because of its importance to Allscripts, Stanley Crane, Allscripts' Chief Technology Officer, would always make a separate presentation on the monthly calls on matters pertaining to V-11, including information about development, implementation problems, problems with the software and outcomes of testing of the software. During these monthly conference calls, Crane informed the

group, including defendants, of the results of the initial limited implementations of V-11 at select customer sites made during 2006. Crane's presentations indicated that the implementation took much longer than expected and resulted in the discovery of a high number of bugs. These 2006 implementations indicated that V-11's features, functionality and quality had major problems. Specifically, these 2006 implementations identified that V-11's workflow was not very efficient and caused physicians to spend a lot of extra time using the application. Crane indicated that customer feedback was that V-11 threw doctors into fire fighting mode. As a result, Allscripts' development team reviewed each screen in V-11 to figure out how to reduce the number of clicks doctors needed to make in order to get to the desired screen.

69.    In fact, by late 2006, defendants knew from these monthly conference calls that V-11 was filled with critical bugs – problems that could impact patient safety. Because of these critical bugs, and the general instability of the software, it was decided in late 2006 that widespread release of V-11 would be delayed. However, despite these substantial known defects, defendants did not run a "testing program" on V-11 before the general release of the software to ensure that the known instabilities and problems had been satisfactorily remedied. Allscripts typically would run a "testing program" with chosen customers to test a new product, or new version of an existing product, which would allow the Company to identify bugs and fix them prior to the general release of the product. No such "testing program" was conducting in 2007 prior to the release of V-11 because the Company was not able to secure testing sites and get them ready in time for the anticipated May 2007 launch. Indeed, Allscripts' quality assurance group was conducting tests of V-11 up until three days before the May 21, 2007 general release. At the time of its release, V-11 had approximately 2000 known bugs that made V-11 unstable and in some cases unusable.

70.    In addition to the information from monthly conference calls described above, defendants also had access to Allscripts' HP Mercury system which was a database that the

development team used to keep track of all the bugs that were identified, and manage their resolution.  The development team prioritized the bugs as critical, major and minor.  Daily "one process" meetings were held to determine which bugs were critical bugs.  The development and quality assurance groups participated in these meetings, as did President of Strategic Accounts Laurie McGraw who was very involved in the development, testing and implementation of V-11, and reported to defendant Tullman.  Critical bugs were referred to as "hot fixes" and were fixed, tested and released by the quality assurance group usually within one week of their identification.  Bugs categorized as major or minor were not addressed as quickly but instead were remedied by "service packs," bug fixes and design changes.  Defendants could gain real time answers to any question they had concerning the number of identified bugs, what problems to functionality the bugs caused and whether bugs had been remedied by accessing the HP Mercury system.

71.     After the May 2007 general release of V-11, hundreds of additional bugs were identified by the implementation teams.  These bugs were reported to the development group, categorized and monitored in the HP Mercury database.  Indeed, after the May 2007 launch of V-11, the quality assurance group continually tested the "fixes" for the bugs that had been identified before the product was released, as well as those bugs that were discovered by the implementation teams.  Defendants were kept apprised of the viability of the software and the status of the resolution of the identified bugs during the monthly conference calls described in ¶¶67-69 above.  Eventually, because of the vast number of bugs that needed fixes, Allscripts released subsequent versions of the V-11 software after the Class Period that incorporated wholesale changes to avoid the bugs identified in the original V-11 version that defendants sold and attempted to implement during the Class Period.

72.     Defendants also knew of the particular difficulties being experienced with the implementation of V-11.  Defendants knew from the monthly conference calls that because V-11

was an almost entirely new application there was no documentation from prior versions to aid the Client Services team in working through implementation problems being encountered. This added greatly to the implementation difficulties in that the Client Services team not only had to try and accommodate the customer's complaints concerning implementation, it had to work with the development and quality assurance teams to figure out how to analyze the problems and formulate a solution to them that worked in the field. This directly lead to increased implementation times and was reported to defendants before and throughout the Class Period at least monthly during the conference calls described in ¶¶67-69.

73.     The Client Services staff was also too inexperienced and under-trained to adequately handle the implementation questions coming from Allscripts' customers and the implementation teams in the field. As the implementation times began to expand, defendants directed that more people be assigned to implement V-11 in the field in an effort to improve the implementation times, and increase billing so that revenue could be recognized. These people were given minimal training, did not have good knowledge of the product and could not answer the customer's questions concerning the functionality and stability problems being encountered. In fact, after mid-2007, implementation trainees no longer "shadowed" more experienced personnel for upwards of three months. The "shadow" period was reduced to no more than one month so that Allscripts could send the trainees into the field sooner.

74.     Defendants knew that at least one of Allscripts' major accounts was more than dissatisfied with V-11 and Allscripts' efforts to implement the software. The CEO of Tennessee Oncology, Dr. Charles McKay, wrote a letter on September 11, 2007 to Allscripts' senior management, notifying them of the serious ongoing problems with V-11, including Allscripts' failure to deliver a functioning software program within the agreed upon timeframe. Despite this letter, the problems at Tennessee Oncology's implementation went unresolved. On December 6,

2007, Tennessee Oncology sent another letter to Allscripts again notifying them of the serious, continuing problems with V-11, and demanding that Allscripts remedy the problems within 30 days pursuant to the terms of Allscripts' contract or Allscripts would be in default of the contract and face possible legal action.  On December 10, 2007, defendant Tullman responded by email to this letter, acknowledging the problems with V-11, claiming that the software was now "ready and tested" and would "resolve" the issues Tennessee Oncology was experiencing.  Tennessee Oncology's issues, however, were not resolved.  On March 4, 2008, Tennessee Oncology sued Allscripts claiming that "Allscripts essentially used TN Oncology as test site where they developed the [V-11] software during the course of implementation and hoped they could work out the flaws during the implementation process," and sought return of the $900,000 it paid to Allscripts for V-11.  A copy of Tennessee Oncology's complaint against Allscripts is attached as Exhibit 1 and is incorporated herein by reference.

75.     In addition to the monthly conference calls and direct communication with Allscripts' clients, defendants also had access to the Company's FastTrack system that was utilized by the V-11 implementation teams.  FastTrack kept track of all the active implementations, showed the dates for deliverable items for each implementation, the status of meeting the deadlines for each implementation, emails exchanged concerning each implementation and the particular bugs identified in each particular implementation.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

76.     At all relevant times, the market for Allscripts' publicly traded securities was an efficient market for the following reasons, among others:

(a)     Allscripts common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, which is a highly efficient and automated market;

(b)     As a regulated issuer, Allscripts filed periodic public reports with the SEC and the NASDAQ;

(c)     Allscripts regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major news wire services and through other wide ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Allscripts was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

77.     As a result of the foregoing, the market for Allscripts' publicly traded securities promptly digested current information regarding Allscripts from all publicly available sources and reflected such information in the prices of Allscripts' publicly traded securities.  Without knowledge of the misrepresented and omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased Allscripts securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were revealed and suffered similar injury.  Thus, a presumption of reliance applies.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

78.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a class consisting of purchasers and/or acquirers of Allscripts' publicly traded securities during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

79.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Allscripts common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Allscripts or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

80.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

81.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

82.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

(b)     Whether statements made by defendants to the investing public during the Class Period misrepresented and omitted material facts about the business, operations and financial results of Allscripts; and

(c)     To what extent the members of the Class have sustained damages and the proper measure of damages.

83.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## NO SAFE HARBOR

84.     The statutory Safe Harbor, which provides for forward-looking statements under certain circumstances, does not apply to any of the allegedly false statements pleaded in this Complaint.  The specific statements pleaded in this Complaint were either not forward-looking or were not identified as "forward-looking statements" when made.  To the extent they were identified as forward-looking statements when made, specific meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements were not presented.  The Safe Harbor warnings in Allscripts' SEC filings and releases as well as those made at the start of Allscripts conference calls were boilerplate and did not materially change during the Class Period, even though the economic and business conditions in which Allscripts operated and the risks facing its business did.  Alternatively, to the extent that the statutory Safe Harbor does apply to any forward-looking statements pleaded in this Complaint, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Allscripts who knew that the statement was false when made.

85.     Allscripts' SEC Report on Form 10-K for the quarter and fiscal year ended December 31, 2006 contained the following relevant "Safe Harbor" language:

> This report contains forward-looking statements that involve risks and
> uncertainties, including those discussed under the caption "Risk Factors."  We

develop forward-looking statements by combining currently available information with our beliefs and assumptions. These statements relate to future events, including our future performance, and some of these statements can be identified by the use of forward-looking terminology such as "believe," "expect," "anticipate," "intend," "contemplate," "seek," "plan," "estimate," "will," "may," "should" and the negative or other variations of those terms or comparable terminology or by discussion of strategy, plans or intentions. Forward-looking statements do not guarantee future performance, which may be materially different from that expressed in, or implied by, any such statements. You should not rely upon these statements as facts.

We make these statements under the protection afforded by Section 27A of the Securities Act of 1933, as amended and Section 21E of the Securities Exchange Act of 1934, as amended. Because we cannot predict all of the risks and uncertainties that may affect us, or control the ones we do predict, these risks and uncertainties can cause our results to differ materially from the results we express in our forward-looking statements. We undertake no obligation to, and expressly disclaim any such obligation to, update or revise any forward-looking statements to reflect changed assumptions, the occurrence of anticipated or unanticipated events, changes to future results over time or otherwise.

*       *       *

**If physicians and hospitals do not accept our product and services, or delay in deciding whether to purchase our products and services, our business, financial condition and results of operations will be adversely affected.**

Our business model depends on our ability to sell our products and services. Acceptance of our products and services requires physicians and hospitals to adopt different behavior patterns and new methods of conducting business and exchanging information. We cannot assure you that physicians and hospitals will integrate our products and services into their workflow or that participants in the healthcare market will accept our products and services as a replacement for traditional methods of conducting healthcare transactions. Achieving market acceptance for our products and services will require substantial sales and marketing efforts and the expenditure of significant financial and other resources to create awareness and demand by participants in the healthcare industry. If we fail to achieve broad acceptance of our products and services by physicians, hospitals and other healthcare industry participants or if we fail to position our services as a preferred method for information management and pharmaceutical healthcare delivery, our business, financial condition and results of operations will be adversely affected.

*       *       *

**It is difficult to predict the sales cycle for our healthcare software solutions and physician education services.**

The duration of the sales cycle for our healthcare software solutions and physician education services depends on a number of factors, including the nature

and size of the potential customer and the extent of the commitment being made by the potential customer, and is difficult to predict.  Our sales and marketing efforts with respect to hospitals and large healthcare organizations generally involve a lengthy sales cycle due to these organizations' complex decision-making processes. Additionally, in light of increased government involvement in healthcare, and related changes in the operating environment for healthcare organizations, our current and potential customers may react by curtailing or deferring investments, including those for our services.  If potential customers take longer than we expect to decide whether to purchase our solutions, our selling expenses could increase and our revenue could decrease, which could harm our business, financial condition and results of operations.

**Competition for our employees is intense, and we may not be able to attract and retain the highly skilled employees we need to support our business.**

Our ability to provide high-quality services to our clients depends in large part upon our employees' experience and expertise.  We must attract and retain highly qualified personnel with a deep understanding of the healthcare and healthcare information technology industries.  We compete with a number of companies for experienced personnel and many of these companies, including clients and competitors, have greater resources than we have and may be able to offer more attractive terms of employment.  In addition, we invest significant time and expense in training our employees, which increases their value to clients and competitors who may seek to recruit them and increases the costs of replacing them.  If we fail to retain our employees, the quality of our services could diminish and this could have a material adverse effect on our business, financial condition and results of operations.

**If we lose the services of our key personnel, we may be unable to replace them, and our business, financial condition and results of operations could be adversely affected.**

Our success largely depends on the continued skills, experience, efforts and policies and our management and other key personnel and our ability to continue to attract, motivate and retain highly qualified employees.  In particular, the services of Glen E. Tullman, our Chairman and Chief Executive Officer, are integral to the execution of our business strategy.  If one or more of our key employees leaves our employment, we will have to find a replacement with the combination of skills and attributes necessary to execute our strategy.  Because competition for skilled employees is intense, and the process of finding qualified individuals can be lengthy and expensive, we believe that the loss of the services of key personnel could adversely affect our business, financial condition and results of operations.  We cannot assure you that we will continue to retain such personnel.  We do not maintain keyman insurance for any of our key employees.

**If we are unable to successfully introduce new products or services or fail to keep pace with advances in technology, our business, financial condition and results of operations will be adversely affected.**

The successful implementation of our business model depends on our ability to adapt to evolving technologies and industry standards and introduce new products and services.  We cannot assure you that we will be able to introduce new products on schedule, or at all, or that such products will achieve market acceptance. Moreover, competitors may develop competitive products that could adversely affect our results of operations.  A failure by us to introduce planned products or other new products or to introduce these products on schedule could have an adverse effect on our business, financial condition and results of operations.

If we cannot adapt to changing technologies, our products and services may become obsolete, and our business could suffer.  Because the Internet and healthcare information markets are characterized by rapid technological change, we may be unable to anticipate changes in our current and potential customers' requirements that could make our existing technology obsolete.  Our success will depend, in part, on our ability to continue to enhance our existing products and services, develop new technology that addresses the increasingly sophisticated and varied needs of our prospective customers, license leading technologies and respond to technological advances and emerging industry standards and practices on a timely and cost-effective basis. The development of our proprietary technology entails significant technical and business risks. We may not be successful in using new technologies effectively or adapting our proprietary technology to evolving customer requirements or emerging industry standards, and, as a result, our business could suffer.

**Our business depends in part on and will continue to depend in part on our ability to establish and maintain additional strategic relationships**.

To be successful, we must continue to maintain our existing strategic relationships and establish additional strategic relationships with leaders in a number of healthcare and healthcare information technology industry segments. This is critical to our success because we believe that these relationships contribute towards our ability to:

- extend the reach of our products and services to a larger number of physicians and hospitals and to other participants in the healthcare industry;

- develop and deploy new products and services;

- further enhance the Allscripts brand; and

- generate additional revenue and cash flows.

Entering into strategic relationships is complicated because strategic partners may decide to compete with us in some or all of our markets. In addition, we may not be able to maintain or establish relationships with key participants in the healthcare industry if we conduct business with their competitors. We depend, in part, on our strategic partners' ability to generate increased acceptance and use of our products and services. If we lose any of these strategic relationships or fail to establish

additional relationships, or if our strategic relationships fail to benefit us as expected, we may not be able to execute our business plan, and our business, financial condition and results of operations may suffer.

*     *     *

**If our products fail to perform properly due to undetected errors or similar problems, our business could suffer**.

Complex software such as ours often contains undetected defects or errors. It is possible that such errors may be found after introduction of new software or enhancements to existing software. We continually introduce new solutions and enhancements to our solutions, and, despite testing by us, it is possible that errors might occur in our software. If we detect any errors before we introduce a solution, we might have to delay deployment for an extended period of time while we address the problem. If we do not discover software errors that affect our new or current solutions or enhancements until after they are deployed, we would need to provide enhancements to correct such errors. Errors in our software could result in:

- harm to our reputation;

- lost sales;

- delays in commercial release;

- product liability claims;

- delays in or loss of market acceptance of our solutions;

- license terminations or renegotiations; and

- unexpected expenses and diversion of resources to remedy errors.

Furthermore, our customers might use our software together with products from other companies. As a result, when problems occur, it might be difficult to identify the source of the problem. Even when our software does not cause these problems, the existence of these errors might cause us to incur significant costs, divert the attention of our technical personnel from our solution development efforts, impact our reputation and cause significant customer relations problems.

**Our future success depends upon our ability to grow, and if we are unable to manage our growth effectively, we may incur unexpected expenses and be unable to meet our customers' requirements**.

We will need to expand our operations if we successfully achieve market acceptance for our products and services. We cannot be certain that our systems, procedures, controls and existing space will be adequate to support expansion of our operations. Our future operating results will depend on the ability of our officers and key employees to manage changing business conditions and to implement and

improve our technical, administrative, financial control and reporting systems. We may not be able to expand and upgrade our systems and infrastructure to accommodate these increases. Difficulties in managing any future growth could have a significant negative impact on our business, financial condition and results of operations because we may incur unexpected expenses and be unable to meet our customers' requirements.

**Our failure to compete successfully could cause our revenue or market share to decline.**

The market for our products and services is fragmented, intensely competitive and is characterized by rapidly evolving industry standards, technology and user needs and the frequent introduction of new products and services. Some of our competitors may be more established, benefit from greater name recognition and have substantially greater financial, technical and marketing resources than us. Moreover, we expect that competition will continue to increase as a result of consolidation in both the information technology and healthcare industries. If one or more of our competitors or potential competitors were to merge or partner with one of our competitors, the change in the competitive landscape could adversely affect our ability to compete effectively. We compete on the basis of several factors, including:

- breadth and depth of services;

- reputation;

- reliability, accuracy and security;

- client service;

- price; and

- industry expertise and experience.

Our clinical solutions business unit's principal competitors include Cemer Corporation, eClinicalWorks Inc., Sage Software, Inc., Epic Systems Corporation, GE, iMedica Corporation, McKesson Corporation, MedHost, Inc., Misys Healthcare Systems, Picis Inc., Quality Systems, Inc. and Wellsoft Corporation. We also face competition from providers of practice management solutions, ambulatory and acute EHR solutions, and enterprise-wide application solutions.

Our physicians interactive business unit's principal competitors include Aptilon Inc., Dendrite International, Inc., WebMD Corporation, Lathian Systems, Inc., Quintiles Transnational Corp. and Ventiv Health, Inc. We also face competition from clinical information and education providers, such as disease state management companies, full service e-marketing companies, companies who provide electronic detailing software, and the in-house efforts of our clients, including health plans, pharmacy benefit managers, and pharmaceutical companies.

Our medication services business unit's principal competitors include Cardinal Health, Inc., DRx (a wholly owned subsidiary of Purkinje, Inc.), McKesson Corporation, PD-Rx Pharmaceuticals, Inc., Pharmapac, Physicians Total Care, Inc., Southwood Pharmaceuticals, Inc. and various other regional distributors. We also face competition from providers of other medication repackaging service and bulk pharmaceutical distributors.

There can be no assurance that we will be able to compete successfully against current and future competitors or that the competitive pressures that we face will not materially adversely affect our business, financial condition and results of operations.

\* \* \*

**If we are forced to reduce our prices, our business, financial condition and results of operations could suffer.**

We may be subject to pricing pressures with respect to our future sales arising from various sources, including practices of managed care organizations, Internet pharmacies, including those operating in Canada and other countries outside the United States, and government action affecting pharmaceutical reimbursement under Medicare. Our customers and the other entities with which we have a business relationship are affected by changes in regulations and limitations in governmental spending for Medicare and Medicaid programs. Recent government actions could limit government spending for the Medicare and Medicaid programs, limit payments to hospitals and other providers and increase emphasis on competition and other programs that potentially could have an adverse effect on our customers and the other entities with which we have a business relationship. If our pricing experiences significant downward pressure, our business will be less profitable and our results of operations would be adversely affected. In addition, because cash from sales funds some of our working capital requirements, reduced profitability could require us to raise additional capital sooner than we would otherwise need.

\* \* \*

**If we do not maintain and expand our business with our existing customers, our business, financial condition and results of operations could be adversely affected.**

Our business model depends on the success of our efforts to sell additional products and services to our existing customers. For example, certain of our clinical solutions business unit customers initially purchase one or a limited number of our modules. These customers might choose not to expand their use of or purchase additional modules. In addition, as we deploy new applications and features for our existing solutions or introduce new solutions and services, our current customers could choose not to purchase these new offerings. If we fail to generate additional business from our current customers, our revenue could grow at a slower rate or even decrease.

