**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PLUMBERS AND PIPEFITTERS LOCAL UNION NO. 630 PENSION-ANNUITY TRUST FUND, On Behalf of Itself and All Others Similarly Situated, et al., Plaintiffs, | ) ) ) ) ) ) | No. 1:09-cv-04726<br><br>Judge Ruben Castillo |
| vs. | ) ) | |
| ALLSCRIPTS-MISYS HEALTHCARE SOLUTIONS, INC., et al., Defendants. | ) ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS
THE AMENDED COMPLAINT**

Walter C. Carlson
James W. Ducayet
Victor D. Quintanilla
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois  60603
(312) 853-7000

ATTORNEYS FOR DEFENDANTS

Dated:  January 11, 2010

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... iv

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 3

A.    Background of Allscripts ............................................................................ 3

B.    Background of TouchWorks EHR............................................................... 4

C.    Allscripts Provides Earnings And Bookings Guidance, Which It Revised During The Class

Period. ................................................................................................................. 5

D.    Alleged False And Misleading Statements ................................................ 7

E.    Alleged Reasons For Falsity Of Alleged Misstatements And For Scienter ..................... 10

ARGUMENT........................................................................................................ 12

I.     THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS DO NOT
       ALLEGE, WITH REQUISITE PARTICULARITY, THAT DEFENDANTS MADE
       ANY FALSE STATEMENTS......................................................................... 14

       A.    The Amended Complaint Is Premised On Information And Belief And Fails To
             Identify A Basis On Which Those Beliefs Are Formed. ...................................... 15

       B.    Generalized Statements Of Optimism And Puffery Are Immaterial As A Matter of
             Law. ............................................................................................................... 16

       C.    The Challenged Forward-Looking Statements Are Not Actionable Due To The
             "Bespeaks Caution" Doctrine And The Reform Act's Safe Harbor..................... 18

       D.    Plaintiffs Have Not Adequately Pleaded The Falsity Of Alleged Present-Tense
             Statements About The Demand For, Testing Of, and Deployment Of V-11. ...... 23

II.    THE COMPLAINT SHOULD ALSO BE DISMISSED BECAUSE PLAINTIFFS'
       ALLEGATIONS DO NOT GIVE RISE TO A STRONG INFERENCE THAT
       DEFENDANTS ACTED WITH SCIENTER. ................................................. 26

       A.    Plaintiffs Do Not Allege A Motive To Commit Fraud. ....................................... 27

B.   Plaintiffs Fail To Allege A Cogent Or Compelling Inference That The Individual Defendants Acted With Scienter..........................................................................28

C.   Plaintiffs Have Failed To Allege Facts Giving Rise To A Strong Inference That Allscripts Acted With Scienter. ..........................................................................34

III.   COUNT II OF THE AMENDED COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO ALLEGE A CONTROL PERSON CLAIM AGAINST THE DEFENDANTS. ...........................................................................................................35

IV.   DISMISSAL SHOULD BE WITH PREJUDICE...............................................................35

CONCLUSION....................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Abbott Labs.*,
140 F. Supp. 2d 894 (N.D. Ill. 2001) ....................................................................16

*Ashcroft v. Iqbal*,
--- U.S. ---, 129 S.Ct. 1937 (2009)......................................................................13

*Asher v. Baxter*,
377 F.3d 727 (7th Cir. 2004) ........................................................................ 19-22

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................................................13

*Brodsky v. Yahoo!, Inc.*,
630 F. Supp. 2d 1104 (N.D. Cal. 2009) ..............................................................25

*Campos v. INS*,
32 F. Supp. 2d 1337 (S.D. Fla. 1998) .................................................................24

*Davis v. SPSS, Inc.*,
385 F. Supp. 2d 697 (N.D. Ill. 2005) ..................................................................22

*Desai v. General Growth Properties*,
--- F. Supp. 2d ---, 2009 WL 2971065 (N.D. Ill. Sept. 17, 2009)................18, 21, 22

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) ..................................................................13, 23, 25

*Dresner v. Utility.com*,
371 F. Supp. 2d 476 (S.D.N.Y. 2005)..................................................................33

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005).............................................................................................13

*Eisenstadt v. Centel Corp.*,
113 F.3d 378 (7th Cir. 1997) ...............................................................................16

*Employers Teamsters Local No. 175 and 505 Pension Trust Fund v. Clorox Comp.*,
353 F.3d 1125 (9th Cir. 2004) .............................................................................18

*Frazier v. Vitalworks, Inc.*,
341 F. Supp. 2d 142 (D. Conn. 2004)..................................................................30

*Harden v. Raffensperger, Hughes & Co.,*
    65 F.3d 1392 (7th Cir. 1995) ...............................................18

*Higginbotham v. Baxter Intern.,*
    495 F.3d 753 (7th Cir. 2007) ........................................ 28-29

*In re Allscripts, Inc. Sec. Litig.,*
    No. 00 C 6796, 2001 WL 743411 (N.D. Ill. Jun. 29, 2001) ...................................2, 23, 33, 34

*In re Alpharma, Inc. Sec. Litig.,*
    372 F.3d 137 (3d Cir. 2004)................................................35

*In re Autodesk, Inc. Sec. Litig.,*
    132 F. Supp. 2d 833 (N.D. Cal. 2000) ...............................15

*In re Career Educ. Corp. Sec. Litig.,*
    No. 03 C 8884, 2006 WL 999988 (N.D. Ill. Mar. 28, 2006) ...................................15

*In re Cerner Corp. Sec. Litig.,*
    425 F.3d 1079 (8th Cir. 2005) ...........................................26

*In re Ford Motor Co. Sec. Litig.,*
    381 F.3d 563 (6th Cir. 2004) ............................................16

*In re Hutchinson Technology, Inc. Sec. Litig.,*
    536 F.3d 952 (8th Cir. 2008) ........................................17, 33

*In re Livent, Inc. Noteholders Sec. Litig.,*
    151 F. Supp. 2d 371 (S.D.N.Y. 2001)................................24

*In re Midway Games, Inc. Sec. Litig.,*
    332 F. Supp. 2d 1152, 1165 (N.D. Ill. 2004). ...................17

*In re NVE Corp. Sec. Litig.,*
    551 F. Supp. 2d 871 (D. Minn. 2007) ...................17, 22, 30, 31

*In re NVE Corp. Sec. Litig.,*
    527 F.3d 749 (8th Cir. 2008) ............................................17

*In re Read-Rite Corp.,*
    No. C-03-03148, 2004 WL 2125883 (N.D. Cal. Sept. 22, 2004)...........................31

*In re Siebel Sys., Inc., Sec. Litig,*
    No. C 04-0983, 2005 WL 3555718 (N.D. Cal. Dec. 28, 2005) .......................30, 34

*In re Silicon Storage Tech., Inc. Sec. Litig.,*
    No. C-05-0295, 2006 WL 648683, (N.D. Cal. Mar. 10, 2006) ..............................16

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   160 F. Supp. 2d. 1059 (N.D. Cal. 2001) ..............................................................29

*In re XM Satellite Radio Holding Sec. Litig.*,
   479 F. Supp. 2d 165 (D.D.C. 2007) ....................................................................22

*Indiana Elecal. Workers Pension Tr. Fund v. Shaw Group, Inc.*,
   537 F.3d 527 (5th Cir. 2008) ............................................................................27

*Konkol v. Diebold, Inc.*,
   --- F.3d --- 2009 WL 4909110 (6th Cir. Dec. 22, 2009)..................................29, 32

*Lipton v. Pathogenesis Corp.*,
   284 F.3d 1027 (9th Cir. 2002) ..........................................................................32

*Premier Capital Mgmt, LLC v. Cohen*,
   No. 02 C 5368, 2003 WL 21960357 (N.D. Ill. Aug. 15, 2003).............................24

*Pugh v. Tribune Co.*,
   521 F.3d 686 (7th Cir. 2008) ........................................................................28, 35

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ............................................................................31

*Roth v. OfficeMax, Inc.*,
   No. 05 C 236, 2006 WL 2661009 (N.D.Ill. Sept. 13, 2006)..................................18

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*,
   75 F.3d 801 (2d Cir. 1996)................................................................................17

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994)..............................................................................27

*Stavros v. Exelon Corp.*,
   266 F. Supp. 2d 833 (N.D. Ill. 2003) ........................................................ passim

*Sundstrand Corp. v. Sun Chem. Corp.*,
   553 F.2d 1033 (7th Cir. 1977) ..........................................................................29

*Taubenfeld v. Career Educ. Corp.*,
   No. 03 C 8884, 2005 WL 350339 (N.D. Ill. Feb. 11, 2005)..................................33

*W. Pennsylvania Elec. Employees Pension Trust v. Plexus Corp.*,
   No. 07 C 0582, 2009 WL 604276 (E.D. Wis. Mar. 6, 2009)...........................21-22

*Wielgos v. Commonwealth Edison Comp.*,
   892 F.2d 509 (7th Cir. 1989) ............................................................................18

*Zerger v. Midway Games,*
  No. 07 C 3797, 2009 WL 3380653 (N.D. Ill. Oct. 19, 2009) ..................................................16

**STATUTES**

15 U.S.C. § 78u-4(b)(1) .................................................................................................14, 15, 23

15 U.S.C. § 78u-4(b)(2) .........................................................................................................26, 27

15 U.S.C. § 78u-4(b)(3)(A) ...........................................................................................................15

15 U.S.C. § 78u-5(c)(1)(A) ...........................................................................................................19

15 U.S.C. § 78u-5(c)(l)(A) ...........................................................................................................14

15 U.S.C. § 78j(b) ...............................................................................................................13, 35

15 U.S.C. § 78t(a) ..............................................................................................................13, 35

Defendants Allscripts-Misys Healthcare Solutions, Inc. ("Allscripts"), Glen E. Tullman, and William J. Davis ("Individual Defendants") (collectively, "Defendants") respectfully submit this memorandum in support of Defendants' Motion to Dismiss the Amended Complaint.

