UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| PLUMBERS AND PIPEFITTERS LOCAL UNION NO. 630 PENSION-ANNUITY TRUST FUND, On Behalf of Itself and All Others Similarly Situated, | ) ) ) ) ) | No. 1:09-cv-04726 <br><br> CLASS ACTION <br><br> Judge Ruben Castillo |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| ALLSCRIPTS-MISYS HEALTHCARE SOLUTIONS, INC., et al., | ) ) ) | |
| Defendants. | ) ) ) | |

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS THE AMENDED COMPLAINT

# TABLE OF CONTENTS

Page

I.      Introduction ............................................................................................................1

II.     Statement of Facts ..................................................................................................1

        A.      Allscripts' Profitability Was Dependant Upon the Successful Launch of
                the Newest Version of Its Flagship Touchworks Product .......................................1

        B.      Defendants Misled the Market About V-11's Functionality and Allscripts'
                Ability to Implement the System ............................................................................2

        C.      Defendants Begin to Reveal the Truth About the Trouble with V-11 ....................7

        D.      Defendants Finally Admit the Truth but Analysts Believe Defendants
                Have Not Yet Told the Whole Story........................................................................9

III.    The Complaint in All Respects Satisfies the PSLRA's Requirements ............................11

        A.      The Complaint Sets Forth Defendants' False and Misleading Statements
                and Omissions, with Great Specificity ..................................................................11

                1.      None of Defendants' False and Misleading Statements Are Mere
                        "Puffery" .................................................................................................12

                2.      The Falsity of Each of Defendants' Present Tense
                        Misrepresentations Are Properly Pleaded.................................................16

                3.      Foundational Evidence Describing Confidential Witnesses Is Not
                        Required to Comply with the PSLRA's Specificity Requirements...........22

        B.      The PSLRA's Safe Harbor Is Unavailable to Defendants ....................................24

        C.      Plaintiffs' Allegations of Scienter Are Strong, Cogent and More
                Compelling than Defendants' Alternate Inferences...............................................28

        D.      Control Person Liability Is Properly Alleged .......................................................34

IV.     Conclusion ...........................................................................................................35

479905_1

# TABLE OF AUTHORITIES

**Page**

## CASES

*ABC Arbitrage v. Tchuruk,*
   291 F.3d 336 (5th Cir. 2002) ...........................................................22

*Adams v. Kinder-Morgan, Inc.,*
   340 F.3d 1083 (10th Cir. 2003) .......................................................22

*Arazie v. Mullane,*
   2 F.3d 1456 (7th Cir. 1993) ............................................................28

*Asher v. Baxter Int'l Inc.,*
   377 F.3d 727 (7th Cir. 2004) ..............................................12, 25, 26

*Chu v. Sabratek Corp.,*
   100 F. Supp. 2d 815 (N.D. Ill. 2000) ..............................................29

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.,*
   399 F.3d 651 (6th Cir. 2005) ...........................................................33

*Danis v. USN Commc'ns Inc.,*
   73 F. Supp. 2d 923 (N.D. Ill. 1999) ................................................32

*Desai v. Gen. Growth Props.,*
   654 F. Supp. 2d 836 (N.D. Ill. 2009) .........................................23, 32

*DiLeo v. Ernst & Young,*
   901 F.2d 624 (7th Cir. 1990) ...........................................................11

*Dura Pharms., Inc. v. Broudo,*
   544 U.S. 336 (2005).........................................................................11

*Eisenstadt v. Centel Corp.,*
   113 F.3d 738 (7th Cir. 1997) ...........................................................13

*Friedman v. Rayovac Corp.,*
   295 F. Supp. 2d 957 (W.D. Wis. 2003) ..............................17, 19, 20

*Gosselin v. First Trust Advisors LP,*
   No. 08 C 5213, 2009 U.S. Dist. LEXIS 117737
   (N.D. Ill. Dec. 17, 2009) .............................................................23, 30

*Harrison v. Dean Witter Reynolds, Inc.,*
   974 F.2d 873 (7th Cir. 1992) ......................................................34, 35

**Page**

*Higginbotham v. Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) ........................................................................23

*Huddleston v. Herman & MacLean*,
    640 F.2d 534 (5th Cir. 1981) .........................................................................28

*In re Catalina Mktg. Corp. Sec. Litig.*,
    390 F. Supp. 2d 1110 (M.D. Fla. 2005)........................................................15

*In re Cephalon Sec. Litig.*,
    No. 96-CV-0633, 1997 U.S. Dist. LEXIS 13840
    (E.D. Pa. Aug. 29, 1997)...............................................................................22

*In re FirstEnergy Corp. Sec. Litig.*,
    316 F. Supp. 2d 581 (N.D. Ohio 2004)........................................................26

*In re JP Morgan Chase & Co. Sec. Litig.*,
    No. 06 C 4674, 2007 U.S. Dist. LEXIS 93877
    (N.D. Ill. Dec. 17, 2007)...............................................................................23

*In re Lattice Semiconductor Corp. Sec. Litig.*,
    No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262
    (D. Or. Jan. 3, 2006) .....................................................................................14

*In re MobileMedia Sec. Litig.*,
    28 F. Supp. 2d 901 (D.N.J. 1998) ................................................................25

*In re Motorola Sec. Litig.*,
    No. 03 C 287, 2004 U.S. Dist. LEXIS 18250
    (N.D. Ill. Sept. 10, 2004) ..............................................................................33

*In re Next Level Sys. Sec. Litig.*,
    No. 97 C 7362, 1999 U.S. Dist. LEXIS 5653
    (N.D. Ill. Mar. 31, 1999)...............................................................................28

*In re Northfield Labs., Inc. Sec. Litig.*,
    No. 06 C 1493, 2008 U.S. Dist. LEXIS 76804
    (N.D. Ill. Sept. 23, 2008) ..............................................................................23

*In re NVE Corp. Sec. Litig.*,
    551 F. Supp. 2d 871, 884 (D. Minn. 2007)..................................................31

*In re Read-Rite Corp.*,
    No. C-03-03148 RMW, 2004 WL 2125883
    (N.D. Cal. Sept. 22, 2004) ............................................................................31

**Page**

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)......................................................................................22

*In re Sears, Roebuck & Co. Sec. Litig.*,
  291 F. Supp. 2d 722 (N.D. Ill. 2003) ......................................................................32

*In re Siebel Sys., Inc. Sec. Litig.*,
  No. C 04-0983 CRB, 2005 WL 3555718
  (N.D. Cal. Dec. 28, 2005) .......................................................................................31

*In re Ulta Salon, Cosmetics & Fragrance, Inc.*,
  604 F. Supp. 2d 1188 (N.D. Ill. 2009) ...............................................................23, 33

*In re Westell Techs., Inc. Sec. Litig.*,
  No. 00 C 6735, 2001 U.S. Dist. LEXIS 17867
  (N.D. Ill. Oct. 30, 2001)....................................................................................13, 14

*In re World Access Sec. Litig.*,
  119 F. Supp. 2d 1348 (N.D. Ga. 2000).....................................................................14

*Lindelow v. Hill*,
  No. 00 C 3727, 2001 U.S. Dist. LEXIS 10301
  (N.D. Ill. July 20, 2001).............................................................................12, 13, 14

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006) ........................................................................ *passim*

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  513 F.3d 702 (7th Cir. 2008) .......................................................11, 24, 28, 32

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000).....................................................................................33

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)......................................................................................27

*Roth v. Aon Corp.*,
  No. 04-C-6835, 2008 U.S. Dist. LEXIS 18471
  (N.D. Ill. Mar. 7, 2008)............................................................................................31

*Selbst v. McDonald's Corp.*,
  No. 04 C 2422, 2005 U.S. Dist. LEXIS 23093
  (N.D. Ill. Sept. 21, 2005) ....................................................................................24, 32

**Page**

*Stavros v. Exelon Corp.*,
266 F. Supp. 2d 833 (N.D. Ill. 2003) ..............................................................32

*Takara Trust v. Molex Inc.*,
429 F. Supp. 2d 960 (N.D. Ill. 2006) .............................................11, 12, 25, 34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)................................................................... *passim*

*United States v. Morris*,
80 F.3d 1151 (7th Cir. 1996) .........................................................................25

*Va. Bankshares, Inc. v. Sandberg*,
501 U.S. 1083 (1991).............................................................................16, 25

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
§78j(b)............................................................................................11, 28
§78u-4(b)(1)(B)..............................................................................11, 23
§78t(a)....................................................................................................34
§78u-4(b)(1)...........................................................................................22

Federal Rules of Civil Procedure
Rule 9(b) ....................................................................................11, 22, 23
Rule 11 ....................................................................................................24

17 C.F.R.
§240.10b-5 ..............................................................................................28

## I.     Introduction

Repeating the often used mantra "this is exactly the type of case" the Private Securities

Litigation Reform Act of 1995 ("PSLRA") intended to prevent, defendants Allscripts-Misys

Healthcare Solutions, Inc. ("Allscripts" or "the Company"), Glen E. Tullman ("Tullman") and

William J. Davis ("Davis") urge the Court to dismiss this action.  Their arguments, however, depend

on a piecemeal review of the Complaint, wholesale disregard of the detailed allegations within it and

a misunderstanding of the requirement that plaintiffs' scienter inference must be cogent, strong and

***at least as likely*** as any non-culpable inference arising from the allegations.

The Complaint sets forth in a clear manner how defendants omitted material, negative

information from investors throughout the Class Period.  Plaintiffs also detail what that information

was, when defendants received it, and from whom.  The Complaint meets, and indeed exceeds, the

pleading requirements, and is precisely the type of meritorious claim that the PSLRA was enacted to

preserve.  Defendants' motion should be denied.

