*MHN*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

PLUMBERS AND PIPEFITTERS LOCAL ) 
UNION NO. 630 PENSION-ANNUITY )
TRUST FUND, on behalf of itself and all )
others similarly situated, )      No. 09 C 4726
           )
           Plaintiff, )      Judge Ruben Castillo
           )
      v. )
           )
ALLSCRIPTS-MISYS HEALTHCARE )
SOLUTIONS, INC., et al., )
           )
           Defendants. )

### MEMORANDUM OPINION AND ORDER

The Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Trust Fund

("Plaintiff") brings this putative class action on behalf of itself and those who purchased

Allscripts Healthcare Solutions, Inc. ("Allscripts" or the "Company")[1] common stock between

May 8, 2007 and February 13, 2008 (the "Class Period"). (R. 25, Am. Compl.)  In its complaint,

Plaintiff alleges that Allscripts, William J. Davis ("Davis"), Allscripts' Chief Financial Officer,

and Glen E. Tullman ("Tullman"), Allscripts' Chief Executive Officer and the Chairman of its

Board (collectively, "Defendants"), violated the Securities Exchange Act of 1934 (the "Exchange

Act") and its implementing regulations.  (*Id.*)  Presently before the Court is Defendants' motion

to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  (R. 29, Defs.' Mot.)  For the

reasons stated below, Defendants' motion is granted.

---

[1]  In October 2008, Allscripts merged with Misys Healthcare Systems, LLC and thus
formed Allscripts-Misys Healthcare Solutions ("Allscripts-Misys"). (R. 25, Am. Compl. ¶ 16.)
Though Allscripts is the entity involved in the allegations set forth in the complaint, Allscripts-
Misys is named as a defendant in this action as a successor in interest. (*Id.*)

## RELEVANT FACTS

### I.    Prior to Class Period Allegations

Allscripts develops and sells software applications to healthcare organizations.  (R. 25,

Am. Compl. ¶ 2.)  According to the Company, more than 150,000 physicians, 700 hospitals, and

nearly 7,000 post-acute and homecare organizations utilize Allscripts software applications.  (*Id.*)

Allscripts products include electronic health records ("EHR") systems and various other

healthcare-related software applications.  (*Id.*)  In the years preceding the Class Period, Allscripts

enjoyed profitable operations as a result of the market's embrace of its leading product:

Touchworks Version 10.1.1.  (*Id.* ¶ 19.)  This version of Touchworks had been certified by the

Commission for Healthcare Information Technology, a private-sector initiative that had been

recognized in the industry as the certification authority for EHR products.  (*Id.*)  Touchworks

Version 11, an upgrade to the successful Version 10.1.1, was originally scheduled for release in

late 2006.  (*See id.* ¶ 3.)  According to Plaintiff, by late 2006, Allscripts realized that Version 11

contained critical bugs which made the system unstable; thus, the Company pushed the

program's release date to May 2007.  (*See id.* ¶¶ 65-69.)

On February 13, 2007, Allscripts announced its 2006 financial results.  (*Id.* ¶ 22.)  During

2006, the Company enjoyed strong sales of Version 11 and, as a result, was "under tremendous

pressure to deliver a product that performed better than the award winning Version 10.1.1."  (*See*

*id.*)  Further, in this announcement, Allscripts reaffirmed the revenue and growth projections it

provided in October 2006.  (*Id.* ¶ 23.)  On a conference call which took place that same day,

Davis mentioned a limited release of Version 11 and noted that its reception had been "very, very

positive."  (*See id.* ¶¶ 15, 22.)  Indeed, according to Davis, Version 11 would be the "Bloomberg

for healthcare." (*Id.* ¶ 22.) Plaintiff claims that Davis' statements regarding Version 11 were untrue because the Company "knew that [Version 11's] limited implementation revealed a product that was unstable and did not operate as intended." (*Id.* ¶ 23.)  Several months later, on May 21, 2007, Version 11 was fully released. (*Id.* ¶ 69.)

