# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| PLUMBERS AND PIPEFITTERS LOCAL UNION NO. 630 PENSION-ANNUITY TRUST FUND, On Behalf of Itself and All Others Similarly Situated, et al., Plaintiffs, | ) ) ) ) ) ) | No. 1:09-cv-04726  Judge Ruben Castillo |
| vs. | ) ) | |
| ALLSCRIPTS-MISYS HEALTHCARE SOLUTIONS, INC., et al., Defendants. | ) ) ) | |

# MEMORANDUM OF LAW IN SUPPORT
# OF DEFENDANTS' MOTION TO DISMISS
# PLAINTIFFS' SECOND AMENDED COMPLAINT

Walter C. Carlson
James W. Ducayet
Victor D. Quintanilla
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois  60603
(312) 853-7000

ATTORNEYS FOR DEFENDANTS

Dated:  June 11, 2010

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................iiii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

    A.   Allscripts and TouchWorks EHR ........................................................................ 3

    B.   Allscripts Provides Earnings And Bookings Guidance, Which It Revised During The Class
        Period. ................................................................................................................ 4

    C.   Alleged False And Misleading Statements. ......................................................... 6

    D.   Alleged Reasons For Falsity Of Alleged Misstatements And For *Scienter* ............... 7

ARGUMENT ...................................................................................................................... 9

    I.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS DO NOT ALLEGE,
        WITH REQUISITE PARTICULARITY, THAT DEFENDANTS MADE ANY FALSE
        STATEMENTS. ................................................................................................. 10

    A.   Generalized Statements Of Optimism And Puffery Are Immaterial As A Matter of Law ...... 11

    B.   The Challenged Forward-Looking Statements Are Not Actionable Due To The "Bespeaks
        Caution" Doctrine And The Reform Act's Safe Harbor ...................................... 12

    C.   Plaintiffs Have Not Adequately Pleaded The Falsity Of Alleged Present-Tense Statements
        About The Demand For, Testing Of, and Deployment Of V-11. ........................... 16

    II.   THE COMPLAINT SHOULD ALSO BE DISMISSED BECAUSE PLAINTIFFS'
        ALLEGATIONS DO NOT GIVE RISE TO A STRONG INFERENCE THAT DEFENDANTS
        ACTED WITH *SCIENTER* ............................................................................... 20

    A.   Plaintiffs Do Not Allege A Motive To Commit Fraud. ....................................... 21

    B.   Plaintiffs Fail To Allege A Cogent Or Compelling Inference That The Individual Defendants
        Acted With *Scienter*. ........................................................................................ 22

    C.   Plaintiffs Have Failed To Allege Facts Giving Rise To A Strong Inference That Allscripts
        Acted With *Scienter*. ........................................................................................ 29

    III.  PLAINTIFFS FAIL TO STATE A CLAIM FOR CONTROL PERSON LIABILITY. ............. 30

    IV.  DISMISSAL SHOULD BE WITH PREJUDICE. .................................................. 30

CONCLUSION ................................................................................................................. 30

## TABLE OF AUTHORITIES

Page(s)

CASES

*Anderson v. Abbott Labs.*,
  140 F. Supp. 2d 894 (N.D. Ill. 2001), *aff'd*, 269 F.3d 806 (7th Cir. 2001) ...........................11

*Anderson v. Simon*,
  217 F.3d 472 (7th Cir. 2000) ...................................................................................................3

*Asher v. Baxter Int'l Inc.*,
  377 F.3d 727 (7th Cir. 2004) ...........................................................................13, 14, 15, 16

*Brodsky v. Yahoo! Inc.*,
  630 F. Supp. 2d 1104 (N.D. Cal. 2009) ...................................................................................18

*City of Livonia Employees' Ret. Sys. v. The Boeing Co.*,
  No. 09 C 7143, 2010 WL 2169491 (N.D. Ill. May 26, 2010) ..............................................25

*Davis v. SPSS, Inc.*,
  385 F. Supp. 2d 697 (N.D. Ill. 2005) ....................................................................................16

*Desai v. Gen. Growth Props., Inc.*,
  654 F. Supp. 2d 836 (N.D. Ill. 2009) ...............................................................................12, 15

*DiLeo v. Ernst & Young*,
  901 F.2d 624 (7th Cir. 1990) ..........................................................................................16, 18

*Douglas v. Wilmington Fin., Inc.*,
  No. 09 C 1370, 2009 WL 3852458 (N.D. Ill. Nov. 18, 2009) ..............................................17

*Dresner v. Utility.com, Inc.*,
  371 F. Supp. 2d 476 (S.D.N.Y. 2005) .....................................................................................28

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ....................................................................................................22

*Eisenstadt v. Centel Corp.*,
  113 F.3d 738 (7th Cir. 1997) ...................................................................................................11

*Frazier v. Vitalworks, Inc.*,
  341 F. Supp. 2d 142 (D. Conn. 2004) .....................................................................................24

*Fulton County Employees' Ret. Sys. v. MGIC Inv. Corp.*,
  No. 08-C-0458, 2010 WL 601364 (E.D. Wis. Feb. 18, 2010)..........................................18, 26

*Higginbotham v. Baxter Int'l Inc.*,
495 F.3d 753 (7th Cir. 2007) ............................................................22

*Hoffman v. Authentic, Inc.*,
No. 6:08-cv-1741-Orl-28DAB, 2009 WL 3109860 (M.D. Fla. Sept. 24, 2009) ...................25

*In re Allscripts, Inc. Sec. Litig.*,
No. 00 C 6796, 2001 WL 743411 (N.D. Ill. June 29, 2001) ......................................16, 28, 29

*In re Cerner Corp. Sec. Litig.*,
425 F.3d 1079 (8th Cir. 2005) ............................................................19

*In re HomeBanc Corp. Sec. Litig.*,
--- F. Supp. 2d ---, 2010 WL 1524836 (N.D. Ga. 2010)...................................19, 22

*In re Huntington Bancshares Inc. Sec. Litig.*,
674 F. Supp. 2d 951 (S.D. Ohio 2009) ............................................................23

*In re Hutchinson Tech., Inc. Sec. Litig.*,
536 F.3d 953 (8th Cir. 2008) ............................................................28

*In re Midway Games, Inc. Sec. Litig.*,
332 F. Supp. 2d 1152 (N.D. Ill. 2004) ............................................................11, 12

*In re NVE Corp. Sec. Litig.*,
551 F. Supp. 2d 871 (D. Minn. 2007) ............................................................16, 24, 25

*In re Read-Rite Corp.*,
No. C-03-03148 RMW, 2004 WL 2125883 (N.D. Cal. Sept. 22, 2004) ..............................25

*In re Sec. Litig. BMC Software, Inc.*,
183 F. Supp. 2d 860 (S.D. Tex. 2001) ............................................................27

*In re Siebel Sys., Inc. Sec. Litig.*,
No. C 04-0983, 2005 WL 3555718 (N.D. Cal. Dec. 28, 2005),
*aff'd*, 261 Fed. Appx. 60 (9th Cir. 2007) ............................................................25, 29

*In re XM Satellite Radio Holding Sec. Litig.*,
479 F. Supp. 2d 165 (D.D.C. 2007)............................................................16

*Ind. Elec. Workers' Pension Trust Fund v. Shaw Group, Inc.*,
537 F.3d 527 (5th Cir. 2008) ............................................................21

*Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*,
No. 08-C-797, 2010 WL 1287058 (E.D. Wis. Mar. 30, 2010)................................17

*Konkol v. Diebold, Inc.*,
590 F.3d 390 (6th Cir. 2009) ............................................................23, 27

*Limantour v. Cray Inc.*,
   432 F. Supp. 2d 1129 (W.D. Wash. 2006) ........................................................................23

*Lipton v. Pathogenesis Corp.*,
   284 F.3d 1027 (9th Cir. 2002) ........................................................................27

*Makor Issues & Rights, Ltd. v. Tellabs, Inc. (Tellabs I)*,
   432 F.3d 588 (7th Cir. 2006),
   *rev'd on other grounds*, 551 U.S. 308 (2007) ........................................................11, 12

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ........................................................................23

*Pugh v. Tribune Co.*,
   521 F.3d 686 (7th Cir. 2008) ........................................................................22, 29, 30

*Raab v. Gen. Physics Corp.*,
   4 F.3d 286 (4th Cir. 1993) ........................................................................11

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ........................................................................25

*Roth v. OfficeMax, Inc.*,
   No. 05 C 236, 2006 WL 2661009 (N.D.Ill. Sept. 13, 2006) ........................................12

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*,
   75 F.3d 801 (2d Cir. 1996) ........................................................................12

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994) ........................................................................21

*Stavros v. Exelon Corp.*,
   266 F. Supp. 2d 833 (N.D. Ill. 2003) ........................................................12, 13, 16, 22

*Sundstrand Corp. v. Sun Chem. Corp.*,
   553 F.2d 1033 (7th Cir. 1977) ........................................................................23

*Taubenfeld v. Career Educ. Corp.*,
   No. 03 C 8884, 2005 WL 350339 (N.D. Ill. Feb. 11, 2005) ........................................29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ........................................................................ passim

*W. Pa. Elec. Employees Pension Trust v. Plexus Corp.*,
   No. 07 C 0582, 2009 WL 604276 (E.D. Wis. Mar. 6, 2009) ........................................15

*W. Wash. Laborers-Employers Pension Trust v. Panera Bread Co.*,
   --- F. Supp. 2d ---, 2010 WL 1006259 (E.D. Mo. 2010) ........................................15

*Zerger v. Midway Games, Inc.*,
    No. 07 C 3797, 2009 WL 3380653 (N.D. Ill. Oct. 19, 2009) ...................................................11

STATUTES

15 U.S.C. § 78u-4(b)(1) ...........................................................................................................10, 16

15 U.S.C. § 78u-4(b)(2) ...........................................................................................................10, 20

15 U.S.C. § 78u-4(b)(3) ...............................................................................................................10

15 U.S.C. § 78u-5(c)(1)(A) .....................................................................................................10, 12

15 U.S.C. § 78u-5(c)(1)(B) ..........................................................................................................22

Defendants Allscripts-Misys Healthcare Solutions, Inc. ("Allscripts" or the "Company"),
Glen E. Tullman, and William J. Davis ("Individual Defendants") (collectively, "Defendants")
respectfully submit this memorandum in support of Defendants' Motion to Dismiss Plaintiffs'
Second Amended Complaint.