- 39 -

*      *      *

**Our quarterly operating results may vary.**

Our quarterly operating results have varied in the past, and we expect that our quarterly operating results will continue to vary in future periods depending on a number of factors, some of which we have no control over, including customers' budgetary constraints and internal acceptance procedures, seasonal variances in demand for our products and services, the sales, service and implementation cycles for our clinical software products and physician education products and services, potential downturns in the healthcare market and in economic conditions generally, and other factors described in this "Risk Factors" section. For instance, all other factors aside, sales of our prepackaged medications have historically been highest in the third and fourth quarters. Sales of our software products have also historically been highest in the fourth quarter.

We base our expense levels in part upon our expectations concerning future revenue, and these expense levels are relatively fixed in the short term. If we have lower revenue than expected, we may not be able to reduce our spending in the short term in response. Any shortfall in revenue would have a direct impact on our results of operations. In addition, our product sales cycle for larger sales is lengthy and unpredictable, making it difficult to estimate our future bookings for any given period. If we do not achieve projected booking targets for a given period, securities analysts may change their recommendations on our common stock. For these and other reasons, we may not meet the earnings estimates of securities analysts or investors, and our stock price could suffer.

Defendants referred investors to these "warnings" in each of Allscripts' press releases, analyst conference calls, and Form 10-Q Reports made during the Class Period.

86.     Allscripts' SEC Report on Form 10-Q for the quarter ended March 31, 2007 contained the following "Safe Harbor" language:

This Management's Discussion and Analysis and certain other sections of this Form 10-Q may contain forward-looking statements that involve a number of risks and uncertainties.  Words such as "expects," "anticipates," "believes," "estimates," and other similar expressions or future or conditional verbs such as "will," "should," "would" and "could" are intended to identify such forward-looking statements. Forward-looking statements are made pursuant to the safe harbor provisions of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934 and are based on our beliefs as well as assumptions made by and information currently available to us.  Accordingly, our actual results may differ materially from those expressed or implied in such forward-looking statements due to known or unknown risks and uncertainties that exist in our operations and business environment, including the risks and uncertainties described in Item 1A of the Company's Annual Report on Form 10-K for the period ended December 31, 2006,

filed with the Securities and Exchange Commission on March 1, 2007.  Although we believe that our forward-looking statements are based on reasonable assumptions, there can be no assurance that actual results, performance or achievements will not differ materially from any future results, performance or achievements expressed or implied by such forward-looking statements.  Readers are cautioned not to place undue reliance on forward-looking statements.  We undertake no obligation to update publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

Allscripts' SEC Report on Form 10-Q for the quarters ended June 30, 2007 and September 30, 2007

contained this identical language.

87.     Allscripts' May 8, 2007 press release contained the following "Safe Harbor"

language:

This announcement may contain forward-looking statements about Allscripts Healthcare Solutions that involve risks and uncertainties.  These statements are developed by combining currently available information with Allscripts beliefs and assumptions.  Forward-looking statements do not guarantee future performance.  Because Allscripts cannot predict all of the risks and uncertainties that may affect it, or control the ones it does predict, Allscripts' actual results may be materially different from the results expressed in its forward-looking statements.  For a more complete discussion of the risks, uncertainties and assumptions that may affect Allscripts, see the Company's 2006 Annual Report on Form 10-K, available through the Web site maintained by the Securities and Exchange Commission at http://www.sec.gov.

Allscripts' press release on August 8, 2007 contained this identical language.

88.     Allscripts' November 8, 2007 press release contained the following "Safe Harbor"

language:

This news release may contain forward-looking statements within the meaning of the federal securities laws.  Statements regarding future events, developments, the Company's future performance, as well as management's expectations, beliefs, intention, plans, estimates or projections relating to the future are forward-looking statements within the meaning of these laws.  These forward-looking statements are subject to a number of risks and uncertainties, some of which are outlined below.  As a result, actual results may vary materially from those anticipated by the forward-looking statements.  Among the important factors that could cause actual results to differ materially from those indicated by such forward-looking statements are: the volume and timing of systems sales and installations; length of sales cycles and the installation process; the possibility that products will not achieve or sustain market acceptance; the timing, cost and success or failure of new product and service introductions, development and product upgrade releases;

competitive pressures including product offerings, pricing and promotional activities; our ability to establish and maintain strategic relationships; undetected errors or similar problems in our software products; compliance with existing laws, regulations and industry initiatives and future changes in laws or regulations in the healthcare industry; possible regulation of the Company's software by the U.S. Food and Drug Administration; the possibility of product-related liabilities; our ability to attract and retain qualified personnel; our ability to identify and complete acquisitions, manage our growth and integrate acquisitions; maintaining our intellectual property rights and litigation involving intellectual property rights; risks related to third-party suppliers; our ability to obtain, use or successfully integrate third-party licensed technology; breach of our security by third parties; and the risk factors detailed from time to time in our reports filed with the Securities and Exchange Commission, including our 2006 Annual Report on Form 10-K available through the Web site maintained by the Securities and Exchange Commission at http://www.sec.gov.  The Company undertakes no obligation to update publicly any forward-looking statement, whether as a result of new information, future events or otherwise.

89.     Allscripts made the following "Safe Harbor" statement in each of its conference calls

with analysts made during the Class Period:

> The statements made by Allscripts or its representatives in this conference call will include certain forward-looking statements that are based on the current beliefs of Allscripts management as well as assumptions made by and information currently available to Allscripts management.  Wherever practical, Allscripts will identify these forward-looking statements by using words such as may, will, expects, anticipates, believes, intends, estimates, could or similar expressions.
>
> These forward-looking statements are subject to a variety of risks and uncertainties including those listed in the earnings press release issued by Allscripts today and in Allscripts filings with the Securities and Exchange Commission, which could cause Allscripts actual results, performance, prospects or opportunities in 2007 and beyond to differ materially from those expressed in or implied by the statements.  Except as required by the Federal Securities Laws, Allscripts undertakes no obligation to publicly update or revise any forward-looking statements whether as a result of new information, future events, changed circumstances or any other reason after the date of this release

90.     The preceding excerpts from Allscripts' 10-Qs, 10-K, press releases and conference

call transcripts show that Allscripts, before and during the Class Period, used boilerplate language in

connection with its forward-looking statements – warning language that did not change in any

material meaningful respect over a nearly year-long period even though the actual operations of

Allscripts' business changed significantly during that period, and for the worse, especially during the Class Period.

## LOSS CAUSATION/ECONOMIC HARM

91.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Allscripts' stock price and operated as a fraud or deceit on Class Period purchasers of Allscripts stock by misrepresenting the Company's present and future operational and financial performance.  Later, however, when the truth concerning Allscripts' present and future operational and financial performance entered the market and became apparent to investors, Allscripts' stock price fell as the prior artificial inflation came out of it.  As a result of their purchases of Allscripts stock during the Class Period at artificially inflated prices, and defendants' subsequent disclosures which removed the inflation from their stock, plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

92.     By failing to disclose: (1) that the 2006 limited implementations of V-11 indicated that the software suffered from serious features, functionality and quality problems – problems that persisted in the Class Period; (2) that the 2006 limited implementations were taking significantly longer to complete due to the complexity and instability of the software; (3) that at the time of the May 2007 launch, V-11 contained 2000 known bugs and thereafter hundreds of more bugs were identified through the implementation process during the Class Period that rendered the software unstable and in some cases unusable; (4) that Allscripts' implementation personnel were inexperienced and under-trained on the V-11 software; (5) that the instability, functionality and quality problems continued after the May 2007 launch; (6) that because of the lack of qualified personnel and the defects in the V-11 product, implementation times were stretching during the Class Period and delaying the recognition of revenue; and (7) by issuing false or misleading

- 43 -

projections for Allscripts' future financial performance, defendants presented a misleading picture of Allscripts' business and prospects.  Defendants' omissions, and false and misleading statements, caused Allscripts stock to trade at artificially inflated levels throughout the Class Period.

93.     On November 8, 2007, defendants announced that they were revising the FY07 revenue and earnings forecasts due to "some near-term impact on revenue associated with the ramping up of resources on some of our largest clients."  They said, however, that the Company experienced a "nice improvement in terms of overall productivity," that the "training was successful" with regard to V-11 implementation staff, and that the Company saw "good progress" on the V-11 rollout.  On this partial revelation of previously misrepresented or concealed information, some of the artificial inflation came out of the price of Allscripts stock, which fell sharply $6.62 per share in after market trading on November 8, 2007, reaching a low of $16.26 on November 9, 2007, before closing at $18.68 per share, a decline of nearly 19% from the previous day on an 11 million trading volume, a company specific stock decline that damaged prior Class Period purchasers.  The stock price, however, continued to trade at artificially inflated prices due to defendants' continued misrepresentations, false assurances and false projections.

94.     Then, on February 13, 2009, defendants finally admitted their prior representations, assurances and forecasts had been false with the shocking revelation that Allscripts had no historical basis for estimating V-11 implementation schedules or the revenue the Company could plan to recognize in FY07.  Defendants also admitted that the Company was experiencing difficulties implementing V-11 at its customer sites due to the complexity of the functions contained in the software.  Defendants further admitted that the Company did not have the personnel qualified to troubleshoot these problems and had brought in some "process expertise, some black belts" to establish a standardized implementation process.

95.     The revelations on February 13, 2009 of previously misrepresented or concealed information caused additional artificial inflation to come out of the price of the stock as Allscripts stock again fell sharply $4.12 per share on February 14, 2009 to $11.21 per share, a nearly 27% decline on a tremendous volume of almost 15 million shares, a company-specific stock decline that damaged prior Class Period purchasers.

96.     The timing and magnitude of Allscripts' stock price decline negates any inference that the loss suffered by plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  Indeed, on November 8-9, 2007, while Allscripts' stock price plummeted 19%, the NASDAQ Composite Index fell only 2.5%.  Likewise, on February 14, 2008, the NASDAQ Composite Index fell a modest 1.7% while Allscripts' stock price dropped nearly 27%.  The economic loss, *i.e.*, damages, suffered by plaintiffs and other members of the Class was a direct and proximate result of defendants' fraudulent scheme to artificially inflate Allscripts' stock price and the subsequent significant decline in the value of Allscripts stock when the truth was revealed to the market.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

97.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

98.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

99.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)      employed devices, schemes and artifices to defraud;

(b)      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Allscripts' publicly traded securities during the Class Period.

100.    Plaintiff and the Class have suffered damages in that, in reliance upon the integrity of the market, they paid artificially inflated prices for Allscripts' publicly traded securities.  Plaintiff and the Class would not have purchased Allscripts' publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

101.    As a direct and proximate result of the defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Allscripts' publicly traded securities during the Class Period.

**COUNT II**

**For Violation of Section 20(a) of the Exchange Act
Against Defendant Allscripts, Tullman and Davis**

102.    Plaintiff repeats and reallages each and every allegation contained above as if fully set forth herein.

103.    The Individual Defendants acted as controlling persons of Allscripts within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions as officers and/or directors of Allscripts, and their ownership of Allscripts stock, the Individual Defendants had the power and authority to cause Allscripts to engage in the wrongful conduct complained of herein.

Allscripts controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Class Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 25, 2009    COUGHLIN STOIA GELLER
            RUDMAN & ROBBINS LLP
           DEBRA J. WYMAN


             s/ Debra J. Wyman
             DEBRA J. WYMAN

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiff

MILLER LAW LLC
MARVIN MILLER
LORI A. FANNING
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone:  312/332-3400
312/676-2676  (fax)

Liaison Counsel

SUGARMAN & SUSSKIND
HOWARD S. SUSSKIND
100 Miracle Mile, Suite 300
Coral Gables, FL  33134
Telephone:  305/529-2801
305/447-8115 (fax)

Additional Counsel for Plaintiff

S:\CasesSD\Allscripts Misys\Amended Cpt Allscripts Misys.doc

EXHIBIT 1

**IN THE CHANCERY COURT FOR STATE OF TENNESSEE**
**TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY**

| | |
|---|---|
| TENNESSEE ONCOLOGY, PLLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. O8 - 527-TIT |
| | ) |
| ALLSCRIPTS HEALTHCARE | ) |
| SOLUTIONS, INC. and | ) |
| ALLSCRIPTS, LLC, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff Tennessee Oncology, PLLC, for its Complaint against defendants Allscripts Healthcare Solutions, Inc., and Allscripts, LLC states as follows:

1.     Tennessee Oncology, PLLC ("TN Oncology") is an oncology specialty clinic located in Nashville, Tennessee, with satellite clinics located across the State of Tennessee. It is organized under the laws of the State of Tennessee, with its principal place of business located at 300 20th Avenue North, Suite 301, Nashville, Tennessee 37203.

2.     Defendant Allscripts Healthcare Solutions, Inc. is a Delaware corporation with its principal place of business located at 222 Merchandise Mart Plaza, Suite 2024, Chicago, Illinois 60654. Its registered agent for service of process is: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

3.     Defendant Allscripts, LLC[1] is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 222 Merchandise Mart Plaza, Suite 2024, Chicago, Illinois 60654. Allscripts, LLC is a wholly-owned subsidiary

---

[1] Defendants Allscripts, LLC and Allscripts Healthcare Solutions, Inc. are referred to herein collectively as "Allscripts" or "Defendants."

of Allscripts Healthcare Solutions, Inc.   It is registered as a foreign entity in Tennessee. Allscripts, LLC's registered agent for service of process in Tennessee is: National Registered Agents, Inc., 1900 Church Street, Suite 400, Nashville, TN 37203.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this matter pursuant to Tennessee law, including but not limited to TENN. CODE ANN. § 16-11-102.

5.      This Court has jurisdiction over this matter because Defendants have solicited or transacted business in the State of Tennessee and have caused financial harm in the State of Tennessee.

6.      Venue lies with this Court pursuant to Tennessee law, including but not limited to TENN. CODE ANN. § 20-4-106.

## FACTS

**A.      Allscripts induced TN Oncology to purchase and implement Allscripts' TouchWorks software program**

7.      In 2005, TN Oncology sought to implement an oncology-specific database system that included both clinical and patient software applications for use by the physicians in its organization.

8.      TN Oncology's primary goal in implementing a new database system was a total electronic medical records ("EMR") solution.  Secondarily, by integrating their multiple software systems into a single software platform for the entire organization, TN Oncology could reduce the expenses associated with supporting and maintaining multiple software systems.

9.      TN Oncology considered various software vendors for its purchase of an integrated software system, including the TouchWorks software program offered by Allscripts.

2

10.     On June 1, 2005, Allscripts CEO, Glen Tullman, met with TN Oncology CEO,

Dr. Charles McKay, regarding the possibility of moving forward with Allscripts. During the

course of this meeting, Mr. Tullman made the following representations:

    a.    that he and Allscripts were qualified to handle a software implementation project such as the type of project TN Oncology sought to pursue;

    b.    that the TouchWorks software program ("TouchWorks") would provide the entire range of applications sought by TN Oncology, including clinical, electronic patient record, and specialized oncology-specific applications, and that its software could be implemented in the timeframe required by TN Oncology;

    c.    that Allscripts was committed to being the leading vendor for all specialties and that if TN Oncology partnered with Allscripts, Allscripts would ensure that the resources and commitment to develop a "top-notch" oncology EMR system would be made available to the project; and

    d.    that Allscripts' TouchWorks software was a good fit for TN Oncology's business and that it could meet the specialized requirements that were necessary in an EMR environment.

11.     Mr. Tullman made the foregoing representations with the intention of inducing

TN Oncology to enter into an agreement with Allscripts for purchase and implementation of the

Allscripts' TouchWorks software program.

12.     Mr. Tullman's intent was evidenced by the fact that he urged TN Oncology to

announce in principle that TN Oncology would be working with Allscripts by the end of June

2005, as he believed that if TN Oncology announced it was entering into an agreement to

purchase and implement Allscripts' TouchWorks software that it would boost Allscripts' third

quarter 2005 financial performance.

13.     During the course of the negotiations, Allscripts consistently represented that it could meet TN Oncology's business needs through implementation of its TouchWorks software program, which included at least thirteen (13) separate core functional modules.

14.     The various modules that comprised the TouchWorks software program provided specialized functions, including but not limited to, a clinical and patient data viewer, laboratory applications, prescriptions, clinical documentation management, order management, health information management, clinical trial management, a patient accounting system, and a decision support tool.

15.     Allscripts assured TN Oncology that the latest version of its TouchWorks software program (Version 11) would be released in the first quarter of 2006 and would be fully-developed, stable and capable of running TN Oncology's business by the summer of 2006.

16.     Allscripts also represented that it would develop and implement oncology-specific software applications that would meet TN Oncology's specialized business needs.

17.     Based on these and other representations, TN Oncology made the decision to purchase the Allscripts' TouchWorks software program rather than any of the software packages offered by other vendors and to engage Allscripts to implement the software program.

18.     TN Oncology also agreed to become a development partner for the program in reliance and based on Allscripts' repeated promises and assurances of basic functionality in TouchWorks and the oncology-specific software.

**B.     The terms of the TouchWorks System Agreement**

19.     On June 30, 2005, the parties entered into the TouchWorks System Agreement ("Agreement") wherein Allscripts sold TN Oncology its TouchWorks software program and certain hardware and an oncology-specific software solution known as "Smart Office Oncology"

4

("SOO")(collectively the "System"), which Allscripts represented would integrate TN Oncology's data and processes into a unified system. (Agreement attached hereto as Exhibit 1).

20.     The Agreement granted TN Oncology a ten (10) year, non-transferable, non-sublicensable, non-exclusive license to a maximum of thirty-eight (38) providers to use the software and associated documentation. (*See* Exh. 1, Agreement at ¶¶ 1-2).

21.     The Agreement provided that Allscripts would sell and deliver to TN Oncology certain hardware and related items, including Clustered Database Servers, a Tape Backup Solution, a Dictation/Transcription/Interface Server, a TouchWorks Analytics Server, Load Balanced Web Servers, a Test Server, a Print Center Server, and Virus Protection Software. (*See* Exh. 1, Agreement at ¶ 1, Schedule 3).

22.     The Agreement further provided that Allscripts would deliver, install and maintain the following modules and proprietary software: TouchWorks Base (includes Physician Homebase®, TouchWorks™, and SnapShot®), TouchWorks Rx+™, TouchWorks Charge™, TouchWorks Note™, TouchWorks Document™, TouchWorks Transcribe™, TouchWorks Dictate™, TouchWorks Result™, TouchWorks Order™, TouchWorks Forms™, TouchWorks Scan™, TouchWorks OCR™, and TouchWorks Analytics™. (*See* Exh. 1, Agreement at ¶ 1).

23.     The parties also entered into a Statement of Work ("SOW") as part of the Agreement, which outlined the standard services provided by Allscripts during implementation of the TouchWorks software program. (*See* Exh. 1, Agreement at Exh. B).

24.     The SOW called for employment of the TouchWorks software program in three phases.

25.     The first two phases of the project consisted of implementation of the standard TouchWorks modules selected by TN Oncology.

5

26.     Allscripts estimated the project duration for implementation of the first two phases at eight months from the effective date of the Agreement and extending through the first "go live" date of the final phase.

27.     The final phase of the project consisted of implementation of custom, oncology-specific features (SOO) and Allscripts estimated that this phase would be complete within 171 days from the date of completion of the second phase.