## INTRODUCTION

On February 13, 2008, Allscripts announced its full fiscal year 2007 financial results. These results were lower than the financial guidance provided by Allscripts for this period. Allscripts had previously in November 2007 reduced its financial guidance for fiscal year 2007, in part because of slower than expected deployments of its TouchWorks Version 11 ("V-11") software product.  Well before then, Allscripts had also clearly and consistently warned investors about the risks to achieving its forecasts from these sorts of difficulties, which are obviously common with any release of a new software product.  Nevertheless, the temporary drop in Allscripts' stock price that followed caught the attention of the plaintiffs' securities bar (albeit eighteen months after the fact), and this lawsuit was filed.

At its core, the Amended Complaint alleges that the Individual Defendants sought to defraud Allscripts' shareholders by means of false statements regarding V-11.  Plaintiffs allege that Allscripts made three general types of misstatements or omissions in an effort to mislead the market from May 8, 2007 to February 13, 2008 (the "Class Period"): (1) generalized optimistic statements about the growth prospects of Allscripts; (2) forward-looking projections about the financial prospects of Allscripts and the deployment of V-11; and (3) statements describing the demand for, and deployment of, V-11.  Notwithstanding its length, however, the Amended Complaint does not meet the demanding standards for alleging securities fraud.

In fact, as the Amended Complaint itself pleads, Allscripts consistently accompanied its public statements with extensive and meaningful warnings concerning the risks regarding introduction of a new software product that could cause it to miss its forecasts – indeed, precisely

the same factors that Plaintiffs allege were the cause of the lower-than-forecasted results

announced in November 2007 and February 2008.  And although Plaintiffs attempt to create an

illusion of particularity by claiming that the Individual Defendants attended monthly meetings

and had "access" to certain information, Plaintiffs provide no basis, as they must under the

Private Securities Litigation Reform Act of 1995 ("Reform Act"), for these claims.  Moreover,

those allegations do not withstand scrutiny in light of Allscripts' public disclosures and the

Amended Complaint's own allegations.

    The Amended Complaint is also notable for what it does *not* allege.  For instance,

Plaintiffs do not allege that either of the Individual Defendants sold even a single share of stock

at the purportedly "inflated" price, or had any other possible motive to have attempted to deceive

Allscripts' shareholders.  In fact, the Individual Defendants were sizable shareholders in their

own right, and they suffered exactly the same decline in the value of their holdings as every other

Allscripts shareholder – hardly indicative of a plan to defraud Allscripts' shareholders for

personal gain.

    In short, for all its rhetoric and prolixity, Plaintiffs' claim can be distilled to an illogical

and unacceptable syllogism:  (1) during the putative Class Period, Allscripts provided forecasts

regarding its business; (2) at the end of the Class Period, Allscripts did not meet these forecasts;

and (3) the Individual Defendants must therefore have engaged in a scheme to artificially inflate

the stock price during the period by deliberately misleading shareholders.  In passing the Reform

Act, Congress clearly requires far more, precisely because of the risk that software companies

such as Allscripts will be subject to abusive and meritless litigation – as Allscripts regrettably

has before, *see In re Allscripts Inc. Sec. Litig.*, No. 00 C 6796, 2001 WL 743411 (N.D. Ill. Jun.

29, 2001) (Kocoras, J.) (dismissing securities fraud claim arising out of an early version of

software product, TouchScript).  As discussed below, Plaintiffs' claims are of the type routinely

found to be insufficient as a matter of law under the Reform Act and should be dismissed.

## BACKGROUND

### A.     Background of Allscripts

Allscripts-Misys Healthcare Solutions, Inc. ("Allscripts" or "the Company") is a leading

provider of health information technology and electronic health record ("EHR") solutions.  (*See*

Am. Compl. ¶ 2.)[1]  Allscripts develops software that physicians use to improve the quality of

health care.  (*See* Allscripts 2006 Form 10-K ("2006 10K") at 3 (*cited* at Am. Compl. ¶ 85) (Ex.

1).)  The Company is among the largest providers of EHR software in the United States.

Contrary to Plaintiffs' allegations that "Allscripts is no longer publicly traded," (Am. Compl. ¶

13), Allscripts continues to be listed on NASDAQ under the ticker symbol MDRX.[2]

During the Class Period, Allscripts reported its financial results utilizing three operating

segments:  (1) Software and Related Services; (2) Information Services; and (3) Prepackaged

Medications.  (Ex. 1 at 3, 6-7, 32.)  The Software and Related Services segment consists of

clinical software solutions offered by the Clinical Solutions business unit, which is responsible

---

[1]  The Court may consider facts alleged in the complaint and documents appended to or incorporated in it by reference; documents "integral" to the complaint and relied upon by it, even if not attached or incorporated by reference; public disclosure documents filed with the Securities and Exchange Commission; and facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007); *see also Anderson v. Simon*, 217 F.3d 472, 474-75 (7th Cir. 2000).

[2]  This allegation reflects a serious misunderstanding of Allscripts' transaction in fall 2008 with Misys plc Health Care Systems, LLC.  (Am. Compl. ¶ 13.)  Plaintiffs incorrectly assert that Allscripts-Misys is "a fully owned division of London-based Misys Plc . . ."  (*Id.* at ¶ 16.)  In fact, however, the transaction was one in which a subsidiary of Misys plc merged into Allscripts (*compare Id.* at ¶¶ 63, 64 *with* Allscripts Q3 2008 Form 10-Q at 18, 19 (Ex. 2), such that Allscripts remains a publicly-listed company, with Misys plc owning approximately 54% of its shares.

for the software at issue in this case, TouchWorks EHR, and other lauded software programs.[3]

This business unit designs and provides software for physician practices, including EHR,

electronic prescribing ("e-prescribing"), practice management, emergency department

information systems ("EDIS"), and hospital care management solutions.  (Ex. 1 at 3.)

EHR software automates the collection and management of clinical data.  (*Id.* at 3.)  EHR

software allows physicians to enter, organize, and effectively utilize patient information at the

point of care.  (*Id.*)  EHR software also streamlines practice-wide clinical workflow and

communication, helping physicians manage lab orders, results, and other data.  (*Id.*)  EHR

software solutions help to improve health care quality and reduce costs by preventing medical

errors, reducing paperwork, and reducing administrative inefficiencies.  (*Id.*)

## B.       Background of TouchWorks EHR

TouchWorks EHR is an award-winning EHR solution.  (*Id.* at 5-6; 2007 10K at 4 (Ex.

3).)  TouchWorks EHR is designed to enhance physician productivity using Tablet PCs, wireless

handheld devices, or desktop workstations to automate common physician activities, such as

prescribing, ordering lab tests, and documenting patient visits.  (Ex. 3 at 4-5.)

The software at issue here, TouchWorks Version 11, was introduced in May 2007.  It

added over two million lines of new code to the TouchWorks EHR platform and many new

features that had been unavailable on TouchWorks Version 10.1.  (*See* Allscripts Q4 2007 Conf.

Call. Tr. at 2 (Ex. 4) (*cited* at Am. Comp. ¶ 54).)  Allscripts designed V-11 to provide more

flexibility than TouchWorks v10.1.  (*Id.*)  Prior to introducing V-11 to the market, Allscripts

partnered closely with a key client, George Washington University Medical Faculty Associates

("GW MFA"), to conduct a significant amount of its quality control and end-user verification.

---

[3]  Clinical Solutions designed TouchWorks EHR for large and mid-size practices.  It also marketed
separate award-winning software, HealthMatics EHR and HealthMatics ED, to small to mid-sized
physician groups and emergency departments.  (*See* Ex. 3 at 4-5.)

(Am. Compl. ¶¶ 27, 28, 36.)  GW MFA is a 300-physician multi-specialty group in Washington,

D.C.  (*See* Allscripts Q1 2007 Conf. Call Tr. at 3 ("Q107 Conf. Call") (Ex. 5) (*cited* at Am.

Compl. ¶ 25).)  GW MFA, in particular, "played a unique role in aiding [Allscripts] in the quality

assurance process."  (Allscripts Q2 2007 Conf. Call Tr. at 11 ("Q207 Conf. Call") (Ex. 6) (*cited*

at Am. Compl. ¶ 36).)[4]  Allscripts had placed V-11 into controlled release at the GW MFA and at

15 to 20 other client sites.  (Am. Compl. ¶ 28.)  GW MFA reviewed, tested, and documented

close to 100 processes before V-11 was approved for launch, (Ex. 5 at 3), and the product went

"live" at GW MFA, its first national site, on May 22, 2007.  (Am. Compl. ¶¶ 27, 28, 36.)

>    **C.    Allscripts Provides Earnings And Bookings Guidance, Which It Revised
>            During The Class Period.**

In recognizing revenue from software such as TouchWorks EHR, Allscripts used a

conservative accounting approach, known as the "percentage-of-completion" method, by which

Allscripts recognized revenue over the course of a software implementation.  In other words,

revenue is recognized incrementally as the implementation proceeds, rather than upon the

signing of the contract or delivery of the software.  (Ex. 1 at 34.)

On May 8, 2007, Allscripts announced its financial results for the first quarter of 2007.

(Am. Compl. ¶ 24; Allscripts 5/8/07 News Release ("5/8/07 News Release") (Ex. 8).)  Allscripts

reported that total revenue for the three months ended March 31, 2007 was $65.0 million,

compared to $42.2 million for the same period in 2006.  (Am. Compl. ¶ 24.)  Revenue from

software and related services (which includes the Clinical Solutions business unit) was $51.2

million, compared to $28.3 million for the same period in 2006, increasing by approximately

---

[4] As explained at the time, Allscripts employed an "iterative design process that gathered extensive
feedback from hundreds of physician users to understand and build the process models and solutions
required to support seamless workflows."  (*See* 5/22/2007 Joint News Release, "The George Washington
University Medical Faculty Associates Goes Live With Latest Allscripts Electronic Health Record For
300 Physicians" (Ex. 7).)