## II.    Statement of Facts

### A.     Allscripts' Profitability Was Dependant Upon the Successful Launch of the Newest Version of Its Flagship Touchworks Product

Allscripts develops and sells software to healthcare organizations.  ¶2.[1]  Between 2004 and

2006, the Company's net income quadrupled due to the market's embrace of Allscripts' leading

Electronic Health Record ("EHR") product, Touchworks Version 10.1.1.   This version of

Touchworks was award winning. In 2006, the Medical Record Institute ranked Version 10.1.1

second among EHR products designed for medium to large practice groups.  Version 10.1.1 had also

been certified by the Commission for Healthcare Information Technology, the recognized

---

[1]      Unless otherwise noted, all references to "¶_" or "¶¶__" are to the Amended Complaint for Violations of the Federal Securities Laws (Dkt. No. 25) (the "Complaint").

- 1 -

certification authority in the industry.  These accolades gave Allscripts a competitive advantage in the industry.  ¶19.

And Allscripts' industry was highly competitive.  The long-term growth prospects, however, were limited.  While the EHR industry was expected to grow 20-25% for five years, this growth was also expected to plummet to the single digit range as the adoption of EHR systems by medium to large practice groups reached 100%.  ¶20.  Analysts reported that the bulk of Allscripts' market growth in 2007 – 40% – would come from EHR sales to large practice groups, with a lesser percentage – 30-35% – expected from medium-sized practice groups.  These were the market segments in which Allscripts sold the Touchworks system, and the segments that Allscripts would sell Version 10.1.1's successor, Version 11 ("V-11").  ¶21.

V-11 was highly anticipated by the market.  Even before the product was available for launch, Allscripts reported 2006 record sales of $190 million – bookings to use Allscripts' vernacular – "led by our TouchWorks business unit."  ¶22.  "Bookings" represented sales to be converted to revenue, a large portion of which was dependant upon the successful launch and implementation of V-11.  These "bookings," and the Company's ability to successfully convert them to revenue, served as the basis for defendants' revenue and earnings guidance given to the market in October 2006 and reiterated by defendants on February 13, 2007 when they announced Allscripts' 2006 financial performance.  ¶23.

### B.     Defendants Misled the Market About V-11's Functionality and Allscripts' Ability to Implement the System

Defendants rode their wave of positive representations concerning V-11 and what it meant to Allscripts into the Class Period.  On May 8, 2007, the first day of the Class Period, defendants announced Allscripts' financial results for 1Q07 in a press release to the market.  ¶24.  During the conference call with analysts and investors that followed that release, defendants announced that

- 2 -

they were ***increasing*** 2007 bookings guidance from $210 million to in excess of $230 million for the year – a 40% increase compared to 2006.  ¶25.  Tullman also announced that, after a short delay, V-11 would go "live" on May 21, 2007, that V-11 "is the most tested product in our history," and that "[m]arket validation of V-11 [a]s a transformational product has been overwhelming. V-11 will allow Allscripts to become what I call the Bloomberg of health care."  ¶¶25-26.  Davis echoed that sentiment telling analysts that "[t]here is a very substantial amount of pent-up demand [for V-11]."  ¶27.  When asked by an analyst if the delay in the launch of V-11 had any impact on 1Q07, Davis responded that, "the delays in the project came not from development.  They came from the fact that we did an awful lot of design work and that actually delayed the start of the development work." *Id.*

Analysts also inquired about "technology risk" in implementing or converting clients to V-11.  Defendants dispelled any concerns that V-11 would result in implementation or conversion delays.  Indeed, Tullman responded that "we don't expect issues to come up relative to the actual installation and – or conversion or transition to the 11.  We did a tremendous amount of work on that process to make sure that doesn't happen."  ¶28.

Even while defendants made these positive assurances to the market, they knew that V-11 was a troubled, unstable product.  Prior to and throughout the Class Period, defendants each participated in monthly conference calls with members of Allscripts' senior management.  During these calls different members of Allscripts' management team would update defendants, and the other senior leaders at Allscripts, on the status of various aspects of Allscripts' business.  ¶67.  Because of its importance to Allscripts, Stanley Crane, Allscripts' Chief Technology Officer, would always make a separate presentation on the monthly calls on matters pertaining to V-11, including information about development, implementation problems, problems with the software and outcomes of testing of the software.  During these monthly conference calls, Crane informed the group, including defendants, of the results of the initial limited implementations of V-11 at select

- 3 -

customer sites made during 2006.  Crane's presentations indicated that the implementation took much longer than expected and resulted in the discovery of a high number of bugs.  These 2006 implementations indicated that V-11's features, functionality and quality had major problems. Specifically, these 2006 implementations identified that V-11's workflow was not very efficient and caused physicians to spend a lot of extra time using the application.  Crane indicated that customer feedback was that V-11 threw doctors into fire fighting mode.  As a result, Allscripts' development team reviewed each screen in V-11 to figure out how to reduce the number of clicks doctors needed to make in order to get to the desired screen.  ¶68.  The results of the 2006 implementations, and the problems encountered with V-11, were concealed from the market even as defendants told analysts that Allscripts had done a "tremendous" amount of work to "make sure" V-11 implementation or conversion problems did not occur.

In fact, by late 2006, defendants knew from these monthly conference calls that V-11 was filled with critical bugs – problems that could impact patient safety.  Because of these critical bugs and the general instability of the software – **not** because additional time was spent doing "design work" as Davis told the market on May 8, 2007 –  it was decided in late 2006 that widespread release of V-11 would be delayed.  However, despite these substantial known defects, defendants did not run a "testing program" on V-11 before the general release of the software to ensure that the known instabilities and problems had been satisfactorily remedied.[2]  ¶69.  While Tullman told investors on the May 8, 2007 conference call that V-11 "was the most tested product" in Allscripts history, the truth was that defendants did not satisfy themselves that the problems discovered in the

---

[2]    Allscripts typically would run a "testing program" with chosen customers to test a new product, or new version of an existing product, which would allow the Company to identify bugs and fix them prior to the general release of the product.  ¶69.

479905_1

2006 implementations had been fixed with the additional work in early 2007, instead misleading the market that V-11 was heavily tested, that it functioned as intended and did not suffer from implementation issues.  Indeed, Allscripts' quality assurance group was still conducting tests of V-11 on May 8, 2007 when defendants told the market that V-11 was ready to go and continued that work up until three days before the May 21, 2007 general release.  At the time of its release, V-11 had approximately 2000 known bugs that made the software unstable and in some cases unusable. *Id*. Defendants omitted this information in responding to analysts' questions concerning the readiness of V-11 for launch.

The difficulties with V-11 continued through the summer of 2007.  Still, on August 7, 2007, when defendants announced Allscripts' 2Q07 financial results, they reiterated their increased bookings guidance and, in response to a question concerning how Allscripts would achieve the $300 million revenue guidance, Davis told the market:

> . . . [T]he perspective on our outlook for the second half of the year is in keeping with our outlook on the bookings in that we have the benefit, one of nice things about Allscripts model we draw very large percentage of our revenues from our reported backlog.  And so *we have clear visibility as to where we expect our revenue to come from.  It is a function of increased productivity in terms of the implementation resources on the Touchworks side* . . . .

¶35.[3]  Additionally, in response to a direct question asking if the implementation times for V-11 were different, or consistent with Allscripts' past experience, Davis proclaimed, "*They [are] roughly consistent with the past*. . . .  As we had subsequently rolled out additional sites, *we [have] seen some consistent trends* relative to the deployment requirements on those upgrade processes."  ¶36.

At the time of these statements, Davis knew from the information received from Stanley Crane monthly that Allscripts was experiencing greatly increased implementation times on V-11.

---

[3]  Unless otherwise noted, all emphasis is added and all internal citations are omitted.

Specifically, Davis and Tullman knew from the monthly conference calls that because V-11 was an almost entirely new application there was no documentation from prior versions to aid the Client Services team in working through implementation problems being encountered. This added greatly to the implementation difficulties in that the Client Services team not only had to try and accommodate the customer's complaints concerning implementation, it had to work with the development and quality assurance teams to figure out how to analyze the problems and formulate a solution to them that worked in the field. This directly lead to increased implementation times and was reported to defendants before and throughout the Class Period. ¶72. Defendants omitted this information in responding to analysts' questions concerning V-11 implementation times.