## II.     May 2007 Statements

On May 8, 2007, Allscripts announced its financial results for the first quarter of the 2007 fiscal year. (*Id.* ¶ 24.)  In its announcement, Allscripts noted that total revenue, revenue from software and related services, gross margin percentage, and net income all increased when compared to the same period in 2006. (*Id.*)  Based on these results, Tullman stated the following: "[Allscripts'] revenue growth, visibility to sales opportunities and solid bottom-line performance gives us confidence in our ability to deliver during the remainder of 2007." (*Id.*)

During a conference call with analysts that same day, Tullman announced Allscripts' intention to raise sales projections for the remainder of the 2007 fiscal year. (*Id.* ¶ 25.)  As detailed by Davis, the Company stated that its clinical sales guidance would exceed $230 million, a $20 million increase over its prior projection; its previously issued revenue projection of $300 million and earnings guidance were unchanged. (*Id.*)  Also during this conference call, Tullman stated that Version 11 was the "the most tested product in [Allscripts'] history." (*Id.*)  Further, based on the limited release of Version 11, Tullman stated that "[m]arket validation of [Version 11] [a]s a transformational product has been overwhelming.  [Version 11] will allow Allscripts to become what I call the Bloomberg of health care." (*Id.* ¶ 26.)

In addition to these positive projections and statements, Plaintiff also objects to other portions of answers provided by Tullman and Davis (collectively, "Individual Defendants") in

response to questions posed during this conference call. First, it questions the veracity of Davis'

statement noting that there was "a very substantial amount of pent-up demand" for Version 11.

(*Id.* ¶ 27.) Second, Plaintiff objects to a response by Davis in which he indicates that the delay in

Version 11's release did not arise out of development issues, but rather work related to software

design. (*Id.*) Third, it challenges an answer by Tullman in which he states that because of the

"tremendous amount of work" the Company invested in the installation process, it did not

"expect issues to come up relative to the actual installation and - or conversion or transition to

[Version 11]." (*Id.* ¶ 28.)

According to Plaintiff, the aforementioned statements, assurances, and projections made

by the Individual Defendants in May 2007 were "materially false and misleading when made and

failed to disclose material information concerning Allscripts' business and business practices."

(*Id.* ¶ 32.) The crux of Plaintiff's challenge to these statements is the following: "based upon

experience in the limited 2006 [Version 11] implementations, Allscripts' management knew by

the beginning of the Class Period that the software was plagued by serious features, functionality

and quality problems. These problems caused Allscripts to experience greatly increased

implementation times on [Version 11] in the 2006 implementations as well as those

implementations made during the Class Period." (*Id.* ¶ 32(a).) Further, according to Plaintiff,

implementation of Version 11 was complicated by the Company's use of "inexperienced and

undertrained personnel." (*Id.* ¶ 32(d).) Because Allscripts recognized revenue derived from

Version 11 sales as the program was implemented,[2] these problems "delayed the conversion of sales backlog into revenue." (*Id.*) Thus, Plaintiff alleges that the misleadingly rosy picture painted by Defendants caused Allscripts stock to trade at artificially inflated prices. (*Id.* ¶ 33.)

**III.    August 2007 Statements**

On August 7, 2007, Allscripts announced its financial results for the second quarter of the 2007 fiscal year. (*Id.* ¶ 34.) In a press release, Allscripts noted that total revenue, revenue from software and related services, and net income all increased when compared to the same period in 2006. (*Id.*) Further, Tullman also noted that investments in new technology and aggressive hiring positioned the Company to capitalize on the significant market opportunity during the second half of the year. (*Id.*)

During a conference call that same day, Davis confirmed the revised clinical sales projections set forth in May 2007 and stated that increased confidence in their ability to close several deals led Allscripts to continue expecting these sales to exceed $230 million. (*Id.* ¶ 35.) In response to a question related to the drivers of the Company's overall revenue projection, Davis stated: "we have clear visibility as to where we expect our revenue to come from. It is a function of increased productivity in terms of the implementation resources on the Touchworks side . . . and incremental license opportunities." (*Id.*) It is this increased productivity, along with a sufficient sales backlog, that led Davis to believe in the feasibility of the Company achieving its 2007 revenue projection of $300 million. (*Id.*)