## INTRODUCTION

On April 13, 2010, the Court dismissed Plaintiffs' First Amended Complaint on the
ground that Plaintiffs failed to describe their confidential sources and therefore failed, as required
by the Private Securities Litigation Reform Act of 1995 ("Reform Act"), to provide the Court
with the basis to evaluate the sufficiency of Plaintiffs' "information and belief" allegations.
(Mem. Op. and Order 17, Apr. 13, 2010 (Docket. No. 41) ("Opinion").)  On May 12, 2010, the
Court granted leave to replead.  (Order, May 12, 2010 (Docket. No. 46).)  On May 14, 2010,
Plaintiffs filed a Second Amended Complaint (the "SAC") (Docket. No. 47).  The SAC now
attributes certain of the allegations to four different confidential witnesses, (SAC ¶¶ 68-77), but
makes no other substantive changes.

Thus, as with the First Amended Complaint, this remains a case about financial
projections.  Plaintiffs assert that the Company's February 2008 announcement that its full fiscal
2007 revenues were lower than had previously been projected indicates that these earlier
projections were the product of fraud.  Plaintiffs persist in this claim despite the fact that, even
according to Plaintiffs themselves, these lower than previously projected results were due to
reasons that Allscripts had consistently warned shareholders could come to pass – specifically,
difficulties associated with the implementation of a new version of its award-winning software
product, TouchWorks EHR Version 11 ("V-11").

In this regard, the cornerstone of Plaintiffs' theory remains the contention that various
statements by the Individual Defendants regarding the Company's financial prospects during the

class period were false and misleading because they failed to account for the purported fact that

at the time of the V-11 launch in May 2007, V-11 had "approximately 2,000 known bugs that

made V-11 unstable, and in some cases unusable."  (SAC ¶¶ 32, 42, 51, 70, 94.)  Notably,

however, despite their attribution of certain allegations to one or more of their confidential

witnesses, Plaintiffs identify no confidential witness to support that specific factual allegation.

(*Id*. ¶ 70.)  Nor do they allege any possible motive for Messrs. Tullman or Davis to have

purportedly deceived Allscripts' shareholders – particularly given that both were shareholders,

and neither individual sold a single share of stock at the purportedly inflated price from May 8,

2007 to February 13, 2008 (the "Class Period") and instead suffered the same decline in the

value of their shares as the rest of the putative class.

Instead, the facts pleaded and attributed to Plaintiffs' confidential witnesses suggest a far

more cogent, non-culpable inference regarding statements concerning V-11 and the Company's

financial projections.  The SAC makes clear that V-11 was reviewed by quality assurance

personnel to resolve the critical issues raised in 2006 before V-11 was launched in May 2007.

(SAC ¶¶ 68-69.)  And after the general release of V-11 in May 2007, the confidential witnesses

confirm that Allscripts had a process in place to identify new software issues, and that Allscripts

employed quality assurance and development teams who worked to attempt to identify and

resolve those issues on a timely basis.  (*Id.* ¶¶ 71-73.)  In November 2007, when it appeared that

this process was proving more difficult than previously anticipated, the Company revised

downward its financial projections to account for the additional delay and expense, and it

disclosed those revised projections to shareholders.  (SAC ¶¶ 46.)

Congress passed the Reform Act precisely to prevent claims such as this from proceeding

beyond the motion to dismiss stage.  (*See* Opinion 13 (noting Reform Act designed to curtail

filing of "dubious lawsuits").)  Indeed, as Congress recognized, software companies, such as

Allscripts, are particularly at risk of being subjected to abusive and meritless securities litigation.

*See* H.R. Rep. No. 104-369 at 43 (1995) (Conf. Rep.), *as reprinted in* 1995 U.S.C.C.A.N. 730,

742 ("Technology companies—because of the volatility of their stock prices—are particularly

vulnerable to securities fraud lawsuits when projections do not materialize.").  For all of the

reasons discussed below, the SAC should be dismissed.

## BACKGROUND

### A.    Allscripts and TouchWorks EHR

Allscripts[1] is a leading provider of health information technology and electronic health

record ("EHR") software.  (*See* SAC ¶ 2; Allscripts, Form 10-K, at 3 (Mar. 1, 2007) ("2006

10K") (Ex. 1) (*cited* at SAC ¶ 87).)[2]  More than 150,000 physicians, 700 hospitals, and nearly

7,000 post-acute and homecare organizations use Allscripts' software applications.  (SAC ¶ 2.)

Allscripts' software TouchWorks EHR is an award-winning solution for mid-sized and

large physician groups.  (2006 10K at 5; Allscripts, Form 10-K, at 4 (Feb. 29, 2008) (Ex. 2);

Allscripts, Form 10-K, at 5 (July 30, 2009) (Ex. 3).)  TouchWorks EHR software automates the

collection and management of clinical data.  (*See* Ex. 1 at 3.)  The version at issue here, Version

11, was designed to offer more flexibility than Version 10.1, and added over two million lines of

new code to the TouchWorks EHR platform, as well as many new features that had been

---

[1]  In October 2008, Allscripts merged with Misys Healthcare Systems.  Allscripts-Misys Healthcare
Solutions is named as a defendant in this action as a successor in interest.  (*See* Opinion 1 n.1.)

[2]  The Court may consider facts alleged in the complaint and documents appended to or incorporated in it
by reference; documents "integral" to the complaint and relied upon by it, even if not attached or
incorporated by reference; public disclosure documents filed with the Securities and Exchange
Commission; and facts of which judicial notice may properly be taken under Rule 201 of the Federal
Rules of Evidence.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); *see
also Anderson v. Simon*, 217 F.3d 472, 474-75 (7th Cir. 2000).

unavailable on Version 10.1. (*See* Allscripts Q4 2007 Conf. Call. Tr. 2 (Feb. 13, 2008) (Ex. 7) (*cited* at SAC ¶ 54).)

Plaintiffs do not contest that V-11 may have been "the most tested product in [Allscripts'] history."[3] Nor do Plaintiffs dispute that, before placing V-11 into general release in May 2007, Allscripts partnered closely with a key client, George Washington University Medical Faculty Associates ("GW MFA"), to conduct a significant amount of its quality control and end-user verification. (SAC ¶¶ 27, 28, 36.) GW MFA is a 300-physician multi-specialty group in Washington, D.C. (*See* Allscripts Q1 2007 Conf. Call Tr. 3 (May 8, 2007) (Ex. 4) (*cited* at SAC ¶ 25).) GW MFA, in particular, "played a unique role in aiding [Allscripts] in the quality assurance process." (Allscripts Q2 2007 Conf. Call Tr. 11 (Aug. 7, 2007) (Ex. 5) (*cited* at SAC ¶ 35).)[4] Allscripts had placed V-11 into controlled release at GW MFA and at 15 to 20 additional client sites. (SAC ¶ 28.) GW MFA reviewed, tested, and documented close to 100 processes before V-11 was approved for general release, (Ex. 4 at 3), and the product went "live" at GW MFA, its first national site, on May 22, 2007. (SAC ¶¶ 3, 25, 27, 28, 36.)

B. **Allscripts Provides Earnings And Bookings Guidance, Which It Revised During The Class Period.**

On May 8, 2007, Allscripts announced its financial results for the first quarter of 2007. (SAC ¶ 24; News Release, Allscripts Reports First Quarter 2007 Results (May 8, 2007) (Ex. 8).) In its announcement, Allscripts reported that total revenue, revenue from software and related

---

[3] Plaintiffs' Memorandum of Law In Opposition To Defendants' Motion To Dismiss The Amended Complaint at 17 (Docket. No. 33) ("Pls.' Opp.").