28.     Under the terms of the Agreement, Allscripts agreed to provide technical services to design, code, test and deliver amendments or alterations to the System necessary to correct or provide a solution to any programming errors. (*See* Exh. 1, Agreement at ¶ 1).

29.     Further, the SOW provided for additional services by Allscripts, including, Project Management and Implementation Consulting, Hardware Services, Technical Services, and Interfaces and Conversions Services. (*See* Exh. 1, Agreement at Exh. B).

## C.     Allscripts fails to deliver and implement a working software system

30.     TN Oncology has consistently met its obligations under the parties' Agreement. To date, TN Oncology has paid Allscripts $896,358.94 under the Agreement. TN Oncology also has provided Allscripts with the business requirements that the software would need to satisfy at TN Oncology's multiple clinics. Moreover, TN Oncology has devoted the necessary resources in terms of personnel and employee time to facilitate the implementation of Allscripts' software and in attempting to make the implementation a success.

31.     Notwithstanding TN Oncology's efforts and contrary to Allscripts' representations, the software proved too unstable to implement as promised by Allscripts.

6

32.      More than two years have passed since the TouchWorks software program was initially pitched to TN Oncology as a solution for handling the oncology-specific requirements necessary in an EMR environment.      Although Allscripts should have completed the implementation by summer 2006, Allscripts has been unable to successfully complete the implementation to date.

33.      TN Oncology realized few if any operational improvements, and the software simply failed to address TN Oncology's business needs.

**D.      Allscripts acknowledges its failure to deliver the promised software system**

34.      On September 11, 2007, TN Oncology sent a letter to Allscripts notifying Allscripts of the serious ongoing problems with the System, including the failure of Allscripts to deliver a functioning software program within the promised time period.

35.      In response, Allscripts pledged to increase its level of resources and to resolve all outstanding issues.

36.      Despite these assurances, Allscripts did not adequately address TN Oncology's concerns or provide tangible proof that the System would perform as promised.

37.      The problems with the System remained, and on December 6, 2007, TN Oncology again notified Allscripts of the serious, continuing problems with the System.  TN Oncology indicated its loss of confidence in the TouchWorks / SOO solution; its concerns about Allscripts' ability to return the SOO database to a true, operational environment; and it inquired as to whether Allscripts could provide an accurate prediction of performance after the System was expanded to all of TN Oncology's users in the near future.

7

38.     Pursuant to the Term and Termination provision set forth in the Agreement, TN Oncology requested that all of the concerns outlined in its December 6, 2007 letter be adequately addressed within a 30-day period.   (*See* Exh. 1, Agreement at ¶ 12).

39.     TN Oncology requested resolution of their concerns within thirty (30) days because they could no longer afford to sustain the slow pace of development of the System given their desire to expand their business opportunities and meet their obligations to others.

40.     By reply e-mail on December 10, 2007, Mr. Tullman again acknowledged the problems with the System and pledged to increase Allscripts' level of resources and to resolve all outstanding issues.

41.     Mr. Tullman explained that the current release of TouchWorks was "ready and tested" and would "resolve many of the issues" that TN Oncology has had with the System.

42.     Mr. Tullman offered to personally fly down to Nashville to meet with Dr. McKay and Dr. Jeffrey Patton in a "final attempt to resolve these issues and move forward."

43.     Mr. Tullman also offered "to put people on site, to manage key parts of the system installation/retraining of [the TN Oncology] team and to, even if it works, make significant financial concessions given all of the challenges" TN Oncology has had with the System.

44.     By letter dated December 17, 2007, Mr. Vandenberg, Allscripts' General Counsel, acknowledged receipt of TN Oncology's demand and notice of default letter dated December 6, 2007, and the 30-day cure period set forth therein.

45.     The 30-day cure period described in the TouchWorks System Agreement between Tennessee Oncology and Allscripts dated June 30, 2005 commenced on December 6, 2007 and expired on January 7, 2008.

46.     By January 8, 2008, Allscripts had made no attempts to resolve the problems with the System.

47.     The significant problems encountered with the System prevented TN Oncology from meeting certain of its business obligations and caused TN Oncology to lose several business opportunities, including disease management contracts with payors and clinical trials.

48.     Given the number of the functions that had been advertised to work by Allscripts but which did not in fact work, the System actually had less functionality than the systems it was supposed to replace at TN Oncology. As a result, TN Oncology's business became much less efficient and more expensive to maintain than with its original software.

49.     The software delivered by Allscripts did not contain the functionality or perform as Allscripts had promised during its sales campaign. In reality, what Allscripts sold to TN Oncology was an untested version of the TouchWorks software program.

50.     Allscripts essentially used TN Oncology as test site where they developed the software during the course of the implementation and hoped they could work out the flaws during the implementation process.

51.     After attempting to run the software program for more than two years and affording Allscripts numerous opportunities to cure the multiple defects in the software and its implementation, TN Oncology ceased its attempted use of the Allscripts' software program in an effort to prevent further injury and loss to TN Oncology's business.

## COUNT I
## FRAUDULENT INDUCEMENT

52.     TN Oncology hereby incorporates the allegations contained in paragraphs 1 through 51 as if fully set forth below.

53.     Allscripts misrepresented the ability of Allscripts' software to meet TN Oncology's needs.  Allscripts induced TN Oncology to enter into contracts to purchase hardware and other equipment, license its software and to retain consulting services through misrepresentations regarding facts material to the parties' transaction including, without limitation, the following:

      a.    that Allscripts could provide TN Oncology with a fully operational software program (TouchWorks);

      b.    that the SOO solution would be able to perform all the oncology-specific requirements necessary to TN Oncology's business;

      c.    that operation of the software would increase TN Oncology's productivity and efficiency;

      d.    that TN Oncology would receive a demonstratable, sustainable return on its investment; and

      e.    that Allscripts' consultants were qualified, experienced, competent, understood the operation of specialized clinics and would enable TN Oncology to re-design and standardize core business processes, increase patient care efficiency, identify and document clinical trials patients, and reduce paperwork.

54.     Allscripts failed to disclose that the System version and oncology-specific applications promised to TN Oncology were not fully developed.  Allscripts knew that these facts were material and intentionally concealed them in order to induce TN Oncology into purchasing the software, hardware, and other equipment.

55.     These fraudulent misrepresentations and omissions were made before the Agreement was executed and for the purpose of inducing TN Oncology to execute the Agreement, rather than pursuing alternative solutions.

56.     TN Oncology reasonably relied upon the false statements and omissions to its detriment.

57.     TN Oncology has sustained damages in an amount to be proven at trial as a proximate result of Allscripts' fraudulent inducement and is entitled to rescission of the parties' Agreement and to monetary damages.

## COUNT II
## FRAUD

58.     TN Oncology hereby incorporates the allegations contained in paragraphs 1 through 57, as if fully set forth below.

59.     Allscripts made numerous representations to TN Oncology before and after the Agreement was executed that were false, and Allscripts knew they were false at the time they were made.

60.     These representations were material and were made for the purpose of inducing TN Oncology to rely on the representations.  TN Oncology relied on the representations to its detriment and suffered damages as a result.

61.     Allscripts also failed to disclose material information to TN Oncology that Allscripts had a duty to disclose.  Had the information been disclosed, TN Oncology would have immediately terminated Allscripts.  TN Oncology has been damaged as a result of the nondisclosures and omissions.

## COUNT III
## NEGLIGENT MISREPRESENTATION

62.     TN Oncology hereby incorporates the allegations contained in paragraphs 1 through 61 as if fully set forth below.

11

63.     During the course of Allscripts' business, Allscripts supplied false information intended to guide TN Oncology in its business transactions in violation of RESTATEMENT (SECOND) OF TORTS, § 552 (1977).

64.     Allscripts failed to exercise reasonable care or competence in communicating this information.

65.     TN Oncology suffered pecuniary loss caused by its justifiable reliance on Allscripts' communications.

66.     As a result of Allscripts' negligent misrepresentations, TN Oncology has been damaged and continues to be damaged.

**COUNT IV**
**NEGLIGENT MISREPRESENTATION**
**BY NONDISCLOSURE**

67.     TN Oncology hereby incorporates the allegations contained in paragraphs 1 through 66 as if fully set forth below.

68.     During the course of Allscripts' business, Allscripts failed to disclose basic, material information about the System that was intended to induce TN Oncology to enter into the Agreement with Allscripts in violation of RESTATEMENT (SECOND) OF TORTS, § 551 (1977).

69.     Allscripts failed to disclose enough information to prevent its statements about the System from becoming misleading.

70.     Allscripts failed to disclose known problems and/or defects that rendered the System defective.

71.     TN Oncology suffered pecuniary loss caused by its justifiable reliance on Allscripts' communications.

72.     As a result of Allscripts' negligent misrepresentations through nondisclosure of material facts, TN Oncology has been damaged and continues to be damaged.

**COUNT V**
**BREACH OF CONTRACT**

73.     TN Oncology hereby incorporates the allegations contained in paragraphs 1 through 72 as if fully set forth below.

74.     The Agreement and its constituent schedules, letters, and other parts constitute binding contracts between the parties.

75.     Allscripts breached the Agreement by failing to abide by the express terms and the implied duties of good faith performance and fair dealing. Allscripts' breaches include, without limitation, the following:

      a.     certain modules of the software are non-functional;

      b.     failure to meet implementation deadlines set forth in the Agreement;

      c.     the software lacks functionality and cannot perform some basic operation generally expected in software of this type;

      d.     grossly underestimating the complexity of the project;

      e.     failure to manage the project effectively;

      f.     failure to devote adequate and consistent resources to the project; and

      g.     failure to timely develop functioning interfaces.

76.     TN Oncology has sustained damages in an amount to be proven at trial as a proximate result of Allscripts' breach of contract.

## COUNT VI
### BREACH OF WARRANTIES

77. TN Oncology hereby incorporates the allegations contained in paragraphs 1 through 76 as if fully set forth below.

78. In violation of the express warranty regarding functionality of the software set forth in Paragraph 9 of the Agreement, Allscripts has been unable to repair or replace the failing items of Allscripts software so that such software performs in accordance with the warranty.

79. In violation of the express warranty regarding personnel performance standards set forth in Paragraph 7 of the Agreement, Allscripts on several occasions assigned employees, agents, or representatives that lacked the proper skill, training, and background so as to be able to perform services rendered under the parties' contracts in a competent and professional manner.

80. Allscripts has violated other express warranties set forth in the Agreement.

81. As a result of Allscripts' breach of warranties, TN Oncology has been damaged and continues to be damaged.

## COUNT VII
### NEGLIGENT SOFTWARE DESIGN

82. TN Oncology hereby incorporates the allegations contained in paragraphs 1 through 81 as if fully set forth below.

83. Allscripts designed certain modules of TouchWorks in a negligent fashion.

84. TN Oncology has sustained damages in an amount to be established at trial as a proximate result of Allscripts' negligent design.

14

## COUNT VIII
## PROFESSIONAL NEGLIGENCE

85.     TN Oncology hereby incorporates the allegations contained in paragraphs 1 through 84 as if fully set forth below.

86.     As a professional entity in the fields of computer applications/consulting and information technology, Allscripts had a duty to render its services using the skills and knowledge normally expected by members of its field of profession.

87.     Allscripts breached its duty to possess and apply the knowledge, skill, and ability that a reasonable, careful professional would have exercised under the circumstances.

88.     TN Oncology has sustained damages in an amount to be established at trial as a proximate result of Allscripts professional negligence.

## COUNT IX
## VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT

89.     TN Oncology hereby incorporates the allegations contained in paragraphs 1 through 88 as if fully set forth below.

90.     Allscripts has committed unfair or deceptive acts or practices in violation of the Tennessee Consumer Protection Act, TENN. CODE ANN. § 47-18-101, *et seq*.

91.     Specifically, Allscripts has violated certain provisions of the Tennessee Consumer Protection Act, including but not limited to §§ 47-18-104(b)(5), 47-18-104(b)(7), and 47-18-104(b)(27).

92.     Allscripts' violation of the provisions of the Tennessee Consumer Protection Act was willful and knowing.

93.     TN Oncology has sustained damages in an amount to be established at trial as a proximate result of Allscripts' violation of the Tennessee Consumer Protection Act.

WHEREFORE, plaintiff TN Oncology demands:

1.     That judgment be entered against Allscripts for fraudulent inducement and that the Court order rescission of the parties' Agreement and for Allscripts to restore TN Oncology to its position prior to entering into the Agreement or, alternatively, award compensatory damages against Allscripts for its fraud;

2.     That judgment be entered against Allscripts to compensate TN Oncology for its damages sustained as a result of Allscripts' misrepresentations, breach of contract, breach of warranties, negligent software design, professional negligence, and violations of the Tennessee Consumer Protection Act;

3.     That the judgment entered against Allscripts be trebled as a result of a willful and knowing violation of the Tennessee Consumer Protection Act, pursuant to TENN. CODE ANN. § 47-18-109(a)(3);

4.     That TN Oncology be awarded its attorneys' fees and costs in bringing this action, pursuant to TENN. CODE ANN. § 47-18-109(e)(1), or other applicable law;

5.     That TN Oncology be awarded prejudgment interest and the costs of this cause to the extent allowable by statute or other applicable law;

6.     That the Court award TN Oncology punitive and exemplary damages for Allscripts' willful, intentional, fraudulent, and reckless conduct;

7.     That Allscripts indemnify TN Oncology for all costs and expenses incurred due to Allscripts' negligent design of its software as required under Section 9.5 of the Agreement;

8.      That Court costs be taxed against Allscripts;

9.      That TN Oncology be awarded such other and further relief, general and special,

at law or in equity to which it may be entitled; and

10.     That a jury be impaneled to hear this cause.


                                        Respectfully submitted,


                                        Matthew M. Curley (18613)
                                        Jennifer M. Eberle (21454)
                                        BASS, BERRY & SIMS PLC
                                        315 Deaderick Street, Suite 2700
                                        Nashville, Tennessee 37238
                                        (615) 742-6200

                                        *Attorneys for Tennessee Oncology, LLC*

17



**ALLSCRIPTS™**
Inform. Connect. Transform.

TOUCHWORKS™ SYSTEM AGREEMENT

Customer Name: <u>Tennessee Oncology, PLLC</u>
Sales Executive: <u>Pamela Werner</u>
Contract Number: _____

THIS AGREEMENT (the "Agreement") is made by and between Allscripts, LLC ("Allscripts") and the Customer identified in the signature area below, as of the latter of Allscripts or Customer's execution below ("Effective Date").

## 1.  PRODUCTS AND SERVICES

Allscripts agrees to (i) sell and deliver to Customer the hardware and related items set forth on the Equipment Schedule attached hereto (collectively, the "Equipment"), (ii) provide to Customer the services described herein or in the schedule(s) attached hereto (collectively, the "Services"), (iii) deliver, install, and maintain those modules of the proprietary software selected in the box below and listed on the Payment Schedule(s) attached hereto (the "Software") and (iv) deliver, install, and maintain those interfaces listed on the Payment Schedule(s) attached hereto (the "Interfaces")(the Software and Interfaces being hereinafter collectively referred to as the "Products"), and to grant to Customer a license to use the Software and all Documentation associated with the foregoing pursuant to the terms and conditions of this Agreement. Customer agrees to pay the fees for the Equipment, Services and Products, as hereinafter set forth.

| | | | |
|---|---|---|---|
| ____X____ | TouchWorks Base (Includes Physician Homebase®, TouchWorks WorkFlow™ and SnapShot®) | ____X____ | TouchWorks OCR™ |
| | | ____X____ | TouchWorks Analytics™ |
| ____X____ | TouchWorks Rx+™ | _____ | TouchWorks Voice™(Dragon) |
| ____X____ | TouchWorks Charge™ | _____ | TouchWorks iHealth™ |
| ____X____ | TouchWorks Note™ | _____ | TouchWorks eUniversity™ |
| ____X____ | TouchWorks Document™ | | |
| ____X____ | TouchWorks Transcribe™ | | |
| ____X____ | TouchWorks Dictate™ | | |
| ____X____ | TouchWorks Result™ | _____ | TouchWorks Pocket Library™ Reference Reader Titles: |
| ____X____ | TouchWorks Order™ | | _____ DrugGuide™ |
| ____X____ | TouchWorks Forms™ | | _____ Pocket Anatomy™ |
| ____X____ | TouchWorks Scan™ | | _____ Pocket Exercises™ _____ PIER™ |

| Check One<br>*(Applies to all Products unless noted otherwise)* | License Type |
|---|---|
| _____ | Subscription License for the number of Providers for which Customer pays subscription fees as reflected on the attached Payment Schedule, with an initial subscription term ending sixty (60) months after the first payment for 100% of the minimum number of Providers is due. |
| ____X____ | Ten (10) Year Term License for a maximum of 38 Providers. |



EXHIBIT

Initials ⌒M

## 2.  LICENSE

Subject to the terms and conditions of this Agreement, Allscripts grants and Customer accepts a limited, non-transferable (except as provided herein), nonsublicensable, non-exclusive license to use, during the term, the Software in object code format only and all related materials supplied by Allscripts hereunder, in accordance with the documentation supplied by Allscripts and subject to the limitations specified herein. Customer agrees to use the Software substantially in accordance with its directions for use and only in connection with Customer's internal business conducted at the address(es) (the "Site(s)") identified on the Site Schedule attached hereto as <u>Schedule 1</u> (the "Site Schedule").  Use of the Software is limited to the number of Providers indicated in the table above. Customer may allow any number of non-Provider users to use the Software, but only in support of the Providers' use. As used in this Agreement, "Provider" means a physician, osteopath, nurse practitioner, physician assistant or similar health care provider who bills for professional charges in his or her name and who has accessed or used the Software product at least twice during any 90 day period.  Customer will timely provide written notice to Allscripts of any change in the list of Providers at the Sites that increases the maximum number of licensed Providers.  Upon Allscripts' receipt of any such notice, this Agreement (and any affected Schedule) will be deemed appropriately amended pursuant to such notice. Unique terms and conditions applicable to certain of the Software modules are set forth in <u>Schedule 2</u> attached hereto. Third party software products identified on the Equipment Schedule are licensed to Customer separately pursuant to end user license agreements from such third party vendors.

## 3.  OWNERSHIP

The Software and accompanying printed materials and all copies and portions thereof contain trade secrets and other Proprietary Information (hereinafter defined) of Allscripts and are the proprietary copyrighted property of Allscripts. Title and ownership to the Software and accompanying printed materials and all copies and portions thereof shall be and at all times remain with Allscripts.  The rights granted by Allscripts to Customer hereunder do not include the right to develop derivative or related works to the Software.  Notwithstanding the foregoing, to the extent that Customer develops any work of authorship, or invention derived from or directly relating to the Software in the course of performance under this Agreement, including in the course of providing consultation in connection with Allscripts' development of oncology specialty functionality within the Allscripts' TouchWorks Software pursuant to Section 6 of this Agreement ("Work Product"), Customer hereby assigns to Allscripts such Work Product and any rights, with respect thereto. To the extent that any rights in any Work Product are not assigned to Allscripts hereunder: (i) Customer grants to Allscripts a world-wide permanent, irrevocable, royalty-free, unlimited, fully paid-up license to such Work Product; (ii) Customer agrees not to assert, file or otherwise raise any claim or action against Allscripts for the infringement of any rights of Customer in such Work Product; and (iii) Customer shall treat such Work Product as Proprietary Information of Allscripts and not disclose or grant any rights in such Work Product to any third party.  Customer shall obtain from its oncologists or other employees who may be engaged in developing works of authorship, or inventions derived from or directly relating to the Software in the course of performance under this Agreement, a Confidentiality and Assignment Agreement in substantially the form attached hereto as <u>Exhibit D</u>.