81.0%.  (*Id.* ¶ 24.)  During the first-quarter earnings call, Messrs. Tullman and Davis explained that the Company would go live with V-11 at GWU MFA later in May.  (Ex. 5 at 3.)  Messrs. Tullman and Davis also provided earnings and bookings guidance for the remainder of 2007. (Am. Compl. ¶ 25.)  Mr. Davis explained that Allscripts continued to forecast total revenue for 2007 to be in excess of $300 million.  (Ex. 5 at 6-7.)

On August 8, 2007, the Company announced its financial results for the second quarter of 2007.  (Am. Compl. ¶ 34; Allscripts 8/8/07 News Release ("8/8/07 News Release") (Ex. 9).) Allscripts reported that total revenue for the three months ended June 20, 2007 was $70.0 million, compared to $60.0 million for the same period in 2006.  (Am. Compl. ¶ 34.)  Revenue from software and related services during the quarter was $54.7 million, compared to $46.7 million for the same period in 2006.  (*Id.*)  Allscripts reported that revenue from software and related services for the six months ended June 30, 2007, was $105.9 million, compared to $75.1 million for the same period in 2006, increasing by 41%.  (Ex. 9 at 1.)  Allscripts again confirmed its forecast and guidance for 2007.  (Ex. 6 at 6.)

On November 8, 2007, Allscripts announced its financial results for the third quarter of 2007.  (Am. Compl. ¶ 44; Allscripts 11/8/07 News Release ("11/8/07 News Release") (Ex. 10).) Allscripts reported that total revenue for the three months ended September 30, 2007 was $73.4 million, a record for the Company, compared to $62.2 million for the same period in 2006.  (Am. Compl. ¶ 44.)  Revenue from software and related services was $59 million, an increase compared to $49.5 million for the same period in 2006.  (*Id.*)  Allscripts reported that revenue from software and related services for the nine months ended September 30, 2007, was $164.9 million, compared to $124.6 million for the same period in 2006, increasing by 32.4%.  (*See* Ex. 10 at 1.)

Significantly, at the same time, Allscripts also lowered its revenue forecast for the full year 2007 to a range of $286 million to $288 million.  (Ex. 10 at 1; Allscripts Q3 2007 Conf. Call Tr. at 6 ("Q307 Conf. Call") (Ex. 11) (*cited* at Am. Compl. ¶ 46).)  Mr. Davis explained that, while the Company "had a great deal of success in signing large enterprise agreements," "because of the complexity and size of these deployments" there would be a slower pace of revenue recognition.  (Ex. 11 at 4.)  That is, under percentage-of-completion accounting methodology, the elongated deployment schedules for Allscripts' large enterprise deals meant that most of the revenues from recently signed large enterprise clients would be recognized in fiscal year 2008.  (*Id.* at 17, 19.)

On February 13, 2008, Allscripts announced its financial results for the fourth quarter and full-year 2007.  (Am. Compl. ¶ 53.)  Although Allscripts reported record revenues for 2007 of $281.9 million, it did not meet its November forecast of $286-288 million - a shortfall of 1.4%. (*Id.*)  Mr. Tullman explained that the Company's 2007 revenue had been affected by "the timing of our TouchWorks V-11 release, and the impact on our deployment schedules, the mix of practice management and electronic health record sales, and the percentage of enterprise sales." (Ex. 4 at 2.)  Nevertheless, 2007 was a record-setting year for Allscripts in earnings, revenues, and bookings.  (*See* Allscripts 2/13/08 News Release (Ex. 12) (*cited* at Am. Compl. ¶ 53).) Allscripts reported total revenue of $281.9 million, compared to $228.0 million for 2006, an increase of 23.7%. (*Id.*)  Revenue from software and related services for the year was $222.7 million compared to $173.5 million for 2006, increasing by 28.3%.  (*Id.*)

### D.    Alleged False And Misleading Statements

The Amended Complaint alleges that a variety of sales and revenue projections, generalized optimistic statements, and statements about the development and implementation of V-11 made in press releases and analyst conference calls during the Class Period were materially

false and misleading.  (*See* Am. Compl. ¶¶ 32, 42, 51.)  The challenged statements fall into three

general categories: (1) vague, generalized optimistic statements about growth prospects for

Allscripts; (2) forward-looking statements and projections about Allscripts' financial

performance or the deployment of V-11; and (3) statements describing the demand for, testing

of, or deployment of V-11.

   ***Generalized Optimistic Statements Regarding Allscripts And V-11.***  Plaintiffs challenge

certain generalized, optimistic statements about Allscripts' growth and V-11.  For example,

Plaintiffs point to the following statements by Mr. Tullman:

- "Our revenue growth, visibility to sales opportunities and solid bottom-line performance give us confidence in our ability to deliver during the remainder of 2007." (Am. Compl. ¶ 24.)

- "V-11 will allow Allscripts to become what I call the Bloomberg of health care.  It will provide physicians with a product they want to use and need to have."  (*Id.* ¶ 26.)

- "Market validation of V-11 [a]s a transformational product has been overwhelming." (*Id.* ¶ 26.)

- "We have a clear vision for integrating software, connectivity and information to transform healthcare, and we continue to demonstrate our ability to deliver on that vision. (*Id.* ¶ 34.)

- Mr. Tullman's statement on August 7, 2007 that "[h]aving invested in new technology and hired aggressively for future growth, we are in a position to capitalize on the significant market opportunity during the second half of the year, which is traditionally the industry's strongest sales period." (*Id.* ¶ 34.)

- "Sales in our clinical software business grew 77 percent over the last year, confirming both the acceleration in the market and Allscripts' continuing leadership."  (*Id.* ¶ 45).[5]

- "Columbia and Lahey raise our profile dramatically, re-enforce [sic] our position as the number one provider for both large enterprise clients and multi-specialty groups, and we are already seeing the impact. . . " (Am. Compl. ¶ 47.)

---

[5] Plaintiffs do not dispute that sales in the clinical software business grew by 77%.  (*See* Ex. 10 at 1.)

***Forward-Looking Statements and Projections.***   In the second category, Plaintiffs

challenge Allscripts' forward-looking statements and projections, including:

- Allscripts' guidance on May 8, 2007 of full year 2007 revenue "in excess of $300 million" (*Id.* ¶ 25; *see also* Ex. 5 6-7.)

- Allscripts' guidance for clinical bookings on May 8, 2007, including Mr. Davis's statement, "As such, we now expect total clinical bookings for the year to exceed $230 million versus our previously communicated guidance . . .") (*Id.*)

- Mr. Davis's statement on August 8, 2007 that "[we] *feel that* we have sufficient backlog and sales opportunities to convert that *to deliver on the $300 million for the year.*" (Am. Compl. ¶ 35.)

- Allscripts' downward revision of its full year revenue forecast on November 8, 2007: "Allscripts has updated its revenue target for the full year 2007 to a range of $286 million to $288 million. . ." (*Id.* ¶¶ 44-46.)

- Mr. Tullman's May 8, 2007 statement that "We don't expect issues to come up relative to the actual installation and—or conversion or transition to the V-11. . ." (*Id.* ¶ 28.)

***Statements About V-11 Testing, Deployment, and Demand.***   Finally, Plaintiffs challenge

certain statements about the status of the development and rollout of V-11, including that:

- V-11 was "the most tested product in our history." (Am. Compl. ¶ 25; *see* Ex. 5 (May 8, 2007) Conf. Call at 3.)

- "We did a tremendous amount of work on the process to make sure that [installation or conversion problems] do[]n't happen." (*Id.* ¶ 28; *see* Ex. 5 (May 8, 2007) Conf. Call at 21.)

The Amended Complaint also challenges statements about the deployment of V-11,

including:

- "Interestingly, by the way, the delays in the project came not from development. They came from the fact that we did an awful lot of design work and that actually delayed the start of the development work." (Am. Compl. ¶ 27; *see* Ex. 5 (May 8, 2007) Conf. Call at 17.)

- "We are looking at a few thousand users probably by the end of August.  That rollout is going very well." (*Id.* ¶ 36; *see* Ex. 6 (Aug. 7, 2007) Conf. Call at 11.)

9

- "[The implementations] [are] roughly consistent with the past. . . As we had subsequently rolled out additional sites, we [have] seen some consistent trends relative to the deployment requirements on those upgrade processes." (*Id*. ¶ 36; *see* Ex. 6 (Aug. 7, 2007) Conf. Call at 11.)

- "We actually saw close to about 25% increase in the production of our resources in terms of overall billable hours in the quarter.  We had anticipated that by virtue of a lot of resources being dedicated to Version 11 efforts earlier in the year and the like.  So we absolutely saw a nice improvement in terms of overall productivity.  The challenge as we tried to highlight in terms of that conversion into revenue was where those efforts were focused on in terms of ramp-up of some of our larger customers and given the long duration and the overall number of hours involved in those implementations, what that translated into overall revenue.  So we absolutely are seeing the capability being there in terms of the production capacity to pull the backlog through, but also recognizing that we were moving large customers into production at the same time;" as well as the statement that "we have more resources, training was successful." (*Id*. ¶ 48; *see* Ex. 11 (Nov. 8, 2007) Conf. Call at 7.)

Finally, the Amended Complaint challenges statements describing demand for the

Company's  product:

- "There is a very substantial amount of pent-up demand." (Am. Compl. ¶ 27; *see* Ex. 5 (May 8, 2007) Conf. Call at 17.)