Moreover, defendants also were told that the Client Services staff was too inexperienced and under-trained to adequately handle the implementation questions coming from Allscripts' customers and the implementation teams in the field. As the implementation times began to expand, defendants directed that more people be assigned to implement V-11 in the field in an effort to improve the implementation times, and increase billing so that revenue could be recognized. These people were given minimal training, did not have good knowledge of the product and could not answer the customer's questions concerning the functionality and stability problems being encountered. In fact, after mid-2007, implementation trainees no longer "shadowed" more experienced personnel for upwards of three months. The "shadow" period was reduced to no more than one month so that Allscripts could send the trainees into the field sooner. ¶73. While Davis told analysts that Allscripts expected to reach the $300 million revenue target through "increased productivity" of Allscripts' V-11 "implementation resources," he failed to mention that those very resources were under-trained and ill-equipped to handle the V-11 implementation at all. ¶35.

Also during the August 7, 2007 conference call, Tullman made an example of the implementation of V-11 at Tennessee Oncology in response to a question for an example of "some

- 6 -

of the successes" Allscripts was experiencing.  ¶36.  Tullman told the market that "***rollout is going***

***very well***" at Tennessee Oncology.  *Id.*  That, however, was not true.  In fact, defendants knew from

their monthly conference calls that the rollout at Tennessee Oncology was going poorly.  Indeed,

within three weeks of Tullman's representation that all was "very well" with the rollout, the troubles,

and Allscripts' inability to satisfactorily address them, had escalated greatly.  On September 11,

2007, Tullman received a letter from Tennessee Oncology's CEO recounting the serious ongoing

problems with V-11, including Allscripts' failure to deliver a functioning software system, and

demanding that the problems be remedied.  ¶74.  Tennessee Oncology had purchased V-11 in June

2005 with the assurance that ***by the first quarter of 2006***, the system would be "fully-developed,

stable and capable of running TN Oncology's business by the summer of 2006."  Ex. 1, ¶15.[4]

However, ***after two years*** of "attempting to run the software . . . and affording Allscripts numerous

opportunities to cure the multiple defects in the software and its implementation," and after payment

of nearly $900,000, Tennessee Oncology stopped using V-11.  *Id.*, ¶¶30, 51.  The troubles at

Tennessee Oncology did not just suddenly appear out of nowhere.  Tullman knew that Allscripts had

been struggling for nearly two years to get V-11 implemented and operational when Tullman cited

Tennessee Oncology as an example of a V-11 implementation "success."

### C.    Defendants Begin to Reveal the Truth About the Trouble with V-11

After a self-imposed "quiet period" in which defendants indicated that they would not talk to

the market (but gave no reason for their silence), on November 8, 2007, defendants reported that

Allscripts' 3Q07 financial results failed to meet Wall Street's revenue and earnings estimates.  ¶¶41,

44.  Defendants lowered the market's revenue expectations to $286-$288 million for 2007 and

---

[4]       All references to Ex. 1 are to Exhibit 1 to the Complaint.

blamed the short fall on "near-term impact on revenue associated with the ramping up of resources" working on large implementations of V-11.  ¶46.  Even with the revenue shortfall and lowering of expectations, defendants reassured the market that "we continue to see a business that is positioned to grow revenue approximately 20% to 25%."  *Id.*

Analysts were curious about the cause of Allscripts' revenue shortfall and lowering of expectations and asked many questions trying to understand the factors that impacted Allscripts' business in a negative way during the quarter.  In response to a direct question concerning the productivity of the staff implementing V-11, Davis told the market, ". . . We actually saw close to about 25% increase in the production of our resources in terms of overall billable hours in the quarter.  We had anticipated that by virtue of a lot of resources being dedicated to Version 11 efforts earlier in the year and the like.  So we absolutely saw a nice improvement in terms of overall productivity."  ¶48.  Tullman added – noting that "*this is really critical*" – "*we have more resources, training was successful*."  *Id.*  Defendants, however, knew otherwise.  ¶¶72-73.

On the conference call, Davis also ***specifically denied that there was a problem with meeting V-11 deployment schedules***, instead telling the market that defendants had made a conscious decision to direct resources to the largest implementations:

> [Analyst]:
>
> . . . when did you just come to the realization that some of your existing customers weren't going to be deploying on schedule and if you were to break it down, how much do you think it's internally and Allscripts implementation situation or how much the clients are actually putting the brakes on a little bit?
>
> Bill Davis:
>
> I guess I would characterize it a little differently in that it was a conscious decision on our part to redirect resources and/or allow some of these larger ramp-ups to consume those resources as opposed to it being kind of opportunistic by virtue of some of our customers stopping or delaying.  We don't mean to convey that sentiment because that's not what's occurring, so that was a consideration.

¶50.  Defendants concealed the continued troubles with implementing V-11 that were being reported

to them on a monthly basis, and which they knew specifically about from direct correspondence with

customers like Tennessee Oncology, in response to these direct inquiries from the market.  ¶¶67-69,

72-74.

Despite defendants' continued deception, Allscripts' stock price fell $6.62 per share in after

market trading on November 8, 2007, and closed down 19% on November 9, 2007.  However,

because defendants continued to conceal the troubles they were having with V-11, Allscripts' stock

price remained inflated by the false and misleading information defendants fed into the market.  ¶52.

**D.     Defendants Finally Admit the Truth but Analysts Believe Defendants Have Not Yet Told the Whole Story**

Then, on February 13, 2008, defendants reported Allscripts' financial results for 2007, which

missed both analysts' expectations and the guidance that defendants had lowered in November 2007.

¶53.  Despite defendants' earlier assertions that there were no implementation delays occurring at

Allscripts (¶50), that Allscripts had seen "consistent trends" in implementation processes site to site

(¶36), that a "tremendous amount of work" was done on the implementation processes to avoid

problems (¶28), and that defendants "have clear visibility as to where we expect our revenue to come

from" (¶35), defendants admitted that ***Allscripts had no historical basis for estimating***

***implementation times for V-11, or the revenue that the Company could plan to recognize during***

***2007***.  ¶54.  Moreover, defendants admitted that they knew of the material revenue impact of the

failing V-11 deployments ***in early November 2007***:

> [Analyst]:
>
> Good evening.  I was wondering if you could speak a little bit to what really changed in Q4 between the time you gave guidance and it actually transpired.  It seems to me that we're talking about longer deployment cycles and the fact that it they combine the practice management EMR's.  You also potentially delaying Was the shortfall in revenue simply due to bookings?

- 9 -

<u>Bill Davis</u>:

It really was two factors, as I hinted my prepared remarks about, 2 million dollars of the shortfall can be directly attributed to the shortfall in bookings, and that would have been by virtue of hardware, being in that mix, which you tend – you're able to recognize more immediately.  ***But there was an impact further impact beyond what even we expected, kind of in early November, relative to the V-11 expansion of project plans and I attempted to quantify that as about 2 1/2 million dollars in the quarter***, it was the combination of the two.  ***The V-11 implications, much greater impact on the bottom line***.  The hardware at $2 million would have only contributed about 200 to $300,000 to our operating income.  So ***much greater impact from the V-11 in terms of profitability***.

¶55.

The market was incensed by defendants' concealment.  Allscripts' stock price plummeted nearly 27% on a huge volume of 15 million shares traded.  ¶56.  One analyst questioned whether defendants had yet fully explained the troubles Allscripts was experiencing with V-11 noting:

The fact to remember, in our view, is that all of these factors were known last quarter when the company revised its 2007 guidance lower.  To miss lowered expectations points decidedly to the fact some of these issues, particularly the v11 upgrade cycle, is going more poorly than the company has expected.

***Our primary concern here is that the company has yet to really come clean about the difficulties it is experiencing with the upgrade cycle***.

¶59.  Little more than a month later, on March 18, 2008, Allscripts announced its intention to merge with Misys plc. ("Misys"), with at least one analyst noting that Allscripts' shareholders had to take a discount from Misys on the merger payment due to the troubles with V-11.  ¶¶61-62.[5]  Defendants' troubles with V-11 continued into 2008 with defendants reporting on April 30, 2008, that the problems with V-11 implementations jeopardized the 20-25% growth defendants had been anticipating for 2008.  ¶63.

---

[5]     The merger with Misys closed on October 10, 2008.  ¶64.

- 10 -

### III.    The Complaint in All Respects Satisfies the PSLRA's Requirements

In evaluating defendants' motion, "the court must treat the pleaded facts as true and 'draw all reasonable inferences in favor of the plaintiff.'"  *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("*Tellabs III*").  Additionally, the "courts must consider the complaint in its entirety" to determine if the claims are properly stated.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("*Tellabs II*").[6]

#### A.    The Complaint Sets Forth Defendants' False and Misleading Statements and Omissions, with Great Specificity

Plaintiffs are required to set forth the allegedly false and misleading statements, and the reasons they are false, in satisfaction of Fed. R. Civ. P. 9(b) and the PSLRA.  To satisfy Rule 9(b), plaintiffs must plead the "'circumstances constituting fraud'" with particularity, *i.e.*, "the who, what, when, where, and how: the first paragraph of any newspaper story."  *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990); *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 971 (N.D. Ill. 2006). In addition to these requirements, the PSLRA also demands that plaintiffs "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. §78u-4(b)(1)(B).

The Complaint in every respect meets these standards.  Defendants, however, contend that many of the allegedly false and misleading statements are immaterial corporate puffery, that certain statements were not false when made and that plaintiffs' allegations are without a proper basis.