---

[2] During the relevant time period, Allscripts used the percentage of completion method of revenue recognition. (R. 31, Defs.' Mot. to Dismiss, Ex. 1, Allscripts 2006 10K; Ex. 3, Allscripts 2007 10K.) Under this method, Allscripts recognized revenue associated with its sales contracts as work on these contracts progressed. (*Id.*)

On top of these representations, other portions of the Individual Defendants' responses to analyst questions drew Plaintiff's attention.  In response to a question concerning implementation times for Version 11 vis-à-vis prior implementations of Touchworks products, Davis noted that implementation times were "roughly consistent with the past." (*Id.* ¶ 36.)  Indeed, according to Davis, after being implemented at the George Washington University Medical Faculty Associates ("George Washington"), the Company "subsequently rolled out additional sites" and saw "consistent trends relative to the deployment requirements on those upgrade processes." (*Id.* ¶¶ 35-36.)

Also during this conference call, Davis announced that it was in the best interest of Allscripts' investors if the Company implemented a "formal quiet period starting at the end of the third quarter." (*Id.* ¶ 41.)  He continued by noting that this quiet period would start on the last day of the quarter and would continue through the day Allscripts announced its quarterly results. (*Id.*)

Plaintiff alleges that the aforementioned representations made by the Individual Defendants in August 2007 were "materially false and misleading when made and failed to disclose material information concerning Allscripts' business and business practices." (*Id.* ¶ 42.)  As with their challenge with respect to the representations made in May 2007, Plaintiff alleges that based on their experience with limited implementations of Version 11 in 2006, the Individual Defendants knew by the beginning of the Class Period that the software contained serious problems. (*Id.* ¶ 42(a).)  Moreover, Plaintiff avers that despite the program's complexity and the Company's lack of experience troubleshooting the software, Allscripts sent inexperienced and undertrained personnel to implement Version 11. (*Id.* ¶ 42(d).)  As a result,

Plaintiff contends that the Defendants' misleadingly positive representations led to Allscripts stock being priced at an artificially inflated level. (*Id.* ¶¶ 42(d)-43.)

## IV.    November 2007 Statements

On November 8, 2007, Allscripts announced its financial results for the third quarter of the 2007 fiscal year. (*Id.* ¶ 44.) In its press release, the Company noted that total revenue, revenue from software and related services, gross margin percentage, and net income all increased when compared to its results for the same period in 2006. (*Id.*) Despite these increases, Plaintiff notes that these results "widely missed analysts' expectations." (*Id.* ¶ 45.) Also in this release, Allscripts lowered its 2007 revenue projections from $300 million to a range of $286 to $288 million. (*Id.* ¶ 44.)

During a conference call that same day, the Individual Defendants discussed these results with analysts. In addressing the lowered 2007 revenue projections, Davis noted that the Company needed to "recalibrate market expectations" as a result of the "near-term impact on revenue associated with the ramping up of resources" to some of its largest clients. (*Id.* ¶ 46.) Despite this downward revision of the Company's 2007 revenue expectations, Tullman was optimistic about Allscripts' future. Indeed, this optimism was apparently fueled by large agreements signed with the Columbia University Medical Center and the Lahey Clinic, which, according to Tullman, raised Allscripts' profile and reenforced its position as the number one provider for large enterprise and multi-speciality clients. (*See id.* ¶¶ 45, 47.)

Also during this call, analysts questioned the "shortage in recognized revenue" and the effect implementation cycles were having on Allscripts' financial results. (*Id.* ¶ 48.) In response to a question involving the ability of Allscripts' implementation staff to convert the sales backlog

into recognized revenue, Davis stated the Company "absolutely saw a nice improvement in terms of overall productivity" and noted that it was "absolutely . . . seeing the capability being there in terms of the production capacity to pull the backlog through[.]" (*Id.*) As a follow up to Davis' response, Tullman added that because the Company was allocating resources supporting Version 11, performing pre-billing services for large clients, and engaging in pre-sales implementation analyses, the timing of recognizing revenue "was not working" for Allscripts during the third quarter. (*Id.*)

Responding to a question requesting information regarding longer Version 11 implementation times, Tullman noted that Allscripts "continue[d] to see good progress." (*Id.* ¶ 49.) Additionally, when an analyst queried the cause of some delayed deployments, Davis provided the following answer:

> I guess I would characterize it a little differently in that it was a conscious decision on our part to redirect resources and/or allow some of these larger ramp-ups to consume those resources as opposed to it being kind of opportunistic by virtue of some of our customers stopping or delaying. We don't mean to convey that sentiment because that's not what's occurring, so that was a consideration.