[4] As explained at the time, Allscripts employed an "iterative design process that gathered extensive feedback from hundreds of physician users to understand and build the process models and solutions required to support seamless workflows." (*See* Joint News Release, The George Washington University Medical Faculty Associates Goes Live With Latest Allscripts Electronic Health Record For 300 Physicians (May 22, 2007) (Ex. 12).)

services, gross margin percentage, and net income all increased when compared to the same period in 2006.  (*See* SAC ¶ 24.)  During the first-quarter earnings call with analysts, Messrs. Tullman and Davis explained that the Company would go live with V-11 at GWU MFA later in May.  (Ex. 4 at 3.)  Messrs. Tullman and Davis also provided earnings and bookings guidance for the remainder of 2007.  (SAC ¶ 25.)  Mr. Davis explained that Allscripts continued to forecast total revenue for 2007 to be in excess of $300 million.  (Ex. 4 at 6-7.)

On August 7, 2007, the Company announced its financial results for the second quarter of 2007.  (SAC ¶ 34; News Release, Allscripts Reports Second Quarter 2007 Results (Aug. 7, 2007) (Ex. 9).)  Allscripts reported that total revenue, revenue from software and related services, and net income all increased when compared to the same period in 2006.  (SAC ¶ 34; Ex. 9 at 1.) Allscripts again confirmed its forecast and guidance for 2007.  (Ex. 5 at 6.)

On November 8, 2007, Allscripts announced its financial results for the third quarter of 2007.  (SAC ¶ 44; News Release, Allscripts Reports Third Quarter 2007 Results (Nov. 8 2007) ("11/8/07 News Release") (Ex. 10).)  Allscripts again reported that total revenue, revenue from software and related services, gross margin percentage, and net income had all increased when compared to its results for the same period in 2006.  (*See* SAC ¶ 44; Ex. 10 at 1.)

Allscripts, however, also lowered its revenue forecast for the full year 2007 to a range of $286 million to $288 million.  (Ex. 10 at 1; Allscripts Q3 2007 Conf. Call Tr. 6 (Nov. 8, 2007) (Ex. 6) (*cited* at SAC ¶ 46).)  Mr. Davis explained that "because of the complexity and size of [large enterprise] deployments," there would be a slower pace of revenue recognition.[5]  (Ex. 6 at 4.)  That is, the elongated deployment schedules for Allscripts' large enterprise deals meant that

---

[5]  In recognizing revenue from software such as TouchWorks EHR, Allscripts used the "percentage-of-completion" method, under which Allscripts recognized revenue associated with its sales contracts as work on these contracts progressed.  (Ex. 1 at 34.)

most of the revenues from recently signed large enterprise clients would not be recognized until 2008.

On February 13, 2008, Allscripts announced its financial results for the fourth quarter and full-year 2007.  (SAC ¶ 53.)  2007 was a record year for Allscripts in earnings, revenues, and bookings.  (*See* New Release, Allscripts Reports Fourth Quarter 2007 Results (Feb. 13, 2008) (Ex. 11) (*cited* at SAC ¶ 53).)  Allscripts reported total revenue of $281.9 million, compared to $228.0 million for 2006.  (*Id.*)  Revenue from software and related services for the year was $222.7 million compared to $173.5 million for 2006.  (*Id.*)  Even so, Mr. Tullman explained that the Company's 2007 revenue had been affected by "the timing of our TouchWorks V-11 release, and the impact on our deployment schedules, the mix of practice management and electronic health record sales, and the percentage of enterprise sales."  (Ex. 7 at 2.)  Allscripts did not meet its November forecast of $286-$288 million – a narrow miss of 1.4%.  (*Id.*)

C.     **Alleged False And Misleading Statements.**

The Complaint alleges that various sales and revenue projections, generalized optimistic statements, and statements about the development and implementation of V-11 made in press releases and analyst conference calls during the Class Period were materially false and misleading.  (*See* SAC ¶¶ 32, 42, 51.)  The challenged statements fall into three general categories: (1) vague, generalized optimistic statements about growth prospects for Allscripts; (2) forward-looking statements and projections about Allscripts' financial performance or the deployment of V-11; and (3) statements describing the demand for, testing of, or deployment of V-11.  Examples are listed below; a full list is appended as Exhibit A.

***Generalized Optimistic Statements Regarding Allscripts And V-11.***  Plaintiffs challenge certain generalized, optimistic statements about Allscripts' growth and V-11, for example:

- "V-11 will allow Allscripts to become what I call the Bloomberg of health care.  It will provide physicians with a product they want to use and need to have."  (SAC ¶ 26; *see also* Ex. 4 at 2.)

***Forward-Looking Statements and Projections.***  In the second category, Plaintiffs

challenge Allscripts' forward-looking statements and projections, including:

- Allscripts' guidance on May 8, 2007 of full year 2007 revenue to be in "excess of $300 million." (Ex. 4 at 6-7; SAC ¶ 25.)

- Allscripts' downward revision of its full year revenue forecast on November 8, 2007: "Allscripts has updated its revenue target for the full year 2007 to a range of $286 million to $288 million." (SAC ¶¶ 44-46.)

***Statements About V-11 Testing, Deployment, and Demand.***  Finally, Plaintiffs challenge

certain statements about the status of the development and testing of V-11, including:

- "V-11 [was] 'the most tested product in our history.'" (SAC ¶ 25; *see* Ex. 4 at 3.)

The Complaint also challenges statements about the deployment of V-11, including:

- "Interestingly, by the way, the delays in the project came not from development.  They came from the fact that we did an awful lot of design work and that actually delayed the start of the development work." (SAC ¶ 27; *see* Ex. 4 at 17.)

- "We are looking at a few thousand users probably by the end of August.  That rollout is going very well."  (*Id.* ¶ 36; *see* Ex. 5 at 11.)

The Complaint also challenges statements describing demand for V-11.  (*See* Ex. A.)

D.     **Alleged Reasons For Falsity Of Alleged Misstatements And For *Scienter*.**

Plaintiffs attempt to plead various reasons why the statements described above were false

and misleading when made.  In general, Plaintiffs contend that V-11 was plagued by serious

features, functionality, and quality problems that delayed the general release of V-11 in 2006,

before the class period began.  (SAC ¶¶ 32, 42, 51, 68-69.)  With respect to events during the

class period beginning in May 2007, Plaintiffs allege that "[a]t the time of its release, V-11 had

approximately 2000 known bugs that made V-11 unstable and in some cases unusable," (SAC ¶

70; *see id.* ¶¶ 32(c), 42(c), 51(a)), and that those software "bugs" caused Allscripts to experience

increased implementation times, thus delaying the conversion of sales into revenue, (*see* SAC ¶¶

32(a), 42(a), 51(a)).  Plaintiffs also assert that "Allscripts sent inexperienced and undertrained

personnel to implement V-11 . . . ," (*see id.* ¶¶ 32(d), 42(d), 51(d)), and that because V-11 "was

an almost entirely new application, there was no documentation from prior versions to aid the

Client Services team in working through implementation problems."  (*Id.* ¶ 74.)

  When dismissing the FAC, the Court noted that Plaintiffs had not set forth sufficient

description of the confidential witnesses supporting their allegations.  (*See* Opinion 16-18.)  In

the SAC, plaintiffs now set forth confidential witnesses (referred to as CW1 through CW4) who

describe purported known software problems in 2006 and who describe the quality control

process implemented before and after Allscripts launched V-11 in 2007.

  According to CW1, as a result of the work done in 2006, Allscripts' development team

reviewed each screen in V-11 to resolve issues that arose.  (SAC ¶ 68.)  According to CW2,

quality assurance teams performed manual and automated tests of V-11 features.  (*Id.* ¶ 69.)

CW2's team identified software issues and submitted them to the development team to be

resolved, and CW2's team then re-tested V-11 for those issues afterward.  (*Id.*)  Allscripts'

quality assurance group continually tested the "fixes" for the bugs that had been identified before

product launch, and continually tested the fixes for bugs that were discovered during

implementations.  (*Id.* ¶ 71.)  As part of the quality assurance process for V-11, the quality

assurance team prioritized bugs as critical, major, and minor.  (*Id.*)  The development team then

promptly fixed critical bugs, usually within one week of identification.  (*Id.*)  The other bugs

were remedied with "service packs, bug fixes, and design changes."  (*Id.*)  Quality assurance

teams then re-tested V-11 once these fixes were incorporated.  (*Id.*)  In addition, CW2 and CW3

are alleged as support for the allegation that after the May 2007 launch, hundreds of additional bugs were identified, reported to the development group, monitored, and tested. (*Id.* ¶¶ 72-73.) CW1, CW3, and CW4 are also alleged to provide the basis for allegations regarding implementation difficulties and allegedly inadequate training of implementation teams. (*Id*. ¶¶ 74-75.)