## 4.  RESTRICTIONS

Customer shall not, nor cause or reasonably permit any third party to, under any circumstances, (a) distribute, rent, sell, lease or otherwise display, disclose, transfer or make available the Software or the associated documentation to any third party; (b) modify, change, reverse assemble, reverse compile or reverse engineer the Software, or otherwise attempt to discover any Software source code or underlying Proprietary Information; (c) remove, efface or obscure any copyright notices, logos or other proprietary notices or legends (whether Allscripts' or its partners) from the Software; (d) export or re-export, or allow the export or re-export of any Proprietary Information or any copy or direct product thereof or in violation of any restrictions, laws or regulations; or (d) copy the Software or the associated documentation in any form, without the express written consent of Allscripts.  Customer may not use or allow any person to examine the Software or any related materials for the purpose of creating another system.

## 5.  EQUIPMENT

The Equipment Schedule attached hereto as <u>Schedule 3</u> sets forth the Equipment to be purchased by Customer from Allscripts.  Unless otherwise stated on the Equipment Schedule, Customer shall purchase from Allscripts all Equipment listed on the Equipment Schedule, at the prices and on the terms and conditions set forth on the Equipment Schedule. On or before the date on which Allscripts is scheduled to install the Products, Customer shall have installed (or made available) electrical power at the Installation Site sufficient to operate the Products. Customer also shall have obtained access to the Site to high-speed Internet access with an approved VPN (virtual private network) hardware device as specified in Allscripts' System Environment Specifications, as in effect from time to time (the "System Environment Specifications"), the current version of which is attached hereto as <u>Exhibit A</u>. If the Products are to operate on Customer's computer network, Customer is responsible for all the hardware, software (including licenses), and other equipment necessary to connect the Products to the Customer's computer network. The cost of computer supplies (e.g., labels, paper and printer cartridges) and the installation of the electrical power, the dedicated telephone line and, if necessary, network cabling, hub and other necessary networking equipment will be borne solely by Customer.

TouchWorks™ System Agreement v.01.05
© Allscripts, LLC.  All Rights Reserved

Initials 

6.   DELIVERY AND IMPLEMENTATION

Allscripts will arrange for shipment by common carrier of Software and Equipment purchased by Customer hereunder, with the cost of shipping and transportation to be borne by Customer. Risk of loss of the Software and Equipment will remain with Allscripts until Delivery. Good and merchantable title to Equipment purchased by Customer from Allscripts hereunder will pass to Customer upon Delivery. When used in this Agreement, the term "Delivery", shall mean (a) with respect to any item of Software, the first to occur of: (i) the release and transfer of possession of the first copy or product master into a device designated by Customer for such purpose, (ii) communication to Customer of access codes that allow Customer to take possession of the first copy or product master, (iii) the release and transfer of possession by Allscripts of the first copy or product master in person to Customer or to any common carrier or delivery service for transport to Customer, or (iv) receipt by Customer of Allscripts' written authorization for duplication of existing copies in the Customer's possession, and (b) with respect to any item of Equipment, the release and transfer of possession of the Equipment from Allscripts or the supplier of the Equipment to a common carrier or delivery service for transport to the Customer or to any location specified by or on behalf of the Customer. Following Delivery, (i) Allscripts will install the Equipment, Software and Interfaces, and otherwise provide software implementation services and initial training on the use of the Products to Customer's personnel, in accordance with the Statement of Work attached hereto as Exhibit B (the "Statement of Work"), and (ii) Customer will install those items to be installed by Customer in accordance with the System Environment Specifications and the Statement of Work. Subject to Sections 11 and 14 hereof, Customer hereby grants a limited, revocable right to Allscripts to access any third party system used by Customer, in order to implement the interfaces requested by Customer, and Customer represents to Allscripts that it has the right and authority to grant the access.

During the period commencing on the Effective Date and continuing for a period of six (6) months thereafter, Customer may, at its option, make up to five (5) of its employed oncologists available to Allscripts for extensive consultation in connection with Allscripts' development of oncology specialty functionality within the Allscripts' TouchWorks Software. Allscripts will compensate such oncologists $50,000 for such consultation, at a daily rate of $2,000, and reimburse the oncologists for their reasonable travel costs and expenses incurred in providing such consultation.

7.   SUPPORT SERVICES

Allscripts will provide technical services to design, code, test and deliver amendments or alterations to the Software necessary to correct or provide a solution to any programming error attributable to Allscripts that has caused the Software, when implemented and operated substantially in accordance with the System Environment Specifications, not to perform substantially as described in the then current user-orientated instructions for the operation of the Software in the form distributed by Allscripts to its customers generally (the "Documentation") ("Support Services"). The Support Services will be promptly provided in the manner set forth in Allscripts then-current TouchWorks Support Manual (the "Support Manual"), the current version of which is attached hereto as Exhibit C, after Customer has identified and notified Allscripts of any error in accordance with Allscripts' reasonable reporting procedures as set forth in the Support Manual. Allscripts will also provide telephone consultation in the use and operation of the Products during the hours of 8:00 A.M. through 6:00 P.M. Central standard time on weekdays, except holidays observed by Allscripts. Allscripts support staff shall be available by beeper at all other times for emergency issues. To enable Allscripts to deliver Support Services, Customer shall establish and maintain connectivity between Allscripts and Customer, as set forth in the System Environment Specifications. In addition, Allscripts will deliver to Customer, from time-to-time, updates, upgrades and enhancements of the Software that Allscripts elects to provide to its customers generally, and does not market separately. Such updates, upgrades and enhancements shall be provided at no additional charge, except fees for professional services provided by Allscripts, at Customer's request, in connection with the installation of such updates, upgrades and enhancements. Customer agrees to test, and if operable, accept and use all such updates, upgrades and enhancements to the Software furnished by Allscripts hereunder. All such updates, upgrades and enhancements shall be considered part of the Software and shall be subject to the license agreement related to the Software. Support Services shall be provided only for the then-current release of Software and the two (2) immediately preceding releases.

Allscripts shall not be responsible for correcting any errors not attributable to Allscripts. Allscripts shall not be responsible for Errors to the extent such Errors are the result of the Software having been modified by someone other than Allscripts or Allscripts' direction. Allscripts is not required to provide any Support Services relating to problems to the extent arising out of (i) Customer's material failure to implement current versions of the Software that are issued under this Agreement; (ii) changes to the Customer's operating system or environment which adversely affect the Software; (iii) any alterations of or additions to the Software performed by parties other than Allscripts or at the direction of Allscripts; (iv) use of the Software in a manner for which it was not designed; (v) accident, negligence, or misuse of the Software other than by Allscripts; (vi) operation of the Software other than in accordance with the System Environmental Specifications; (vii) interconnection of the Software with other software products not supplied or recommended by Allscripts; (viii) introduction of data into any database used by the Software by any means other than the use of the Products; or (ix) use of the Software on equipment other than the Equipment purchased hereunder or equipment specified by Allscripts. If the parties reasonably determines that a problem for which Support

Services are requested was not caused by an error or defect in the Software, the Customer agrees to pay Allscripts' standard consulting rates for services performed in connection therewith, plus reasonable travel and lodging expenses approved in advance by Customer. Travel time will be charged at Allscripts' consulting rates.

To the extent a federal regulation issued pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") requires a modification of a Customer business process that is intended to be supported by functions of the Software, and Software support is necessary for such modified business process, Allscripts shall instruct Customer in methods for using the Software to support such modified business process. If, despite such instructions, the modified business process cannot be reasonably supported by the Software, Allscripts shall supply Customer with one (1) or more updates to the Software, as necessary, as deliverables provided under standard Support Services to support Customer's use of the Software in the manner for which it is intended (a "HIPAA Update"). Such HIPAA Updates shall not include any products or services that add on to or function separately from the Software. In addition, if Allscripts provides a HIPAA Update that requires: (a) communication links, (b) interfaces to outside databases, (c) third-party technologies that Allscripts elects to incorporate into the Software, (d) services to implement, or (e) additional hardware or hardware upgrades, (e) additional software development efforts, or (f) additional Allscripts services, including but not limited to, implementation services, training services or support services, Allscripts may charge, and Customer agrees to pay, for such additional components described in a, b, c, d, and e and f above, at a price not to exceed Allscripts' standard fees. To the extent a federal regulation issued pursuant to HIPAA contemplates more than one means to satisfy a requirement, the obligation of Allscripts to provide a HIPAA Update shall apply to only one such HIPAA Update provided by Allscripts. If Customer desires any other or additional means, Allscripts shall make available consulting and implementation services at its standard rates.

Anything contained herein to the contrary notwithstanding, Allscripts' commitments under this Section 7 will apply only if Customer is receiving, and is current or undisputed payment of, Support Services for the Software.

## 8. FEES AND PAYMENTS

Allscripts shall invoice Customer, and Customer will pay to Allscripts for the Equipment, Services and Products, all fees and other amounts set forth in the Payment Schedule(s) attached hereto as <u>Schedule 4</u> (the "Payment Schedule"). Invoices are due and payable when received. Undisputed invoices not paid within 45 days of the invoice date shall be subject to a late charge of one percent (1%) per month, or the maximum lawful rate, whichever is lower. Customer is responsible for payment of any federal, state or local excise, sales, use or similar taxes assessed with respect to the Products provided and sold hereunder, as well as any transaction-based charges levied by third parties in connection with Customer's use of the Products except for taxes based on Allscripts' income or assets.

The dollar value of any Products not paid for by, or provided at a reduced charge to, Customer and received by Customer under this Agreement, are "discounts or other reductions in price" to Customer under Section 1128B(b)(3)(A) of the Social Security Act [42 U.S.C. 1320a-7b(b)(3)(A)]. To the extent applicable, Customer shall disclose the discounts or other reduction in price under any state or federal program that provides cost or charge based reimbursement to Customer for the Products provided under this Agreement.

## 9. LIMITED WARRANTY

Allscripts warrants that the Software will conform in all material respects to all Documentation for a warranty period commencing on the "Go Live Date" and continuing for six (6) months thereafter (the "Warranty Period"), provided that Customer uses the Software substantially in accordance with the System Environment Specifications. "Go Live Date," when used in this Agreement, shall mean, as to any module of Software product, the first date on which Customer may use such Software to process actual data in a live production environment in the operation of Customer's business (i.e., creating a prescription, creating a charge form, dictating or creating a note, or recording a treatment).

Customer must notify Allscripts in writing within 30 days of Customer's discovery of any material defect in the Software. If, during the Warranty Period, Customer notifies Allscripts that of any material defect in the Software, such that the Software fails perform or operate in accordance with the Documentation, Allscripts shall perform a reasonable, good faith review and evaluation of the defect alleged by Customer and, within 30 days of its receipt of such Customer notice, provide notification to Customer as to whether Allscripts agrees or disagrees relative to the existence of a material defect in the Software. If the Software is found by Allscripts to be materially defective, Allscripts will promptly design, code, test and deliver amendments or alterations to the Software necessary to correct or provide a solution to any programming error attributable to Allscripts that has caused the Software to fail to perform as warranted above. Customer agrees promptly to provide documentation, in a format reasonably prescribed by Allscripts, substantiating any problems caused by an error or defect in the Software.

Allscripts does not warrant third party software products or Equipment distributed by Allscripts; the manufacturers of such third party software or Equipment may provide warranties thereto, and such warranties, if any, may accompany such products. Allscripts shall assign to Customer any and all warranties received from the manufacturer of the Equipment and shall use commercially reasonable efforts to ensure that such third party warranties are validated.

Initials 

Customer shall notify Allscripts in writing within 10 days of Customer's discovery that a third party software product or item of Equipment does not conform with its warranty, and Allscripts shall obtain the repair or replacement of the nonconforming item with product that conforms to the warranty.

Allscripts warrants that all Services provided under this Agreement will be performed professionally, in a workmanlike manner, and by individuals with appropriate skills, experience and expertise. Customer must notify Allscripts promptly if Customer is dissatisfied at any time with the performance of any Services. If Allscripts reasonably and in good faith determines that such Services were not provided in conformity with the foregoing warranty, Allscripts will arrange for the performance to be raised to the warranted level and, if necessary, for the Services to be re-performed.

THE ABOVE IS A LIMITED WARRANTY AND IT IS THE ONLY WARRANTY MADE BY ALLSCRIPTS WITH RESPECT TO THE EQUIPMENT, SERVICES AND PRODUCTS, AND THIRD PARTY PRODUCTS. ALLSCRIPTS DOES NOT MAKE, NOR DOES THE CUSTOMER RECEIVE, ANY OTHER WARRANTY, WHETHER EXPRESS OR IMPLIED, AND ALL WARRANTIES OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE, AND OF COMPATIBILITY WITH CUSTOMER'S EXISTING COMPUTER HARDWARE, SOFTWARE SYSTEM AND/OR NETWORK ARE EXPRESSLY EXCLUDED. CUSTOMER IS SOLELY RESPONSIBLE FOR IMPLEMENTING APPROPRIATE VIRUS PROTECTION PROCEDURES AND TOOLS AND SYSTEM AND NETWORK SECURITY MEASURES TO PREVENT CORRUPTION OF, OR UNAUTHORIZED ACCESS TO, THE SOFTWARE AND RELATED DATA. THE FOREGOING LIMITED WARRANTY AND ASSOCIATED REMEDIES FOR THE EQUIPMENT, SERVICES AND PRODUCTS, AND THIRD PARTY PRODUCTS, ARE CUSTOMER'S SOLE AND EXCLUSIVE WARRANTY OF PERFORMANCE REGARDING THE EQUIPMENT, SERVICES AND PRODUCTS, AND THIRD PARTY PRODUCTS, AND CUSTOMER'S SOLE AND EXCLUSIVE REMEDIES FOR BREACH OF THE LIMITED WARRANTY. EXCEPT FOR A BREACH OF CONFIDENTIALITY HEREUNDER, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, EXEMPLARY, SPECIAL, INDIRECT, PUNITIVE, OR INCIDENTAL DAMAGES ARISING FROM THIS AGREEMENT, EVEN IF ALLSCRIPTS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF GOODWILL, WORK STOPPAGE, COMPUTER FAILURE OR MALFUNCTION, OR ANY AND ALL OTHER COMMERCIAL DAMAGES OR LOSSES, PERSONAL INJURY OR PROPERTY DAMAGE. THIS EXPRESS WARRANTY IS IN LIEU OF ALL LIABILITIES OR OBLIGATIONS OF ALLSCRIPTS FOR DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE DELIVERY, USE, OR PERFORMANCE OF THE EQUIPMENT, SERVICES OR PRODUCTS, OR THIRD PARTY PRODUCTS.

Customer acknowledges that Allscripts has set its prices and entered into this Agreement in reliance upon the limitations and exclusions of liability, the disclaimers of warranties and damages and Customer's indemnity obligations set forth herein, and that the same form an essential basis of the bargain between the parties. The parties agree that the limitations and exclusions of liability and disclaimers specified in this Agreement will survive and apply even if found to have failed of their essential purpose.

## 10.  CUSTOMER RESPONSIBILITY
Customer acknowledges that it is solely responsible for inputting and retrieving data from the Products, and for the accuracy and adequacy of information and data furnished for processing. CUSTOMER ACKNOWLEDGES THAT IT SHALL HAVE FULL RESPONSIBILITY FOR THE CARE AND WELL BEING OF ITS PATIENTS, AND ANY RELIANCE BY CUSTOMER UPON THE PRODUCTS SHALL NOT DIMINISH THAT RESPONSIBILITY.

## 11.  HIPAA COMPLIANCE
Allscripts shall comply with all provisions of HIPAA applicable to a Business Associate in connection with its use and disclosure of Protected Health Information ("PHI"), as those terms are defined in HIPAA. In particular, Allscripts will: (i) not use or further disclose PHI other than as permitted or required by the Agreement or as required by law; (ii) use appropriate safeguards to prevent use or disclosure of PHI other than as provided for by the Agreement; (iii) implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the electronic PHI that Allscripts creates, receives, maintains, or transmits on behalf of Customer, (iv) report to Customer within thirty (30) days any use or disclosure of PHI not provided for by the Agreement or any security incident of which it becomes aware; (v) ensure that any agents, including a subcontractor, to whom it provides PHI received from, or created or received by it on behalf of, Customer agree in writing to the same restrictions and conditions that apply to it with respect to such information; (vi) make available to Customer within fifteen (15) days of a request for PHI in accordance with § 164.524 of the HIPAA regulations; (vii) within fifteen (15) days of a request for an amendment, make available PHI for amendment and incorporate any amendments to PHI in accordance with §164.526 of the HIPAA regulations; (viii) within fifteen (15) days of receiving a request from Customer, make available the information required to provide an accounting of disclosures in accordance with § 164.528 of the HIPAA regulations; (ix) make its internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by it on behalf of, the Customer available to the Secretary of the U.S. Department of Health and Human Services for purposes of determining the Customer's compliance with HIPAA; and (x) at termination of the Agreement, if feasible, return or destroy all PHI received from, or created or received by it on behalf of, Customer that it still maintains in any form and retain no copies of such



information or, if such return or destruction is not feasible, extend the protections of the contract to the information and limit further uses and disclosures to those purposes that make the return or destruction of the information infeasible. In the event an individual requests access to PHI directly from AllScripts or an accounting of disclosures of PHI directly from Allscripts, Allscripts shall forward such request to Customer within ten (10) days.

Provided that the use or disclosure would be permissible if made by Customer, Allscripts may use or disclose PHI as necessary for the following purposes: (i) loading the Software at Customer's Site(s); (ii) interfacing the Software with other software used by Customer; (iii) training Customer and its users in the use of the Products; (iv) providing on-site Support Services to Customer and its users; (v) providing help desk Support Services to Customer and its users; (vi) repairing the Products; (vii) upgrading the Products; (viii) updating information on the Software; (ix) transmitting prescriptions, dictations, claims, orders, results or other records as requested by Customer, its users and/or the patient; (x) to another covered entity, either directly or through its business associate, in connection with a use for which the HIPAA privacy rule allows such disclosure by Customer; (xi) any other purpose which supports the intended use of the Software by Customer or its users; or (xii) for its proper management and administration or to carry out its legal responsibilities, provided that such disclosures are required by law, or Allscripts obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used on further disclosed only as required by law or for the purpose for which it was disclosed to the person, and the person notifies Allscripts of any instances of which it is aware in which the confidentiality of the information has been breached. Allscripts shall not use or disclose to others any PHI, including but not limited to de-identified and aggregated PHI, without Customer's prior written consent.

Customer shall notify Allscripts of (i) any limitation(s) in its notice of privacy practices of Customer in accordance with 45 C.F.R. § 164.520, to the extent that such limitation may affect Allscripts' use or disclosure of PHI; (ii) any changes in, or revocation of, permission by an individual to use or disclose PHI, to the extent that such changes may affect Allscripts' use or disclosure of PHI; and (iii) any restriction to the use or disclosure of PHI that Customer has agreed to in accordance with 45 C.F.R. § 164.522, to the extent that such restriction may affect Allscripts' use or disclosure of PHI.

Customer may terminate this Agreement if Customer determines that Allscripts has violated a material term of the preceding two paragraphs of this section and Allscripts does not cure such violation within thirty (30) days of receipt of written notice from Customer.

Customer and users will request from their patients all requisite written consents in order to utilize the capabilities of the Products in compliance with applicable laws and regulations, including, but not limited to HIPAA, and to carry out the purposes of this Agreement.