- "Relative to Version 11, we continue to see good progress there and rolling it out we see very strong demand, and again, in some respects the demand has outstripped what we expected because of the positive response and that means that we have taken our resources and deployed them to Version 11 . . ." (*Id*. ¶ 49; *see* Ex. 11 (Nov. 8, 2007) Conf. Call at 10.)[6]

### E.     Alleged Reasons For Falsity Of Alleged Misstatements And For *Scienter*

Plaintiffs attempt to plead various reasons why the statements described above were false

and misleading when made.  In general, Plaintiffs contend that V-11 was "plagued by serious

features, functionality, and quality problems," and that those software "bugs" caused Allscripts

to experience increased implementation times, thus delaying the conversion of sales into

revenue.  (*See* Am. Compl. ¶¶ 32(a), 42(a), 51(a).)  Plaintiffs also assert that "Allscripts sent

---

[6] Plaintiffs also attempt to allege that the formal quiet period announced during the Company's second quarter earnings call, on August 7, 2007, was unusual and designed to conceal problems arising during the third quarter.  (Am. Compl. ¶ 41.)  As Allscripts explained at the time, however, adoption of the quiet period was consistent with best practices in the industry.  (*See* Ex. 6 at  6.)

inexperienced and undertrained personnel to implement V-11 . . . ," (*see id.* ¶¶ 32(d), 42(d),
51(d)), and that because V-11 "was an almost entirely new application, there was no
documentation from prior versions to aid the Client Services team in working through
implementation problems."  (*Id.* ¶ 72.)  Significantly, all of these allegations are made on
information and belief.  Plaintiffs nowhere identify the basis for any of these allegations.  As
discussed at pp. 15-16, *infra*, they appear to be based on confidential sources.

Though Plaintiffs challenge certain statements made in earnings calls and news releases,
Plaintiffs do not challenge other contemporaneous statements, such as that Allscripts had
partnered closely with GW MFA and employed an iterative design process gathering extensive
feedback from hundreds of physician users.  (Am. Compl. ¶¶ 27, 28, 36; Ex. 5 at 3; Ex. 7 at 1.)
Nor do they dispute that GW MFA played a unique role in the quality assurance process by
reviewing, testing, and documenting close to 100 processes before approving V-11.  (Ex. 5 at 3;
Ex. 6 at 11.)

Moreover, as Plaintiffs themselves plead, after the May 2007 launch of V-11, Allscripts'
quality assurance group continually tested the "fixes" for the bugs that had been identified before
product launch, and continually tested the fixes for bugs that were discovered during
implementations.  (Am. Compl. ¶ 71.)  As part of the quality assurance process for V-11,
Allscripts employed development technicians and quality-assurance personnel who used
databases to identify and resolve software issues.  (*Id.* ¶ 70.)  The development team prioritized
bugs as critical, major, and minor.  (*Id.*)  The quality assurance group promptly fixed critical
bugs, usually within one week of identification.  (*Id.*)  The other bugs were remedied with
"service packs, bug fixes, and design changes."  (*Id.*)  Plaintiffs do not allege that Allscripts'

development technicians or quality assurance teams failed to address software issues in timely fashion.  (*See id*. ¶¶ 69, 70.)

As for *scienter*, Plaintiffs do not allege any motive on the part of the Individual Defendants to commit securities fraud.  Instead, Plaintiffs attempt to plead that the Individual Defendants "knew" of the alleged falsity of their public statements based on the following: *First*, the Individual Defendants are alleged to have participated in monthly conference calls with other members of senior management where they were allegedly provided with updates on aspects of the Company's business and V-11, including the performance of V-11 and the resolution of software issues.  (Am. Compl. ¶¶ 68, 71, 72.)  *See infra* at pp. 30-32.  *Second*, the Individual Defendants allegedly had "access" to two internal databases (HP Mercury and FastTrack) used by the quality assurance group and development team.  (*See id.* ¶¶ 70, 75.)  *See infra* at 32.  *Third*, Defendants allegedly knew that one of Allscripts' accounts, Tennessee Oncology, was dissatisfied with Allscripts' efforts to implement V-11 as a result of a letter dated September 11, 2007.  (*Id.* ¶ 74.)  *See infra* at pp. 33-34.  *Fourth*, Allscripts released a subsequent version of V-11 after the end of the Class Period, which improved upon the original version.  (*Id.* ¶ 71.)  *See infra* at 34.[7]

## ARGUMENT

Plaintiffs' Amended Complaint purports to assert two claims.  Count I alleges violations of Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  Count II alleges violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

---

[7] Plaintiffs allege that Defendants "admitted" that they had lacked a basis for estimating installation times for V-11. (Am. Compl. ¶ 54).  As is clear from the quoted excerpts set forth in the Amended Complaint, however, that is not an accurate characterization of what was said during the February 13, 2008 call, which was merely that there were variations in implementation times across the 30 or so clients at which it was being implemented.  (*Id.*)

To state a claim under Section 10(b), Plaintiffs must allege (1) a material misrepresentation or omission, (2) *scienter* or intent to defraud, (3) in connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005).  To survive a motion to dismiss, Federal Rule of Civil Procedure 8(a) requires that, at minimum, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, --- U.S. ---, 129 S.Ct. 1937 (2009).  Section 10(b) claims, moreover, are subject to the special pleading requirements of Federal Rule of Civil Procedure 9(b), which requires plaintiffs to "state with particularity any circumstances constituting [an alleged] fraud."  *DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir. 1990) (internal quotation marks and citation omitted).

In promulgating the Reform Act, one of the problems that Congress sought to address was the chilling effect on innovation that abusive securities litigation has on technology companies such as Allscripts.  *See* H.R. Conf. Rep. No. 104-369 at 43 (1995), as reprinted in 1995 U.S.C.C.A.N. 730 at 742 ("H.R. Conf. Rep.") ("Technology companies—because of the volatility of their stock prices—are particularly vulnerable to securities fraud lawsuits when projections do not materialize.  If a [technology] company fails to satisfy its announced earnings projections—perhaps because of . . . the timing of an order or new product—the company is likely to face a lawsuit).[8]  To that end, the Reform Act enacted three additional heightened pleading standards beyond those imposed under the Federal Rules of Civil Procedure, which are designed to weed out meritless suits.

---

[8]  *See also* S. Rep. No. 104-98 at 33 (2005), as reprinted in 1995 U.S.C.C.A.N. 679 at 711 ("[T]here seems to be a pattern of targeting high technology companies . . . Either the securities litigation system is broken, or there is an enormous disrespect for the law in Silicon Valley. We believe that the problem lies with the system of litigation.").

*First*, plaintiffs are required to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).  And, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity "all facts on which the belief is formed." *Id.*

*Second*, under the "Safe Harbor" provision, when a challenged statement is forward-looking, the Reform Act provides that defendants "shall not be liable" if it is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *See* 15 U.S.C. § 78u-5(c)(l)(A).

*Third*, the Reform Act requires plaintiffs to set forth facts giving rise to a "strong inference" that the defendant acted with *scienter*. *Id.* § 78u-4(b)(2).  As the Supreme Court has explained, to create a "strong" inference of scienter, the well-pleaded allegations and other matter properly considered on a motion to dismiss must give rise to an inference of fraudulent misconduct that is "more than merely plausible or reasonable–it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 324.

For all the reasons discussed below, Plaintiffs fail to meet these heightened pleading standards and dismissal is required under the Reform Act.  *See* 15 U.S.C. § 78u-4(b)(3)(A).

## I. THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS DO NOT ALLEGE, WITH REQUISITE PARTICULARITY, THAT DEFENDANTS MADE ANY FALSE STATEMENTS.

Plaintiffs attempt to challenge as materially false and misleading various generalized optimistic statements about growth; forward-looking projections for 2007; and statements about the demand for, testing of, and deployment of, V-11.  These attempts fail for a number of reasons.

A.     **The Amended Complaint Is Premised On Information And Belief And Fails
To Identify A Basis On Which Those Beliefs Are Formed.**

As an initial matter, Plaintiffs' claims of falsity are almost exclusively premised upon
allegations with respect to internal Allscripts' meetings and data.  No Plaintiff is alleged to have
participated in those meetings or to have any personal knowledge of those matters.  Thus, these
allegations are necessarily based upon "information and belief."  *See e.g., In re Autodesk, Inc.
Sec. Litig.*, 132 F. Supp. 2d 833, 839 (N.D. Cal. 2000) ("[W]here plaintiffs do not allege personal
knowledge, the complaint must be based on information and belief—that is the only
alternative").  Under these circumstances, the Reform Act requires plaintiffs to "state with
particularity all facts" on which their beliefs were formed.  15 U.S.C. § 78u-4(b)(1).  Where, as
appears to be the case here, the information and belief is based on confidential sources, plaintiffs
must, at a minimum, "describe their sources with sufficient particularity to support the
probability that a person in the position occupied by the source would possess the information
alleged."  *In re Career Educ. Corp. Sec. Litig.*, No. 03 C 8884, 2006 WL 999988, *3-4 (N.D. Ill.
Mar. 28, 2006) (*citing Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) ("If [] the descriptions
indicate that the sources would not have access to, or knowledge of, the facts underlying the
allegations, the allegations would be insufficient.").

Remarkably, Plaintiffs ignore this requirement, and fail even to state that their allegations
are based on information and belief, much less to make the detailed factual allegations required
under the Reform Act.  This is no small matter, particularly given the centrality of these
allegations to Plaintiffs' claims.  For instance, Plaintiffs attempt to ground their allegations about
the falsity of Messrs. Tullman's and Davis' statements based upon information that Messrs.
Tullman and Davis were supposedly provided during monthly conference calls.  (Am. Compl. ¶¶
67-69, 71-72.)  Yet Plaintiffs do not indicate whether their source even participated in these

monthly conference calls; if so, whether he or she participated during the Class Period; or simply

heard something about the conference calls second- or third-hand.  Likewise, Plaintiffs claim that

V-11 had bugs that allegedly made it "unstable, and in some cases unusable."  (*Id.*)  Yet

Plaintiffs do not indicate whether their source was involved in the development or design

process, or even knows anything about software at all.  These critical omissions are an

independent basis for dismissal with respect to all three categories of purported misstatements.