---

[6]    To state a claim for violation of §10(b), a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and, (6) loss causation.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  Defendants' motion only challenges the first two elements described by *Dura*.

Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint (Dkt. No. 31) ("MTD") at 15-18, 23-26.  Each of these arguments fail.

### 1.     None of Defendants' False and Misleading Statements Are Mere "Puffery"

Defendants erroneously contend that many of the statements alleged in the Complaint are nothing but immaterial, corporate puffery.  MTD at 16-18.  But as this Court has previously observed, "'[i]n general, the materiality of a statement or omission is a question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss.'"  *Takara*, 429 F. Supp. 2d at 976; *see also Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 735 (7th Cir. 2004) (determination of materiality was inappropriate on motion to dismiss). This is because "materiality depends upon the facts" and "'the significance the reasonable investor would place on the withheld or misrepresented information.'"  *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006) ("*Tellabs I*").  A court will deem a fact to be material if there is a substantial likelihood that it would significantly alter the total mix of information available to a reasonable investor.  *Id.*

Defendants list seven statements they contend to be immaterial.  MTD at 8.  Contrary to defendants' argument, these statements cannot be considered puffery or expressions of corporate optimism, even if some of the statements traversed into "matters of opinion and hope."  *See Lindelow v. Hill*, No. 00 C 3727, 2001 U.S. Dist. LEXIS 10301, at *11 (N.D. Ill. July 20, 2001). "The crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company." *Tellabs I*, 437 F.3d at 596. As such, "statements of goals can, in context, be read by the investor to imply that the company had a reasonable basis for its opinion," thus rendering them actionable. *Lindelow*, 2001 U.S. Dist. LEXIS 10301, at *11-*12.  In addition, statements of opinion are actionable if they are "so discordant with reality that they would induce a reasonable investor to buy the stock at a higher price than it was

- 12 -

worth ex ante." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997)).  Applying these principles, courts have routinely held that statements conveying corporate aspirations are actionable where, as here, the speaker failed to disclose existing facts that undermined those representations. *See, e.g.*, *In re Westell Techs., Inc. Sec. Litig.*, No. 00 C 6735, 2001 U.S. Dist. LEXIS 17867, at *26 (N.D. Ill. Oct. 30, 2001) (optimistic statements were actionable where undermined by true facts); *Lindelow*, 2001 U.S. Dist. LEXIS 10301, at *13 (statements of "strategy" and "goals" were actionable where "the stated goals were not attainable").

Here, the Complaint alleges that defendants made positive representations about Allscripts' financial outlook and the launch of V-11 without having a reasonable basis to do so, while failing to disclose adverse information that would have exposed the problems with the V-11 software and implementation, permitting investors to make an independent determination whether the Company's financial projections were in fact attainable.  Defendants' repeated assurances that V-11 was functioning as intended, and their flat denials that any implementation issues existed, made against the backdrop of their optimistic (yet unattainable) financial estimates, imbued confidence in the market that defendants would convert the sales bookings into revenue in line with their estimates.  In fact, each of the "puffing" statements defendants list, aided their deception.[7]

For example, on May 8, 2007, defendants announced that during 1Q07 revenue increased 81% and that net income during the quarter almost tripled over the prior year.  ¶24.  Defendants used

---

[7]    Included in defendants' list is a quotation from ¶45 which reads: "Sales in our clinical software businesses grew 77 percent over last year, confirming both the acceleration in the market and Allscripts continuing leadership."  Plaintiffs do not claim that Allscripts' sales did not grow at the level reported. Plaintiffs' claim is centered on defendants' misleading statements and omissions concerning the viability and implementation of V-11.  Defendants' concealment of the problems they were having with V-11 undoubtedly resulted in positive sales opportunities resulting in the robust growth they reported.  Defendants' omissions and misleading statements about their ability to convert those sales into revenue, however, is the basis of plaintiffs' claims against defendants.

that revenue and net income growth to support the statement: "Our revenue growth, visibility to sales opportunities and solid bottom-line performance give us confidence in our ability to deliver during the remainder of 2007." *Id.*; MTD at 8.  That same day, defendants further boosted investors' confidence in Allscripts' ability to meet its revenue goals by telling the market that V-11 was being overwhelmingly embraced by the market and likening V-11 to Bloomberg – one of the most important and well-respected financial databases. *Id.*  Considering that defendants used their report of fantastic financial success as a basis to support the challenged statements, these statements are not generalized, vague, optimistic statements.  This is information that an investor would deem material, because it directly related to Allscripts' ability to capitalize on its new flag-ship product, the success of which was crucial to the Company's attaining its publicly-disclosed financial projections.  *See, e.g.*, *Westell Techs*, 2001 U.S. Dist. LEXIS 17867, at *26 (statements of corporate "optimism" were actionable where a company's executives made them while knowing that sales to a major customer would "drop precipitously"); *see also In re Lattice Semiconductor Corp. Sec. Litig.*, No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262, at *16 (D. Or. Jan. 3, 2006) (statements regarding customer enthusiasm for product were actionable because product was not performing well); *In re World Access Sec. Litig.*, 119 F. Supp. 2d 1348, 1354-55 (N.D. Ga. 2000) (statements made about success of products, when company was experiencing problems with the products, were actionable).

The other statements defendants challenge as immaterial are similarly predicated on positive factual information.  On August 7, 2007 after announcing "[r]ecord [r]evenue and [e]arnings [p]er [s]hare," defendants touted their "clear vision for integrating software," that the reported "record" financial performance "continue[d] to demonstrate our ability to deliver on that vision," and that because they were staffed for the growth they promised, Allscripts was "in a position" to capitalize, as they had just demonstrated with their "record revenue and earnings per share" results in 2Q07, during the "industry's strongest sales period."  ¶34; MTD at 8.  In context, these statements were

- 14 -

much more than corporate bandwagoning.  *In re Catalina Mktg. Corp. Sec. Litig.*, 390 F. Supp. 2d

1110, 1113 (M.D. Fla. 2005) (statements that "publicly touted new operations as a continuing source

of rapid growth with knowledge that these operations would not yield revenue increases for some

time, if ever," were actionable).

Indeed, the facts here are remarkably similar to those in *Tellabs I*, in which the Seventh

Circuit held that misrepresentations regarding a product launch were sufficiently alleged to have

been "material and false" when made. 437 F.3d at 598. There the company's CEO (Richard

Notebaert) assured the market that the company was shipping its most important new product (the

TITAN 6500), when, in fact, it was not in a position to do so:

> According to the complaint, the TITAN 6500 was not available for delivery until
> well after the class period ended. Yet on December 11, 2000, the first day of the class
> period, Tellabs flatly stated, "The TITAN 6500 system is available now." On March
> 8, 2001, Notebaert told analysts, "Interest in and demand for the 6500 continues to
> grow. . . . We continue to ship the . . . 6500 through the first quarter. We are
> satisfying very strong demand and growing customer demand." Again, on April 6,
> 2001, in response to an analyst's question whether Tellabs was still on track to
> recognize TITAN 6500 revenue in the second quarter, Notebaert stated, "we should
> hit our full manufacturing capacity in May or June to accommodate the demand we
> are seeing. Everything we can build, we are building and shipping. The demand is
> very strong."

*Id.*  The court held that the statements rose above mere puffery because, in context, they gave the

market confidence that the company was shipping its new core product, and investors had no reason

to doubt the veracity of those representations. *See id.* at 597-98.  So too here.

Defendants' report of "record revenue and earnings" served as the basis for their

proclamations of continued success.  However, defendants failed to share with investors critical

information concerning the problems with V-11 they had already experienced, and were continuing

to experience, that cast serious doubt on the success defendants forcefully told investors was

occurring, and would continue to occur in the future.  Thus, the statements alleged in the Complaint

are much more than mere puffery or vague optimism, but rather were "reasonably understood to rest

- 15 -

on a factual basis that justifies them as accurate, the absence of which renders them misleading" and thus actionable. *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991).

### 2.    The Falsity of Each of Defendants' Present Tense Misrepresentations Are Properly Pleaded

Defendants' argument that plaintiffs have not pleaded that certain statements were false when made (MTD at 23-26), ignores the abundant and detailed allegations to the contrary.[8]  In determining whether plaintiffs' allegations passed muster, they must be considered holistically, not piecemeal and out of context as defendants have.  *Tellabs II*, 551 US. at 322 (the "courts must consider the complaint in its entirety" to determine if the claims are properly stated).  Properly considered, plaintiffs' allegations of falsity are sufficiently stated.

Defendants contend that Tullman's statement on May 8, 2007 that V-11 "is the most tested product in our history" was not false at the time it was made because plaintiffs do not dispute defendants' representations that they partnered with *one* customer in a quality assurance capacity. MTD at 23-24.  Even giving defendants' contention some credence, defendants fail to mention the core of plaintiffs' allegations that show that Tullman's statement was *at best* misleading and thus actionable.