(*Id.* ¶ 50.)

Again, Plaintiff alleges that the aforementioned representations made by Defendants in November 2007 were "materially false when made and failed to disclose material information concerning Allscripts' business and business practices." (*Id.* ¶ 51.) As with the previously described objections, Plaintiff avers that Allscripts' management knew, by the beginning of the Class Period, that Version 11 had serious defects. (*Id.* ¶ 51(a).) According to Plaintiff, these defects "greatly increased implementation times on [Version 11] in the 2006 implementations as well as those implementations made during the Class Period, thus delaying the conversion of

8

sales backlog into revenue." (*Id.*) As an additional contributing factor to implementation problems, Plaintiff avers that the Company sent inexperienced and undertrained personnel to implement Version 11, despite the complexities involved in its implementation. (*Id.* ¶ 51(d).)

As a result of these problems, Plaintiff alleges that, based on available information, Defendants "actually knew that their revised forecasts were false and misleading when made as there was no reasonable probability that the revised forecasted levels of revenue and earnings growth would in fact be achieved." (*Id.* ¶ 51(f).) Further, Plaintiff avers that implementation difficulties Allscripts was having at one of its major clients, Tennessee Oncology, rendered the positive portrait painted by Defendants in November 2007 false or misleading. (*Id.* ¶¶ 51(e), 74.)

Following the November 2007 announcements, the price of Allscripts common stock fell 19% by the end of the following trading day. (*Id.* ¶ 52.) Despite this dip, Plaintiff avers that Allscripts' stock price was still artificially inflated as a result of Defendants' alleged failure to reveal accurate information about Version 11 sales and product problems. (*Id.*)

## VI.    February 2008 Statements

On February 13, 2008, Allscripts reported its fiscal year 2007 financial results. (*Id.* ¶ 53.) Total revenue for 2007 was $281.9 million, compared to $228.0 million for 2006; net income increased from $11.9 million to $20.6 million. (*Id.*)

As with prior releases of financial results, the Individual Defendants participated in a conference call with analysts that same day. (*Id.* ¶ 54.) Again, the issue of Version 11 implementation was the subject of analyst questions. According to Plaintiff, the Individual Defendants' answers to these questions raise doubts regarding the truthfulness of their prior representations. (*See id.* ¶ 56.)

9

Plaintiff directs the Court's attention to two "shocking revelations of the serious problems with Allscripts' business" that became public during this call. First, in response to a query regarding the average Version 11 implementation time and the efforts being made to reduce it, Davis stated that Allscripts didn't "quite yet have an average." (*Id.* ¶ 54.) Second, Plaintiff also points to Davis' answer to a question suggesting a relationship between longer implementation cycles and a failure to meet revenue projections. (*Id.* ¶¶ 55, 57.) While noting that part of the shortfall was attributable to bookings, he stated that "there was an impact further [] beyond what even we expected, kind of in early November, relative to the expansion of project plans and I attempted to quantify that as about 2 ½ million dollars in the quarter, it was the combination of the two. The [Version 11] implications, much greater impact on the bottom line." (*Id.* ¶ 55.)

After the release of their financial information, the press pinned the Company's failure to meet revenue expectations on "problems with the rollout of Allscripts' Touchworks v11 application, and large contracts that were not completed by the end of the quarter." (*Id.* ¶ 57.) Indeed, according to one analyst, the failure to meet "lowered expectations points decidedly to the fact some of these issues, particularly the [Version 11] upgrade cycle, is going more poorly than the company has expected." (*Id.* ¶ 59.)