As for *scienter*, Plaintiffs do not allege any motive on the part of the Individual Defendants to commit securities fraud. Instead, Plaintiffs attempt to plead that the Individual Defendants "knew" of the alleged falsity of their public statements based on the following: *First*, the Individual Defendants are alleged to have participated in monthly conference calls with other members of senior management where they were allegedly provided with updates on aspects of the Company's business and V-11, including the performance of V-11 and the resolution of software issues. (*Id.* ¶¶ 68, 73, 74.) *See infra* pp. 24-27. *Second*, the Individual Defendants allegedly had "access" to two internal databases (HP Mercury and FastTrack) used by the quality assurance group and development team. (SAC ¶¶ 71, 77.) *See infra* p. 27. *Third*, Defendants allegedly knew that one of Allscripts' accounts, Tennessee Oncology, was dissatisfied with Allscripts' efforts to implement V-11, as a result of a letter dated September 11, 2007. (SAC ¶ 76.) *See infra* pp. 27-29. *Fourth*, Allscripts released a subsequent version of V-11 after the end of the Class Period, which improved upon the original version. (SAC ¶ 73.) *See infra* p. 29.[6]

## ARGUMENT

As the Court previously noted, private securities fraud lawsuits are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) as well as the even

---

[6] Plaintiffs allege that Defendants "admitted" that they had lacked a basis for estimating installation times for V-11. (SAC ¶ 54.) As is clear from the quoted excerpts set forth in the SAC, however, that is not an accurate characterization of what was said during the February 13, 2008 call. All that was said was that there were variations in implementation times across the 30 or so clients at which V-11 was being implemented. (*Id.*)

more stringent requirements of the Reform Act. (Opinion 11-13.) These requirements include the identification of each statement alleged to be misleading, the reasons why it is misleading, and, for allegations based on "information and belief," the plaintiff must set forth "all facts on which that belief is formed." (Opinion 13 (*citing* 15 U.S.C. § 78u-4(b)(1)).) In addition, under the "Safe Harbor" provision of the Reform Act, when a challenged statement is forward-looking, the Reform Act provides that defendants "shall not be liable" if the statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A).

Finally, the Reform Act requires plaintiffs to set forth facts giving rise to a "strong inference" that the defendant acted with *scienter*. *Id.* § 78u-4(b)(2). As the Supreme Court has explained, to create a "strong" inference of *scienter*, the well-pleaded allegations and other matter properly considered on a motion to dismiss must give rise to an inference of fraud that is "more than merely plausible or reasonable–it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

For all the reasons discussed below, the SAC does not meet these demanding requirements and must therefore be dismissed. (Opinion 13 (*citing* 15 U.S.C. § 78u-4(b)(3)).)

## I.     THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS DO NOT ALLEGE, WITH REQUISITE PARTICULARITY, THAT DEFENDANTS MADE ANY FALSE STATEMENTS.

As described above, Plaintiffs attempt to challenge as materially false and misleading various generalized optimistic statements about growth; forward-looking projections; and statements about the demand for, testing of, and deployment of, V-11. These attempts fail for a number of reasons.

10

A. **Generalized Statements Of Optimism And Puffery Are Immaterial As A Matter of Law.**

It is well-settled that vague statements of optimism and puffery made by management are immaterial, *see Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 905 (N.D. Ill. 2001), *aff'd*, 269 F.3d 806 (7th Cir. 2001), and that claims based on such statements warrant dismissal. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.* (*Tellabs I*), 437 F.3d 588, 596-97 (7th Cir. 2006), *rev'd on other grounds*, 551 U.S. 308 (2007); *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004).

In the context of vague optimistic statements and puffery, the issue is whether, under the circumstances, a reasonable investor would rely on such a statement as "reflecting a consequential *fact* about the company." *Tellabs I*, 437 F.3d at 596 (emphasis added). Statements that amount to "vague aspiration or unspecific puffery" are not actionable precisely because a reasonable investor would not view them as conveying information about specific *facts*. *Id.* Hence, publicly adopting a hopeful posture that strategic plans will be successful cannot form the basis of a federal securities lawsuit, *see Zerger v. Midway Games, Inc.*, No. 07 C 3797, 2009 WL 3380653, at *6 (N.D. Ill. Oct. 19, 2009), nor can putting a "rosy face on an inherently uncertain process." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746-47 (7th Cir. 1997). This rule is grounded on the common sense notion that reasonable investors do not make investment decisions based upon vague optimistic statements. *See Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993) ("The whole discussion of growth is plainly by way of loose prediction, and . . . anything but definite.").

The Seventh Circuit and others routinely deem loosely optimistic statements, such as the vague optimism and puffery at issue here, not actionable as a matter of law. *Compare* SAC ¶ 24 ("Our . . . performance give[s] us confidence in our ability to deliver solid results during the

11

remainder of 2007.") *with Tellabs I*, 437 F.3d at 597 (statement that "we feel very, very good about the robust growth we're experiencing" not actionable); *compare* SAC ¶ 26 ("V-11 will allow Allscripts to become what I call the Bloomberg of health care.") *with In re Midway Games*, 332 F. Supp. 2d at 1165 (statement by corporation, "Midway believes these products comprise the strongest home video game lineup in the Company's history and that these products will produce record home video game results in 2002" not actionable); *compare* SAC ¶ 34 ("We have a clear vision . . . and we continue to demonstrate our ability to deliver on that vision") *with San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 807, 811 (2d Cir. 1996) (the company "expects . . . another year of strong growth in earnings per share"); *see also Roth v. OfficeMax, Inc.*, No. 05 C 236, 2006 WL 2661009, at *4 (N.D.Ill. Sept. 13, 2006).  The same result is required here.

B.     **The Challenged Forward-Looking Statements Are Not Actionable Due To The "Bespeaks Caution" Doctrine And The Reform Act's Safe Harbor.**

At its core, the Complaint is directed at Allscripts' financial projections that, in hindsight, were not achieved.  These projections are protected by the Safe Harbor of the Reform Act.  *See Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 845-47, 852 (N.D. Ill. 2003) (Castillo, J.) (applying Safe Harbor and dismissing securities claims based on financial projections); *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 843-45 (N.D. Ill. 2009) (Shadur, J.) (same).  The Safe Harbor provides that defendants "*shall not be liable* with respect to any forward-looking statement, written or oral," if the forward-looking statement is identified as such and "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. § 78u-5(c)(1)(A).

12

Here, the SAC challenges statements that on their face are forward-looking projections of sales, revenue, earnings guidance, or predictions about the deployment of V-11.  Each statement was accompanied by express reference to the extensive risk factors set forth in Allscripts' 2006 10K.  The 11/8/07 News Release additionally highlighted certain risks relating to software implementation.  Moreover, before each of the earnings calls, Mr. Davis read a Safe Harbor statement, which referred to the 2006 10K, and, in the case of the November call, also referenced the 11/8/07 News Release.  (*See* SAC ¶¶ 87-91.)  This language clearly and adequately identified forward-looking statements and the accompanying risk factors to the marketplace.  *See, e.g.*, *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 732 (7th Cir. 2004); *Stavros*, 266 F. Supp. 2d at 844.

These risk factors plainly identified the very risk that Plaintiffs claim caused Allscripts to fail to meet its original and revised forecasts.  (*See* SAC ¶¶ 32(a), 42(a), 51(a).)  As Allscripts cautioned, "*[i][f our products fail to perform properly due to undetected errors or similar problems, our business could suffer.*" (SAC ¶ 87; *see also* 2006 10-K at 13 (emphasis in original).)  Allscripts also warned that "[c]omplex software such as ours often contains undetected defects or errors.  *It is possible that such errors may be found after . . . new enhancements to existing software.*" (SAC ¶ 87 (emphasis added); *see also id.* ("We continually introduce new solutions and enhancements to our solutions, and, *despite testing by us, it is possible that errors might occur in our software*.") (emphasis added).)  In addition, the Company cautioned that its operating results may vary because of elongated deployment and sales cycles.  Thus, for instance, Allscripts warned investors that it expected its quarterly operating results to vary depending on a number of factors, including the "sales, service, and *implementation cycles* of our clinical software products and physician education products and services." (*Id.*; 2006 10-K at 26 (emphasis added).)  In fact, not only did Allscripts identify the very contingencies that

13

Plaintiffs say came to pass, but it identified the very consequences that Plaintiffs say the Company suffered as a result: "errors in our software could result in . . . lost sales; delays in commercial release; . . . delays in or loss of market acceptance of our solutions; . . . unexpected expenses and diversion of resources to remedy errors." (2006 10-K at 13.)

Plaintiffs attempt to allege that these risk factors were vague and that they did not change over the Class Period, and have previously suggested that the Seventh Circuit's decision in *Asher* precludes dismissal on Safe Harbor grounds at the pleading stage. (SAC ¶¶ 86, 92; Pls.' Opp. 25-26.) The facts here, however, are much different than *Asher*.

Most critically, in *Asher*, Baxter had identified certain factors that could cause actual results to differ materially from those in the forward-looking statement, but did not identify the precise risks that were alleged to have come to pass. Because of the variance between the disclosed risk factors and the subsequent events, the *Asher* court was required to determine whether those factors identified by Baxter were "meaningful." *Asher*, 377 F.3d at 734 ("The problem is not that what actually happened went unmentioned; issuers need not anticipate all sources of deviations from expectations. Rather, the problem is that there is no reason (on this record) to conclude that Baxter mentioned those sources of variance that (at the time of the projections) were the principal or important risks."). In this context, the *Asher* court observed in *dicta* that the fact that the risk factors had not changed despite changes in Baxter's business situation could be a factor indicating that the risk factors were not viewed at the time as "meaningful." *Id*.