## 12. TERM AND TERMINATION
Either party may terminate this Agreement upon prior written notice to the other party: (a) in the event of a material breach by the other party, unless the breach is cured within 30 days of the termination notice; or (b) in the event of the voluntary or involuntary bankruptcy, dissolution or insolvency of the other party. Upon termination of this Agreement, all amounts payable to Allscripts and/or credits to Customer in accordance with this Agreement shall be made or given promptly. Upon termination of this Agreement, all licenses and rights granted hereunder shall terminate, Customer will cease all use of the Software, and Customer will, at its expense, immediately uninstall and return to Allscripts the applicable Software, all duplicates thereof, and any Proprietary Information, together with any and all documents, notes and other materials relating to the Software, including, without limitation, all Proprietary Information and all copies and extracts of the foregoing and all documentation and copies thereof, and any associated Equipment specified for return. Upon termination, the following Sections of this Agreement will otherwise survive and remain in effect: 3, 4, 8, 9, 12, 13 and 14.

## 13. INDEMNIFICATION
Customer agrees to indemnify, defend and hold harmless Allscripts and its officers, directors, employees and agents, from and against any and all third party losses, claims, damages, costs, charges, expenses, liabilities, demands, proceedings and actions, including, without limitation, reasonable attorneys' fees, expenses and costs of defense, arising out of injuries to persons (including death) or damage to property which may be sustained or incurred as a result of or by reason of (a) the negligence, recklessness, or willful misconduct of Customer or its agents and employees; (b) any unauthorized action or omission of Customer or its agents and employees; (c) any breach or alleged breach of any applicable laws or regulations relating to the gathering, transmission, processing, use, receipt, reporting, disclosure, maintenance, storage, or other treatment of confidential patient information, including, but not limited to, HIPAA; (d) any claim of infringement of patents, trade marks, industrial designs, copyrights, or other intellectual property rights if such claim shall be due to Customer's alteration, modification or adjustment of the Software; (e) a taxing jurisdiction's refusal to recognize any of Customer's exemption certificates or Customer's failure to properly obtain or maintain such certificates; and (f) Customer's breach of any representation, warranty or covenant under this Agreement, or its failure to otherwise comply with any obligation under any such agreement.

Initials

Allscripts agrees to indemnify, defend and hold harmless Customer and its officers, directors, employees and agents, from and against any and all losses, claims, damages, costs, charges, expenses, liabilities, demands, proceedings and actions, including, without limitation, attorneys' fees, expenses, and costs of defense, arising out of injuries to persons (including death) or damage to property which may be sustained or incurred as a result of or by reason of (a) the negligence, recklessness, or willful misconduct of Allscripts or its agents and employees; (b) any unauthorized action or omission of Allscripts or its agents and employees; (c) any breach or alleged breach of any applicable laws or regulations relating to the gathering, transmission, processing, use, receipt, reporting, disclosure, maintenance, storage, or other treatment of confidential patient information, including, but not limited to, HIPAA; (d) Allscripts' breach of any representation, warranty or covenant under this Agreement or any related agreement, or its failure to otherwise comply with any obligation under any such agreement, and (e) any claim that any Software infringes any intellectual property right or misappropriates a trade secret, provided that (i) Customer promptly notifies Allscripts in writing of the claim or action and (ii) Allscripts has sole control of the defense and settlement of the claim or action.

In defending against any claim or action pursuant to clause (e) above, Allscripts may at its option procure for Customer the right to continue using the Software, or modify or replace the Software so that it no longer infringes, to the extent that the exercise of any option does not result in a material adverse change in the material operational characteristics of the Software, and so long as equivalent functions and performance provided by the Software remain following implementation of the option. If Allscripts concludes in its judgment that none of the foregoing options is reasonable or practicable, then Allscripts may terminate the license to the Software, upon which Customer will return the original and all whole or partial copies of the Software to Allscripts and, if Customer has purchased a term license, Allscripts shall refund to Customer an amount equal to the pro rata portion of the license fees-paid by Customer proportionate to the remainder of the license term. Allscripts has no liability with respect to patent infringement or trade secret misappropriation to the extent arising out of modifications of the Software made to Customer's written order or written specification or use of the Software in combination with other software, products or equipment not specified in this Agreement.

## 14. CONFIDENTIALITY

Allscripts and Customer shall take all steps and do all things reasonably necessary to ensure that the terms of this Agreement and Proprietary Information acquired pursuant to this Agreement shall not be disclosed to others, provided, however, that the foregoing shall not apply to information: (i) that recipient party can show was known to it prior to disclosure by the other party; (ii) that is or becomes public knowledge through no fault of the party to whom disclosure is made, (iii) that is independently developed by the other party without use of the other party's information, (iv) that is required by law to be disclosed, or (v) that is necessary to be disclosed in order to carry out the purposes of this Agreement. For purposes of this Agreement, the term "Proprietary Information" means all non-public information concerning either party, its subsidiaries and affiliates, and their respective officers, agents, employees, consultants, licensors, suppliers and customers, including but not limited to trade secrets, know-how, inventions (whether or not patentable), techniques, processes, programs, ideas, algorithms, schematics, testing procedures, software design and architecture, computer code, systems configurations, technologies, data files, internal documentation, design and function specifications, product requirements, problem reports, analysis and performance information, software documents, initiatives, and other technical, business, product, marketing and financial information, plans, data, projections and reports.

Both parties agree that any breach of the confidentiality obligations under this Section may result in irreparable damage for which there is no adequate remedy at law. Therefore, it is agreed that the non-breaching party shall be entitled to equitable relief, without the necessity of posting a bond or other undertaking, including permanent injunctive relief enjoining such breach, by a court of competent jurisdiction, in addition to whatever remedies it may have at law. This provision will survive the termination of this Agreement.

## 15. MISCELLANEOUS

(a) Customer agrees to designate a "Site Coordinator" whose daily duties will include, but not be limited to: (i) checking that the Products are functioning, (ii) managing inventory needs, when applicable, (iii) providing ongoing training to users, (iv) running reports to meet the Customer's needs, (v) acting as the primary contact between Customer and Allscripts.

(b) Each party shall secure and maintain professional liability and general liability insurance coverage as necessary to cover its indemnity obligations pursuant to this Agreement, but not less than $1 million per occurrence and $2 million aggregate annual limits, and, upon request, provide the other party with a certificate of insurance evidencing such coverage.

(c) Allscripts is an independent contractor of Customer hereunder, and nothing herein shall be deemed to create a partnership, joint venture, employment, or similar relationship.

(d) This Agreement is binding on the parties, their successors and assigns, provided that neither party may assign this Agreement without the prior written consent of the other party except for (i) assignment to affiliates or (ii) assignment as part of the sale of all or substantially all of the assets of such party.

Initials 

(e) Failure by a party to enforce noncompliance with any term of this Agreement shall not act as a waiver of any other act of noncompliance of that or any other provision hereof or any right or remedy hereunder.

(f) Except for payment obligations, neither party shall be liable for failure or delay of performance for reasons beyond the reasonable control of that party provided, however, if a party is so delayed or prevented from performing its obligations under this Agreement for a period of sixty (60) consecutive days, the other party shall have the immediate right to terminate this Agreement at the end of such sixty (60) consecutive-day period, without any right of cure on the party so delayed. Notwithstanding anything set forth in the Agreement, no amounts shall accrue or be payable during the continuance of a force majeure event.

(g) This Agreement shall be governed in accordance with the laws of the State of Illinois.

(h) All notices given under this Agreement shall be in writing and be deemed to have been given upon personal delivery, or upon delivery to the address provided below (or such other address as to which proper notice is given hereunder) by a reputable overnight courier providing written evidence of delivery or by facsimile transmission (to the fax number provided below) with proof of transmittal.

(i) In the event that any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable, the remaining provisions of the Agreement will not be affected, unless the absence of the invalidated provision adversely affects the substantive rights of the parties, in which case, the parties agree to replace any such provision or parts thereof with new provision(s) that closely approximate the economic and proprietary results intended by the parties.

(j) This Agreement, including all Schedules, Exhibits or other attachments, constitutes the entire agreement between the parties with respect to the subject matters hereof and supersedes all prior agreements and understandings related to such subject matters. No contrary terms or conditions of any subsequent Customer purchase order, no course of dealing, trade, custom or usage of trade, and no warranty or promise made during the course of performance, will vary or contradict the terms of this Agreement, unless expressly agreed to in writing.

(k) Each party agrees that it shall not, during the term of this Agreement and for one (1) year after such employee leaves the employ of the other party, solicit, entice or hire, directly as an employee or indirectly as a contractor or subcontractor, or in any other capacity, any person who is or was an employee of the other during the term of this Agreement.

IN WITNESS WHEREOF, authorized representatives of the parties have signed this Agreement

Customer: Tennessee Oncology, PLLC

By: _____
Name: _Charles McKay_____
Title: __CEO_____
Date: __6/30/05_____
Business Address: 300 20ᵗʰ Avenue North, Ste. 301
                  Nashville, TN  37202

Tel: _____
Fax: _____
E-mail: _____

Customer's Billing Information:

Name: _____
Business Address: _____
_____
_____
Fax: _____

Customer: Please complete Schedule 6

Attachments

Schedules
Schedule 1 - Site Schedule
Schedule 2 - Terms Applicable to Software Modules
Schedule 3 - Equipment Schedule
Schedule 4 - Payment Schedule
Schedule 5 - Rx+ SubSchedule
Schedule 6 - Primary Contacts

Exhibits
Exhibit A - System Environment Specifications
Exhibit B - Statement of Work
Exhibit C - TouchWorks Support Manual
Exhibit D - Confidentiality and Assignment Agreement
Exhibit E - Source Code Escrow Agreement

Allscripts, LLC

By: _____
Name: _JOSEPH  E. CAREY_____
Title: __C.O.O._____
Date: __06 30 2005_____
Business Address:  222 Merchandise Mart Plaza
                   Suite 2024
                   Chicago, IL  60654

Sales Executive: _____
Fax:  800-826-2079

## SCHEDULE 1
## SITE SCHEDULE

THIS SCHEDULE 1 is made as of June__, 2005 (the "Effective Date"), by and between Allscripts and Tennessee Oncology, PLLC ("Customer"). This Schedule is a part of the TouchWorks System Agreement dated June__, 2005 (the "Agreement"), and, with respect to the Products, modifies, supplements and amends the Agreement. In the event of any inconsistency between the terms of this Schedule and the terms of the Agreement, the terms of this Schedule shall govern and control. In all other respects, the Agreement is and shall remain in full force and effect. Unless expressly indicated to the contrary hereinbelow, the defined terms used in the Schedule shall have the meanings ascribed to them in the Agreement.

If any Site is operated or owned by a legal entity other than Customer, Customer agrees that it shall obtain the Site's agreement to all of the terms and conditions of this Agreement, including that Allscripts may enforce the terms and conditions of this Agreement directly against the Site.

Customer agrees to use the Software only in accordance with its directions for use and only at the address(es) identified below (each of which will use ALL Products selected in the box on the first page of the Agreement, unless indicated otherwise below). Such list may be updated by Customer from time to time, upon written notice to Allscripts.

|  Site Name and Location | Exceptions to Product Use (Specify ONLY the Products selected on page 1 that the Site WILL NOT be using) |
|---|---|
| Name: Tennessee Oncology, PLLC<br>Address: 300 20th Avenue North, Ste. 301<br>City: Nashville State: TN Zip Code: 37203<br>Phone Number: _____<br>Fax Number: _____ |  |
| Name: _____<br>Address: _____<br>City: _____ State: ___ Zip Code: _____<br>Phone Number: _____<br>Fax Number: _____ |  |
| Name: _____<br>Address: _____<br>City: _____ State: ___ Zip Code: _____<br>Phone Number: _____<br>Fax Number: _____ |  |
| Name: _____<br>Address: _____<br>City: _____ State: ___ Zip Code: _____<br>Phone Number: _____<br>Fax Number: _____ |  |

## SCHEDULE 2
## TERMS APPLICABLE TO SOFTWARE MODULES

THIS SCHEDULE 2 (the "Schedule") is made as of June__, 2005 (the "Effective Date"), by and between Allscripts and Tennessee Oncology, PLLC ("Customer.") This Schedule is a part of the TouchWorks System Agreement dated June__, 2005 (the "Agreement") and, with respect to the Software, modifies, supplements and amends the Agreement. In the event of any inconsistency between the terms of this Schedule and the terms of the Agreement, the terms of this Schedule shall govern and control. In all other respects, the Agreement is and shall remain in full force and effect. Unless expressly indicated to the contrary hereinbelow, the terms defined in the Agreement shall have the same meanings when used in this Schedule.

### TERMS APPLICABLE TO TOUCHWORKS PHYSICIAN HOMEBASE®

**Advertisements/Links To Or From Third Party Websites.** Advertisements and/or links to other World Wide Web sites or resources may be available via the TouchWorks Physician Homebase product. ALLSCRIPTS DOES NOT RECOMMEND OR ENDORSE THE USE OF ANY THIRD PARTY WEBSITES, RESOURCES, PRODUCTS OR SERVICES OF ANY PERSON. ALLSCRIPTS ASSUMES NO LIABILITY TO CUSTOMER, CUSTOMER'S AUTHORIZED USERS OR ANYONE ELSE FOR USE OF ANY THIRD PARTY WEBSITES, ADVERTISEMENTS, RESOURCES, PRODUCTS OR SERVICES ACCESSIBLE VIA TOUCHWORKS PHYSICIAN HOMEBASE. Customer acknowledges and agrees that Allscripts shall not be responsible or liable for any loss or damage of any kind incurred in connection with any third party websites, advertisements, products, services or resources or as the result of the presence of such third parties or links on TouchWorks Physician Homebase.

**Content.** Any content available via the TouchWorks Physician Homebase product is not a substitute for the professional judgment of healthcare providers in diagnosing and treating patients. Allscripts does not give medical advice nor does it provide medical or diagnosis services. Allscripts is not responsible for the accuracy, timeliness, completeness, appropriateness or helpfulness of any content. Reliance by Customer and Customer's users upon information and content obtained through TouchWorks Physician Homebase is solely at the risk of Customer and Customer's users.

**Customer's Content.** At Customer's request, Allscripts shall place Customer's tradename or logo and links to other content requested by Customer on the TouchWorks Physician Homebase product. Customer shall provide Allscripts with all materials necessary to customize the TouchWorks Physician Homebase product in a format specified by Allscripts. Customer assumes sole responsibility for (a) acquiring any authorization(s) necessary for hypertext links to third party web sites, and (b) ensuring that Customer's tradename, logo and any hypertext links do not infringe or violate any right of any third party. Allscripts reserves the right, upon ___ days prior written notice to Customer, but in Allscripts' good faith and reasonable discretion, to exclude or remove from the TouchWorks Physician Homebase product any hypertext links to third party web sites, Customer's tradename or logo, or other content supplied by Customer which in Allscripts' sole reasonable discretion, may violates or infringes any law or third party rights or which otherwise exposes or potentially exposes Allscripts to civil or criminal liability. Customer shall not request that Allscripts place or cause to be placed on the TouchWorks Physician Homebase product any content containing any materials that are obscene, threatening, malicious, which infringe on or violate any applicable law or regulation or any proprietary, contract, privacy or other third party right, or which otherwise exposes, or potentially exposes, Allscripts to civil or criminal liability. During the term of this Agreement, Customer hereby grants Allscripts a limited, nontransferable nonexclusive, revocable, royalty-free license to use Customer's content, data, designs, trademarks, trade dress, service marks and other work, as specified in writing or otherwise provided by Customer to Allscripts, for the sole purpose of and only so far as is necessary for Allscripts to provide the services described and authorized herein with respect to incorporating Customer content on the TouchWorks Physician Homebase product; provided however that such use shall be in strict accordance with Customer policies that Allscripts is made aware of in a timely manner, and Allscripts shall promptly change the manner of such use if requested to do so by Customer. Customer warrants that it is legally permitted to provide such content, data, designs, trademarks, trade dress, service marks and other documents to Allscripts.

### TERMS APPLICABLE TO TOUCHWORKS CHARGE™

TOUCHWORKS CHARGE CONTAINS FUNCTIONS SUPPORTING THE PREPARATION AND SUBMISSION OF CLAIMS. CUSTOMER IS SOLELY RESPONSIBLE (AND ALLSCRIPTS IS NOT RESPONSIBLE) FOR THE PROPER, COMPLETE AND ACCURATE SUBMISSION OF CLAIMS, INCLUDING WITHOUT LIMITATION THE DETERMINATION OF PROPER BILLING AND DIAGNOSIS CODES AND THE MAINTENANCE OF PATIENT MEDICAL RECORDS CONTAINING APPROPRIATE DOCUMENTATION OF THE SERVICES BILLED. ALLSCRIPTS SHALL HAVE NO LIABILITY WHATSOEVER FOR IMPROPER CLAIMS SUBMITTED BY CUSTOMER AS A RESULT OF CUSTOMER'S MISUSE OF TOUCHWORKS CHARGE. CUSTOMER AGREES TO INDEMNIFY AND HOLD HARMLESS ALLSCRIPTS AND ITS SUPPLIERS FROM AND AGAINST ANY AND ALL THIRD PARTY CLAIMS, DAMAGES OR PENALTIES ARISING OUT OF OR RELATED TO CUSTOMER'S

Initials 

MISUSE OF TOUCHWORKS CHARGE NOT IN ACCORDANCE WITH OR OTHERWISE PERMITTED UNDER THIS AGREEMENT.

CUSTOMER MAY NOT USE TOUCHWORKS CHARGE TO PERFORM MEDICAL DIAGNOSTIC FUNCTIONS, SET TREATMENT PROCEDURES OR SUBSTITUTE FOR THE MEDICAL JUDGMENT OF A PHYSICIAN OR QUALIFIED HEALTHCARE PROVIDER. WHEN SELECTING A NARRATIVE CONDITION OR CODED DIAGNOSIS (ICD-9-CM), CUSTOMER MUST MAKE AN INDEPENDENT AND INFORMED JUDGMENT, BASED UPON THE PATIENT'S CONDITION AND SYMPTOMS AND/OR A PHYSICIAN'S SUBMITTED DIAGNOSIS, TO SELECT A DIAGNOSIS CODE APPROPRIATE FOR THAT PATIENT. NEITHER ALLSCRIPTS NOR ITS LICENSORS MAKE ANY REPRESENTATION OR WARRANTY REGARDING THE APPROPRIATENESS OF ANY OF THE NARRATIVE OR CODED DIAGNOSIS CODES ASSIGNED TO ANY OR ALL PATIENTS.

SINCE IT IS POSSIBLE THAT A PAYOR'S LOCAL MEDICAL REVIEW POLICIES MAY BE IN EFFECT PRIOR TO THEIR RECEIPT OR UPDATE BY ALLSCRIPTS OR ITS LICENSORS, CUSTOMER, AS A PROVIDER UNDER FEDERAL HEALTH CARE PROGRAMS, ASSUMES RESPONSIBILITY FOR THE ACCURACY OF ALL CLAIMS SUBMITTED FOR SERVICES PERFORMED FOR MEDICARE BENEFICIARIES.

## TERMS APPLICABLE TO TOUCHWORKS ORDER™

CUSTOMER MAY NOT USE TOUCHWORKS ORDER TO PERFORM MEDICAL DIAGNOSTIC FUNCTIONS, SET TREATMENT PROCEDURES OR SUBSTITUTE FOR THE MEDICAL JUDGMENT OF A PHYSICIAN OR QUALIFIED HEALTHCARE PROVIDER. WHEN SELECTING A NARRATIVE CONDITION OR CODED DIAGNOSIS (ICD-9-CM), CUSTOMER MUST MAKE AN INDEPENDENT AND INFORMED JUDGMENT, BASED UPON THE PATIENT'S CONDITION AND SYMPTOMS AND/OR A PHYSICIAN'S SUBMITTED DIAGNOSIS, TO SELECT A DIAGNOSIS CODE APPROPRIATE FOR THAT PATIENT. NEITHER ALLSCRIPTS NOR ITS LICENSORS MAKE ANY REPRESENTATION OR WARRANTY REGARDING THE APPROPRIATENESS OF ANY OF THE NARRATIVE OR CODED DIAGNOSIS CODES ASSIGNED TO ANY OR ALL PATIENTS.