*See e.g., In re Silicon Storage Tech., Inc. Sec. Litig.*, No. C-05-0295, 2006 WL 648683, at *10-

11 (N.D. Cal. Mar. 10, 2006) (dismissing complaint, in part, for failure to plead with particularity

that the confidential informants occupied positions such that they would possess the information

alleged and because the informants were not at the company during the alleged class period).

### B.     Generalized Statements Of Optimism And Puffery Are Immaterial As A Matter of Law.

It is well-settled that vague statements of optimism and puffery made by corporations and

their management are immaterial as a matter of law.  *See Anderson v. Abbott Labs.*, 140 F. Supp.

2d 894, 905 (N.D. Ill. 2001), *aff'd*, 269 F.3d 806 (7th Cir. 2001).  That is, publicly adopting a

hopeful posture that strategic plans will be successful cannot form the basis of a federal

securities lawsuit, *see Zerger v. Midway Games,* No. 07 C 3797, 2009 WL 3380653, at *6 (N.D.

Ill. Oct. 19, 2009), nor can putting a "rosy face on an inherently uncertain process."  *Eisenstadt*

*v. Centel Corp.*, 113 F.3d 378, 746 (7th Cir. 1997).  This rule is grounded on the common sense

notion that reasonable investors do not make investment decisions based upon vague optimistic

statements.  Courts, therefore, routinely hold immaterial as a matter of law "loosely optimistic

statements about growth prospects that are so vague, so lacking in specificity, or so clearly

constituting the opinions of the speaker, that no reasonable investor could find them important to

the total mix of information available."  *See e.g.*, *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563,

570-71 (6th Cir. 2004) (determining that statements regarding company's commitment to safety and quality were immaterial because a reasonable investor would not view them as "significantly changing the general gist of available information"); *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 894 (D. Minn. 2007) (deeming inactionable vague optimistic statements about development of high tech product given that those statements "must be viewed in light of the fact that [that product] is an innovative and developing technology. . ."), *aff'd,* 527 F.3d 749 (8th Cir. 2008).

This doctrine mandates dismissal of the various vague, optimistic statements about growth identified at pp. 8, *supra*, all of which are quintessential examples of corporate puffery. *Compare* Am. Compl. ¶ 24 ("Our . . . performance give[]s us confidence in our ability to deliver during the remainder of 2007") *with In re Hutchinson Technology, Inc. Sec. Litig.,* 536 F.3d 952, 959 (8th Cir. 2008) (statement that "[w]e believe we are well-positioned on a number of new disk drive programs that will be transitioning into volume production in the coming months" not actionable); *compare* Am. Compl. ¶ 26 ("V-11 will allow Allscripts to become what I call the Bloomberg of health care") *with In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1165 (N.D. Ill. 2004) (statement by corporation, "Midway believes these products to comprise the strongest home video game lineup in the Company's history and that these products will produce record home vide game results in 2002" was immaterial as a matter of law); *compare* Am. Compl. ¶ 34 ("We have a clear vision . . . and we continue to demonstrate our ability to deliver on that vision") *with San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (deeming not actionable the statement that the company "expects . . . another year of strong growth in earnings per share"); *compare* Am. Compl. ¶ 47 ("Columbia and Lahey raise our profile dramatically re-enforc[ing] [sic] our position as the number one provider for both large enterprise clients and multi-specialty groups,

and we are already seeing the impact . . . ") *with Roth v. OfficeMax, Inc.*, No. 05 C 236, 2006

WL 2661009, at *4 (N.D.Ill. Sept. 13, 2006) ("combined office products business will be

strategically stronger and better able to deliver compelling value . . ." held to be puffery).

> **C.     The Challenged Forward-Looking Statements Are Not Actionable Due To The "Bespeaks Caution" Doctrine And The Reform Act's Safe Harbor.**

At its core, the Amended Complaint is directed at Allscripts' financial projections that, in

hindsight, were not met.  *See* pp. 9, *supra*.  These projections, however, are protected by the

"bespeaks caution" doctrine and the Safe Harbor of the Reform Act.  *See Stavros v. Exelon*

*Corp.*, 266 F. Supp. 2d 833 (N.D. Ill. 2003) (Castillo, J.) (applying Safe Harbor and dismissing

securities claims based on financial projections); *Desai v. General Growth Properties*, --- F.

Supp. 2d ---, 2009 WL 2971065 *4-6 (N.D. Ill. Sept. 17, 2009) (applying Safe Harbor and

dismissing claim based upon forward-looking statements).

As the Seventh Circuit has noted, projections of future performance are inevitably

inaccurate because things almost never go as planned.  *See Wielgos v. Commonwealth Edison*

*Comp.*, 892 F.2d 509, 514 (7th Cir. 1989).  The "bespeaks caution" doctrine reflects the

proposition that projections must be read in context with cautionary language.  *Harden v.*

*Raffensperger, Hughes & Co.,* 65 F.3d 1392, 1405 (7th Cir. 1995).  When forecasts, opinions, or

projections are accompanied by meaningful warnings and sufficient cautionary language, those

forward-looking statements are not misleading and not actionable as securities fraud.  *Stavros*,

266 F. Supp. 2d at 843 n.6.

The Reform Act codified and strengthened the pre-Reform Act "bespeaks caution"

doctrine through the statutory "Safe Harbor."  *See Employers Teamsters Local No. 175 and 505*

*Pension Trust Fund v. Clorox Comp.*, 353 F.3d 1125, 1132-33 (9th Cir. 2004); *Stavros,* 266 F.

Supp. 2d at 842.  The Safe Harbor provides that defendants "*shall not be liable* with respect to

any forward-looking statement, written or oral," if the forward-looking statement is identified as

such and "is accompanied by meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those identified in the forward-looking

statement." 15 U.S.C. § 78u-5(c)(1)(A).[9]  Application of the Safe Harbor is especially important

here because one of the problems that Congress sought to address was the vulnerability of

technology companies to securities fraud lawsuits.  *See* pp. 13, *supra.*

　　As set forth above (at pp. 9, *supra*), the Amended Complaint challenges statements that

on their face are forward-looking projections of sales, revenue, earnings guidance, or predictions

about the deployment of V-11.  Each of these statements was identified as forward-looking in

accordance with the Reform Act – each of the Press Releases makes express reference to the

extensive risk factors in the 2006 10K, and the November 8, 2007 Press Release highlighted the

risks relating to implementation.  And before each of the earnings calls, Mr. Davis read a Safe

Harbor statement, which referred to the 2006 10K, and, in the case of the November call, also

referenced the November 8, 2007 Press Release.  (*See* Am. Compl. ¶¶ 85- 89).  This language

clearly and adequately identified forward-looking statements and the accompanying risk factors

to the marketplace.  *See e.g., Asher v. Baxter*, 377 F.3d 727, 732 (7th Cir. 2004); *Stavros*, 266 F.

Supp. 2d at 844.

　　As the Amended Complaint itself demonstrates, Allscripts' risk factors plainly identified

the very risk that Plaintiffs claim caused Allscripts to fail to meet its original and revised

forecasts.  (*See* Am. Compl. ¶¶  32(a), 42(a), 51(a)).  As Allscripts cautioned, "*If our products*

---

[9] The Safe Harbor specifically defines the term "forward-looking statement" to include: "(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items; and (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer; . . . and (D) any statement of the assumptions underlying or relating to" the above.  *Id.* § 78u-5(i)(1).

*fail to perform properly due to undetected errors or similar problems, our business could suffer.*"
(Am. Compl. ¶ 85; *see also* 2006 10-K at 13) (emphasis in original).  Allscripts warned that
"[c]omplex software such as ours often contains undetected defects or errors.  *It is possible that
such errors may be found after . . . new enhancements to existing software.*" (*Id.*) (emphasis
added); *see also id.* ("We continually introduce new solutions and enhancements to our
solutions, and, *despite testing by us, it is possible that errors might occur in our software.*")
(emphasis added).)  In addition, the Company cautioned that its operating results may vary
because of elongated deployment and sales cycles.  Thus, Allscripts warned investors that it
expected its quarterly operating results to vary depending on a number of factors, including the
"sales, service, and *implementation cycles* of our clinical software products and physician
education products and services." (Am. Compl. ¶ 85; 2006 10-K at 26) (emphasis added).  In
fact, not only did Allscripts identify the very contingencies that Plaintiffs say came to pass, but it
identified the very consequences that Plaintiffs say Allscripts suffered as a result: "errors in our
software could result in . . . lost sales; delays in commercial release; . . . delays in or loss of
market acceptance of our solutions; . . . unexpected expenses and diversion of resources to
remedy errors." (*Id.* at 13).

   In an effort to blunt the impact these explicit risk factors have on their claims, Plaintiffs
attempt to plead them away as "boilerplate."  (*See* Am. Compl. ¶ 84).  Plaintiffs are wrong.
Plaintiffs incorrectly assert that these risk factors were vague and that they did not change over
the Class Period and apparently will attempt to invoke the unique factual circumstances
addressed in *Asher v. Baxter Int'l Inc.*, 377 F.3d 727 (7th Cir. 2004).  The facts here, however,
are much different.