Plaintiffs have alleged that during the 2006 limited implementation of V-11, defendants learned that: (1) V-11's features, functionality and quality had major problems and was filled with critical bugs that jeopardized patient safety; (2) implementation took much longer than expected and resulted in the discovery of a high number of bugs; (3) when it did work, V-11 was not very efficient and caused doctors to spend a lot of extra time using the application; and, (4) because of the dissatisfaction expressed by customers, Allscripts' development team was working through each

---

[8]    Again, plaintiffs do not claim that defendants misrepresented the increase in bookings they reported throughout the Class Period.  MTD at 23.

screen to reduce the time doctors needed to spend using the system.  ¶¶68-69. Plaintiffs also allege

that these factors precipitated the decision in late 2006 to delay the launch of V-11 and that these

same problems continued to be reported to defendants throughout the Class Period.  *Id.*  Moreover,

plaintiffs allege that after discovering these fundamental problems with V-11 in 2006, in their rush to

deliver the already long delayed V-11 to the market, defendants failed to conduct the testing program

typically run at Allscripts to ensure that the problems discovered in the 2006 implementations had

been successfully remedied before the product was launched in May 2007.  *Id.*

Even with Allscripts' quality assurance group testing V-11, without the testing program – run

at client sites and not in the controlled environment of Allscripts' quality assurance lab – defendants

had no idea if known bugs had been remedied and patient safety was no longer in potential jeopardy,

if there were new bugs as a result of the attempts to fix the ones already discovered, if the

implementation problems experienced in the field had been corrected, or if V-11 was more efficient

and user-friendly, and was rid of the functionality problems discovered in 2006 implementations.

Indeed, defendants knew that V-11 was still unstable because ***the same problems experienced in the***

***2006 implementations continued to be reported to defendants during the Class Period***.  While it

may have been true that V-11 was the "most tested product in Allscripts' history" – ***it was so only***

***because it did not work as intended and suffered from severe implementation problems***.

Tullman's statement, however, implied that because V-11 was heavily tested, it performed as

intended and Allscripts did not expect any surprises with the functionality or implementation of the

software.  This was misleading and is actionable.  *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957,

991 (W.D. Wis. 2003) ("'Some statements, although literally accurate, can become, through their

context and manner of presentation, devices which mislead investors.'").

Likewise, Tullman's statement – in response to a direct question about V-11 implementation

risks – that "we don't expect issues to come up relative to the actual installation and – or conversion

- 17 -

or transition to the 11.  We did a tremendous amount of work on that process to make sure that

doesn't happen," (¶28; MTD at 24) was also false when made.  As described above, defendants

knew from the 2006 implementations, and the continuing problems being experienced in the field,

that V-11 suffered from tremendous implementation issues that did delay, and would delay in the

future, the conversion of bookings into revenue. Tullman's statement flatly contradicts what was

known inside Allscripts about the V-11 implementation experience.  This statement too is properly

alleged as false when made.

Plaintiffs have also adequately alleged the falsity of defendants' response to an analyst's

question concerning the cause of the delay in launching V-11.  Defendants' attempt to re-write the

challenged statement (MTD at 24-25) falls flat when the whole of the exchange is considered:

[Analyst]:

And finally just *you talked about the V-11 release being pushed back four to six weeks with Steve Badger and his team providing a lot of the quality control of the product, are you suggesting that had any impact in the quarter*?  Or will it have any impact in this upcoming quarter?

\*     \*     \*

Bill Davis:

From a booking standpoint, you are right.  There are I think we did see a few agreement that basically said we want to visit.  We want to see it up live and operating before we put pen to paper.  In both ways that delay had an impact.  That said, I couldn't be more pleased with what's coming out from the standpoint of the fact that it's in controlled release and running on GW servers today, and they will probably within about a week and a half of being live will be hosting site visits.  There is a very substantial amount of pent-up demand.  We were a little concerned in the fourth quarter that people might hold off and that might impact the fourth quarter.  I think the issue was that we told folks they would be visiting live sites in the first quarter and we were off that by about four to six weeks given the size of the project, given how significant a change it is and capabilities. I think we were still pleased with where it came from.  Interestingly, by the way, *the delays in the project came not from development.  They came from the fact that we did an awful lot of design work and that actually delayed the start of the development work*.

¶27.  Clearly, Davis was responding to a question about why the V-11 release was "pushed back four

to six weeks," as was mentioned by Tullman earlier in the same conference call (¶25), and if that

delay had a financial impact in 1Q07, rather than asking about the work with GW MFA as

defendants' motion assumes.  MTD at 24.  Defendants' characterization of the meaning of this

statement is a factual question that must wait to be resolved.  *Tellabs II*, 551 U.S. at 328 ("the case

will fall within the jury's authority to . . . resolve any genuine issues of fact").  Regardless, plaintiffs

allege that in late 2006 the decision was made to delay the V-11 launch because of the disastrous

2006 implementation experience.  ¶69.  Even if this meant more "design work" which delayed

"development work,"  defendants' omission of the fundamental problems they were experiencing

with V-11, that caused a decision to be made six months earlier to delay its launch, misled the

market.  *Friedman*, 295 F. Supp. 2d at 991.

Defendants completely side-step plaintiffs' allegation that they falsely told the market that V-

11 implementation times were "roughly consistent in the past" and that Allscripts was experiencing

"consistent trends relative to the deployment requirements."  ¶36.  While defendants mention these

statements in their factual summary (MTD at 10), it is absent in their argument attacking the

remaining false statements alleged in ¶36.  This is not surprising given that defendants knew from

the 2006 implementations, and from continuing reports, that V-11 implementation times were much

longer than Allscripts' past experience dictated.  ¶¶68-69, 72-73.  Indeed, defendants admitted this

was the case at the end of the Class Period.  ¶54.  Defendants also knew that the personnel

responsible for implementing V-11 was under-trained and ill-equipped to do so, adding substantial

time to the implementation process.  ¶¶72-73.  Defendants also admitted, at the end of the Class

Period, that the implementation requirements and experiences from site to site varied, making the

process "complex" adding to the time it took to implement the software such that the Company

- 19 -

brought in "process expertise, some black belts" to standardize the implementation process and give it "focus."  ¶54.

Instead, defendants concentrate their efforts on re-writing the meaning of their answer to a direct question asking for an example of a V-11 implementation "success."  ¶36.  The exchange which occurred is as follows:

[Analyst]:

So I guess you hit on just one small extra follow-up which version 11 did you activate other customers in the quarter and maybe you can give us highlights on some of the successes they are seeing.

Glen Tullman:

Yes.  This is Glen.  We did in fact activate a number of other clients in the quarter.  And specifically, we tried to make sure that we had a mixture so folks like Tennessee Oncology, the largest oncology private practice in the country, came up and a number of other as well, we were looking at – GW has on the order of 250 physicians.  We are looking at a few thousand users probably by the end of August.  *That rollout is going very well.*

*Id.*  Tullman's use of Tennessee Oncology as an example of a "success" story implementing V-11 is flatly contradicted by plaintiffs' allegations of the continued reporting of implementation problems defendants received.  ¶¶68-69, 72-73.  Tennessee Oncology's experience with V-11 was a long and tortured one, beginning in June 2005.  ¶74.  Tennessee Oncology was one of the original purchasers of V-11, and Allscripts had been struggling for years to get the system to work.  Over the course of two years, Tennessee Oncology paid nearly $900,000 for V-11, which did not work and could not be made to work despite Allscripts', and Tullman's, assurances that V-11 was a market ready product.  Ex. 1, ¶¶15, 30-32.  It is implausible, assuming as the Court must that those allegations are true, that defendants first learned of any problems at Tennessee Oncology – especially given Tullman's description of Tennessee Oncology as the "largest oncology private practice in the country" and clearly an important client to Allscripts – in September 2007.  ¶36.  Moreover, given that less than

- 20 -

one month later the troubles at Tennessee Oncology with Allscripts' failure over the previous ***two***

***years*** to make V-11 work greatly escalated infers that Tullman was either misrepresenting the

situation at Tennessee Oncology, or was recklessly using that customer's experience as an example

of Allscripts' success not knowing whether that was in fact true.  ¶74; Ex. 1, ¶¶37-51.

Finally, defendants challenge several statements concerning "productivity."  MTD at 10, 25.

Defendants contend that plaintiffs have not alleged any facts showing these statements to be false.

MTD at 25.  Not so.

Defendants told the market on November 8, 2007 that Allscripts had missed its revenue

expectations for 3Q07 and was lowering the revenue guidance for 2007.  ¶44.  While they coined

this miss as a "near-term impact on revenue" while resources were being devoted to the largest

implementations, they knew, as plaintiffs have alleged, that the implementation staff was under-

trained and ill-equipped to manage the complicated V-11 implementation process, and deal with the

hundreds of new bugs that were being discovered in the field that prevented the system from being

operationally stable.  ¶¶46, 71-73.  As a result, implementation times were increasing and more

hours were spent trying to make the product work as intended.  This is consistent with defendants'

statement that personnel increased their billings, however, defendants were careful ***not to say*** that the

increased billings meant increased revenue recognized.  Indeed, just the opposite occurred as

defendants reported on November 8, 2007, and again in 4Q07, when defendants reported that the

Company did not meet its revenue goal and ***admitted that they knew about the material impact on***

***revenue because of V-11 implementation delays in early November 2007***.  ¶¶53-55.  Plaintiffs'

allegations that defendants knew that the implementation teams were not able to satisfy the

customers' desires, is entirely consistent with defendants' reporting of decreasing revenues.  The

teams may have been working harder, but that additional work was not translating into recognizable

revenue.