## PROCEDURAL HISTORY

Plaintiff filed its original complaint on August 4, 2009. (R. 1, Compl.) On November 25, 2009, Plaintiff filed a two-count amended complaint ("complaint"). (R. 25, Am. Compl.) In Count I, Plaintiff alleges that Defendants either disseminated or approved false statements "which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading." (*Id.* ¶ 98.) These actions, according to Plaintiff, constitute violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) ("Section 10(b)"), and Securities Exchange Commission Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5. (*Id.* ¶ 99.) In Count II, Plaintiff avers that, "[b]y reason of their positions as officers and/or directors of Allscripts, and their ownership of Allscripts stock, the Individual Defendants had the power and authority to cause Allscripts to engage in the wrongful conduct" alleged, and thus violated Section 20(a) of the Exchange Act ("Section 20(a)"), 15 U.S.C. § 78t(a). (*Id.* ¶ 103.)

On January 11, 2010, Defendants moved to dismiss. (R. 29, Defs.' Mot. to Dismiss.) In support of their motion, Defendants make several arguments. First, Defendants argue that Count I fails to state a claim because Plaintiff does not allege, with requisite particularity, that they made any false statements. (*Id.* ¶ 3.) Second, they contend that any alleged forward-looking statements and projections were accompanied by meaningful cautionary language and are therefore protected by a statutory safe harbor. (*Id.*) Third, they maintain that Plaintiff fails to allege facts giving rise to the required "strong inference" of scienter needed to state a claim under Section 10(b). (*Id.*) Finally, Defendants assert that since Plaintiff has failed to properly plead a Section 10(b) claim, its Section 20(a) claim also fails. (*Id.*)

## LEGAL STANDARD

Defendants' motion to dismiss implicates Federal Rules of Civil Procedure 12(b)(6) and 9(b), as well as the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4. A motion under Rule 12(b)(6) challenges the sufficiency of the complaint. *Cler v. Illinois Educ. Ass'n*, 423 F.3d 726, 729 (7th Cir. 2005). In ruling on a motion to dismiss brought pursuant to

Rule 12(b)(6), the court assumes all well-pleaded allegations in the complaint to be true and draws all inferences in the light most favorable to the plaintiff. *Killingsworth v. HSBC Bank*, 507 F.3d 614, 618 (7th Cir. 2007) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). To survive a motion to dismiss, the complaint must overcome "two easy-to-clear hurdles": (1) "the complaint must describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds on which it rests"; and (2) "its allegations must actually *suggest* that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the 'speculative level.'" *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008) (emphasis in original).

The heightened pleading requirements of Rule 9(b) further require plaintiffs to plead the "circumstances constituting fraud" with particularity. Fed. R. Civ. P. 9(b). These circumstances include "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech Fin. Servs.*, 536 F.3d 663, 668 (7th Cir. 2008) (citations and quotation omitted).

Finally, in addition to the requirements of Rule 9(b), the PSLRA further raises the pleading standard in securities actions. First, the PSLRA requires that the complaint specify each statement alleged to have been misleading, the reasons why the statement is misleading, and, if an allegation regarding a statement or omission is made on information and belief, it must state with particularity all facts on which that belief is formed. 15 U.S.C. § 78u-4(b)(1). Second, in cases where a plaintiff may only recover money damages with proof that the defendant acted with a particular state of mind, the PSLRA mandates that the complaint "state with particularity facts giving rise to a strong

inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

## ANALYSIS

### I.     Section 10(b) and Rule 10b-5

In 1995, Congress passed the PSLRA in response to a "perceived need to deter strike

suits wherein opportunistic private plaintiffs file securities fraud claims of dubious merit in order

to exact large settlement recoveries." *See Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)

(citing H.R. Conf. Rep. No. 104-369, at 31 (1995)). To curtail the filing of dubious lawsuits, the

PSLRA imposed stringent pleading requirements that exceed the particularity requirement of

Federal Rule of Civil Procedure Rule 9(b). *See, e.g., In re Rockefeller Cent. Props., Inc. Sec.*

*Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (noting that the PSLRA "imposes another layer of

factual particularity to allegations of securities fraud"). Among other requirements, the PSLRA

mandates that a complaint arising out of the Act contain: (1) each statement alleged to have been

misleading; (2) the reason why the statement is misleading; and (3) if an allegation regarding the

statement or omission is made on information and belief, the complaint shall state with

particularity all facts on which that belief is formed. 15 U.S.C. § 78u-4(b)(1) ("paragraph

(b)(1)"). A court must dismiss a complaint if it fails to satisfy any of these requirements. 15

U.S.C. § 78u-4(b)(3).