But no such additional inquiry is needed here. As courts have repeatedly held, while the Reform Act does not demand clairvoyance, if the identified risk factors are actually the same as what is alleged to have come to pass, they are *a fortiori* "meaningful" cautionary statements.

14

*See, e.g.*, *W. Wash. Laborers-Employers Pension Trust v. Panera Bread Co.*, --- F. Supp. 2d ---, 2010 WL 1006259, at *6 (E.D. Mo. 2010) (inclusion of cautions "referring in general terms to the specific risks that ultimately materialized," means that these statements were meaningful); *Desai*, 654 F. Supp. 2d at 846 ("While prescience is not required under the [Reform Act]'s Safe Harbor provision, General Growth's cautionary statements were in fact entirely anticipatory of Plaintiffs' claim. General Growth identified the exact risks that have been identified in Plaintiffs' Complaint . . . To call those statements 'boilerplate' borders on the farcical."); *see also W. Pa. Elec. Employees Pension Trust v. Plexus Corp.*, No. 07 C 0582, 2009 WL 604276, at *8 n.7 (E.D. Wis. Mar. 6, 2009) (granting motion to dismiss and noting that case was different from *Asher* in that "the cautionary language identifies and discusses the risk at issue -- future order placement," *i.e.,* the same risk that plaintiffs alleged was realized and caused their loss).

Moreover, unlike Baxter in *Asher*, Allscripts *did* update its warnings as additional information became available. *See Plexus Corp.*, 2009 WL 604276, at *8 n.7 (noting that, unlike *Asher*, "defendants' cautionary language is not static, but changes over time to reflect new risks and problems [the company] encounters."). Allscripts revised its Safe Harbor statement in its press release in November 8, 2007, to caution more specifically about the length of installations:

> These forward-looking statements are subject to a number of risks and uncertainties, some of which are outlined below. As a result, actual results may vary materially from those anticipated by the forward-looking statements. Among the important factors that could cause actual results to differ materially from those indicated by such forward-looking statements are: the volume and timing of systems sales and installations; length of sales cycles and the installation process; the possibility that products will not achieve or sustain market acceptance; the timing, cost and success or failure of new product and service introductions, development and product upgrade releases . . . .

(Ex. 10 at 2; SAC ¶ 90.) On similar facts, Courts in this District and elsewhere have consistently applied the Reform Act's Safe Harbor and granted dismissal. *Desai*, 654 F. Supp. 2d at 847; *see also In re XM Satellite Radio Holding Sec. Litig.*, 479 F. Supp. 2d 165, 185 (D.D.C. 2007)

(dismissing complaint where warnings "relate[d] directly to the language by which plaintiffs claim to have been misled") (internal citations omitted); *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 893 (D. Minn. 2007) (dismissing complaint and deeming statements inactionable where "filing specifically warned of technological challenges to development of . . . technology such as the control of magnetic and other parameters and the need to develop stable designs"). *See generally Stavros*, 266 F. Supp. 2d at 843-47, 852 (granting dismissal pursuant to the Safe Harbor); *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 711 (N.D. Ill. 2005) (same); *In re Allscripts, Inc. Sec. Litig.*, No. 00 C 6796, 2001 WL 743411, at *9 (N.D. Ill. June 29, 2001) (same).

      C.      **Plaintiffs Have Not Adequately Pleaded The Falsity Of Alleged Present-Tense Statements About The Demand For, Testing Of, and Deployment Of V-11.**

The essence of a misrepresentation claim is that the challenged statement was false at the time it was made. "There cannot be fraud by hindsight." *Asher*, 377 F.3d at 730. It is axiomatic under Rule 9(b) that plaintiffs seeking relief under Rule 10b-5 must point to specific facts suggesting that fraud occurred. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 627-28 (7th Cir. 1990). Moreover, the Reform Act requires factual particularity for allegations of false statements. 15 U.S.C. § 78u-4(b)(1). Applying these principles to the remaining statements, Plaintiffs have not properly alleged that they were false at the time they were made.

*First*, Plaintiffs challenge Mr. Tullman's statements regarding the testing that Allscripts had conducted on V-11. (*See* SAC ¶ 25 (V-11 was "the most tested product in our history") *and* ¶ 28 ("We did a tremendous amount of work on the process to make sure that doesn't happen.").) Yet Plaintiffs do not dispute that V-11 may have been "the most tested product in [Allscripts'] history." *See supra* p. 4. Instead, Plaintiffs allege that, according to CW2, Allscripts did not run a "testing program" on V-11 before the general release of the software. (*See* SAC ¶ 70.) There is simply no way to reconcile that allegation with other allegations in the Complaint or with

documents incorporated by reference in the Complaint that Plaintiffs do not challenge.  Indeed,

Plaintiffs acknowledge in the *very same paragraph* (once again, attributing the information to

CW2) that the Company was, in fact, conducting tests up to three days before the May 21, 2007

general release.  (*Id.*)  Moreover, Plaintiffs allege but do not challenge statements indicating that,

before releasing V-11, Allscripts partnered closely with GW MFA to conduct a significant

amount of testing and end-user verification, (*id.* ¶¶ 27, 28, 36), or that GW MFA "played a

unique role in aiding [Allscripts] in the quality assurance process."  (*Id.* ¶ 36.)  Plaintiffs also do

not challenge Allscripts' statement that it placed V-11 into controlled release at GW MFA and at

15 to 20 different client sites, (*id.* ¶ 28), or that GW MFA reviewed, tested, and documented

close to 100 processes before approving V-11 for launch.  (Ex. 4 at 3.)  Because Plaintiffs'

assertions are both internally inconsistent and contradicted, the Court need not accept them.  *See*

*Douglas v. Wilmington Fin., Inc.,* No. 09 C 1370, 2009 WL 3852458, at *3 (N.D. Ill. Nov. 18,

2009) ("[A]n inconsistent conclusory statement does not plausibly suggest a right to relief.");

*Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*, No. 08-C-797, 2010 WL 1287058,

at *20 (E.D. Wis. Mar. 30, 2010) ("[I]t is impossible to divine an intent to deceive from the facts

alleged because the Plaintiffs' story is internally inconsistent . . . .").

     *Second*, the Complaint also seeks to challenge statements of Messrs. Tullman and Davis

about the deployment of V-11.  For example, Plaintiffs challenge as false Mr. Tullman's answer

to a question posed about the launch being delayed four to six weeks: "delays in the project [at

GW MFA] came not from development.  They came from the fact that we did an awful lot of

design work and that actually delayed the start of the development work."  (SAC ¶ 27.)

Plaintiffs, however, offer no well-pleaded basis to surmise that the brief delay in launching V-11

at GW MFA was due other than to an iterative design process.  (*See supra* note 4.)

Likewise, Plaintiffs challenge a statement that Mr. Tullman made when reporting Allscripts' second quarter results in early August 2007: "We are looking at a few thousand users probably by the end of August.  That rollout is going very well." (SAC ¶ 36.)  Here too, Plaintiffs offer no well-pleaded allegation contradicting Mr. Tullman's statement, such as by showing that deployments of V-11 had suffered delays before August 2007.  *See DiLeo*, 901 F.2d at 627 ("The complaint has more in the same vein, but not a single concrete example.").

To the extent that the Complaint relies on the situation at Tennessee Oncology ("TN Oncology") (*see* SAC ¶ 76), that illustration is inapposite.  CW1 confirms (SAC ¶ 76) that TN Oncology wrote Allscripts about its concerns on September 11, 2007.  But there is no basis to infer knowledge any earlier than that.  That is because despite allegedly being in a position to know, CW1 does *not* say that senior management had discussed TN Oncology's concerns any earlier than the date the letter was received, and it is reasonable to infer that he or she would have said so if it were true.  *Fulton County Employees' Ret. Sys. v. MGIC Inv. Corp.,* No. 08-C-0458, 2010 WL 601364, at *17 (E.D. Wis. Feb. 18, 2010) (fact that confidential source does not allege a material fact despite being in a position to know reasonably suggests that the requested inference is not accurate).  As such, this allegation does not support the falsity of any statements made prior to the date that the letter was received.  *See, e.g.*, *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1114-17 (N.D. Cal. 2009) (dismissal where alleged misstatement made prior to discovery of allegedly corrective information).

*Finally*, Plaintiffs challenge a statement Mr. Tullman made in November 2007 regarding productivity.  (*See* Ex. A at 2-3.)  Plaintiffs, however, offer no well-pleaded allegation that contradicts Mr. Tullman's account of the increase in overall billable hours or the increase in capacity resulting from Allscripts' hiring in the first six months of 2007.  (*See* SAC ¶ 48.)  Nor

18

do Plaintiffs dispute that the Company hired more personnel or that this would have increased the overall capacity and hours available for deployments of TouchWorks EHR.[7]  While CW4 opines that Allscripts' staff were under-trained and critiques Allscripts' decision to send employees into the field after having "shadowed" an experienced employee for one month, Plaintiffs offer no support for the proposition that the Individual Defendants shared that view. *See In re HomeBanc Corp. Sec. Litig.*, --- F. Supp. 2d ---, 2010 WL 1524836, at *9 (N.D. Ga. 2010) ("[A] key problem with Plaintiff's heavy reliance upon these confidential witnesses" is that "Plaintiff has largely failed to plead any facts demonstrating that either Defendant supported or endorsed the confidential witnesses' assessments . . . .").