## TERMS APPLICABLE TO TOUCHWORKS NOTE™

TouchWorks Note contains the Medcin nomenclature. The Medcin nomenclature and its related files are a work in progress, are not complete, and will always contain errors due to the constant changes in the field of medicine as it evolves. The Medcin Expert file contains diagnostic information to support a process called Intelligent Prompting, the sole intent of which is to provide a list containing one or more potentially relevant findings for the documentation of what the provider has already done. The Intelligent Prompting list, or any other list provided by Medcin or by applications using Medcin, should never be used for decision support as it contains tests, therapy and other items that, although relevant for some patients, would be harmful or even fatal for other patients. The findings prompted by the Intelligent Prompting option are for purposes of documentation only and are not meant to suggest any procedures, medications or physical findings for the patient.

Customer agrees that the sole and exclusive responsibility for any medical decisions or actions with respect to the patient's medical care and for determining the accuracy, completeness, or appropriateness of any diagnostic, clinical, billing, or medical information provided by the TouchWorks Note Software and any underlying clinical database resides solely with the health care provider. Allscripts and Medicomp Systems, Inc. assume no responsibility for how such materials are used. The choice with regard to when and how to use the TouchWorks Note Software and any database for patient medical records is the health care provider's responsibility and this program and any database is to be used at the health care provider's discretion. Customer understands and agrees that the responsibility for the medical treatment, and the billing for such treatment, rests with the health care provider and revolves around the health care provider's judgment and the health care provider's analysis of the patient's condition. In addition, Customer agrees that the Intelligent Prompting Option is a tool available to the health care provider for augmenting the documentation of the patient's electronic medical records and is not intended in any way to eliminate, replace, or substitute for, in whole or in part, the health care provider's judgment and analysis of patient's condition.

## TERMS APPLICABLE TO TOUCHWORKS RX+™

TouchWorks Rx+ facilitates point-of-care electronic prescribing through Allscripts' proprietary prescribing system. Customer will use its best efforts to have all physicians at the Site input into the TouchWorks Rx+ system all of the original prescriptions they write at the Site, regardless of whether such prescriptions are to be dispensed at the Site. Customer will complete the SubSchedule attached to this Schedule.

Customer will be responsible for the assignment of access and usage privileges to users of the Product. Such assignment shall be in conformity with applicable laws and regulations, including but not limited to those related to proper licensure of users. Customer will be responsible for ensuring that the licensing information and the dates for permitted use of the Product are correctly entered and updated. Allscripts is responsible for neither the granting nor monitoring of user privileges to the Product nor any incorrect entry or lack of updating of licensing information by Customer.

Initials 

Because of the rapidly changing legal and regulatory environment (particularly with regard to state requirements applicable to electronic prescribing and dispensing of medication), the information in the Product may not be current, and accordingly, Customer should not rely solely upon the Product for such information. In particular, Customer is solely responsible for knowing and complying with all applicable laws and regulations with respect to faxing or electronically transmitting a prescription.

The laws of each state may vary on their treatment of the Drug Enforcement Agency's ("DEA") classes of drugs. Customer is responsible for verifying that the DEA class is correct for each prescription that Customer or its permitted users transmit via electronic transmission. With respect to generic drugs, Customer is responsible for verifying that generic drugs, offered in their respective classes, are properly classified according to FDA regulations and guidelines. In prescribing generic drugs using the Product, Customer accepts sole responsibility for the prescription of the generic drug for the patient, the complete review of the drug, and an understanding of its proper uses. In selecting a generic drug, the Customer accepts sole responsibility for any payor issues arising due to classification of the generic drugs.

With respect to Drug Utilization Review (including, but not limited to, Drug to Drug interactions, Drug to Food interactions, Drug to Alcohol interactions, Dose Checking, Allergy Checking, and Prior Adverse Reaction Screening), the presence or absence of any warning through the Product does not imply that any drug being prescribed, or having been prescribed, is suitable or safe for the patient for whom it is being, or has been, prescribed, or for any other patient. The clinical information presented by the Product is generalized and may not be appropriate for any given patient.

TERMS APPLICABLE TO TOUCHWORKS SCAN™
Customer is solely responsible for the information entered into TouchWorks Scan and for creating and maintaining backups of such information.

Initials: CM

| 042 | 1Riser,ROMB,PCI-X,PE2850 | Inc. | | |
| 043 | 173GB,U320,SCSI,1IN 10K,PE2850 | Inc. | | |
| 044 | 11.44MB Floppy Drive | Inc. | | |
| 045 | 1Dual On-Board NICS ONLY | Inc. | | |
| 046 | 124X IDE CD-ROM | Inc. | | |
| 047 | 1Bezel for PE2850 | Inc. | | |
| 048 | 11x6 Hard Drive Backplane PE2850 | Inc. | | |
| 049 | Electronic Documentation and OpenManage CD Kit, 1PE2850 | Inc. | | |
| 050 | 1Motherboard SCSI, No RAID PE2850 | Inc. | | |
| 051 | Rack Chassis w/Versarail RoundHole-Universal for 3rd-1party racks, PE2850 | Inc. | | |
| 052 | Type 2 Contract Same Day 4HR Parts and Labor On-1Site Response,Initial Year and 2 yr extended | Inc. | | |
| 053 | 1OpenManage Server Subscription4 Editions, 1 Year | Inc. | | |
| 054 | Redundant Power Supply With Straight Cords,No Y-1Cord PE2850 | Inc. | | |
| 055 | 1PCI Sound Card | Inc. | | |
| 056 | 1Windows 2003 Server | | $ | 855.43 |
| 057 | 1Windows 2000 Server Media Kit | Inc. | | |
| 058 | Microsoft SQL Server 2000 Standard Runtime (ISV 1Royalty) | Inc. | | |
| 059 | 1Microsoft SQL Server 2000 Standard Edition Media Kit | Inc. | | |
| 060 | | Subtotal | $ | 3,869.08 |
| 061 | | | | |
| 062 | **TouchWorks Analytics Server** | | | |
| 063 | 3.2GHz/1MB Cache, Xeon, 800MHzFront Side Bus for 1PowerEdge 2850 | | $ | 2,963.06 |
| 064 | (2) 72GB 10K U320 UNI HDD ALL (Rd1-OS - Shared 0Storage) | Inc. | | |
| 065 | (2) 72GB 10K U320 UNI HDD ALL (Rd5 - Data - Shared 0Storage) | Inc. | | |
| 066 | 12GB DDR2 400MHz (2X1GB) Single Ranked DIMMs | Inc. | | |
| 067 | 1Riser,ROMB,PCI-X,PE2850 | Inc. | | |
| 068 | 173GB,U320,SCSI,1IN 10K,PE2850 | Inc. | | |
| 069 | 11.44MB Floppy Drive | Inc. | | |
| 070 | 1Dual On-Board NICS ONLY | Inc. | | |
| 071 | 124X IDE CD-ROM | Inc. | | |
| 072 | 1Bezel for PE2850 | Inc. | | |
| 073 | 11x6 Hard Drive Backplane PE2850 | Inc. | | |
| 074 | Electronic Documentation and OpenManage CD Kit, 1PE2850 | Inc. | | |
| 075 | 1Motherboard SCSI, No RAID PE2850 | Inc. | | |
| 076 | Rack Chassis w/Versarail RoundHole-Universal for 3rd-1party racks, PE2850 | Inc. | | |
| 077 | Type 2 Contract Same Day 4HR Parts and Labor On-1Site Response,Initial Year and 2 yr extended | Inc. | | |
| 078 | 1OpenManage Server Subscription4 Editions, 1 Year | Inc. | | |
| 079 | Redundant Power Supply With Straight Cords,No Y-1Cord PE2850 | Inc. | | |

| 080 | 1PCI Modem | Inc. | | |
|-----|-----------|------|---|---|
| 081 | 1Windows 2003 Server | | $ | 855.43 |
| 082 | 1Windows 2000 Server Media Kit | Inc. | | |
| 083 | Microsoft SQL Server 2000 Standard Runtime (ISV 1Royalty) | Inc. | | |
| 084 | 1Microsoft SQL Server 2000 Standard Edition Media Kit | Inc. | | |
| 085 | | Subtotal | $ | 3,818.48 |
| 086 | | | | |
| 087 | **Load Balanced Web Servers** | | | |
| 088 | 3.4GHz/1MB Cache, Xeon, 800MHzFront Side Bus for 2PowerEdge 2850 | | $ | 5,926.98 |
| 089 | 473GB,U320,SCSI,1IN 10K,PE2850 | Inc. | | |
| 090 | 21GB DDR2 400MHz (2X512MB) Single Ranked DIMMs | Inc. | | |
| 091 | 2Riser,ROMB,PCI-X,PE2850 | Inc. | | |
| 092 | 2Embedded RAID - PERC4 Embedded Integrated | Inc. | | |
| 093 | 21.44MB Floppy Drive | Inc. | | |
| 094 | 2Dual On-Board NICS ONLY | Inc. | | |
| 095 | 224X IDE CD-ROM | Inc. | | |
| 096 | 2Bezel for PE2850 | Inc. | | |
| 097 | 21x6 Hard Drive Backplane PE2850 | Inc. | | |
| 098 | Electronic Documentation and OpenManage CD Kit, 2PE2850 | Inc. | | |
| 099 | MR1, ROMB RAID 1, Drives attached to 2PERC4ei,PE2850 | Inc. | | |
| 100 | Rack Chassis w/Versarail RoundHole-Universal for 3rd-2party racks, PE2850 | Inc. | | |
| 101 | Type 2 Contract Same Day 4HR Parts and Labor On-2Site Response,Initial Year and 2 yr extended | Inc. | | |
| 102 | Redundant Power Supply With Straight Cords,No Y-2Cord PE2850 | Inc. | | |
| 103 | CISCO 11501 CONTENT SERVICES SWITCH WITH 2AC AND HARD DISK | | $ | 17,731.71 |
| 104 | MAINTENANCE 1 YR NBD 8x5 SMARTNET CAT 210(ESD) | Inc. | | |
| 105 | 2Windows 2003 Server | | $ | 1,768.25 |
| 106 | 2Windows 2000 Server Media Kit | Inc. | | |
| 107 | 2SQL SVR Ent 2000 1 Clt Runtime + software assurance | Inc. | | |
| 108 | 0CRYSTAL REPORTS 10 PRO FULL PRODUCT | Inc. | | |
| 109 | (Crystal Reports will be needed if custom reports are created.) | Subtotal | $ | 25,426.94 |
| 110 | | | | |
| 111 | **Test Server** | | | |
| 112 | 3.4GHz/1MB Cache, Xeon, 800MHzFront Side Bus for 1PowerEdge 2850 | | $ | 3,089.81 |
| 113 | 11GB DDR2 400MHz (2X512MB) Single Ranked DIMMs | Inc. | | |
| 114 | 273GB,U320,SCSI,1IN 10K,PE2850 | Inc. | | |
| 115 | 1Riser,ROMB,PCI-X,PE2850 | Inc. | | |

| | | | | |
|---|---|---|---|---|
| 116 | 1Embedded RAID - PERC4 Embedded Integrated | Inc. | | |
| 117 | 11.44MB Floppy Drive | Inc. | | |
| 118 | 1Dual On-Board NICS ONLY | Inc. | | |
| 119 | 124X IDE CD-ROM | Inc. | | |
| 120 | 1Bezel for PE2850 | Inc. | | |
| 121 | 11x6 Hard Drive Backplane PE2850 | Inc. | | |
| 122 | Electronic Documentation and OpenManage CD Kit, 1PE2850 | Inc. | | |
| 123 | MR1, ROMB RAID 1, Drives attached to 1PERC4el,PE2850 | Inc. | | |
| 124 | Rack Chassis w/Versarail RoundHole-Universal for 3rd-1party racks, PE2850 | Inc. | | |
| 125 | Type 2 Contract Same Day 4HR Parts and Labor On-1Site Response,Initial Year and 2 yr extended | Inc. | | |
| 126 | Redundant Power Supply With Straight Cords,No Y-1Cord PE2850 | Inc. | | |
| 127 | 1PCI Modem | Inc. | | |
| 128 | 1PCI Sound Card | Inc. | | |
| 129 | 1Windows 2003 Server | | $ | 855.43 |
| 130 | 1Windows 2000 Server Media Kit | Inc. | | |
| 131 | Microsoft SQL Server 2000 Standard Runtime (ISV 1Royalty) | Inc. | | |
| 132 | 1Microsoft SQL Server 2000 Standard Edition Media Kit | Inc. | | |
| 133 | 0CRYSTAL REPORTS 10 PRO FULL PRODUCT | Inc. | | |
| 134 | | Subtotal | $ | 3,945.24 |
| 135 | | | | |
| 136 | **Print Center Server** | | | . . |
| 137 | 3.4GHz/1MB Cache, Xeon, 800MHzFront Side Bus for 1PowerEdge 2850 | | $ | 3,039.21 |
| 138 | 11GB DDR2 400MHz (2X512MB) Single Ranked DIMMs | Inc. | | |
| 139 | 273GB,U320,SCSI,1IN 10K,PE2850 | Inc. | | |
| 140 | 1Riser,ROMB,PCI-X,PE2850 | Inc. | | |
| 141 | 1Embedded RAID - PERC4 Embedded Integrated | Inc. | | |
| 142 | 11.44MB Floppy Drive | Inc. | | |
| 143 | 1Dual On-Board NICS ONLY | Inc. | | |
| 144 | 124X IDE CD-ROM | Inc. | | |
| 145 | 1Bezel for PE2850 | Inc. | | |
| 146 | 11x6 Hard Drive Backplane PE2850 | Inc. | | |
| 147 | Electronic Documentation and OpenManage CD Kit, 1PE2850 | Inc. | | |
| 148 | MR1, ROMB RAID 1, Drives attached to 1PERC4ei,PE2850 | Inc. | | |
| 149 | Rack Chassis w/Versarail RoundHole-Universal for 3rd-1party racks, PE2850 | Inc. | | |
| 150 | Type 2 Contract Same Day 4HR Parts and Labor On-1Site Response,Initial Year and 2 yr extended | Inc. | | |
| 151 | Redundant Power Supply With Straight Cords,No Y-1Cord PE2850 | Inc. | | |
| 152 | 2PCI Modem | Inc. | | |

| | | | |
|---|---|---|---|
| 153 | 1Windows 2003 Server | $ | 884.13 |
| 154 | 1Windows 2003 Server Media Kit | Inc. | |
| | | | |
| 155 | 1SQL SVR Ent 2000 1 Clt Runtime + software assurance Inc. | | |
| 156 | 0CRYSTAL REPORTS 10 PRO FULL PRODUCT | Inc. | |
| 157 | | Subtotal   $ | 3,923.34 |
| 158 | | | |
| 159 | **Virus Protection Software** | | |
| 160 | 2Symantec antiVirus Smal Business 9.0 5U Retail CD | $240.35 | $480.70 |
| 161 | | Subtotal | $480.70 |
| 162 | | | |
| 163 | **Server Installation Services** | | |
| 164 | Per server cost for Allscripts-supplied Installation services for hardware integration, Windows 2000 servers, and Microsoft SQL/Server database. Does not include configuration of Cisco load balancing switch. 4Travel and expenses not included. | $500.00 | $2,000.00 |
| 165 | Per server cost for Allscripts-supplied Installation services for hardware integration for servers that will 4boot off existing SAN. | $150.00 | $600.00 |
| 166 | | Subtotal | $2,600.00 |
| 167 | | | |
| 168 | | TOTAL | $54,401.46 |

Quotation is Valid for 30 DAYS.

Tax and Shipping is not included and is the responsibility of the purchaser.

SCHEDULE 5
TOUCHWORKS RX+™
SubSchedule

## PROVIDERS

| Provider Name | DEA # | Site | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Initials

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

Initials

**SCHEDULE 6**
**PRIMARY CONTACTS**

**Primary Contacts:**

| | | |
|---|---|---|
| Shipping contact: | _____ | Address: _____ |
| (Contract documents) | | _____ |
| | | Phone: _____ |
| | | E-mail: _____ |
| Shipping contact: | _____ | Shipping _____ |
| (Software) | | Address: _____ |
| | | Phone: _____ |
| | | E-mail: _____ |
| Shipping contact: | _____ | Address: _____ |
| (Hardware) | | _____ |
| | | Phone: _____ |
| | | E-mail: _____ |
| Accounts payable contact: | _____ | Address: _____ |
| | | _____ |
| | | Phone: _____ |
| | | E-mail: _____ |
| Implementation project lead: | _____ | Address: _____ |
| | | _____ |
| | | Phone: _____ |
| | | E-mail: _____ |
| PO Number: | _____ | |
| (if required for invoicing) | | |
| Tax Exempt ID: | _____ | Note: Attach copy of certificate, if |
| (if applicable) | | applicable. |

Initials

PAYMENT SCHEDULE
TEN (10) YEAR TERM LICENSE AGREEMENT

Customer: Tennessee Oncology, PLLC

Initials: _____

This SCHEDULE is made as of June___, 2005 ("Effective Date"), by and between Allscripts and Customer.  This Schedule is a part of the TouchWorks System Agreement dated June___, 2005 (the "Agreement").  In the event of an inconsistency between the terms of this Schedule and the terms of the Agreement, this Schedule shall govern and control.  Unless expressly indicated to the contrary hereinbelow, the defined terms used in the Schedule shall have the meanings ascribed to them in the Agreement.