Most critically, in *Asher*, Baxter had identified certain factors that could cause actual results to differ materially from those in the forward-looking statement, but did not identify the precise risks that were alleged to have come to pass.  Because of the variance between the disclosed risk factors and the subsequent events, the *Asher* court was required to determine whether those factors identified by Baxter were "meaningful."  *Id*. at 734 ("The problem is not that what actually happened went unmentioned; issuers need not anticipate all sources of deviations from expectations.  Rather, the problem is that there is no reason (on this record) to conclude that Baxter mentioned those sources of variance that (at the time of the projections) were the principal or important risks.").  In this context, the *Asher* court observed in *dicta* that the fact that the risk factors had not changed despite changes in Baxter's underlying business situation could be a factor indicating that the risk factors were not viewed at the time as "meaningful."  *Id*.  Under those circumstances, the Seventh Circuit remanded for further proceedings.  *Id*.

But no such additional inquiry is needed here.  That is because, as Judge Shadur recently explained, although the Reform Act does not demand clairvoyance, where the identified risk factors are actually the same as what is alleged to have come to pass, they are *a fortiori* "meaningful" cautionary statements.  *Desai*, --- F. Supp. 2d ---, 2009 WL 2971065, at *6 ("While prescience is not required under the [Reform Act]'s Safe Harbor provision, General Growth's cautionary statements were in fact entirely anticipatory of Plaintiffs' claim.  General Growth identified the exact risks that have been identified in Plaintiffs' Complaint . . . To call those statements 'boilerplate' borders on the farcical."); *see also W. Pennsylvania Elec. Employees Pension Trust v. Plexus Corp.*, No. 07 C 0582, 2009 WL 604276, * 8 (E.D. Wis. Mar. 6, 2009)  (granting motion to dismiss and noting that case was different from *Asher* in that "the

cautionary language identifies and discusses the risk at issue -- future order placement," *i.e.,* the same risk that plaintiffs alleged was realized and the cause of their loss).  Under these circumstances, the plaintiffs' claim is dismissed.  *Desai*, -- F. Supp. 2d ---, 2009 WL 2971065, at *7; *see also In re XM Satellite Radio Holding Sec. Litig.*, 479 F. Supp. 2d 165, 185 (D.D.C. 2007) (dismissing complaint where warnings "relate[d] directly to the language by which plaintiffs claim to have been misled") (internal citations omitted); *In re NVE Corp. Sec. Litig..*, 551 F. Supp. 2d at 893 (dismissing complaint and deeming statements inactionable where "filing specifically warned of technological challenges to development of . . . technology such as the control of magnetic and other parameters and the need to develop stable designs.").

Moreover, unlike Baxter's situation in *Asher*, Allscripts did update its warnings as additional information became available.  *See Plexus Corp.*, 2009 WL 604276, * 8 (noting that, unlike *Asher*, "defendants' cautionary language is not static, but changes over time to reflect new risks and problems [the company] encounters.").  Thus, Allscripts revised its Safe Harbor statement in its third-quarter press release of November 8, 2007, to caution specifically about the length of installations:

> These forward-looking statements are subject to a number of risks and uncertainties, some of which are outlined below.  As a result, actual results may vary materially from those anticipated by the forward-looking statements.  Among the important factors that could cause actual results to differ materially from those indicated by such forward-looking statements are: the volume and timing of systems sales and installations; length of sales cycles and the installation process; the possibility that products will not achieve or sustain market acceptance; the timing, cost and success or failure of new product and service introductions, development and product upgrade releases . . .

(Ex. 10 at 2; Am. Compl. ¶ 88).

On similar facts, this Court and others in this District have consistently applied the Reform Act's Safe Harbor and granted dismissal.  *See Stavros*, 266 F. Supp. 2d at 843-847 (granting dismissal pursuant to the Safe Harbor); *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 711

22

(N.D. Ill. 2005) (same).  Indeed, the Northern District has granted dismissal to Allscripts itself on

virtually this precise factual scenario:

> [Allscripts] disclosed in the Form 10-K that early versions of TouchScript were
> susceptible to technological errors.  If this later proved to be the case, Plaintiffs had
> already been put on notice as to the potential for errors and cannot recover against
> Defendants for alleged omissions or affirmative misrepresentations.

*In re Allscripts, Inc. Sec. Litig.*, 2001 WL 743411, at *9.   The same result is required here.

### D.    Plaintiffs Have Not Adequately Pleaded The Falsity Of Alleged Present-Tense Statements About The Demand For, Testing Of, and Deployment Of V-11.

The essence of a misrepresentation claim is that the challenged statement was false at the

time it was made.  It is axiomatic under Rule 9(b) that plaintiffs seeking relief under Rule 10b-5

must point to specific facts suggesting that fraud occurred.  *See DiLeo v. Ernst & Young*, 901

F.2d 624, 627-28 (7th Cir. 1990).  Moreover, the Reform Act requires factual particularity for

allegations of false statements.  15 U.S.C. § 78u-4(b)(1).  Applying these principles to the

remaining statements that Plaintiffs challenge, Plaintiffs have not properly alleged that they were

false at the time they were made.

*First*, in conclusory fashion, Plaintiffs assert that statements describing demand for V-11,

*see* pp. 10, *supra,* were false or misleading when made.  However, Plaintiffs do not plead any

basis to assert that demand was somehow weaker than reported in May 2007 or November 2007,

respectively, when Mr. Tullman made these statements.  Nor can they.  It is undisputed that, in

the third quarter of 2007, clinical sales reached $63.2 million, a 77% increase year-over-year,

and that Allscripts had its largest quarter of bookings ever.  (*See* pp. 6, *supra*).

*Second*, Plaintiffs challenge Mr. Tullman's statements regarding the testing that

Allscripts conducted on V-11.  Mr. Tullman described tests that Allscripts had conducted on V-

11.  (*See* Am. Compl. ¶ 25) (V-11 was "the most tested product in our history") *and* ¶ 28 ("We

did a tremendous amount of work on the process to make sure that doesn't happen."). Plaintiffs apparently challenge these statements because, according to Plaintiffs, Allscripts did not run a "typical testing program" on V-11 before the general release of the software. (*See* Am. Compl. ¶ 69.) But there is simply no way to reconcile Plaintiffs' assertion with undisputed allegations in the Amended Complaint or with documents incorporated by reference in the Amended Complaint that Plaintiffs do not challenge. *See* pp. 11-12, *supra*. Thus, for instance, Plaintiffs do not dispute that, before releasing V-11, Allscripts partnered closely with GW MFA to conduct a significant amount of testing and end-user verification, (Am. Compl. ¶¶ 27, 28, 36), or that GW MFA "played a unique role in aiding [Allscripts] in the quality assurance process." Plaintiffs also do not dispute that Allscripts placed V-11 into controlled release at GW MFA and at 15 to 20 different client sites, (Am. Compl. ¶ 28), or that GW MFA reviewed, tested, and documented close to 100 processes before approving V-11 for launch. Because Plaintiffs' assertions are both internally inconsistent and contradicted, the Court need not accept them. *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001); *Campos v. INS*, 32 F. Supp. 2d 1337 (S.D. Fla. 1998) ("Courts must liberally construe and accept as true allegations of fact in the complaint and inferences reasonable deducible therefrom, but need not accept factual claims that are internally inconsistent, facts which run counter to facts of which the court can take judicial notice, [or] conclusory allegations . . ."); *Premier Capital Mgmt, LLC v. Cohen*, No. 02 C 5368, 2003 WL 21960357, at *10 (N.D. Ill. Aug. 15, 2003).

*Third*, the Amended Complaint also seeks to challenge statements of Messrs. Tullman and Davis about the deployment of V-11. For example, Plaintiffs challenge as false Mr. Tullman's statement that "delays in the project [at GW MFA] came not from development. They came from the fact that we did an awful lot of design work and that actually delayed the start of

the development work." (Am. Compl. ¶ 27.) But Plaintiffs offer no well-pleaded basis to

surmise that significant delays at GW MFA occurred other than during the design stage.

Likewise, Plaintiffs challenge a statement Mr. Tullman made when reporting Allscripts'

second quarter results in early August 2007: "We are looking at a few thousand users probably

by the end of August. That rollout is going very well." (Am. Compl. ¶ 36.) Here too, Plaintiffs

offer no well-pleaded allegation contradicting Mr. Tullman's statement, such as by showing that

deployments of V-11 had suffered delays before August 2007. *See DiLeo*, 901 F.2d at 627 ("The

complaint has more in the same vain, but not a single concrete example."). To the extent that the

Amended Complaint relies on the situation at Tennessee Oncology (*see* Am. Compl. ¶ 74), that

illustration is inapposite. The Amended Complaint specifically alleges that Tennessee Oncology

notified Allscripts' senior management of its concerns on September 11, 2007, a month after Mr.

Tullman made these statements. *See e.g., Brodsky v. Yahoo!, Inc.*, 630 F. Supp. 2d 1104, 1114-

17 (N.D. Cal. 2009) (dismissal where alleged misstatement made prior to allegedly corrective

information).

Finally, Plaintiffs challenge a statement Mr. Tullman made in November 2007 regarding

productivity. (*See* pp. 10, *supra*.) Plaintiffs, however, offer no well-pleaded allegation that

contradicts Mr. Tullman's account of the increase in overall billable hours or the increase in

capacity resulting from Allscripts' hiring in the first six months of 2007. (*See* Am. Compl. ¶

48.)[10] Nor do Plaintiffs dispute that the Company hired more personnel or that this would have

increased the overall capacity and hours available for deployments of TouchWorks EHR.

---

[10] *See* Ex. 6 at 15 ("Analyst: Okay. . . . finally, . . . you mentioned, a lot of hiring. I guess over the first
six months of this year. Are you done there and should we look for margins to ratchet up as you sort of
are done adding expenses on the employee count? Tullman: I think I will let Bill handle part of it. I will
handle the first part. As we mentioned, we have in some respects overinvested up front to make sure we
have trained people on board to deploy the systems we were selling. . .").

These deficiencies are fatal.  The Amended Complaint challenges statements Messrs.