- 21 -

Plaintiffs have alleged substantial facts showing that each of the statements defendants challenge was false or misleading when made. Defendants' attempts to re-write the meaning of their statements and isolate each from the context in which it was given are wholly improper. Plaintiffs' Complaint meets the demands of the PSLRA and Rule 9(b).

### 3. Foundational Evidence Describing Confidential Witnesses Is Not Required to Comply with the PSLRA's Specificity Requirements

Defendants' argument regarding plaintiffs' use or non-use of confidential sources is a red herring intended to direct the Court's attention away from the detailed allegations of their actual knowledge of the false and misleading nature of their statements. They contend that the PSLRA requires plaintiffs to plead *foundational evidence* to meet its particularity requirements but cite *no authority requiring such allegations*. MTD at 15-16.[9] As many courts have confirmed, the PSLRA and Rule 9(b) require the pleading of facts, not evidence, at this stage of the proceedings. *See, e.g.*, *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 351 n.70 (5th Cir. 2002) ("[E]ven when the requirements of Rule 9(b) are combined with the requirements of 15 U.S.C. §78u-4(b)(1) under the PSLRA, the plaintiff need not plead '*all* his evidence' related to a securities fraud claim.") (emphasis in original); *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1101 (10th Cir. 2003) ("PSLRA did not, however, purport to move up the trial to the pleadings stage."); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (holding that the PSLRA does not require the pleading of "detailed evidentiary matter"); *In re Cephalon Sec. Litig.*, No. 96-CV-0633, 1997 U.S. Dist. LEXIS 13840, at *5-*6 (E.D. Pa. Aug. 29, 1997) ("[The PSLRA] requires some precision in alleging facts, however, it does not

---

[9]     Plaintiffs are mindful of the case law that requires, when allegations include attribution of information to a confidential source, that the description of the source comply with the PSLRA's requirements. None of that law *requires* a plaintiff to attribute allegations to a source as a prerequisite for complying with the PSLRA, however.

require pleading all of the evidence and proof thereunder supporting a plaintiff's claim.").[10] As the Supreme Court recently made clear, it is the function of the *jury* to "assess the credibility of witnesses". *Tellabs II*, 551 U.S. at 328.[11]

There is simply no requirement in the PSLRA or Rule 9(b) that plaintiffs attribute any allegation to a confidential witness or source. The PSLRA requires that plaintiffs "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1)(B). As the Seventh Circuit in *Tellabs I* noted in rejecting a literal interpretation of "all facts" in the PSLRA, "the relevant question is 'whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission'" and rejecting the conclusion that dismissal of a complaint would be required "'where the complaint pled facts fully sufficient to support a convincing inference if any known facts were omitted.'" 437 F.3d at 595.

The "information and belief" at issue is plaintiffs' claim that defendants made false and misleading statements. Plaintiffs have outlined in great detail the facts that form the basis for their

---

[10]     Indeed, many courts in this district have found sufficient securities fraud allegations without the inclusion of foundational evidence describing confidential witnesses. *See Gosselin v. First Trust Advisors LP*, No. 08 C 5213, 2009 U.S. Dist. LEXIS 117737 (N.D. Ill. Dec. 17, 2009); *Desai v. Gen. Growth Props.*, 654 F. Supp. 2d 836 (N.D. Ill. 2009); *In re Ulta Salon, Cosmetics & Fragrance, Inc.*, 604 F. Supp. 2d 1188 (N.D. Ill. 2009); *In re Northfield Labs., Inc. Sec. Litig.*, No. 06 C 1493, 2008 U.S. Dist. LEXIS 76804 (N.D. Ill. Sept. 23, 2008); *In re JP Morgan Chase & Co. Sec. Litig.*, No. 06 C 4674, 2007 U.S. Dist. LEXIS 93877 (N.D. Ill. Dec. 17, 2007).

[11]     Defendants' citation to *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) to support their argument that the Complaint is without a proper basis is misplaced. MTD at 29. The Complaint, here, unlike in *Higginbotham*, provides sufficient detail to determine who at Allscripts knew about the alleged improprieties and what, when, where and how they knew. *See* §§III.A.1-2, III.C. That is all the PSLRA requires.

- 23 -

belief that defendants were less than candid with investors during the Class Period.  No more is required.[12]

## B.  The PSLRA's Safe Harbor Is Unavailable to Defendants

Plaintiffs have no quarrel with defendants' assertion that the revenue and growth forecasts plaintiffs have pled were false and misleading are forward-looking statements within the meaning of the PSLRA.  MTD at 9 (identifying those statements defendants argue are forward-looking in ¶¶25, 28, 35, 44-46).[13]  However, those statements are not protected by the PSLRA's safe harbor or the bespeaks caution doctrine, as defendants contend, because none of those statements was accompanied by the meaningful cautionary language required for those protections to apply.[14]

The PSLRA's safe harbor does not apply to forward-looking statements unless those statements were ""'"accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those identified in the forward-looking statement.'"'"  *Tellabs I*, 437 F.3d at 598-99. As an initial matter, it is clear that the issue of whether cautionary language is sufficient is an intensive fact issue that is not resolvable on a motion to dismiss.  "Exactly what constitutes 'meaningful cautionary language' is 'difficult if not impossible' to decipher, particularly 'at the pleading stage, before plaintiffs have access to discovery.'"  *Selbst v. McDonald's Corp.*, No. 04 C 2422, 2005 U.S. Dist. LEXIS 23093, at *50 (N.D. Ill. Sept. 21, 2005)

---

[12]      Plaintiffs conducted a thorough investigation of their claims and have stated those claims mindful of the requirements of Fed. R. Civ. P. 11.  The Court is obligated to assume these facts are true.  *Tellabs III*, 513 F.3d at 705.  Defendants' implication that plaintiffs have made up their allegations or that they are based on unreliable information (MTD at 15-16) is unfounded.

[13]      As plaintiffs have previously stated, they do not claim that defendants' "bookings guidance" (MTD at 6) (citing ¶25) is false or misleading.

[14]      As discussed in §III.C., the safe harbor is also inapplicable because plaintiffs have alleged that defendants made and reiterated the forecasts with actual knowledge they were false and unattainable.

(quoting *Asher*, 377 F.3d at 729, 734).  *See also United States v. Morris*, 80 F.3d 1151, 1167 (7th

Cir. 1996) (because "the effect of cautionary language on an otherwise misleading statement must be

assessed on a case-by-case basis," these defenses require a fact-specific showing that is generally

inappropriate on a motion to dismiss).

     In any event, the cautionary language cited by defendants is not sufficient to invoke the

protection that defendants seek.  Cautionary language accompanying forward-looking statements

must be meaningful in nature, *i.e.*, "'substantive and tailored to the specific future projections,

estimates or opinions' that are alleged to be misleading."  *Id.*  In other words, it must "'mention[]

those sources of variance that (at the time of the projection) were the principal or important risks.'"

*Takara*, 429 F. Supp. 2d at 974 (quoting *Tellabs I*, 437 F.3d at 599).  Further, as one court has held

with respect to the bespeaks caution doctrine, "[the] cautionary statement must discredit the alleged

misrepresentation to such an extent that 'the risk of real deception drops to nil.'"  *In re MobileMedia*

*Sec. Litig.*, 28 F. Supp. 2d 901, 928 (D.N.J. 1998) (quoting *Va. Bankshares*, 501 U.S. 1083).

     Defendants' cautionary language did none of the above.  In fact, defendants' "cautionary

language" listed general factors that would affect ***any*** company in their industry and is strikingly

similar to the language found lacking in *Asher* and *Tellabs I*.  The general, broad approach employed

by Allscripts was specifically rejected by the Seventh Circuit in *Asher*:

> For its part, Baxter says that mentioning these business segments demonstrates that
> the caution is sufficient; but this also is wrong, because then any issuer could list its
> lines of business, say "we could have problems in any of these," and avoid liability
> for statements implying that no such problems were on the horizon even if a
> precipice was in sight.

377 F.3d at 733.   This approach was again rejected by the Seventh Circuit in *Tellabs I*, when the court considered risk disclosures similar to those relied upon by defendants here.[15]   *See* 437 F.3d at 599.   Noting that the risk factors' "generalized statements" encompassed the problems relating to the products at issue, the *Tellabs I* court held that the factors "also encompass a whole world of other possible contingencies" which rendered them too broad to address the specific risks that the company faced.   *Id.* (holding "that Tellabs's warnings were not particularized enough for it to claim shelter under the PSLRA's safe harbor provision").   These risk factors touch upon so many product areas and general contingencies that they ostensibly cover any problem the Company could ever face.   *Id.*

Indeed, defendants' "cautionary language" suffers a more fundamental flaw.   While defendants vaguely warned of the possibility that certain risks could come to bear, those risks ***were already negatively impacting Allscripts' business results*** thus rendering defendants' "warnings" meaningless to investors.   What defendants already knew by the beginning of the Class Period, and what was continually reported to them during the Class Period, was that V-11 was unstable, jeopardized patient safety, was not efficient or user friendly, and could not be implemented in a timely manner.   §§II.B., III.A.1-2.   No warnings defendants have directed the Court to informed investors that Allscripts was then experiencing the negative effects the generalized warnings described.   The safe harbor is not a game of "gotcha" and does not protect "'someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'"   *In re FirstEnergy Corp. Sec. Litig.*, 316 F.