Defendants argue that the complaint does not satisfy paragraph (b)(1), and thus should be

dismissed, because Plaintiff's claims–which they assert are founded upon information and belief

drawn from confidential sources–do not contain allegations indicating that its sources would

have access to the information upon which it relies. (*See* R. 31, Defs.' Mem. at 15.) In response,

Plaintiff contends that the PSLRA does not require it to plead "foundational evidence" attributing allegations to a confidential witness or source. (R. 33, Pl.'s Mem. at 22-23.) To resolve this dispute, the Court must examine the degree of particularity required to satisfy paragraph (b)(1).

In *Novak v. Kasaks*, the Second Circuit articulated what a plaintiff must plead to satisfy paragraph (b)(1). 216 F.3d at 312-314. In *Novak*, it held that in situations involving allegations based on information and belief, plaintiffs need not "plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based"; rather, they need only "plead with particularity *sufficient* facts to support their beliefs." *Id.* at 313-14 (italics in original). Thus, the court held that where plaintiffs rely on "confidential sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendant's statements were false." *Id.* In situations, however, where plaintiffs rely solely on confidential sources as the basis for their allegations, it stated that these sources must be described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information alleged. *Id.* at 314. A complaint, the court continued, can meet paragraph (b)(1)'s pleading requirement by "providing documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs." *Id.* This articulation of the PSLRA's pleading requirement under paragraph (b)(1) has been adopted by various circuits.[3] *See, e.g., In re Daou*

---

[3] Although there is no binding precedent on this question, the Seventh Circuit has cited approvingly to the Second Circuit's articulation. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595-96 (7th Cir. 2006), *vacated on other grounds and remanded by, Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2006). As the Supreme Court's opinion left its analysis under paragraph (b)(1) untouched, this Court will consider the Seventh Circuit's opinion on this question as persuasive authority. *E.g., In re Taffi*, 68 F.3d 306, 310 (9th Cir. 1995) (following as persuasive authority a decision vacated by the Supreme Court on other grounds).

*Sys.*, 411 F.3d 1006, 1015-1016 (9th Cir. 2005); *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F. 3d 126, 147 (3d Cir. 2004); *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 352-53 (5th Cir. 2002); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 28-30 (1st Cir. 2002). Accordingly, the Court will use the standard set forth in *Novak* in evaluating the sufficiency of the allegations in Plaintiff's complaint.

In this case, Plaintiff alleges that the positive statements, assurances, and projections made by Defendants during the Class Period were false and misleading when made because the Company knew that Version 11 had serious flaws which caused increased implementation times. (*See* R. 25, Am. Compl. ¶¶ 32, 42, 51.) It further alleges that these representations were unfounded because Version 11 contained bugs which rendered it unstable or unusable and, in certain circumstances, could potentially risk patient safety. (*Id.*) Finally, it predicates its allegations on the unqualified personnel Defendants sent to implement Version 11. (*Id.*) In its complaint, Plaintiff does not allege that it personally had access to the meetings or documents in which this information was revealed. (*See* R. 25, Am. Compl.) Because it does not allege firsthand knowledge, the Court can only conclude that these allegations are based upon information and belief. *See* Black's Law Dictionary 795 (8th ed. 2004) (defining information and belief allegations as being "based on secondhand information that the declarant believes to be true"); *In re Silicon Graphics, Inc. Sec. Litig.*, 970 F. Supp. 746, 763 (N.D. Cal. 1997) (noting that where plaintiffs do not have personal knowledge, the complaint must be based on information and belief). Indeed, Plaintiff does not claim that the relevant allegations are based on firsthand knowledge. (*See* R. 33, Pl.'s Mem. at 22-24.)