These deficiencies are fatal.[8]  The Complaint challenges statements Messrs. Tullman and Davis made about the demand for, testing of, and deployment of V-11 by conflating events that transpired in the third and fourth quarters of 2007 with statements Messrs. Tullman and Davis made earlier in the year.  Plaintiffs, however, are not permitted to allege that statements were false merely because circumstances later changed.  The Reform Act requires that the Complaint show that the statements were misleading at the time they were made.  *See, e.g.*, *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1083 (8th Cir. 2005) ("[T]he complaint must indicate why the

---

[7]  *See* Ex. 5 at 15 ("Analyst: Okay.  . . . finally, . . . you mentioned, a lot of hiring.  I guess over the first six months of this year.  Are you done there and should we look for margins to ratchet up as you sort of are done adding expenses on the employee count?  Tullman:  . . . As we mentioned, we have in some respects overinvested up front to make sure we have trained people on board to deploy the systems we were selling . . . .").

[8]  Plaintiffs conclusorily assert that statements describing demand for V-11, *see supra* p. 7, were false or misleading when made.  However, Plaintiffs do not plead any basis to assert that demand was somehow weaker than reported.  And it is undisputed that Allscripts posted record sales in 2007.  *See supra* p. 6.  Plaintiffs also contend that implementation times were not "roughly consistent with the past" *as of August 2007*.  (*See* Ex. A at 2.)  Here too, Plaintiffs fail to plead a basis that this statement was actually false when made in *August 2007*.  Plaintiffs suggest that Defendants "admitted" that they had lacked a basis for estimating installation times for V-11.  (SAC ¶ 54.)  As is clear from the quoted excerpts set forth in the Complaint, however, that is not an accurate characterization of what was said during the February 13, 2008 call.

alleged statements would have been false or misleading at the several points in time in which it is alleged they were made.") (internal quotes omitted).

## II. THE COMPLAINT SHOULD ALSO BE DISMISSED BECAUSE PLAINTIFFS' ALLEGATIONS DO NOT GIVE RISE TO A STRONG INFERENCE THAT DEFENDANTS ACTED WITH *SCIENTER*.

To state a claim for securities fraud under the Reform Act, Plaintiffs must also plead particularized facts giving rise to a "strong inference" that defendants made the alleged misrepresentations with fraudulent intent (*i.e.*, *scienter*).  *See* 15 U.S.C. § 78u-4(b)(2).

Under *Tellabs*, the Supreme Court held that "[a] complaint will survive . . . only if a reasonable person would deem the inference of *scienter* cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  551 U.S. at 324  (emphasis added). Accordingly, "in determining whether the pleaded facts give rise to a 'strong' inference of *scienter*, the court must take into account" not only inferences argued by the plaintiff, but also "plausible opposing inferences."  *Id.* at 323.  In assessing whether the pleaded facts give rise to a strong inference of *scienter*, a court "must consider the complaint in its entirety," together with "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Id.* at 322.

Here, the relevant inquiry under *Tellabs* is whether, considering the allegations of the Complaint and those facts properly considered on a motion to dismiss, Plaintiffs have met their burden of setting forth facts from which a cogent and compelling inference may be drawn that the Individual Defendants fraudulently misrepresented Allscripts' prospects so as to inflate the price of Allscripts' stock.  Of course, under Plaintiffs' theory, the alleged fraud would have quickly come to light when Allscripts was unable to realize the revenues it had forecast.  And as a consequence of the alleged fraud, the Individual Defendants, who did not sell any stock or receive any other benefit as a result of the purported artificial inflation, experienced the same

20

decline in the value of their stock as every other shareholder. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning.").

Under *Tellabs*, Plaintiffs must establish that their requested inference is at least as cogent and compelling as the alternative, non-fraudulent inference: that the Individual Defendants provided investors with timely information and estimates based on the best information then available to them. As discussed below, Plaintiffs' contrary inference that the Individual Defendants were engaged in fraud is neither cogent nor compelling, and the Complaint must be dismissed under the Reform Act and *Tellabs*.

### A.       Plaintiffs Do Not Allege A Motive To Commit Fraud.

As an initial matter, the Complaint does not allege that Messrs. Tullman or Davis sold a single share of Allscripts stock during the putative Class Period. Nor does the Complaint allege that either of them realized or could have realized any "concrete benefits" by making one or more of the false statements and wrongful nondisclosures alleged. *See Ind. Elec. Workers' Pension Trust Fund v. Shaw Group, Inc.*, 537 F.3d 527, 543 (5th Cir. 2008) ("To demonstrate motive, plaintiffs must show concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.") (internal quotation marks omitted). In fact, Messrs. Tullman and Davis were each significant shareholders who experienced the same market declines as did other shareholders.[9]

Although *Tellabs* holds that Plaintiffs are not absolutely required to plead motive to establish *scienter*, *Tellabs*, 551 U.S. at 325, the post-*Tellabs* case law in the Seventh Circuit

---

[9]  Mr. Tullman owned 366,994 shares, and Mr. Davis owned 17,513 shares at the beginning of the Class Period. Neither Mr. Tullman nor Mr. Davis sold any shares during the Class Period. (*See* excerpts from Allscripts Proxy Statement 13 (Apr. 30, 2007) (Ex. 13) and Allscripts Proxy Statement 151 (Aug. 21, 2008) (Ex. 14).)

makes clear that their failure to do so is nevertheless significant.  The Seventh Circuit has held, absent a concrete motive, it is difficult to find an inference of *scienter* that is either cogent or compelling and that the absence of stock sales by those supposedly "in the know" implies that the Complaint lacks the required "strong" inference of *scienter.  Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 759 (7th Cir. 2007); *see also Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008) ("*Tellabs* instructs us to consider all potential inferences, and the fact that the defendants are not alleged to have sold the stock at the inflated prices meant that they stood to lose a lot of money if the value of Tribune's stock fell.").  Where plaintiffs do not allege facts supporting a motive, under the holistic review, their circumstantial evidence of actual knowledge must be correspondingly greater.  *See ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198-99 (2d Cir. 2009); *In re HomeBanc Corp. Sec. Litig.*, --- F. Supp. 2d ---, 2010 WL 1524836, at *18 (citing cases).

    B.    **Plaintiffs Fail To Allege A Cogent Or Compelling Inference That The Individual Defendants Acted With *Scienter*.**

Plaintiffs attempt to meet the heightened requirement of establishing a strong inference of *scienter*—in circumstantial fashion—by alleging that Messrs. Tullman and Davis knew of the purported falsity of their statements.  With respect to the forward-looking statements governed by the Safe Harbor, Plaintiffs must plead with particularity facts that the Individual Defendants actually knew that their forward-looking statements and projections were false or misleading when made.  *See Stavros*, 266 F. Supp. 2d at 847 (*citing* 15 U.S.C. § 78u-5(c)(1)(B)).  As to present-tense statements, the standard is, at a minimum, recklessness, which requires "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the

defendant or so obvious that the actor must have been aware of it." *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977).

This Court dismissed Plaintiffs' first complaint for failure to describe its confidential sources "with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information alleged." (Opinion 14-17.) The SAC purports to cure the problems of the first by attributing many of the allegations about software problems in 2006 to confidential witnesses. (SAC ¶¶ 67-69.) But as noted above, Plaintiffs conspicuously do *not* attribute the allegation that V-11 contained known critical software problems when launched that "made V-11 unstable and in some cases unusable." (*Id.* ¶ 70.) The Court may not credit this allegation. *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1069 n. 13 (9th Cir. 2008) ("The problem for [Plaintiffs] is not that the confidential witnesses are inadequately identified—the problem is that these witnesses do not convey information sufficient to support the strong inference of *scienter* that the PSLRA requires."); *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 963 (S.D. Ohio 2009) ("[M]uch of the confidential witnesses' statements are irrelevant in that they fail to explain why Defendants' statements were fraudulent."). And to the extent that confidential witnesses are attributed to vague and conclusory assertions, those assertions must be discounted as well. *See Konkol v. Diebold, Inc.*, 590 F.3d 390, 398-99 (6th Cir. 2009) ("[V]ague and conclusory allegations from confidential witnesses . . . are properly discounted."); *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1142 (W.D. Wash. 2006) (same).

Plaintiffs have attempted to plead *scienter* by reference to (i) monthly management meetings; (ii) access to internal databases; (iii) problems with one of Allscripts' customers; and

(iv) the fact that Allscripts subsequently upgraded Version 11 to Version 11.1.  As shown below, none of these allegations establishes a cogent and compelling inference of *scienter*.

>    1.    **The Monthly Management Conference Calls Do Not Establish a Strong Inference of *Scienter*.**

Plaintiffs allege that Messrs. Tullman and Davis participated in monthly conference calls and that they knew that their statements were false as a result of these meetings.  (SAC ¶ 67.)  Given the process for identifying and resolving software problems described by Plaintiffs' confidential witnesses, however, the far more compelling inference is that Tullman and Davis did not knowingly make any false statements regarding the status of V-11.