The pricing information reflected on this Payment Schedule shall be treated as a price quote that will expire on June 30, 2005 unless the Agreement is executed on or before such date.

| TouchWorks ™ PRODUCT Term: Ten (10) Year License | Number of Providers (Maximum) | Software License Fee Per Provider (Note 5) | Aggregate Based on Total MAXIMUM Number of Providers | | Other Comments |
|---|---|---|---|---|---|
| | | | Software License Fee | Annual Support Fee | |
| EMR Package | | | | | |
| --Base (PHS, WF, Repository, SnapShot) | 38 | $ 850 | $ 32,300 | $ 4,757 | |
| --Rx+ | 38 | $ 3,000 | $ 114,000 | $ 16,326 | |
| --Charge | 38 | $ 2,492 | $ 94,696 | $ 13,577 | |
| --Document | 38 | $ 1,745 | $ 66,310 | $ 9,767 | |
| --Result | 38 | $ 1,590 | $ 60,143 | $ 8,582 | |
| --Order | 38 | $ 1,500 | $ 57,000 | $ 8,413 | |
| --Note | 38 | $ 2,900 | $ 110,200 | $ 16,266 | |
| --Forms | 38 | $ 1,000 | $ 38,000 | $ 5,609 | |
| Dictate | 38 | $ 977 | $ 37,126 | $ 5,480 | Note 1 |
| Scan | 38 | $ 2,000 | $ 76,000 | $ 11,218 | Note 3 |
| AnaMics | 38 | $ 1,450 | $ 55,100 | $ 9,919 | |
| Transcribe Package | | | $ 12,900 | $ 2,322 | |
| --Transcribe Base | 5 | | | | Note 4 |
| Scan OCR | 25-50 | | $ 15,000 | $ 2,214 | |
| Remote Scanning | 2 | | $ 2,495 | | Note 3 |
| | | | | | |
| IMEDGE? | 38 | $ 54 | | $ 2,052 | |
| Rx+ (Database, Formulary, Fax) | 38 | $ 250 | | $ 9,500 | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Subtotal | | | $ 769,367 | $ 126,931 | |
| Software Module Bundle Discount | | | $ (225,779) | | |
| TouchWorks System Discount | | | $ (100,872) | | |
| Total | | | $ 542,516 | $ 126,931 | |

| Other PRODUCT or SERVICE | One-Time Fees | Annual Fees | Aggregate Monthly Fees |
|---|---|---|---|
| Hardware - Purchased from Allscripts (Note 5) | $ 54,401 | | |
| Interface and Data Conversion Fees | $ 40,000 | | |
| Interface Support Fees | | $ 7,200 | |
| Implementation Fees  (Note 2) | $ 279,650 | | |
| Dragon NaturallySpeaking Training and Support | | | |
| Site Coordinator Training | $ - | | |
| Education on Interfaces | $ 25,000 | | |
| Abraxas Training | $ - | | |
| Implementation Fee Module Bundle Discount | $ (46,962) | | |
| Total | $ 352,089 | $ 7,200 | $ - |

Funding:

Note 1:  If the number of devices on which TouchWorks Dictate is loaded exceeds the number of Providers for which Customer has paid license fees, then Allscripts may increase the number of Providers for which Customer must pay license fees for TouchWorks Dictate to equal the number of devices.
Note 2:  The Implementation Fees cover only the services included in the Statement of Work dated _____ , provided by Allscripts to Customer.
Note 3:  Use of Remote Scanning Software is limited to 2 sites.
Note 4:  For the purposes of TouchWorks Transcribe, the term "Provider" shall be deemed to mean a typist and the license limitation applies to typists.
Note 5:  Shipping costs are estimated to be approximately $400.
Note 6:  Note 2: During the 12-month period following the Effective Date, Customer shall have right to purchase additional licenses of any Software product at the Per Provider software license fee set forth above (less discounts, calculated as above).  Thereafter, Customer shall have the right to purchase additional licenses of any such Product, or licenses of any other TouchWorks product, at a 15% discount from either (i) the then-current list price thereof, or, (ii) if applicable, the Bundled List Price thereof, at the time of such purchase.  The term "Bundled List Price" means, at any time, the then-current Per Provider list price of each of 5 or more Software modules purchased together, less a bundled discount of 18%, and shall be applicable only when 5 or more Software modules are purchased together by Customer.  Annual Support Fees on all such licenses shall be calculated at 18% of list price or Bundled List Price, as applicable.

The next page sets forth terms and provisions related to Fees.

Continued on Next Page

PAYMENT SCHEDULE - continued
TEN (10) YEAR TERM LICENSE AGREEMENT

Invoiced as Follows:

Software License Fees for new Agreements or for Products added to existing Agreements will be invoiced on a Product-by-Product basis and will be based on the following milestones:
> 20% on Effective Date of Agreement
> 30% on Software Delivery Date
> 30% on the earlier of Project Team Training completion or, in the event Project Team Training is delayed solely be reason of Customer's actions or omissions, 120 days following the Software Delivery Date
> 20% on the earlier of Go Live Date or, in the event Go Live is delayed solely be reason of Customer's actions or omissions, 150 days following the Software Delivery Date

Software License Fees for Providers added to existing Products and Agreements will be invoiced on a Product-by-Product basis and be based on the following milestones:
> 100% on Schedule Effective Date

Software License Fees for TouchWorks Pocket Library Reference Reader and titles, Touchworks Patient Ed and all third party software will be invoiced on a Product-by-Product basis and be based on the following milestones:
>100% on Software Delivery Date

Any increase in the Maximum Number of Providers will require execution of an amendment to this Agreement or a new agreement between the parties.

Implementation, Data Conversion and Interface Fees shall be invoiced based on the following milestones:
>10% on Effective Date of the Agreement
>30% on Software Delivery Date
>25% on the earlier of Project Team Training completion or, in the event Project Team Training is delayed solely be reason of Customer's actions or omissions, 120 days following the Software Delivery Date
>25% on the earlier of Go Live Date or, in the event Go Live is delayed solely be reason of Customer's actions or omissions, 150 days following the Software Delivery Date

Implementation fees do not include travel and lodging expenses, which will be invoiced as incurred.

Annual Support Fees will commence, on a Product-by-Product basis, as follows:
> as to five (5) Providers, as of the earlier of the Go Live Date or, in the event Go Live is delayed solely be reason of Customer's actions or omissions, 150 days following the Software Delivery Date, and
> as to thirty-three (33) Providers, on January 1, 2006
(either, the "Initial Billing Date") for the applicable Software Product for an initial period of 12 months ("Annual Support Period"). Allscripts will invoice Customer for initial annual Support Fees as of the Initial Billing Date and as of each annual anniversary thereafter for subsequent Annual Support Periods. Initial Annual Support Fees are set forth in the table.

Annual Support Fees may be adjusted by Allscripts, on a Product-by-Product basis, as of January 1 of each calendar year, in an amount not in excess of than the lesser of (i) three percent (3%) per annum or (ii) the "Annual Change in CPI." Any increase will apply to Customer for the next Annual Support Period that commences following such increase. Annual Support Fee adjustments will be reflected on Customer's invoices. Either party may discontinue Support Services at any time effective at the end of the applicable paid Annual Support Period following no less than 30 days prior written notice to the other. If Support Services are discontinued by Customer, Customer may, at a later date, resume Support Services then currently available and at then current rates following no less than 30 days prior written notice to Allscripts and upon payment to Allscripts of the total amount of Support Fees accrued and unpaid attributable to the period of Support Service discontinuation.

"Annual Change in CPI" means the change, if any, in the Consumer Price Index, all items, all urban consumers, U.S. city average (1982-84 = 100), published by the Bureau of Labor Statistics of the United States Department of Labor (the "CPI") and most recently reported as of January 1, over the CPI reported twelve (12) months earlier. If the CPI shall be converted to a base year other than 1982-84, or otherwise revised or discontinued, the determination of the CPI shall be made using a generally accepted conversion/substitution factor (selected by Allscripts) which reasonably approximates the CPI as described above.

Equipment Purchased will be invoiced in full as of the date of Delivery.

Interfaces and Data Conversions - Description and Fees:

| Interface Description | Purchased? | Convert Data? | Type | Additional Description |
|---|---|---|---|---|
| Reg/Sched - Inbound - All Products | Yes | | Standard | Adds/updates patient demographic, insurance and enrollment information |
| Patient List - Inbound - Charge | Yes | | Standard | Adds/updates the patient list on the handheld |
| Charge - Outbound - Charge | Yes | | Standard | Sends the entered charges to the practice management system |
| Result - Inbound - Result (per lab) | Yes | | Standard | Adds/updates radiology or lab results in the Results product |
| Order - Outbound - Order | Yes | | Standard | Sends routed orders entered via Orders to appropriate location for processing |
| Pyxix Interface | Yes | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| Interface Fees | # Purchased | Total Cost for Interfaces | Cost for Data Conversion | Total Initial Cost | Annual Support Cost |
|---|---|---|---|---|---|
| Reg/Sched - Inbound - All Products | 1 | $ - | | $ - | $ - |
| Patient List - Inbound - Charge | 1 | $ - | | $ - | $ - |
| Charge - Outbound - Charge | 1 | $ - | | $ - | $ - |
| Result - Inbound - Result (per lab) | 1 | $ 10,000 | | $ 10,000 | $ 1,800 |
| Order - Outbound - Order | 1 | $ 15,000 | | $ 15,000 | $ 2,700 |
| Pyxix Interface | 1 | $ 15,000 | | $ 15,000 | $ 2,700 |
| | | $ | | $ - | |
| | | $ | | $ - | |
| | | $ | | $ - | |
| | | $ | | $ - | |
| | | $ | | $ - | |
| | | $ | | $ - | |
| | | $ | | $ - | |
| | | $ | | $ - | |
| | | $ | | $ - | |
| TOTAL | 6 | $ 40,000 | $ - | $ 40,000 | $ 7,200 |



# ALLSCRIPTS™
Inform. Connect. Transform.

SOURCE CODE ESCROW AGREEMENT

THIS SOURCE CODE ESCROW AGREEMENT governs the custody and release of source code for certain computer software licensed to the undersigned customer ("Customer"), is effective as of the date of acceptance by Allscripts, LLC, a Delaware limited liability company ("Allscripts"), at its offices in Chicago, Illinois, and is made by and among Allscripts, the undersigned customer, and The Merchant's Trust Company, a corporation organized and existing under the laws of the State of Vermont and having its principal offices at 275 Kennedy Drive, South Burlington, Vermont, 05403 ("Escrow Agent").

**THIS AGREEMENT INCLUDES AND IS SUBJECT TO ALL OF THE TERMS AND CONDITIONS
SET FORTH BELOW AND ON PAGE 2**

EXECUTED on the date(s) indicated below.

| Tennessee Oncology, PLLC | Allscripts, LLC | The Merchants Trust Company |
|---|---|---|
| By: _CMcKay_ | By: _Joseph E. Carey_ | By: _____ |
| _Charles McKay_ | _JOSEPH E. CAREY_ | _____ |
| [Type or Print Name] | [Type or Print Name] | [Type or Print Name] |
| _CEO_ | _C-O-O-_ | _____ |
| Title | Title | Title |
| Date: _6/30/05_ | Date: _06/30/2005_ | Date: _____ |

## TERMS AND CONDITIONS

### Deposits
Escrow Agent has accepted and currently holds on deposit a single copy of the source code for certain computer programs ("Source Code") that have been licensed to Customer pursuant to a written license agreement (the "License Agreement"). Allscripts shall deposit updated copies of these computer programs upon each general release, and each updated copy shall upon deposit be deemed the Source Code under this Agreement. The copy of the Source Code held by Escrow Agent shall be and remain the exclusive property of Allscripts, and Escrow Agent will hold the Source Code as specifically provided in this Agreement. Escrow Agent will hold the copy of the Source Code in safekeeping at its offices and may deliver a copy of the Source Code to Customer, but only under the conditions specified below. Upon reasonable request, and at customer's cost, Customer may examine the copy of the Source Code to verify compliance with the terms hereof. Such examination shall be conducted on a computer to be made available by Allscripts at its premises in Burlington, Vermont.

### Conditions for Release
Customer shall be entitled to receive from Escrow Agent and to make limited use as herein provided of a single copy of the Source Code, if (i) Allscripts releases the Source Code to other licensees of the computer programs as a matter of general policy; (ii) material breach of the License Agreement by Allscripts or in the event Allscripts refuses to offer Licensee error correction services or changes required to comply with federal regulations at Allscripts' standard rates and on its standard terms and conditions; (iii) Allscripts makes a general assignment for the

benefit of creditors, suffers or permits the appointment of a receiver for its business or assets, or has voluntarily wound up or liquidated its business (or that segment of its business pertinent to the License Agreement); or (iv) Allscripts as a debtor-in possession or a trustee-in-bankruptcy (collectively, "Trustee") in a case under the United States Bankruptcy Code (the "Code") rejects the License Agreement.

Any of the foregoing events is referred to below as a "Release Condition."

Upon the happening of any Release Condition, Customer may at its option give Escrow Agent written notice (the "Notice") requesting a copy of the Source Code. The Notice shall (i) be labeled "Notice Under Escrow Agreement Dated _____;" (ii) specify the Release Condition with reference to the applicable section of this Agreement; and (iii) identify (by application name, version number and release date, and any other pertinent information) the computer programs for which Source Code is on deposit and which Customer desires to have released.

Not earlier than ten (10) business days following its receipt of the Notice, Escrow Agent is authorized and directed to deliver a copy of the applicable Source Code to Customer and to notify Allscripts of such release. Upon delivery to Customer under any circumstances, the Source Code shall become a part of the licensed software (as defined in the License Agreement) and shall be subject to all of the license and confidentiality provisions

and obligations set forth in the License Agreement, and all of the conditions and restrictions set forth herein.

In the event that Allscripts delivers the Statement to Escrow Agent in the manner and within the time period set forth above, Escrow Agent shall not release a copy of the Source Code or any part thereof to Customer unless (i) required to do so by order of a court of competent jurisdiction, or (ii) Escrow Agent has received written instructions with authorized signatures of both Allscripts and Customer requesting release to Customer.

### Use of Source Code.

In the event that a copy of the Source Code is released from escrow to Customer by the Escrow Agent in accordance with the terms and conditions of this Agreement, and subject to all of the terms hereof, Customer shall use the Source Code strictly in accordance with the following conditions:

(a) Customer shall have the right to retain and use the Source Code only for the duration of the condition giving rise to Customer's right to receive the Source Code, as set forth in the immediately preceding Section, and should such condition conclude and Allscripts resume performance of its obligations under the License Agreement, then Customer shall within seven (7) days thereafter return all copies of the Source Code then in Customer's possession or control to Allscripts, which Allscripts shall then return to the Escrow Agent in accordance with the provisions of this Agreement;

(b) Customer may use the Source Code under the license granted herein and in the License Agreement only to make modifications to the Source Code that are necessary to support and maintain the Software for the uses expressly provided in the License Agreement and for no other purpose. Customer will not make copies of the Source Code except as necessary to support and maintain the Software as provided in the preceding sentence, and will not authorize anyone else to make copies of the Source Code. All copies of the Source Code will be marked with a restrictive legend identifying the Source Code as confidential and proprietary to Allscripts and prohibiting any unauthorized use or reproduction;

(c) Customer will allow use of or access to the Source Code only by employees and contractors of Customer who have a need to use the Source Code for exercise of Customer's rights with respect to the Source Code set forth herein and who have signed nondisclosure agreements containing terms at least as restrictive as those set forth in this Agreement;

(d) Customer will not allow use of or access to the Source Code by any third parties, and when provided with access to the Source Code, will maintain and use the Source Code only in secure locked facilities to which access is limited to such employees and contractors. For Source Code that are useable or stored on any computer equipment (whether a multi-user system, network, stand-alone computer or otherwise), the equipment must have password-based access control, with each user having a unique user identification and associated password;

(e) Customer will maintain a record of (i) all employees, contractors and other personnel who use or have access to the Source Code, (ii) the number of copies made, if any, of the Source Code, and (iii) the computer equipment and storage media on which the Source Code is used or stored, and will provide such record(s) to Customer upon request; and

(f) The Source Code are the Confidential Information of Allscripts, and Customer will maintain the Source Code in a secure fashion, and take all reasonable measures to protect the Source Code from theft, or unauthorized disclosure, reproduction, or copying.

### Payments and Fees

Customer shall pay to Allscripts its standard charge for establishment of an account with Escrow Agent (not to exceed five hundred dollars ($500)) and Allscripts' standard charge for maintenance of the account (not to exceed five hundred dollars ($500) per year during the first two (2) years of the term of this Agreement). Customer shall reimburse Escrow Agent for all out of pocket costs in connection with its performance of services hereunder, including without limitation the cost of media, copies, delivery charges, long distance charges, postage, shipping, handling and insurance.

### Termination

This Escrow Agreement shall terminate upon delivery of a copy of the Source Code to Customer in accordance with the terms of this Agreement or the termination of the License Agreement, whichever occurs first. Upon delivery of a copy of the Source Code to Customer, all of Allscripts' responsibilities hereunder shall terminate, and all warranties of Allscripts and all of Allscripts' software maintenance obligations under the License Agreement and all other agreements, shall terminate.

### Limitation on Escrow Agent's Responsibility and Liability

Escrow Agent shall not be obligated or required to examine or inspect the Source Code. Escrow Agent's obligation for safekeeping shall be limited to providing the same degree of care for the source Code as it maintains for its valuable documents and those of its customers at the same location. However, Escrow Agent shall not be responsible for any loss or damage to the Source Code due to changes in atmospheric conditions (including, but no limited to, failure of the air conditioning system), unless such changes are proximately caused by the gross negligence or malfeasance of Escrow Agent. Escrow Agent shall be protected in acting upon any written notice, request, waiver, consent, receipt or other paper document furnished to it, not only in assuming its due execution and the validity and effectiveness of its provisions but also as to the truth and acceptability of any information therein contained, which it in good faith believes to be genuine and what it purports to be.

In no event shall Escrow Agent be liable for any act or failure to act under the provisions of this Escrow Agreement except where its acts are the result of its gross negligence or malfeasance. Escrow Agent shall not have duties except those which are expressly set forth herein, and it shall not be bound by any notice of a claim, or demand with respect thereto, or any waiver, modification, amendment, termination or rescission of this Escrow Agreement, unless such notice is in writing and actually received, and if its duties herein are affected, unless it shall have given its prior written consent thereto.

Allscripts and Customer shall jointly and severally indemnify Escrow Agent against any loss, liability, or damage (other than any caused by the gross negligence or malfeasance of Escrow Agent), including reasonable costs of litigation and counsel fees, arising from and in connection with the performance of its duties under this Agreement.

### Bankruptcy

Allscripts acknowledges that this Escrow agreement is an "agreement supplementary to" the License Agreement as provided in Section 365(n) of Title 11, United States Bankruptcy Code (the "Code"). Allscripts acknowledges that if a Trustee in a case under the Code rejects the License Agreement or this Escrow Agreement, Licensee may elect to retain its rights under the License Agreement and this Escrow Agreement as provided in Section 365(n) of the Bankruptcy Code. After commencement of a case under the Bankruptcy Code by or against Allscripts, and unless and until the License Agreement is rejected upon written request of licensee to the Trustee, Trustee (a) shall not interfere with the rights of Licensee as provided in the License Agreement and this Escrow Agreement, including the right to obtain the Source Code from the Escrow Agent. If the Trustee rejects the License Agreement or this Escrow Agreement and Licensee elects to retain its rights hereunder and upon written request of Licensee to the Trustee, the Trustee shall provide the Source Code to the Licensee.

### Miscellaneous

This Agreement is the entire agreement and understanding between the parties with respect to the subject matter, and as such this Agreement supersedes all prior and contemporaneous agreements, negotiations, representations and proposals, written and oral, relating to the subject matter. Customer expressly acknowledges, agrees and represents to Allscripts that there are no understandings or agreements with respect to the subject matter other than as expressly set forth in this Agreement. Customer agrees that no contrary terms or conditions of any subsequent Customer purchase order, no course of dealing, trade custom or usage of trade, and no warranty made during the course of performance, will apply, unless expressly agree to by Allscripts in writing. Any notice or communication provided or permitted hereunder shall expressly describe its purpose and scope, and shall be in writing and shall be deemed duly given or made if delivered in person or sent by U.S. registered mail, return receipt requested, postage prepaid, addressed to the party for which it is intended at the address set forth in this Agreement or at any other address specified by a party in writing, and as to Allscripts, a copy shall be sent to General Counsel, Allscripts Healthcare Solutions, Inc., 2401 Commerce Drive, Libertyville, Illinois 60048. In the event any provision hereof shall be deemed invalid or unenforceable by any court or governmental agency, such provision shall be deemed severed from this Agreement and replaced by a valid provision which approximates as closely as possible the intent of the parties. All remaining provisions shall be afforded full force and effect. The obligations of Customer under this Agreement will extend to, and be binding on, any trustee in bankruptcy or other fiduciary (including, without limitation, any examiner or responsible person), receiver, administrator or liquidator appointed for Customer, to Customer as debtor-in-possession, or to any assignee or other successor in interest to Customer. Such binding effect is an integral part of this Agreement. This Agreement shall become effective and shall be binding only upon acceptance by Allscripts at its offices in Libertyville, Illinois, and it shall be governed by, subject to, and interpreted in accordance with, the laws of the State of Vermont.