Tullman and Davis made about the demand for, testing of, and deployment of V-11 by conflating

events that transpired in the third and fourth quarters of 2007 with statements Messrs. Tullman

and Davis made earlier in the year.  Plaintiffs, however, are not permitted to allege that

statements were false merely because circumstances subsequently changed.  The Reform Act

requires that the Amended Complaint show that the statements were misleading when made.  *See*

*In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1083 (8th Cir. 2005) ("[T]he complaint must

indicate why the alleged statements would have been false or misleading at the several points in

time in which it is alleged they were made.") (internal quotes omitted).  Plaintiffs have not done

so.

## II.     THE COMPLAINT SHOULD ALSO BE DISMISSED BECAUSE PLAINTIFFS' ALLEGATIONS DO NOT GIVE RISE TO A STRONG INFERENCE THAT DEFENDANTS ACTED WITH *SCIENTER*.

To state a claim for securities fraud under the Reform Act, Plaintiffs must also plead

particularized facts giving rise to a "strong inference" that defendants made the alleged

misrepresentations with fraudulent intent (*i.e.*, *scienter*).  *See* 15 U.S.C. § 78u-4(b)(2).

In *Tellabs*, the Supreme Court instructed that "in determining whether the pleaded facts

give rise to a 'strong' inference of *scienter*, the court must take into account plausible opposing

inferences."  511 U.S. at 322.  "A complaint will survive . . . only if a reasonable person would

deem the inference of *scienter* cogent and at least as compelling as any opposing inference one

could draw from the facts alleged."  *Id.* (emphasis added).  Accordingly, federal courts must take

into account not only inferences argued by the plaintiff, but also "plausible opposing inferences."

*Id.*  In assessing whether the pleaded facts give rise to a strong inference of *scienter*, the Supreme

Court has emphasized that a court "must consider the complaint in its entirety," together with

26

"documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Id.*

Here, the relevant inquiry under *Tellabs* is whether, considering the allegations of the Amended Complaint and those facts properly considered on a motion to dismiss, Plaintiffs have met their burden of setting forth facts from which a cogent and compelling inference may be drawn that the Individual Defendants fraudulently misrepresented Allscripts' prospects so as to inflate the price of Allscripts' stock.  Of course, under Plaintiffs' theory, the alleged fraud would have quickly come to light when Allscripts was unable to realize the revenues it had forecast. And as a consequence of the alleged fraud, the Individual Defendants, who did not sell any stock or receive any other benefit as a result of the purported artificial inflation, experienced the same decline in the value of their stock as every other shareholder.  *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning.").

Under *Tellabs*, Plaintiffs must establish that their requested inference is more cogent and compelling than the alternative, non-fraudulent inference:  that the Individual Defendants provided investors with information and estimates based on the information then available to them.  As discussed below, Plaintiffs' inference of fraud is neither cogent nor compelling, and the Amended Complaint must be dismissed under the Reform Act and *Tellabs*.

**A.**     **Plaintiffs Do Not Allege A Motive To Commit Fraud.**

As an initial matter, the Amended Complaint does not allege that Messrs. Tullman or Davis sold a single share of Allscripts stock during the putative Class Period.  Nor does the Amended Complaint allege that either of them realized or could have realized any "concrete benefits" by making one or more of the false statements and wrongful nondisclosures alleged. *See Indiana Elecal. Workers Pension Tr. Fund v. Shaw Group, Inc.*, 537 F.3d 527, 543 (5th Cir.

2008) ("To demonstrate motive, plaintiffs must show concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.") (internal quotation marks omitted).  In fact, Messrs. Tullman and Davis were each significant shareholders who experienced the same market declines as did other shareholders.[11]

Although *Tellabs* holds that Plaintiffs are not absolutely required to plead motive to establish *scienter*, *Tellabs*, 551 U.S. at 325, their failure to do so is significant.  That is because as the Seventh Circuit has held, absent a concrete motive, it is difficult to find an inference of *scienter* that is either cogent or compelling under the holistic approach of *Tellabs*: the absence of stock sales by those supposedly "in the know" implies that the Amended Complaint lacks the required "strong" inference of *scienter*.  *Higginbotham*, 495 F.3d at 759; *see also Pugh*, 521 F.3d 686, 695 (7th Cir. 2008) ("*Tellabs* instructs us to consider all potential inferences, and the fact that the defendants are not alleged to have sold the stock at the inflated prices meant that they stood to lose a lot of money if the value of Tribune's stock fell."); *In re Healthcare Compare Corp. Sec. Litig. v. Healthcare Compare Corp.*, 75 F.3d 276, 285 (7th Cir. 1996) ("People sometimes act irrationally, but indulging ready inferences of irrationality would too easily allow the inference that ordinary business reverses are fraud.").  This is precisely the case here.

**B.    Plaintiffs Fail To Allege A Cogent Or Compelling Inference That The Individual Defendants Acted With Scienter.**

Plaintiffs attempt to meet the heightened requirement of establishing a strong inference of *scienter*—in circumstantial fashion—by alleging that Messrs. Tullman and Davis knew of the purported falsity of their statements.  With respect to the forward-looking statements governed by the Safe Harbor, Plaintiffs must plead with particularity facts that the Individual Defendants

---

[11]  Mr. Tullman owned 366,994 shares, and Mr. Davis owned 17,513 shares at the beginning of the Class Period.  Neither Mr. Tullman nor Mr. Davis sold any shares during the Class Period.  (*See* excerpts from Allscripts Proxy 4/30/2007 at 13 (Ex. 13) and Allscripts Proxy 8/21/2008 at 151 (Ex. 14).)

actually knew that their forward-looking statements and projections were false or misleading when made. *See Stavros*, 266 F. Supp. 2d at 84 (*citing* 15 U.S.C. § 78u-5(c)(1)(B)). As to present-tense statements, the standard is, at a minimum, recklessness, which requires "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that the actor must have been aware of it." *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1044-45 (7th Cir. 1977).

In reviewing the allegations, the Seventh Circuit has made clear that courts should not accord weight to allegations made on information and belief when those allegations are based on unidentified and undisclosed sources. As the Seventh Circuit explained in *Higginbotham*, "[a]nonymity conceals information that is essential to the sort of evaluation required by *Tellabs*. To determine whether a 'strong' inference of scienter has been established, the judiciary must evaluate what the complaint reveals and disregard what it conceals." 495 F.3d at 757. As such, allegations based on information from confidential witnesses should be discounted and "[u]sually that discount will be steep." *Id.* Here, having provided no detail whatsoever about the basis for their information and belief, Plaintiffs' allegations should be subject to the steep discount typically applied to undisclosed sources. *See Konkol v. Diebold, Inc.*, --- F.3d --- 2009 WL 4909110, *5 (6th Cir. Dec. 22, 2009) (discounting allegations based on information provided by confidential sources; noting that "complaint does not provide any details about most of the Confidential Witnesses, such as dates of employment, job description, employment location or sector, or which of the Defendants interacted with them."); *see also In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d. 1059 (N.D. Cal. 2001) (dismissal granted, no strong inference of *scienter* given "[f]ailure to allege the sources of plaintiffs' information").

Moreover, Plaintiffs' allegations of (i) monthly management meetings; (ii) access to internal databases; (iii) problems with one of Allscripts' customers; and (iv) the fact that Allscripts subsequently upgraded Version 11 to Version 11.1 provide no inference of scienter.

### 1.    Monthly Management Conference Calls

Plaintiffs allege on information and belief that Messrs. Tullman and Davis participated in monthly conference calls and that Messrs. Tullman and Davis knew that their statements were false as a result of these meetings.  (Am. Compl. ¶ 67.)  For example, Plaintiffs allege that the existence and resolution of various "bugs" in the over two million lines of source code that V-11 added to TouchWorks EHR were discussed in the monthly conference calls.

In bringing any high-tech software product to market, however, problems are the norm, not the exception.  *See e.g., In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d at 884 ("[G]eneral difficulties in technology development are part and parcel of any attempt to commercialize new technology.").  It is a matter of common knowledge, moreover, that "bugs" exist in even the most highly marketable and successful software programs.  *See Frazier v. Vitalworks, Inc.*, 341 F. Supp. 2d 142, 153 n.4 (D. Conn. 2004) ("Indeed, one would be hard pressed to find a software program on the market without at least some technical glitches . . . [E]ven Microsoft regularly releases patches and service packages designed to correct bugs in its products.").  As such, it would be entirely unremarkable – and not at all indicative of fraud – if the Individual Defendants may have been made aware of "bugs" both before and after V-11 was released.  It is precisely because these issues are ubiquitous in the software industry that courts require far more to establish that a defendant's positive public statements and forecasts were knowingly false.  *See In re Siebel Sys., Inc., Sec. Litig*, No. C 04-0983, 2005 WL 3555718, at *4, (N.D. Cal. Dec. 28, 2005) (granting dismissal where plaintiffs failed to "allege any specific facts that give rise to a strong inference that the defendants—that is the upper management—knew there were problems

of such magnitude that it would make their positive statements false."), *aff'd*, 261 Fed. Appx. 60 (9th Cir. 2007); *In re Read-Rite Corp.*, No. C-03-03148, 2004 WL 2125883, at *4 (N.D. Cal. Sept. 22, 2004) (granting dismissal where plaintiffs "fail to specify the magnitude of [software] problems," since "[w]ithout at least an allegation of the magnitude or severity of the technical challenges existing at the time each statement was made, it cannot be inferred that the defendants knew or should have known . . . that those problems could not be overcome."); *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d at 884 ("Plaintiffs must allege that Defendants knew the difficulties to . . . technological development were insurmountable or particularly significant.  Knowledge that there were some obstacles to development that SMS was working to resolve or that engineers experienced frustration is not sufficient to show knowledge of falsity."); *see also Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) ("Problems and difficulties are the daily work of business people.  That they exist does not make a lie out of any of the alleged false statements.").