---

[15]   In *Tellabs I*, the court considered the following cautionary language: "'Factors that might cause such a difference include, but are not limited to, risks associated with introducing new products, entering new markets, availability of resources, competitive response, and a downturn in the telecommunications industry.'"   437 F.3d at 599.   The "cautionary" language at issue here is similar.   *See* ¶¶85-89.

Supp. 2d 581, 596 (N.D. Ohio 2004); *see also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (same).

Moreover, throughout the Class Period, defendants tempered their warnings about "'undetected defects or errors'" in their products and how "'implementation cycles'" could effect Allscripts' operating results (MTD at 20) with positive statements ***disclaiming*** any negative effects from those factors. For instance, during the May 8, 2007 conference call with analysts, while announcing the widespread launch of the long awaited V-11, Tullman told the market that V-11 was "the most tested product in our history," implying that defendants had satisfied themselves that no "undetected defects or errors" would hamper the product's acceptance in the market, and the resulting conversion of bookings into revenue. ¶25. During this same conference call Tullman also dispelled any notion that the recognizing of revenue would be negatively effected by V-11 implementation problems when he told analysts that defendants did not expect implementation issues with V-11 because they "did a tremendous amount of work on that process to make sure that doesn't happen." ¶28. Likewise, on the August 7, 2007 conference call with analysts, defendants flatly denied that V-11 implementation times were having a negative effect on revenue recognition, proclaiming that they are "roughly consistent in the past" and that defendants were seeing "consistent trends relative to the deployment requirements." ¶36. Even after defendants lowered their revenue guidance in 3Q07, they continued to assure the market that all was under control again absolutely denying that Allscripts' lower revenue performance was the result of V-11 deployment delays or issues.[16] ¶50. Defendants argue that the safe harbor does not require "clairvoyance."

---

[16]     The fact that defendants revised the "safe harbor warning" in the November 8, 2007 press release is of no consequence. MTD at 22. Defendants already knew that the V-11 implementation delays and issues with the operability of V-11 caused the 3Q07 revenue miss and the resulting lowering of guidance – albeit by an

- 27 -

MTD at 21.  They are right, however, ***the safe harbor is not a shield for the defendants to use when they know the negative factors they warn of were already occurring*** and where they flatly deny Allscripts was experiencing the consequences of the risks they "warned" investors about.[17] *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981) ("[t]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit"), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375 (1983); *In re Next Level Sys. Sec. Litig.*, No. 97 C 7362, 1999 U.S. Dist. LEXIS 5653, at *20 (N.D. Ill. Mar. 31, 1999) ("While it is true that, 'predictions of future performance are inevitably inaccurate,' if inaccurate when made, defendants may be liable under §10(b) and Rule 10b-5.") (citing *Arazie v. Mullane*, 2 F.3d 1456, 1468 (7th Cir. 1993)).

    For these reasons, the safe harbor is unavailable to defendants and does not protect them from liability for the false revenue and growth guidance they reiterated throughout the Class Period.

### C.    Plaintiffs' Allegations of Scienter Are Strong, Cogent and More Compelling than Defendants' Alternate Inferences

    In the Seventh Circuit, a plaintiff may plead scienter by alleging facts which demonstrate that a defendant knowingly made a false statement (if that statement is forward-looking) or recklessly disregarded "a substantial risk that it was false," (if the statement if not forward-looking).  *Tellabs III*, 513 F.3d at 704.  In this context, recklessness is defined as "'an extreme departure from the standards of ordinary care, [] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"  *Tellabs I*, 437

---

insufficient amount, but when bluntly asked if V-11 implementation issues caused the miss and revision, ***defendants unequivocally denied that to be the case***.  ¶50.

[17]    It is for these reasons that defendants' reliance on the case law cited on pages 21-23 supporting their argument that their safe harbor warnings were sufficient is misplaced.

F.3d at 600.  A court must consider the totality of the facts alleged to determine whether they give

rise to "'an inference of scienter *at least as likely* as any plausible opposing inference.'"  *Tellabs II*,

551 U.S. at 328 (emphasis in original).[18]

Here, the only plausible inferences that can be drawn from the facts alleged is that defendants

(1) knowingly over-estimated Allscripts' ability to convert its large and growing bookings into

revenue and increased earnings; (2) omitted material, negative information about V-11's

functionality, stability and customer acceptance; (3) omitted material, negative information about

Allscripts' V-11 implementation experience; and, (4) unequivocally rejected the notion that V-11

implementation times were growing longer negatively impacting Allscripts' conversion of bookings

to revenue.

Defendants pin their hopes of dismissal, in part, on the fact that plaintiffs have not alleged

that defendants sold any Allscripts stock during the Class Period.  MTD at 27-28.  However, the

Supreme Court specifically rejected the notion that "motive" allegations are necessary to adequately

allege scienter and agreed with the Seventh Circuit "that the absence of a motive allegation is not

fatal," noting that "the significance that can be ascribed to an allegation of motive, or lack thereof,

depends on the entirety of the complaint."  *Tellabs II*, 551 U.S. at 325.  Long before *Tellabs II*, this

Court noted that the type of pleaded facts are immaterial as long as their amalgam gives "rise to 'a

strong inference' of scienter."  *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 823 (N.D. Ill. 2000).

There is no dispute that defendants sold no stock during the Class Period.  However, there are

many reasons, other than that defendants were not misleading the market as they contend, that can be

---

[18]     Defendants' motion argues that plaintiffs' scienter inferences must be "more" cogent and compelling
than the alternative, non-fraudulent inferences.  MTD at 27.  That assertion cannot be squared with the plain-
language in *Tellabs II*.

attributed to defendants' non-selling.  For instance, perhaps defendants did not want to draw attention to themselves.  Perhaps defendants did not want to increase their exposure to a shareholder suit, were they not able to remedy the troubles with V-11, in the event Allscripts did not meet the market's revenue expectations.  Perhaps defendants had tax planning reasons for not selling their stock.  Perhaps they owned options and those options were under-water, *i.e.*, the exercise price was more than the market value, and they could not sell them.  Resolution of these factual issues is premature, as is defendants' assertion that the lack of selling is "significant."  MTD at 28; *Tellabs II*, 551 U.S. at 328 (reiterating that it is the province of the jury to resolve questions of fact and weigh credibility).  *See also Gosselin*, 2009 U.S. Dist. LEXIS 117737, at *20-*21 (noting that whether or not motive is necessary for scienter inference is a question of fact).  The whole of the Complaint paints a cogent and compelling picture of defendants' knowledge of the substantial V-11 troubles and their concealment of that information from the market.  The absence of insider selling is irrelevant to that conclusion.

That is not to say that plaintiffs have not alleged a reason for defendants' actions.  Plaintiffs allege that defendants faced a very limited period of future growth in an extremely competitive industry.  ¶¶19-21.  Consequently, it was imperative for them to convince the market V-11 was an improvement over its award-winning and highly praised predecessor and deliver on those representations.  ¶22.  In other words, the present and future financial health of Allscripts was riding on the successful launch and implementation of V-11.

As described throughout this memorandum, and in great detail in the Complaint, plaintiffs allege equivocally that defendants knew long before the Class Period of the fundamental flaws with V-11's functionality and stability, and with the Company's inability to implement it at their customer sites.  ¶¶66-70.  The Complaint alleges that these problems continued, unabated by further "testing," throughout the Class Period.  Indeed, the Complaint alleges that in their rush to get the long-delayed,

- 30 -

and highly anticipated, V-11 to the market, defendants side-stepped Allscripts' usual procedure of running a "testing program" which would have permitted defendants to determine if the early fundamental problems with V-11 had been remedied.  ¶69.  The Complaint also plainly alleges that defendants were informed at least monthly of the continuing issues with V-11 both before, and during the Class Period.  ¶67.[19]

Defendants try and brush off these allegations by arguing that all new software technologies have "bugs."  MTD at 30-31.  What defendants refuse to acknowledge is that plaintiffs do not merely allege that there were "bugs" with V-11 but that those bugs were causing critical errors that put patient safety at risk and caused the software to not work at all, and that those issues persisted throughout the Class Period.  Plaintiffs have alleged what defendants' own case citations require, i.e., "that Defendants knew the difficulties to . . . technological development were insurmountable or particularly significant."  MTD at 31 (citing *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 884 (D. Minn. 2007), *aff'd*, 527 F.3d 749 (8th Cir. Minn. 2008).[20]  "[A]s corporate executives, [they] had the opportunity to make or correct the alleged [misrepresentations and] omissions," as well as to control the dissemination of information to the public (which they did).  *See Roth v. Aon Corp.*, No. 04-C-6835, 2008 U.S. Dist. LEXIS 18471, at *21 (N.D. Ill. Mar. 7, 2008).  Yet, defendants did not take that opportunity to truthfully inform the market about what was going on with V-11 and how it was effecting the conversion of bookings into revenue.