Since these allegations are based upon information and belief, Plaintiff must provide

"documentary evidence and/or a sufficient general description of the personal sources of [its] beliefs" to satisfy paragraph (b)(1)." *Novak*, 216 F.3d at 314. While it does provide documentary evidence in the form of a state court complaint filed by Tennessee Oncology,[4] (R. 25, Am. Compl., Ex. 1), the Court finds that this document, by itself, is not an adequate basis for believing that the statements made by Defendants throughout the Class Period were false or misleading. Thus, in order to satisfy paragraph (b)(1), Plaintiff must provide a sufficient general description of the personal sources which provided it with the information supporting its allegations regarding the false or misleading nature of Defendants' representations.

In the absence of sufficient documentary evidence, a plaintiff whose allegations are based on information and belief must describe her sources "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. Here, Plaintiff has failed to even attempt to satisfy this requirement. (*See* R. 25, Am. Compl.) Instead, it tries to evade this requirement by arguing, without citation to any legal authority, inapplicability because it does not attribute information to a confidential source. (*See* R. 33, Pl.'s Mem. at 22 n.9.) The Court finds this argument unpersuasive as it would, if accepted, undermine the stringent pleading regime set forth by Congress when it passed the PSLRA. More importantly, the Court concludes that the reading of the PSLRA that Plaintiff's argument is based upon is inconsistent with the line of cases interpreting paragraph (b)(1)'s requirements.

While Plaintiff is correct in noting that it is not required to plead "all of [its] evidence" at

---

[4] The Court may refer to this state court complaint as it was attached to the complaint, and is thus incorporated as part of the pleading for all purposes. Fed. R. Civ. P. 10(c); *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010).

this procedural stage, it erroneously concludes that the allegations in the complaint have crossed

the pleading threshold established by PSLRA.[5] (*See id.* at 22-23)  To satisfy paragraph (b)(1)'s

requirements, Plaintiff must allege certain details–such as a source's job title, location and dates

of employment, and work duties–to support the probability that its sources had access to the

information alleged in the complaint. *See, e.g.*, *In re Career Educ. Corp. Sec. Litig.*, No 03 C

8884, 2006 WL 999988, at *3-6 (N.D. Ill. Mar. 28, 2006) (considering source's job title, duties,

and dates of employment in determining compliance with the PSLRA); *Davis v. SPSS, Inc.*, 431

F. Supp. 2d 823, 827-28 (N.D. Ill. 2006) (considering job title, office location and dates of

employment); *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 943-

45 (S.D. Ind. 2005) (evaluating the relationship between sources' job titles and allegations in

determining whether they were "relaying information received first, second, or even third

hand.").  In short, the complaint must provide a court with a sufficient basis to determine whether

a source "is speaking from personal knowledge or merely regurgitating gossip and innuendo." *In*

*re Career Educ. Corp. Sec. Litig.*, 2006 WL 999988, at *4 (internal quotation and citation

omitted).  By failing to provide any description of its sources, Plaintiff has not given the Court a

sufficient basis to evaluate the connection between its sources and the allegations which

undergird the claims regarding the false and misleading nature of Defendants' representations.

Accordingly, the Court dismisses the complaint for failure to satisfy the PSLRA.

---

[5] Plaintiff also seems to suggest that counsel's obligation under Rule 11 shields it from
the PSLRA's pleading requirements. (*See* R. 33, Pl.'s Mem. at 24 n.12.)  The Court finds this
argument unpersuasive as it fails to distinguish between counsel's duty in making representations
to a court and the sufficiency of those representations under the PSLRA.

## II.   Section 20(a)

Section 20(a) provides a basis for holding individuals liable for acts of securities fraud if they control other individuals or businesses that violate the securities laws.  15 U.S.C. § 78t.  To state a claim under Section 20(a), "a plaintiff must first adequately plead a primary violation of securities laws."  *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).  Because Plaintiff has failed to properly plead a primary violation of Section 10(b) or Rule 10b-5, its Section 20(a) claim must be dismissed under Rule 12(b)(6) for failing to state a claim upon which relief can be granted.

CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (R. 29) under Rule 12(b)(6) is GRANTED.


Entered:  _____

**Judge Ruben Castillo**
**United States District Court**

**Dated:** April 13, 2010