For example, CW1 and CW2 allege that the existence and resolution of various "bugs" in the over two million lines of code that V-11 added to TouchWorks EHR were discussed in the monthly conference calls.  In bringing any high-tech software product to market, problem solving is the norm, not the exception.  *See, e.g.*, *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d at 884 ("[G]eneral difficulties in technology development are part and parcel of any attempt to commercialize new technology.").  It is common knowledge that "bugs" exist in even the most marketable and successful software programs.  *See Frazier v. Vitalworks, Inc.*, 341 F. Supp. 2d 142, 154 n.4 (D. Conn. 2004) ("Indeed, one would be hard pressed to find a software program on the market without at least some technical glitches . . . [E]ven Microsoft regularly releases patches and service packages designed to correct bugs in its products.").  As such, it would be entirely unremarkable – and not at all indicative of fraud – if the Individual Defendants may have been made aware of "bugs" both before and after V-11 was released.  It is precisely because these issues are ubiquitous in the software industry that courts require far more to establish that a

defendant's positive public statements and forecasts were knowingly false.[10]  Therefore, even

Plaintiffs agree that the standard for purposes of establishing a strong inference of *scienter*

requires knowledge that the "difficulties to . . . technological development were insurmountable

or particularly significant."   (*See* Pls.' Opp. 31.)  And, of course, "[f]raud cannot be inferred [in

hindsight] from subsequent investigation and testing."  *City of Livonia Employees' Ret. Sys. v.

The Boeing Co.*, No. 09 C 7143, 2010 WL 2169491, at *6 (N.D. Ill. May 26, 2010).

In this regard, CW1 and CW2 fail to assert that the Individual Defendants had any

knowledge during the launch or afterward that software bugs would result in significant

implementation delays rendering it unlikely for Allscripts to reach its projections.  CW1's

allegation that *by late 2006* the Individual Defendants knew from the monthly conference calls

"that V-11 was filled with critical bugs," (SAC ¶ 69), is insufficient, in light of Allscripts'

quality control process, because CW1 does not further assert that Allscripts failed to identify and

remedy the critical bugs before or after launch in May 2007.  *See Hoffman v. Authentic, Inc.*, No.

6:08-cv-1741-Orl-28DAB, 2009 WL 3109860, at *14, *18 (M.D. Fla. Sept. 24, 2009)

(determining that defendant's knowledge of software problems during development of the

product failed to create a "strong inference" of *scienter*).

---

[10]   *See In re Siebel Sys., Inc. Sec. Litig.*, No. C 04-0983, 2005 WL 3555718, at *4 (N.D. Cal. Dec. 28,
2005) (granting dismissal where plaintiffs failed to "allege any specific facts that give rise to a strong
inference that the defendants—that is the upper management—knew there were problems of such
magnitude that it would make their positive statements false."), *aff'd*, 261 Fed. Appx. 60 (9th Cir. 2007);
*In re Read-Rite Corp.*, No. C-03-03148 RMW, 2004 WL 2125883, at *4 (N.D. Cal. Sept. 22, 2004)
(granting dismissal where plaintiffs "fail to specify the magnitude of [software] problems," since
"[w]ithout at least an allegation of the magnitude or severity of the technical challenges existing at the
time each statement was made, it cannot be inferred that the defendants knew or should have known . . .
that those problems could not be overcome."); *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d at 884
("Plaintiffs must allege that Defendants knew the difficulties to . . . technological development were
insurmountable or particularly significant.  Knowledge that there were some obstacles to development
that SMS was working to resolve or that engineers experienced frustration is not sufficient to show
knowledge of falsity."); *see also Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) ("Problems and
difficulties are the daily work of business people.  That they exist does not make a lie out of any of the
alleged false statements.").

25

In this regard, CW1 or CW2 were allegedly in a position to know whether the "critical bugs" identified in 2006 had been resolved as of *May 2007* and whether the Individual Defendants were so apprised. As such, their failure to allege that the Individual Defendants were informed that the "critical bugs" had not been fixed by May 2007 is significant. Under these circumstances, the allegations regarding issues in 2006 do not create a plausible inference that these supposedly serious and unsolvable problems persisted up until the beginning and throughout the class period in May 2007, or that V-11 was filled with "critical bugs" at the time the Individual Defendants made the allegedly false statements or that the Individual Defendants knew that to be the case. *Fulton County*, 2010 WL 601364, at *17 (fact that confidential source does not allege a material fact despite being in a position to know reasonably suggests that the requested inference is not accurate). In fact, the absence of any inference of fraud is further supported by the fact that, as noted, Plaintiffs point to no confidential witness at all to support the allegation that at the time of its release, V-11 had bugs that made V-11 "unstable and in come cases unusable." (SAC ¶ 70.)

As such, taking the "holistic" approach required by *Tellabs*, 551 U.S. at 326, the realities of software development coupled with the allegations in the Complaint lead to a cogent and compelling non-culpable inference -- that Allscripts had a process in place to identify and resolve software issues as they arose, that this system was working, and that the Individual Defendants had no reason to believe otherwise. CW1 affirmatively alleged that each screen of V-11 was reviewed by quality assurance personnel to resolve the issues raised in 2006 before V-11 was launched in May 2007. (*See* SAC ¶ 68.) Following the general release of V-11, CW2 alleged that Allscripts employed quality assurance and development teams which identified and resolved software errors. (*Id.* ¶ 71.) Those teams prioritized bugs as critical, major, and minor, and fixed

critical bugs within one week of their identification.  (*Id.*)  Plaintiffs plead no facts from which to

infer that Messrs. Tullman or Davis were ever told or should have had any reason to believe that

this quality control process was not functioning or that critical software issues identified in 2006

were not solved before launch in 2007.[11]

### 2. Individual Defendants' Access To Internal Databases Does Not Establish A Strong Inference of *Scienter*.

Plaintiffs allege that the Individual Defendants "had access" to Allscripts' product

databases used by technicians.  (*See* SAC ¶¶ 71, 77.)  Plaintiffs neither allege that the Individual

Defendants actually received or reviewed information generated by these databases, nor that

these databases revealed specific data that would have rendered Allscripts' projections false

when made if the Individual Defendants had consulted them.  *See, e.g.*, *Konkol*, 590 F.3d at 398

(affirming dismissal where the complaint alleged "access" to "real-time data software to track its

sales and revenue;" but did not allege "what would have been obvious to a reasonable person

upon examining the software"); *see also Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th

Cir. 2002) (affirming motion to dismiss, holding that conclusory assertions that the defendants

had access to internal data demonstrating a decline in sales were insufficient to plead *scienter*).

These allegations do not give rise to a "strong" inference of *scienter*.

### 3. The Dispute With Tennessee Oncology Does Not Establish a Strong Inference of *Scienter*.

Plaintiffs also attempt to base an inference of *scienter* from alleged problems deploying

TouchWorks at one client, TN Oncology.  Allscripts' contract with TN Oncology was a multi-

---

[11]  Plaintiffs also allege, in conclusory fashion, that Messrs. Tullman and Davis learned from monthly
conference calls that there was insufficient documentation to assist Client Services teams who
implemented the V-11.  (*See* SAC ¶ 74.)  However, there is no allegation that they were ever told that this
problem was not remediable or was so serious so as to affect revenue forecasts.  *See In re Sec. Litig. BMC
Software, Inc.*, 183 F. Supp. 2d 860, 889 (S.D. Tex. 2001) ("Plaintiffs' conclusory allegation that BMC's
sales people were inadequately trained and ineffective . . ." deemed insufficient).

year service contract entered into in June 2005, almost two years before V-11 was even launched.  *See* Compl. at ¶ 19, 23, 26, *Tenn. Oncology, PLLC v. Allscripts Healthcare Solutions, Inc.*, No. 1:09-cv-4726 (Ch. Ct. Tenn Mar. 4, 2008) (SAC Ex. 1).  The TN Oncology complaint, *see id.* at ¶ 34, and CW1, (*see* SAC ¶ 76), alleges that TN Oncology wrote a letter to Allscripts on September 11, 2007 and CW1 asserts that senior executives discussed the letter sometime thereafter.  (*See* SAC ¶ 76.)

Neither the TN Oncology complaint nor the Complaint contain any allegation that Allscripts was notified about "problems" at TN Oncology before September 11, 2007.  Therefore, the allegations provide no basis for inferring *scienter* with respect to statements made prior to that date.  *See In re Allscripts, Inc. Sec. Litig.*, 2001 WL 743411, at *9 (dismissing claims where alleged returns occurred after alleged misrepresentations); *Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 496, 498 (S.D.N.Y. 2005) (granting dismissal, "[f]raud cannot be pled by hindsight and plaintiffs have not alleged facts indicating that the statements were false at the time they were made. . . . These allegations are deficient because they lack a temporal nexus to the transaction at issue.  Plaintiffs never allege with particularity that the specific problems with [the software] were occurring at the time of the [alleged misstatements.]").  The only alleged misstatements *after* Allscripts received TN Oncology's September 11, 2007 letter were in November 2007, at which time the Individual Defendants both reduced Allscripts' forecast and noted that Allscripts was beginning to face lengthening deployments.  *See supra* pp. 5-6.