[Remainder of this page intentionally left blank]



**ALLSCRIPTS**

Inform. Connect. Transform.

## *STATEMENT OF WORK*

### Prepared for:

### Tennessee Oncology, PLLC

Last Revised: *June 29, 2005*

*Submitted June 29, 2005 to:*

Tennessee Oncology, PLLC
397 Wallace Road
Nashville, TN 37211

*By:*

John Jacksack
Area Vice President, Deployment
Allscripts Healthcare Solutions
222 Merchandise Mart Plaza
Chicago, IL 60654
800-654-0889 x4356
John.Jacksack@Allscripts.com

Description
This Statement of Work is provided by Allscripts, LLC ("Allscripts") to outline the standard services provided as part of the TouchWorks 3D Implementation™ methodology. This Statement of Work describes only those services included as part of our standard implementation fees. Scope, resource or duration changes may result in modifications to the schedule, fees and/or other terms of this Statement of Work.

Overview
Allscripts offers a modular approach to implementation to bring the greatest value to your organization with your first use of TouchWorks. The 3D methodology provides a specific framework for execution of the implementation within the following phases: Prepare, **Design, Develop, Deliver** and Advance.

The Allscripts team of service professionals will guide your organization through this approach and associated deliverables leveraging our extensive experience in software implementation. Allscripts provides a consultative approach to implementation through the value-added services outlined in this statement of work, which span the following areas: training, project management, implementation consulting, hardware services, technical services and interfaces and conversions.

Project
Objective
Tennessee Oncology, PLLC ("TN Oncology") is an oncology specialty clinic located in Nashville, Tennessee, intending to implement the following TouchWorks Modules for 38 physicians.

Web workstation platform:
TouchWorks Base (includes Physician Homebase (PHB), Problem and Workflow), TouchWorks Rx+, TouchWorks Charge, TouchWorks Document, TouchWorks Result, TouchWorks Order, TouchWorks Note, TouchWorks Forms, TouchWorks Dictate, TouchWorks Scan, TouchWorks Analytics, TouchWorks Transcribe, TouchWorks Scan OCR.

PDA platform:
TouchWorks RX+, TouchWorks Charge, TouchWorks Dictate, TouchWorks Document, TouchWorks Problem List, TouchWorks Snapshot View.

The proposed phasing for this implementation is outlined below:
Phase 1: TouchWorks Base (includes Physician Homebase (PHB), Problem and Workflow), TouchWorks Rx+, TouchWorks Document, TouchWorks Result, TouchWorks Note, TouchWorks Forms, TouchWorks Dictate, TouchWorks Scan, TouchWorks Analytics, TouchWorks Transcribe, TouchWorks Scan OCR.
Phase 2: TouchWorks Order, TouchWorks Charge
Phase 3: Additional features listed below

Implementation
Methodology
As mentioned in the Overview section, Allscripts employs the 3D Implementation Methodology in deploying the TouchWorks products. The TouchWorks 3D methodology includes five phases: Prepare, Design, Develop, Deliver and Advance. Although 3D stands for the core phases of implementing TouchWorks: **Design, Develop and Deliver**, the Prepare and Advance phases are also critical to the success of your implementation. Additional information can be found in the *TouchWorks Implementation Guide* available upon contract signing.

**Prepare Phase:** The focus of this phase is to establish a solid project infrastructure to allow the subsequent project work to proceed in an uninterrupted fashion. The activities of this phase include: defined technical and functional foundations for the implementation, establishment of the project team, joint executive strategic planning (Allscripts and Customer executives sponsoring the project), documentation of the project's goals and quantifiable success criteria, new hardware installation, TouchWorks software installation, and project team training on all purchased modules of the TouchWorks system.

The critical path components of this phase include:  technical infrastructure readiness, server and Customer device hardware procurement and installation, project team formulation, and completion of any outside projects that could impede project team readiness or technical installation/build activities of the TouchWorks system.

**Design Phase:**  The focus of this phase is establishing the processes of planning for and managing end-user change.   During this time, your core project team is guided through a structured TouchWorks design process including application and system integration design, complete project and change management planning, and completion of key design decisions, which will drive configuration and build work.

**Develop Phase:** The focus of this phase is for the project team to execute the system build work and develop end-user training and support materials based upon the information gathered in the Design phase.  This phase includes simulation testing of new workflows with a subset of early adopter users, and system testing of applications, technical devices and supporting interfaces. During this phase, end-user training materials, and operational support materials are prepared, and users and/or support staff obtain any needed pre-requisite training (such as developing core competency with the technologies, hardware, and operating systems) and/or competency with core organizational policies and practices (such as charge coding/billing, clinical documentation compliance rules, HIPAA standards, etc).

**Deliver Phase:** The focus of this phase is to deliver the new system and workflows to end-users. Users and support staff are trained on TouchWorks and their new workflows, final system readiness tasks are completed, and the go-live event is staged.  Allscripts resources provide onsite support for the initial go live event to insure a successful experience. A period of post-live support follows to ensure the system is performing in a stable, optimal environment, and the phase concludes with a transition to Allscripts support and account management teams and formal closeout of the implementation project.

**Advance Phase:** During the Advance Phase, clients focus on rollout beyond their "early adoptor" physicians.  Allscripts services included in this phase are:  regularly scheduled Executive Status Review meetings, co-development of strategic account plans and issue oversight.   Allscripts offers a number of services which clients may purchase to drive physician adoption, utilization and achievement or ROI goals.    Services for purchase include:  rollout support and consultation, TouchWorks Health Assessment visits, System Configuration and Refinement Training and Note Summits.

**Deliverables**      The following services will be provided to TN Oncology:

**Training**
As part of the TouchWorks 3D Methodology, product training is provided for up to four (4) members of the Customer's core project team.  This immediate and extensive "best practice" knowledge-transfer enables your project team to make highly informed, effective decisions very early in the project lifecycle.

Training is conducted by TouchWorks certified staff in our Chicago headquarters, which offers a professional, distraction-free training environment fully equipped with the technology you will be leveraging in your clinical operations.  This session provides a rapid, hands-on immersion into TouchWorks functionality and administration, and the opportunity to network with industry peers who are also beginning the same EMR journey.

The project team training session is five (5) full days. The Customer is responsible for attending a session on one of the following scheduled dates: July 11th – 15th, July 18th – 22nd, August 8th – 12th or August 22nd – 26th.  Customer is responsible for travel and expense costs associated with attending training.

Confidential. © 2005 Allscripts, LLC. All rights reserved.

System administration and configuration training is provided at various stages of the 3D Methodology with portions of the training occurring during product training, on-site sessions or via webcast.

Allscripts will provide consultative guidance on the design and execution of end-user training through an on-line education offering. Actual execution of end-user training assessments, education sessions, end-user certifications or customization of education materials is the responsibility of the Customer and not included in the standard implementation fees.

### Project Management and Implementation Consulting

Project management services are provided to maintain and track progress of the implementation against the scope and objectives finalized by Allscripts and TN Oncology. Project management services include detailed project planning, weekly project status calls, monthly executive status calls and associated status reports to maintain frequent and interactive communication throughout the project.

Implementation consultation services guide you through a proven system design process, including assistance with documentation of current and future workflows, navigating key TouchWorks design decisions and consultation on best practices for end-user change management and migration strategies. Issue tracking, triage and resolution, as well as, consultation on Customer system testing are also covered in the standard service offering.

Implementation consultation services for process design re-engineering (beyond TouchWorks processes), ROI analysis or customization of standard materials are not included in the standard implementation fees.

### Hardware Services

Allscripts has relationships with the top national hardware vendors and it is our goal to match or beat existing pricing agreements TN Oncology may have in place. Allscripts also offers a comprehensive hardware design and configuration service, proven to reduce the duration, effort and cost of TouchWorks implementations. These add-on services provide value-added results including a configuration design that is matched to TN Oncology's TouchWorks deployment and configuration of hardware and system level software to optimize the operation of TouchWorks on the selected platform. For clients taking advantage of these services, a hardware discussion and quotation by Allscripts must occur prior to contract signing. Regardless of where hardware is purchased from, additional post-contract effort associated with design of hardware configuration may incur additional fees added to the project budget.

Clients deciding to purchase hardware from a third party are responsible for meeting Allscripts minimum hardware requirements and may incur additional fees for effort associated with troubleshooting of hardware or software installation and configuration (not attributable to Allscripts software).

### Technical                                                                                    Services

Technical services include software delivery and regular nomenclature updates during the project implementation and prior to live use of the TouchWorks solution. As part of the 3D Methodology Allscripts will coordinate a Technical Site Certification visit with TN Oncology. The Technical Site Certification is a comprehensive visit and certification process during the Prepare phase that will require dedicated time from the appropriate Customer resources to complete the following tasks:

- Detailed technical planning meeting
- Analysis of current technical support capabilities
- Configuration of Virtual Private Network (VPN) tunnel for Allscripts support connectivity
- TouchWorks server-side installation
- Registration and scheduling interface delivery
- System certification testing

- Training on server-side maintenance of TouchWorks
- Training on TouchWorks Customer configuration

Additionally, system maintenance training and technical support for issue triage and resolution during the implementation process will be provided. Standard implementation fees do not include services related to software upgrades, installation of software on hardware acquired from a third party, RF network surveys, network installations or network troubleshooting.

TN Oncology is responsible for meeting Allscripts minimum requirements for hardware, networking, and 'connection' to TN Oncology's TouchWorks system for technical support as outline in the TouchWorks System Environment Specification (SES). Clients deciding not to use Nortel VPN devices will be billed time and materials for setup beyond four hours of Allscripts effort.

**Interfaces and Conversions**

Interfaces included as part of the proposed implementation project:

| Interface | Quantity |
|---|---|
| Registration and Scheduling -- Inbound | 1 |
| Patient List -- Inbound -- Charge | 1 |
| Charge -- Outbound -- Charge | 1 |
| Result -- Inbound -- Result | 1 |
| Order -- Outbound -- Order | 1 |

This effort includes extracts, eight (8) hours of customization, and patient and appointment data bulk loads. Any additional effort needed will be billed on a time and materials basis. Each interface involves some level of customization based on your organizational workflow needs. Your interface analyst will assess if more than the eight (8) hours allocated will be needed to meet your business needs.

Other data conversions are not included as part of the standard implementation and can be provided for an additional fee.

**Staffing**

Allscripts will make every attempt to fully staff new implementation projects within thirty (30) days of contract signing. Typically, a project manager, technical consultant and interface analyst comprise the core team for each project.

The TN Oncology project team must be staffed with resources as outlined in the Roles and Responsibilities document prior to product training at Allscripts. A dedicated project manager should be assigned by TN Oncology to coordinate all activities between TN Oncology and Allscripts and other related projects, and secure additional TN Oncology resources as necessary. Additionally, knowledgeable subject matter experts must be available to the project team as required during the course of this project. These individuals should represent the business, technical and clinical implementation areas and be informed of the decision process.

Allscripts recommends a parallel implementation and rollout strategy in order to demonstrate early benefits and influence further rollout of functionality to other physicians. This strategy employs the use of a focused implementation team working with the showcase users. As these physicians complete the implementation of functionality in a given phase, the implementation team remains with these physicians to design and deploy the next phase of functionality. As the showcase physicians successfully complete a given phase, a separate "Rollout" team of educators and support staff work with each subsequent department, sites, and users to deliver the functionality of that phase to additional users.

**Timeline and Effort**

The following approach to implementation of TouchWorks is recommended.

| Months | M1 | M2 | M3 | M4 | M5 | M6 | M7 | M8 |
|--------|----|----|----|----|----|----|----|----|
| Phase 1 | ▓▓▓ | ░░░ | ░░░ | ░░░ | ▓▓▓ | | | |
| Phase 2 | | | | | ░░░ | ░░░ | ░░░ | ▓▓▓ |
| Phase 3 | | | | | | | | |

▓▓▓ Prepare
░░░ Design/Develop
▓▓▓ Deliver (Initial Go Live & Post Live Support)

The proposed project duration is eight (8) months for Phases 1 and 2 combined, starting from the effective date of the contract and extending through the first go live of the final phase. Phase 3 will commence upon the completion of Phase 2, with a time-line to be agreed upon by TN Oncology and Allscripts at that time. The initial project planning phase is expected to take no more than 30 days from contract signing to complete. Extended project duration may incur additional fees when attributed to Customer or third party vendor delays. Scope changes or events resulting in project duration changes longer than one (1) week will be tracked through a project scope change request.

The following features will be implemented as part of Phase 3.
- Diagnosis to include indication of stage.
- Flowsheets will add the ability to flow problems and scheduled orders such as chemotherapeutic protocols.
- Ability to use weight or BSA to calculate a parenteral drug order.
- User customization of a standard "starter set" of drug regimens or building protocols ("favorites") based on individual physician practices, including cycle/day information.

**Estimated Effort:** up to 171 days

**On-site Days:** Up to 20 days of on-site services are included as part of the standard implementation as determined by the initial project plan developed by the Customer and Allscripts to support project duration/effort defined above. These days are customarily applied toward the following implementation events:
- Technical site certification (required)
- Project kick-off meeting
- TouchWorks design sessions
- Go-live

**Additional On-site Days Based on Phase Complexity**

| | | |
|---|---|---|
| Phase 1: | Base, Rx+, Dictate, Document, Result, Note, Scan, Forms, OCR, Transcribe. | 5 days |
| Phase 2: | TouchWorks Order, TouchWorks Charge, Analytics | 5 days |
| Phase 3: | Additional features | 5 days |

**Change Control**

All significant project changes to the baseline project plan and scope documents will be reviewed and mutually agreed upon by TN Oncology and Allscripts project leadership as part of a formal project management change control process. If delays attributable to external factors (i.e. customer or third-party vendor delays beyond the control of Allscripts) force the remaining project

duration identified above to be extended, a supplemental agreement for additional implementation services time may be required.

Estimated
Investment

| Module | |
|---|---|
| TouchWorks Base (includes Physician Homebase and WorkFlow) | $40,000 |
| TouchWorks Rx+ | $20,000 |
| TouchWorks Charge | $40,000 |
| TouchWorks Document | $20,000 |
| TouchWorks Dictate | $20,000 |
| TouchWorks Result | $20,000 |
| TouchWorks Order | $20,000 |
| TouchWorks Note | $20,000 |
| TouchWorks Forms | $15,000 |
| TouchWorks Scan | $20,000 |
| TouchWorks Scan with OCR | $11,200 |
| TouchWorks Transcribe | $14,700 |
| TouchWorks Analytics | $15,000 |
| TouchWorks Scan – Remote Scanning (Maximum two sites) | $3,750 |
| SUBTOTAL | $279,650 |
| BUNDLE DISCOUNT | ($46,962) |
| TOTAL | $232,688 |

Additional
Services

· TN Oncology may contract for the following additional professional services at Allscripts then current rates.

- Training Services:  Additional training days, on-site product training, end-user training, or customized training materials.
- Supplemental onsite go-live/rollout support resources to provide additional support to new end-users (who require greater than normal levels of assistance during their first few weeks of live use).  Supplemental rollout resources allow the project team to quickly re-focus on implementation activities of the next phase's modules and minimize risks of future project delays or insufficient initial support to new TouchWorks users.
- Technical Services:  Wireless networking site surveys or installation, system backup strategy, disaster recovery planning and testing, system checkups, security reviews, custom reports or additional customizations not requiring source code changes, on-site technical training prior to go-live on TouchWorks modules, server monitoring, transactional SQL reporting training, or any additional services beyond those provided as part of our standard services
- Interface Services: Other interface services such as training on building interfaces
- Outsourced customer project team resources (such as project management, clinical/business analysts for project-related building and testing activities)
- Outsourced paper chart scanning conversion
- Detailed ROI/Cost Benefit analysis, and/or business process re-engineering consulting

Assumptions.

1. Customer Confirmation Forms (CCFs) will be used to track progress during the course of the implementation. Customer will be required to 'sign-off' on CCFs as project milestones are completed.

2. All implementation services will be provided during normal business hours. Any work that must be scheduled outside of normal business hours will be billable at Allscripts standard after-hours rate.

3. Standard implementation services include implementation of a single "showcase" site or defined "early-adopter" group who will represent the first live users of TouchWorks.  A scope document will be required to define these

parameters and will require customer sign-off.  Rollout support to additional users/sites can be provided for an additional fee.

4.  Customer will provide an appropriate work area for the Allscripts team when scheduled to be onsite.  If customer policies prohibit Allscripts resources from gaining network access to the TouchWorks system using their own equipment, the customer will need to provide each onsite Allscripts team member with a networked PC and PDA device, and PC "remote control" access to the TouchWorks servers (using the standard Microsoft Windows applet, Remote Desktop Connection).

5.  All services provided for an additional fee will be billable at Allscripts' then current rate.

6.  Out of pocket expenses are not included in standard implementation services fees and will be billed as incurred.

7.  Allscripts will support one (1) test and one (1) live environment for system setup and testing as well as production use.  Additional environments requested will be provided for an additional fee.

8.  Interface error maintenance is the responsibility of the customer. Assistance with interface error maintenance will be provided during the project's duration.  Afterwards, if routine maintenance assistance is needed (above and beyond resolving a specific technical support incident), this service can be provided on a time and materials basis.

9.  TouchWorks product implementations are provided using the current general release version of software. Any services related to software version upgrades will be provided for an additional fee.

10. Creation and quarterly maintenance of custom formularies with TouchWorks Rx+ are not included and can be provided for an additional fee.

11. Customer agrees to use WebFirst (online issue management system) to communicate all issues, questions, and requests as the primary means of reporting issues, receiving updates, and managing an issue list.

12. Allscripts and Customer agree not to solicit for hire, directly as employees or indirectly as contractors or subcontractors, or in any other capacity, any person who is an employee of the other during the term of this Agreement.

This Statement of Work expires on:  June 30, 2005.

IN WITNESS WHEREOF, authorized representatives of the parties have signed this Agreement.

Customer: Tennessee Oncology, PLLC
By: Charles McKay
Name: McKay
Title: CEO
Date: 6/30/05

Business Address: 397 Wallace Road
Nashville, TN  37211

Fax: _____
E-mail: _____

Allscripts, LLC
By: Joseph E. Carey
Name: JOSEPH E. CAREY
Title: C.O.D.
Date: 06/30/2005

Business Address: 222 Merchandise Mart
Suite 2024
Chicago, IL  60654
Sales Executive: _____

Fax: 800-826-2079

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 25, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 25, 2009.

<u>s/ Debra J. Wyman</u>
DEBRA J. WYMAN

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:debraw@csgrr.com

# Mailing Information for a Case 1:09-cv-04726

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Walter C. Carlson**
  wcarlson@sidley.com,efilingnotice@sidley.com

- **James Wallace Ducayet**
  jducayet@sidley.com,efilingnotice@sidley.com

- **Lori Ann Fanning**
  LFanning@MillerLawLLC.com,MMiller@MillerLawLLC.com,JRamirez@millerlawllc.com

- **Marvin Alan Miller**
  Mmiller@millerlawllc.com,LFanning@millerlawllc.com,KPulido@millerlawllc.com,JRamirez@millerlawllc.com

- **Brian O O'Mara**
  briano@lerachlaw.com,smarcks@lerachlaw.com

- **Debra J. Wyman**
  debraw@csgrr.com,nhorstman@csgrr.com,stremblay@csgrr.com,e_file_sd@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing. You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)