In this regard, Plaintiffs do not allege that Messrs. Tullman or Davis learned that the software errors discovered in 2006 went unremedied in 2007.  Nor are Plaintiffs' vague allegations that "[d]efendants were kept apprised of the viability of the software and the status of the resolution of the identified bugs" during the Class Period sufficient.  (Am. Compl. ¶ 71.)  Indeed, given the realities of software development and design, the allegations in the Amended Complaint themselves plead a non-culpable inference rather than any inference of *scienter*.  The Amended Complaint affirmatively alleges that each screen of V-11 was reviewed by quality assurance personnel to resolve the issues raised in 2006.  (*See id.* ¶ 68.)  Following its general release, Allscripts is alleged to have employed a development team and quality assurance personnel who used databases to identify and resolve software errors in V-11.  (*Id.* ¶ 70)  Those

teams prioritized bugs as critical, major, and minor, and fixed critical bugs within one week of their identification.  (*Id.*)  Plaintiffs plead no facts from which to infer that Messrs. Tullman or Davis were ever told or should have had any reason to believe that this quality control process was not functioning.[12]

## 2.  Access To Internal Databases

The fact that the Individual Defendants may have had access to internal databases likewise does not support a strong inference of scienter.  Plaintiffs allege only that the Individual Defendants *had access to* Allscripts' product databases used by technicians.  (*See* Am. Compl. ¶¶ 71, 75.)  Plaintiffs neither allege that the Individual Defendants actually received or reviewed information generated by these databases, nor that these databases revealed specific data that would have rendered Allscripts' projections false when made if the Individual Defendants had consulted them.  *See, e.g., Konkol*, -- F.3d --, 2009 WL 4909110, at *4 (affirming dismissal where the complaint alleged "access" to "real-time data software to track its sales and revenue;" but did not allege "what would have been obvious to a reasonable person upon examining the software."); *see also Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) (affirming motion to dismiss, holding that conclusory assertions that the defendants had access to internal data demonstrating a decline in sales were insufficient to plead *scienter*).  These allegations do not give rise to a "strong" inference of *scienter*.

---

[12]  Plaintiffs also allege, in conclusory fashion, that Messrs. Tullman and Davis learned from monthly conference calls that there was insufficient documentation to assist Client Services teams who implemented the V-11.  (*See* Am. Compl. ¶ 72.)  But apart from being made on information and belief and without basis, Plaintiffs do not allege that either Messrs. Tullman and Davis were ever told that this problem was not remediable or was so serious as to cause Allscripts to miss its revenue forecasts.  *See In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 889 (S.D. Tex. 2001) ("Plaintiffs' conclusory allegation that BMC's sales people were inadequately trained and ineffective . . ." deemed insufficient.).

### 3.       Tennessee Oncology

Plaintiffs attempt to base an inference of *scienter* from alleged problems deploying TouchWorks at one client, Tennessee Oncology.  Allscripts' contract with Tennessee Oncology was a multi-year service contract entered into in June 2005, almost two years before V-11 was even launched. (*See* Tennessee Oncology, PLLC v. Allscripts Healthcare Solutions, Inc., Case 1:09-cv-4726 (Ch. Ct. Tenn) ¶¶ 19, 23, 26.  The Tennessee Oncology complaint (*see id.* at ¶ 34) and the Amended Complaint, (*see* Am. Compl. ¶ 74), allege that the CEO of Tennessee Oncology wrote a letter to Allscripts on September 11, 2007.

But none of this gives rise to a strong inference of scienter.  In the first place, courts have long held it improper to infer that problems with one discrete customer were widespread and rampant.  *See, e.g., In re Hutchinson Technology, Inc. Sec. Litig.,* 536 F.3d at 960 ("Events at one specific plant or with one individual customer are not enough to meet the [Reform Act's] heightened standard); *Taubenfeld v. Career Educ. Corp.*, No. 03 C 8884, 2005 WL 350339, at *12 (N.D. Ill. Feb. 11, 2005) (holding that where a corporate operator of colleges was alleged to have under-reported bad debt expenses, it was "unreasonable to infer, based on the well-pled allegations that the under-reporting of two schools' bad debt expense reserves is attributable to a significantly larger number" of more than seventy schools); *In re Allscripts, Inc. Sec. Litig.*, 2001 WL 743411, at *11 (refusing to "infer from two instances the existence of 'widespread problems'" among several hundred customers).  Moreover, the allegations provide no basis for inferring *scienter* with respect to statements made prior to September 11, 2007.  *See In re Allscripts Inc. Sec. Litig.*, 2001 WL 743411, at *9 (dismissing claims where alleged returns occurred after alleged misrepresentations); *Dresner v. Utility.com*, 371 F. Supp. 2d 476, 496, 498 (S.D.N.Y. 2005) (granting dismissal, "[f]raud cannot be pled by hindsight and plaintiffs have not alleged facts indicating that the statements were false at the time they were made. . . These

allegations are deficient because they lack a temporal nexus to the transaction at issue.  Plaintiffs never allege with particularity that the specific problems with [the software] were occurring at the time of the [alleged misstatements.]").  The only alleged misstatements after Allscripts received Tennessee Oncology's September 11, 2007 letter were made in November 2007, at which time the Individual Defendants both reduced Allscripts' forecast and noted that Allscripts was beginning to face lengthening deployments.

### 4. The Software Upgrade From Version 11 To Version 11.1

Finally, the fact that Allscripts continued to innovate and subsequently upgraded TouchWorks EHR from Version 11 to Version 11.1 in no way supports an inference that Messrs. Tullman or Davis made fraudulent statements.  *See In re Siebel Sys., Inc. Sec. Litig.*, 2005 WL 3555719, at *4 ("While one can reasonably infer that Siebel 7.5 fixed some of the problems with Siebel 7, such a fix does not mean that defendants' statements that Siebel 7 'set the standard' and was 'rich with functionality' were false.").  Innovation of software is the norm, particularly within the health care information technology industry.  This innovation is not indicative of falsity or *scienter*, but rather the intensity of competition in the marketplace.  *See In re Allscripts Inc. Sec. Litig.*, 2001 WL 743411, at *9 ("It is obvious to any reasonable investor that [Allscripts] anticipated the continuing evolution of its products . . .").

### C. Plaintiffs Have Failed To Allege Facts Giving Rise To A Strong Inference That Allscripts Acted With *Scienter*.

Because Plaintiffs have failed to set forth a strong inference of *scienter* with regard to Messrs. Tullman and Davis, Plaintiffs cannot establish a strong inference of *scienter* on behalf of Allscripts.  The Seventh Circuit has instructed that the corporate *scienter* inquiry must focus on the "state of mind of the individual corporate official or officials who make or issue the statement . . ." and rejected the notion that a corporation's *scienter* may be stitched together from

the "collective knowledge of all the corporation's officer and employees acquired in the course

of their employment." *See Pugh*, 521 F.3d at 697.  Accordingly, the Section 10(b) claim against

Allscripts must be dismissed.

### III.   COUNT II OF THE AMENDED COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO ALLEGE A CONTROL PERSON CLAIM AGAINST THE DEFENDANTS.

To state a claim for control person liability under Section 20(a) of the Exchange Act, the

complaint must first establish a primary violation of the federal securities laws.  *Pugh*, 521 F.3d

at 693.  Having failed to establish a violation of Rule 10b-5, Count II should also be dismissed.

### IV.   DISMISSAL SHOULD BE WITH PREJUDICE.

In light of the failure of the Amended Complaint to state a claim in any respect, and given

the effect of the Reform Act's Safe Harbor, Plaintiffs' claims should be dismissed with prejudice

and without leave to amend.  These defects are not curable, and any motion for leave to amend

would be futile.  *Stavros*, 266 F. Supp. 2d at 852 ("The Court recognizes that leave to amend

should be granted freely, but in this case, any amendment to the instant complaint would be

futile.  The extensive cautionary language bars any claims based on the projections . . .").

Plaintiffs have had ample opportunity between the filing of their initial complaint and the filing

of the Amended Complaint to perfect their pleadings, but failed to do so.  *See In re Alpharma,*

*Inc. Sec. Litig.*, 372 F.3d 137, 153-54 (3d Cir. 2004) (initial individual complaints folded into

one consolidated complaint, which was then dismissed with prejudice without leave to amend).

### CONCLUSION

For all of the foregoing reasons, the Amended Complaint should be dismissed with

prejudice.

January 11, 2010          Respectfully submitted,
                          ALLSCRIPTS-MISYS HEALTHCARE SOLUTIONS, INC.,
                          GLEN E. TULLMAN, AND  WILLIAM J. DAVIS
                          By: __/s/ James W. Ducayet _____   One of the Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I, James W. Ducayet, an attorney, certify that on January 11, 2010, I electronically filed the Memorandum of Law In Support of Defendants' Motion To Dismiss The Amended Complaint with the Clerk of the Court using the Court's CM-ECF system which will send notification of the filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

__/s/__ James W. Ducayet

# Mailing Information for a Case 1:09-cv-04726

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Walter C. Carlson**
  wcarlson@sidley.com,efilingnotice@sidley.com

- **James Wallace Ducayet**
  jducayet@sidley.com,efilingnotice@sidley.com

- **Lori Ann Fanning**
  LFanning@MillerLawLLC.com,MMiller@MillerLawLLC.com,JRamirez@millerlawllc.com

- **Marvin Alan Miller**
  Mmiller@millerlawllc.com,LFanning@millerlawllc.com,KPulido@millerlawllc.com,JRamirez@millerlawllc.com

- **Brian O O'Mara**
  briano@lerachlaw.com,smarcks@lerachlaw.com

- **Debra J. Wyman**
  debraw@csgrr.com,nhorstman@csgrr.com,stremblay@csgrr.com,e_file_sd@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)