---

[19]     Defendants' contention that the Complaint does not allege that the defendants were told that known problems with V-11 were ***reported to defendants*** as unresolved during the Class Period (MTD at 31), requires complete disregard of clear allegations to the contrary.  ¶¶66-73.

[20]     *See also* MTD 30-31 (citing *In re Siebel Sys., Inc. Sec. Litig.*, No. C 04-0983 CRB, 2005 WL 3555718, at *4 (N.D. Cal. Dec. 28, 2005)) (requiring allegations that problems were of "such magnitude that it would make their positive statements false); *In re Read-Rite Corp.*, No. C-03-03148 RMW, 2004 WL 2125883, at *4 (N.D. Cal. Sept. 22, 2004) (same).

Given the prominence of the Company's plans to develop V-11 as an improvement to its highly regarded predecessor, it is incredible to suggest that defendants did not know of, or were unaware, of the significant problems with the product. That the industry projected that demand for products like V-11 would run dry within five years due to market saturation, makes it all the more incredible that defendants did not know of V-11's fundamental problems. ¶¶20-21.[21] In fact, it would be ***utterly implausible*** for the highest-level executives at Allscripts – CEO (Tullman) and CFO (Davis) – not to have known that the development and implementation of V-11 was plagued by significant problems,  particularly when they were regularly making public statements regarding V-11 and Allscripts' positive experience with it. *See Tellabs III*, 513 F.3d at 709 ("That no member of the company's senior management who was involved in authorizing or making public statements about the demand for the 5500 and 6500 knew that they were false is very hard to credit, and no plausible story has yet been told by the defendants that might dispel our incredulity.").  As the Seventh Circuit asked in *Tellabs III*: "Is it conceivable that [the CEO] was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company? It is conceivable, yes, ***but it is exceedingly unlikely***." *Id.* at 711; *see also Desai*, 654 F. Supp. 2d at 860 (noting that a strong inference of scienter may be credited "where 'it is almost

---

[21]     Defendants' refusal to acknowledge that these facts contribute to a strong inference of scienter also runs contrary to a wealth of authority in this Circuit.  *See, e.g.*, *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 850 (N.D. Ill. 2003) (holding that a strong inference of scienter can be inferred by pleading "key officers knew of facts critical to a business's core operations"); *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (holding that "[o]fficers of a company can be assumed to know of facts 'critical to a business's core operations or to an important transaction that would affect a company's performance'"); *Selbst*, 2005 U.S. Dist. LEXIS 23093, at *61(holding that "'high-level [] managers . . . may be presumed to have been aware of [] problems' at their company") (quoting *Danis v. USN Commc'ns Inc.*, 73 F. Supp. 2d 923, 938-39 (N.D. Ill. 1999)) (in which the court imputed knowledge or reckless disregard of pervasive problems affecting core operations to executives).

inconceivable'" that an individual defendant would be unaware of the matter at issue). The same conclusion can be drawn here.

Not only were defendants being told at least monthly that V-11 was continuing to have major problems consistent with the results of the 2006 implementations, but defendants themselves had ready access to information about the known bugs, new ones that continually were discovered, if those bugs were critical to V-11's functionality, what stage of resolution the development and quality assurance teams were at in remedying the problems, as well as real-time updates on the V-11 implementations underway, including access to the email exchanges from the field personnel documenting problems encountered implementing the product. ¶¶70-71, 73. Plaintiffs allege that not only did defendants have access to these databases, but that Tullman's direct report, President of Strategic Accounts Laurie McGraw, attended *daily* meetings with the development and quality assurance teams where they discussed the bugs being worked on and which of those bugs were "critical" and needed to be immediately fixed. ¶70. These facts also contribute to a strong inference of scienter. *See City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 684 (6th Cir. 2005) (crediting scienter inference from negative data that was "known *or available* to" defendants); *In re Motorola Sec. Litig.*, No. 03 C 287, 2004 U.S. Dist. LEXIS 18250, at *92 (N.D. Ill. Sept. 10, 2004) (holding that defendants' "access to information contradicting their public statements" supports a finding that they "'knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation'") (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)); *Ulta Salon*, 604 F. Supp. 2d at 1196-97 (holding that allegations that defendants had access to crucial information about a company's troubles was more cogent and compelling than an inference that they were "essentially clueless as to major problems existing within the company").

- 33 -

Defendants' contention that plaintiffs' allegations concerning Tennessee Oncology are fraud by "hindsight," misses the mark.  MTD at 33.  As discussed at length in §II.B., Tullman's use of Tennessee Oncology as an example of a V-11 implementation "success" was either knowingly false, given the ***two years*** Allscripts had spent unsuccessfully implementing V-11 for that customer, or made recklessly not knowing if the success claim was true.  In any event, even after defendants were informed by this major customer that V-11 was not working and could not be made to work, defendants flatly denied that they were having any implementation problems or delays that were impacting the conversion of bookings into revenue.  ¶50; §III.C.  Given the totality of plaintiffs' allegations that defendants were informed of widespread V-11 implementation problems throughout the Class Period, the specific example of those very problems that Tennessee Oncology provides does not stand alone and does not require the Court to make an improper extrapolation about the troubles at Allscripts as defendants argue.  MTD at 33.

Finally, because the totality of the Complaint's allegations sufficiently plead the scienter of both Tullman and Davis, Allscripts' scienter is also sufficiently stated.  *Takara*, 429 F. Supp. 2d at 980 (holding that "where a corporate agent is acting within the scope of his position, such as CEO, his alleged knowledge of the falsity of his statements can be imputed to the corporation") (citing *Tellabs I*, 437 F.3d at 603).

### D.      Control Person Liability Is Properly Alleged

Section 20(a) of "[t]he Exchange Act imposes liability not only on the person who actually commits the securities law violation, but also on the persons who 'directly or indirectly' control the violator."  *Takara*, 429 F. Supp. 2d at 983 (quoting 15 U.S.C. §78t(a)).  The Seventh Circuit has "long viewed the statute as remedial, to be construed liberally, and "'requiring only some indirect means of discipline or influence short of actual direction to hold a "control person" liable.'""  *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880 (7th Cir. 1992).  A court need only

- 34 -

determine "whether the alleged control-person actually participated in, that is, exercised control over, the operations of the person in general and, then, to whether the alleged control-person possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Id.* at 881.  As CEO and CFO, and the primary spokespeople for Allscripts, there can be no serious debate about whether Tullman and Davis controlled the Company.  As discussed above, plaintiffs have more than adequately alleged each defendant's primary violation of the federal securities laws.  Accordingly, each defendant's control person liability has also been sufficiently stated.

## IV.    Conclusion

For the above reasons, the Complaint in every respect meets the PSLRA pleading requirements, thus defendants' motion should be denied.  Moreover, defendants' argument that the Complaint should be dismissed with prejudice should be rejected if the Court determines any allegations wanting.  As discussed in §III.B., defendants' safe harbor warnings do not shield them from liability for the false and unattainable revenue and earnings growth forecasts they made, therefore amendment would not be futile.  Additionally, should the Court determine that attribution of facts alleged must be made to a described source, plaintiffs are prepared to amend the Complaint to add that information.

DATED:  February 2, 2010                     Respectfully submitted,

                                             COUGHLIN STOIA GELLER
                                               RUDMAN & ROBBINS LLP
                                             DEBRA J. WYMAN


                                             _____
                                                  s/ DEBRA J. WYMAN
                                                 DEBRA J. WYMAN

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

MILLER LAW LLC
MARVIN MILLER
LORI A. FANNING
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone:   312/332-3400
312/676-2676  (fax)

Liaison Counsel

SUGARMAN & SUSSKIND
HOWARD S. SUSSKIND
100 Miracle Mile, Suite 300
Coral Gables, FL  33134
Telephone:  305/529-2801
305/447-8115 (fax)

Additional Counsel for Plaintiff

- 36 -

479905_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 2, 2010, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will send notification of such filing to the e-mail

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on February 2, 2010.

s/ DEBRA J. WYMAN
DEBRA J. WYMAN

COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:debraw@csgrr.com

# Mailing Information for a Case 1:09-cv-04726

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Walter C. Carlson**
  wcarlson@sidley.com,efilingnotice@sidley.com

- **James Wallace Ducayet**
  jducayet@sidley.com,efilingnotice@sidley.com

- **Lori Ann Fanning**
  LFanning@MillerLawLLC.com,MMiller@MillerLawLLC.com,JRamirez@millerlawllc.com

- **Marvin Alan Miller**
  Mmiller@millerlawllc.com,LFanning@millerlawllc.com,KPulido@millerlawllc.com,JRamirez@millerlawllc.com

- **Brian O O'Mara**
  briano@lerachlaw.com,smarcks@lerachlaw.com

- **Debra J. Wyman**
  debraw@csgrr.com,nhorstman@csgrr.com,stremblay@csgrr.com,e_file_sd@csgrr.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)