Moreover, courts have long held it improper to infer that problems with one discrete customer were widespread and rampant.  *See, e.g.*, *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 953, 960 (8th Cir. 2008) ("[E]vents at one specific plant or with one individual customer are not enough to meet the [Reform Act's] heightened standard."); *Taubenfeld v. Career Educ.*

28

*Corp.*, No. 03 C 8884, 2005 WL 350339, at *12 (N.D. Ill. Feb. 11, 2005) (holding that it was unreasonable to infer, based on the well-pled allegations, that the under-reporting of reserves at two schools was attributable to a significantly larger number of more than seventy schools); *In re Allscripts, Inc. Sec. Litig.*, 2001 WL 743411, at *11 (same).

> ### 4. The Software Upgrade From Version 11 To Version 11.1 Does Not Establish A Strong Inference of *Scienter*.

Finally, CW1 and CW2 both allege that software bugs were the reason that Allscripts later released a subsequent version of V-11.  (SAC ¶ 74.)  However, even crediting this allegation, the fact that Allscripts continued to innovate and subsequently upgraded TouchWorks EHR from Version 11 to Version 11.1 in no way supports an inference that Messrs. Tullman or Davis made fraudulent statements.  *See In re Siebel Sys., Inc. Sec. Litig.*, 2005 WL 3555718, at *4 ("While one can reasonably infer that Siebel 7.5 fixed some of the problems with Siebel 7, such a fix does not mean that defendants' statements that Siebel 7 'set the standard' and was 'rich with functionality' were false.").  Innovation of software is the norm, particularly within the health care information technology industry.  This innovation is not indicative of falsity or *scienter*, but rather the intensity of competition in the marketplace.  *See In re Allscripts, Inc. Sec. Litig.*, 2001 WL 743411, at *9 ("[I]t is obvious to any reasonable investor that [Allscripts] anticipated the continuing evolution of its products . . . .").

> ### C. Plaintiffs Have Failed To Allege Facts Giving Rise To A Strong Inference That Allscripts Acted With *Scienter*.

Because Plaintiffs have failed to set forth a strong inference of *scienter* with regard to the Individual Defendants, Plaintiffs cannot establish such an inference on behalf of Allscripts itself. *See Pugh*, 521 F.3d at 697.  Accordingly, the Section 10(b) claim against Allscripts must also be dismissed.

III.   **PLAINTIFFS FAIL TO STATE A CLAIM FOR CONTROL PERSON LIABILITY.**

Because the Complaint fails to establish a primary violation of the federal securities laws against any of the Defendants, Count II must be dismissed as well.  *See Pugh*, 521 F.3d at 693.

IV.   **DISMISSAL SHOULD BE WITH PREJUDICE.**

Plaintiffs have now had multiple bites at the apple.  Given the failure of the Second Amended Complaint to state a claim, the case should be dismissed with prejudice.  *See Pugh*, 521 F. 3d at 698 (A plaintiff is not entitled to "leisurely repeated bites at the apple, forcing a district judge to decide whether each successive complaint [is] adequate under the PSLRA").

<u>**CONCLUSION**</u>

For all of the foregoing reasons, the Second Amended Complaint should be dismissed with prejudice.

Dated:  June 11, 2010                                          Respectfully submitted,

                                                              ALLSCRIPTS-MISYS HEALTHCARE
                                                              SOLUTIONS, INC., GLEN E. TULLMAN,
                                                              AND WILLIAM J. DAVIS


                                                              By:  /s/ James W. Ducayet
                                                              One of the Attorneys for Defendants


Walter C. Carlson
James W. Ducayet
Victor D. Quintanilla
Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

EXHIBIT A

## EXHIBIT A - ALLEGED FALSE AND MISLEADING STATEMENTS

### *Generalized Optimistic Statements Regarding Allscripts And V-11.*

- "Our revenue growth, visibility to sales opportunities and solid bottom-line performance give us confidence in our ability to deliver solid results during the remainder of 2007." (SAC ¶ 24.)

- "V-11 will allow Allscripts to become what I call the Bloomberg of health care. It will provide physicians with a product they want to use and need to have." (*Id.* ¶ 26.)

- "Market validation [th]at V-11 is a transformational product has been overwhelming." (*Id.* ¶ 26.)

- "We have a clear vision for integrating software, connectivity and information to transform healthcare, and we continue to demonstrate our ability to deliver on that vision. (*Id.* ¶ 34.)

- Mr. Tullman's statement on August 7, 2007 that "[h]aving invested in new technology and hired aggressively for future growth, we are in a position to capitalize on the significant market opportunity during the second half of the year, which is traditionally the industry's strongest sales period." (*Id.* ¶ 34.)

- "Sales in our clinical software business grew 77 percent over the last year, confirming both the acceleration in the market and Allscripts['] continuing leadership." (*Id.* ¶ 45.)[12]

- "Columbia and Lahey raise our profile dramatically and re-enforce [sic] our position as the number one provider for both large enterprise clients and multi-specialty groups, and we are already seeing the impact." (*Id.* ¶ 47.)

### *Forward-Looking Statements and Projections.*

- Allscripts' guidance on May 8, 2007 of full year 2007 revenue of "$300 million." (*Id.* ¶ 25; *see also* Ex. 4 at 6-7.)

- Allscripts' guidance for clinical bookings on May 8, 2007, including Mr. Davis's statement, "As such, we now expect total clinical bookings for the year to exceed $230 million versus our previously communicated guidance . . .") (Ex. 4 at 6-7; *see also* SAC ¶ 25.)

---

[12] Plaintiffs do not contest Allscripts' bookings guidance or figures. (*See* Pls.' Opp. at 24, 13; Ex. 10 at 1.)

- Mr. Davis's statement on August 8, 2007 that "[we] *feel that* we have sufficient backlog and sales opportunity to convert that *to deliver on the $300 million for the year.*"  (SAC ¶ 35. (emphasis added).)

- Allscripts' downward revision of its full year revenue forecast on November 8, 2007: "Allscripts has updated its revenue target for the full year 2007 to a range of $286 million to $288 million." (*Id.* ¶¶ 44-46.)

- Mr. Tullman's May 8, 2007 statement that "[W]e don't expect issues to come up relative to the actual installation and—or conversion or transition to the 11." (*Id.* ¶ 28.)

### *Statements About V-11 Testing, Deployment, and Demand.*

*Testing*

- V-11 was "the most tested product in our history." (*Id.*.¶ 25; *see* Ex. 4 at 3.)

- "We did a tremendous amount of work on the process to make sure that [installation or conversion problems] do[]n't happen." (SAC ¶ 28; *see* Ex. 4 at 21.)

*Deployment*

- "Interestingly, by the way, the delays in the project came not from development. They came from the fact that we did an awful lot of design work and that actually delayed the start of the development work." (SAC ¶ 27; *see* Ex. 4 at 17.)

- "We are looking at a few thousand users probably by the end of August.  That rollout is going very well."  (SAC ¶ 36; *see* Ex. 5 at 11.)

- "[The implementations] [are] roughly consistent with the past. . . . As we had subsequently rolled out additional sites, we [have] seen some consistent trends relative to the deployment requirements on those upgrade processes." (SAC ¶ 36; *see* Ex. 5 at 11.)

- "We actually saw close to about 25% increase in the production of our resources in terms of overall billable hours in the quarter.  We had anticipated that by virtue of a lot of resources being dedicated to Version 11 efforts earlier in the year and the like. So we absolutely saw a nice improvement in terms of overall productivity.  The challenge as we tried to highlight in terms of that conversion into revenue was where those efforts were focused on in terms of ramp-up of some of our larger customers and given the long duration and the overall number of hours involved in those implementations, what that translated into overall revenue.  So we absolutely are seeing the capability being there in terms of the production capacity to pull the backlog through, but also recognizing that we were moving large customers into

2

production at the same time;" as well as the statement that "we have more resources, training was successful."  (SAC ¶ 48; *see* Ex. 6 at 7.)

*Demand*

- "There is a very substantial amount of pent-up demand." (SAC ¶ 27; *see* Ex. 4 at 17.)

- "Relative to Version 11, we continue to see good progress there and rolling it out we see very strong demand, and again, in some respects the demand has outstripped what we expected because of the positive response and that means that we have taken our resources and deployed them to Version 11 . . . ." (SAC ¶ 49; *see* Ex. 6 at 10.)[13]

---

[13] Plaintiffs also attempt to allege that the formal quiet period announced during the Company's second quarter earnings call, on August 7, 2007, was unusual and designed to conceal problems arising during the third quarter.  (SAC ¶ 41.)  As Allscripts explained at the time, however, adoption of the quiet period was consistent with best practices in the industry.  (*See* Ex. 5 at  6.)

## CERTIFICATE OF SERVICE

I, James W. Ducayet, an attorney, certify that on June 11, 2010, I electronically filed a copy of the Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint with the Clerk of the Court using the Court's CM/ECF system which will send notification of the filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

/s/ James W. Ducayet
One of the Attorneys for Defendants

4