UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| PLUMBERS AND PIPEFITTERS LOCAL UNION NO. 630 PENSION-ANNUITY TRUST FUND, On Behalf of Itself and All Others Similarly Situated, | ) ) ) ) ) | No. 1:09-cv-04726<br><br>CLASS ACTION<br><br>Judge Ruben Castillo |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| ALLSCRIPTS-MISYS HEALTHCARE SOLUTIONS, INC., et al., | ) ) ) | |
| Defendants. | ) ) ) | |

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    STATEMENT OF FACTS ......................................................................................2

    A.    Allscripts' Profitability Was Dependant Upon the Successful Launch of the Newest Version of Its Flagship Touchworks Product ........................................2

    B.    Defendants Misled the Market About V-11's Functionality and Allscripts' Ability to Implement the System ............................................................................3

    C.    Defendants Begin to Reveal the Truth About the Trouble with V-11 ....................8

III.    THE COMPLAINT IN ALL RESPECTS SATISFIES THE PSLRA'S REQUIREMENTS...............................................................................................10

    A.    The Complaint Properly Pleads the Falsity of Defendants' False and Misleading Statements and Omissions ................................................................11

        1.    None of Defendants' False and Misleading Statements Are Mere "Puffery" ..................................................................................................11

        2.    The Falsity of Each of Defendants' Present Tense Misrepresentations Are Properly Pleaded..................................................15

    B.    The PSLRA's Safe Harbor Is Unavailable to Defendants ....................................20

    C.    Plaintiffs' Allegations Raise a Strong Inference of Scienter ................................24

        1.    The Complaint Alleges a Strong Inference of Conscious Disregard or Recklessness ........................................................................................25

        2.    Defendants' Lack of Insider Trading Does Not Negate Scienter .............29

    D.    Control Person Liability Is Properly Alleged .......................................................30

IV.    CONCLUSION....................................................................................................30

# TABLE OF AUTHORITIES

Page

**CASES**

*Arazie v. Mullane,*
   2 F.3d 1456 (7th Cir. 1993) ........................................................................24

*Asher v. Baxter Int'l Inc.,*
   377 F.3d 727 (7th Cir. 2004) ...............................................................11, 21

*Brodsky v. Yahoo! Inc.,*
   630 F. Supp. 2d 1104 (N.D. Cal. 2009) ......................................................19

*Chu v. Sabratek Corp.,*
   100 F. Supp. 2d 815 (N.D. Ill. 2000) ..........................................................29

*Danis v. USN Commc'ns, Inc.,*
   73 F. Supp. 2d 923 (N.D. Ill. 1999) ............................................................26

*Desai v. Gen. Growth Props.,*
   654 F. Supp. 2d 836 (N.D. Ill. 2009) ..........................................................27

*DiLeo v. Ernst & Young,*
   901 F.2d 624 (7th Cir. 1990) .......................................................................11

*Dolphin & Bradbury, Inc. v. SEC,*
   512 F.3d 634 (D.C. Cir. 2008) .....................................................................22

*Eisenstadt v. Centel Corp.,*
   113 F.3d 738 (7th Cir. 1997) ..................................................................12, 13

*Friedman v. Rayovac Corp.,*
   295 F. Supp. 2d 957 (W.D. Wis. 2003) ..................................................16, 18

*Fulton County Employees' Ret. Sys. v. MGIC Inv. Corp.,*
   No. 08-C-0458, 2010 U.S. Dist. LEXIS 14037
   (E.D. Wis. Feb. 18, 2010) ............................................................................19

*Gosselin v. First Trust Advisors L.P.,*
   No. 08 C 5213, 2009 U.S. Dist. LEXIS 117737
   (N.D. Ill. Dec. 17, 2009) ..............................................................................29

*Herman & MacLean v. Huddleston,*
   459 U.S. 375 (1983)......................................................................................25

*Higginbotham v. Baxter Int'l, Inc.,*
   495 F.3d 753 (7th Cir. 2007) .......................................................................29

**Page**

*Huddleston v. Herman & MacLean*,
   640 F.2d 534 (5th Cir. 1981),
   *aff'd in part and rev'd in part on other grounds*,
   459 U.S. 375 (1983)..................................................................................................24

*In re Catalina Mktg. Corp. Sec. Litig.*,
   390 F. Supp. 2d 1110 (M.D. Fla. 2005).................................................................13

*In re HomeBanc Corp. Sec. Litig.*,
   No. 1:08-cv-1461-TCB, 2010 U.S. Dist. LEXIS 38548
   (N.D. Ga. Apr. 13, 2010)........................................................................................20

*In re Lattice Semiconductor Corp. Sec. Litig.*,
   No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262
   (D. Or. Jan. 3, 2006)...............................................................................................13

*In re Motorola Sec. Litig.*,
   No. 03 C 287, 2004 U.S. Dist. LEXIS 18250
   (N.D. Ill. Sept. 10, 2004)........................................................................................27

*In re Next Level Sys. Sec. Litig.*,
   No. 97 C 7362, 1999 U.S. Dist. LEXIS 5653
   (N.D. Ill. Mar. 31, 1999).........................................................................................24

*In re NVE Corp. Sec. Litig.*,
   551 F. Supp. 2d 871 (D. Minn. 2007), *aff'd*,
   527 F.3d 749 (8th Cir. Minn. 2008)........................................................................26

*In re Read-Rite Corp.*,
   No. C-03-03148 RMW, 2004 WL 2125883
   (N.D. Cal. Sept. 22, 2004).......................................................................................26

*In re Sears, Roebuck & Co. Sec. Litig.*,
   291 F. Supp. 2d 722 (N.D. Ill. 2003).......................................................................26

*In re Siebel Sys., Inc. Sec. Litig.*,
   No. C 04-0983 CRB, 2005 WL 3555718
   (N.D. Cal. Dec. 28, 2005)........................................................................................26

*In re Ulta Salon, Cosmetics & Fragrance, Inc.*,
   604 F. Supp. 2d 1188 (N.D. Ill. 2009).....................................................................28

**Page**

*In re Westell Techs., Inc. Sec. Litig.*,
  No. 00 C 6735, 2001 U.S. Dist. LEXIS 17867
  (N.D. Ill. Oct. 30, 2001) ............................................................................13

*In re World Access Sec. Litig.*,
  119 F. Supp. 2d 1348 (N.D. Ga. 2000) ...................................................13

*Institutional Investors Group v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009).......................................................................30

*Jones v. Corus Bankshares, Inc.*,
  No. 09 C 1538, 2010 U.S. Dist. LEXIS 33579
  (N.D. Ill. Apr. 6, 2010) ..................................................................... *passim*

*Lindelow v. Hill*,
  No. 00 C 3727, 2001 U.S. Dist. LEXIS 10301
  (N.D. Ill. July 20, 2001) .............................................................................12

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) .....................................................................22

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006) ............................................................. *passim*

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  513 F.3d 702 (7th Cir. 2008) ..........................................................10, 24, 27

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000).......................................................................28

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*,
  595 F.3d 86 (2d Cir. 2010)....................................................................16, 18

*PR Diamonds, Inc. v. Chandler*,
  364 F.3d 671 (6th Cir. 2004) .....................................................................30

*Pugh v. Tribune Co.*,
  521 F.3d 686 (7th Cir. 2008) .....................................................................29

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004).......................................................................22

*Selbst v. McDonald's Corp.*,
  No. 04 C 2422, 2005 U.S. Dist. LEXIS 23093
  (N.D. Ill. Sept. 21, 2005) ....................................................................21, 26

**Page**

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. May 18, 2010) ..................................................................22

*Stavros v. Exelon Corp.*,
    266 F. Supp. 2d 833 (N.D. Ill. 2003) ..............................................................26

*Takara Trust v. Molex Inc.*,
    429 F. Supp. 2d 960 (N.D. Ill. 2006) .................................................11, 21, 28, 30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...............................................................10, 17, 25, 29

*Va. Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991)..................................................................14

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b)....................................................................24
    §78t(a)....................................................................30
    §78u-4(b)(1)(B)..........................................................11

Federal Rules of Civil Procedure
    Rule 9(b) ................................................................11

17 C.F.R.
    §240.10b-5 ..............................................................24

## I.    INTRODUCTION

On April 13, 2010, this Court granted defendants Allscripts-Misys Healthcare Solutions, Inc.

("Allscripts" or the "Company"), Glen E. Tullman ("Tullman") and William J. Davis ("Davis")

motion to dismiss plaintiffs' prior complaint.  The Court faulted plaintiffs for not attributing certain

allegations to the confidential witnesses who provided the information.  Memorandum Opinion and

Order (Docket No. 41) ("Order") at 17.  Plaintiffs have remedied this defect by including detailed

descriptions of each confidential witness ("CW") relied upon.  Indeed, defendants' motion does not

challenge these descriptions as insufficient.

As outlined in the Complaint, plaintiffs' allegations are based upon confidential witnesses

who personally witnessed defendants receiving the information plaintiffs allege was concealed, who

worked to try and make operable the software at issue and who worked trying to implement the

software at customer sites.   ¶¶66-77.[1]   CW1 was Allscripts Vice-President of Information

Technology during the Class Period and reported directly to Davis.  CW1 participated in the monthly

conference calls where defendants were told of the substantial and continuing problems with the

newest version of Allscripts' flag ship Touchworks product ("V-11").  ¶¶67-69, 73-74, 76.  CW2

was Allscripts Quality Assurance Analyst during the Class Period, participated in the monthly

conference calls with defendants, reported to Stanley Crane who made the relevant reports to

defendants and headed the team testing the functionality of V-11.  CW2 also participated in daily

meetings with Tullman's direct report, Laurie McGraw, were the status of the identified bugs were

discussed in detail.  ¶¶69-73.  CW3 was an Allscripts Implementation Consultant during the Class

Period who worked directly with customers to implement V-11 who described the cataloging of the

---

[1]     Unless otherwise noted, all references to "¶_" or "¶¶__" are to the Second Amended Complaint for Violations of the Federal Securities Laws (Dkt. No. 47) (the "Complaint").

bugs discovered by the implementation teams and how the difficulties with the software impacted Allscripts' ability to successfully implement V-11 on site. ¶¶72, 74. Finally, CW4 was an Allscripts Implementation Manager during the Class Period staffing customer site implementation teams. CW4 described how, as the implementation times grew longer, defendants directed that more people be assigned to the implementation teams. However, these people were not adequately trained. CW4 also described a database available to defendants that kept track, in great detail, the status of each customer implementation, including emails concerning the difficulties and bugs encountered. ¶¶75, 77.

The only plausible inferences that can be drawn from the facts alleged is that defendants (1) omitted material, negative information about V-11's functionality, stability and customer acceptance; (2) omitted material, negative information about Allscripts' V-11 implementation experience; (3) knowingly over-estimated Allscripts' ability to convert its large and growing bookings into revenue and increased earnings; and, (4) unequivocally rejected the notion that V-11 implementation times were growing longer, negatively impacting Allscripts' conversion of bookings to revenue. The Complaint paints a cogent and compelling picture of defendants' violations of the federal securities laws. Defendants' motion should be denied.

## II.   STATEMENT OF FACTS

### A.   Allscripts' Profitability Was Dependant Upon the Successful Launch of the Newest Version of Its Flagship Touchworks Product

Allscripts develops and sells software to healthcare organizations. ¶2. Between 2004 and 2006, the Company's net income quadrupled due to the market's embrace of Allscripts' leading Electronic Health Record ("EHR") product, Touchworks Version 10.1.1. This version of Touchworks was award winning. In 2006, the Medical Record Institute ranked Version 10.1.1 second among EHR products designed for medium to large practice groups. Version 10.1.1 had also

been certified by the Commission for Healthcare Information Technology, the recognized certification authority in the industry. These accolades gave Allscripts a competitive advantage in the industry. ¶19.

And Allscripts' industry was highly competitive. The long-term growth prospects, however, were limited. While the EHR industry was expected to grow 20-25% for five years, this growth was also expected to plummet to the single digit range as the adoption of EHR systems by medium to large practice groups reached 100%. ¶20. Analysts reported that the bulk of Allscripts' market growth in 2007 – 40% – would come from EHR sales to large practice groups, with a lesser percentage – 30-35% – expected from medium-sized practice groups. These were the market segments in which Allscripts sold the Touchworks system, and the segments that Allscripts would sell Version 10.1.1's successor, V-11. ¶21.

V-11 was highly anticipated by the market. Even before the product was available for launch, Allscripts reported 2006 record sales of $190 million – bookings to use Allscripts' vernacular – "led by our TouchWorks business unit." ¶22. "Bookings" represented sales to be converted to revenue, a large portion of which was dependant upon the successful launch and implementation of V-11. These "bookings," and the Company's ability to successfully convert them to revenue, served as the basis for defendants' revenue and earnings guidance given to the market in October 2006 and reiterated by defendants on February 13, 2007 when they announced Allscripts' 2006 financial performance. ¶23.

**B.     Defendants Misled the Market About V-11's Functionality and Allscripts' Ability to Implement the System**

Defendants rode their wave of positive representations concerning V-11 and what it meant to Allscripts into the Class Period. On May 8, 2007, the first day of the Class Period, defendants announced Allscripts' financial results for 1Q07 in a press release to the market. ¶24. During the

- 3 -

conference call with analysts and investors that followed that release, defendants announced that they were increasing 2007 bookings guidance from $210 million to in excess of $230 million for the year – a 40% increase compared to 2006. ¶25. Tullman also announced that, after a short delay, V-11 would "go live" on May 21, 2007, that V-11 "is the most tested product in our history," and that "[m]arket validation at V-11 [a]s a transformational product has been overwhelming. V-11 will allow Allscripts to become what I call the Bloomberg of health care." ¶¶25-26. Davis echoed that sentiment telling analysts that "[t]here is a very substantial amount of pent-up demand [for V-11]." ¶27. When asked by an analyst if the delay in the launch of V-11 had any impact on 1Q07, Davis responded that, "the delays in the project came not from development. They came from the fact that we did an awful lot of design work and that actually delayed the start of the development work." *Id.*

Analysts also inquired about "technology risk" in implementing or converting clients to V-11. Defendants dispelled any concerns that V-11 would result in implementation or conversion delays. Indeed, Tullman responded that "we don't expect issues to come up relative to the actual installation and – or conversion or transition to the 11. We did a tremendous amount of work on that process to make sure that doesn't happen." ¶28.

Even while defendants made these positive assurances to the market, they knew that V-11 was a troubled, unstable product. Prior to and throughout the Class Period, defendants each participated in monthly conference calls with members of Allscripts' senior management. During these calls different members of Allscripts' management team would update defendants, and the other senior leaders at Allscripts, on the status of various aspects of Allscripts' business. ¶67. Because of its importance to Allscripts, Stanley Crane, Allscripts' Chief Technology Officer, would always make a separate presentation on the monthly calls on matters pertaining to V-11, including information about development, implementation problems, problems with the software and outcomes of testing of the software. During these monthly conference calls, Crane informed the

- 4 -

group, including defendants, of the results of the initial limited implementations of V-11 at select customer sites made during 2006.  Crane's presentations indicated that the implementation took much longer than expected and resulted in the discovery of a high number of bugs.  These 2006 implementations indicated that V-11's features, functionality and quality had major problems.  Specifically, these 2006 implementations identified that V-11's workflow was not very efficient and caused physicians to spend a lot of extra time using the application.  Crane indicated that customer feedback was that V-11 threw doctors into fire fighting mode.  As a result, Allscripts' development team reviewed each screen in V-11 to figure out how to reduce the number of clicks doctors needed to make in order to get to the desired screen.  ¶68.  The results of the 2006 implementations, and the problems encountered with V-11, were concealed from the market even as defendants told analysts that Allscripts had done a "tremendous" amount of work to "make sure" V-11 implementation or conversion problems did not occur.

In fact, by late 2006, defendants knew from these monthly conference calls that V-11 was filled with critical bugs – problems that could impact patient safety.  Because of these critical bugs and the general instability of the software – it was decided in late 2006 that widespread release of V-11 would be delayed.  However, despite these substantial known defects, defendants did not run a "testing program" on V-11 before the general release of the software to ensure that the known instabilities and problems had been satisfactorily remedied.[2]  ¶70.  While Tullman told investors on the May 8, 2007 conference call that V-11 was "the most tested product" in Allscripts history (¶25), the truth was that defendants did not satisfy themselves that the problems discovered in the 2006

---

[2]    Allscripts typically would run a "testing program" with chosen customers to test a new product, or new version of an existing product, which would allow the Company to identify bugs and fix them prior to the general release of the product.  ¶70.

implementations had been fixed with the additional work in early 2007, instead misleading the market that V-11 was heavily tested, that it functioned as intended and did not suffer from implementation issues.  Indeed, Allscripts' quality assurance group was still conducting tests of V-11 on May 8, 2007 when defendants told the market that V-11 was ready to go and continued that work up until three days before the May 21, 2007 general release.  At the time of its release, V-11 had approximately 2000 known bugs that made the software unstable and in some cases unusable.  *Id*.

The difficulties with V-11 continued through the summer of 2007.  Still, on August 7, 2007, when defendants announced Allscripts' 2Q07 financial results, they reiterated their increased bookings guidance and, in response to a question concerning how Allscripts would achieve the $300 million revenue guidance, Davis told the market, because revenue is drawn from Allscripts' bookings "***we have clear visibility as to where we expect our revenue to come from.  It is a function of increased productivity in terms of the implementation resources on the Touchworks side***." ¶35.[3]  Additionally, in response to a direct question asking if the implementation times for V-11 were different, or consistent with Allscripts' past experience, Davis proclaimed, "***They [are] roughly consistent with the past***. . . .  As we had subsequently rolled out additional sites, ***we [have] seen some consistent trends*** relative to the deployment requirements on those upgrade processes." ¶36.

At the time of these statements, Davis knew from the information received from Stanley Crane monthly that Allscripts was experiencing greatly increased implementation times on V-11. Specifically, Davis and Tullman knew from the monthly conference calls that because V-11 was an almost entirely new application there was no documentation from prior versions to aid the Client

---

[3]        Unless otherwise noted, all emphasis is added and all internal citations are omitted.

Services team in working through implementation problems being encountered.  This added greatly to the implementation difficulties in that the Client Services team not only had to try and accommodate the customer's complaints concerning implementation, it had to work with the development and quality assurance teams to figure out how to analyze the problems and formulate a solution to them that worked in the field.  This directly lead to increased implementation times and was reported to defendants before and throughout the Class Period.  ¶72.

Moreover, defendants also were told that the Client Services staff was too inexperienced and under-trained to adequately handle the implementation questions coming from Allscripts' customers and the implementation teams in the field.  As the implementation times began to expand, defendants directed that more people be assigned to implement V-11 in the field in an effort to improve the implementation times, and increase billing so that revenue could be recognized.  These people were given minimal training, did not have good knowledge of the product and could not answer the customer's questions concerning the functionality and stability problems being encountered.  In fact, after mid-2007, implementation trainees no longer "shadowed" more experienced personnel for upwards of three months.  The "shadow" period was reduced to no more than one month so that Allscripts could send the trainees into the field sooner.  ¶75.  While Davis told analysts that Allscripts expected to reach the $300 million revenue target through "increased productivity" of Allscripts' V-11 "implementation resources," he failed to mention that those very resources were under-trained and ill-equipped to handle the V-11 implementation at all.  ¶35.

Also during the August 7, 2007 conference call, Tullman made an example of the implementation of V-11 at Tennessee Oncology in response to a question for an example of "some of the successes" Allscripts was experiencing.  ¶36.  Tullman told the market that "*rollout is going very well*" at Tennessee Oncology.  *Id.*  That, however, was not true.  In fact, defendants knew from their monthly conference calls that the rollout at Tennessee Oncology was going poorly.  Indeed,

- 7 -

within three weeks of Tullman's representation that all was "very well" with the rollout, the troubles, and Allscripts' inability to satisfactorily address them, had escalated greatly.  On September 11, 2007, Tullman received a letter from Tennessee Oncology's CEO recounting the serious ongoing problems with V-11, including Allscripts' failure to deliver a functioning software system, and demanding that the problems be remedied.  ¶74.  Tennessee Oncology had purchased V-11 in June 2005 with the assurance that *by the first quarter of 2006*, the system would be "fully-developed, stable and capable of running TN Oncology's business by the summer of 2006."  Ex. 1, ¶15.[4] However, *after two years* of "attempting to run the software . . . and affording Allscripts numerous opportunities to cure the multiple defects in the software and its implementation," and after payment of nearly $900,000, Tennessee Oncology stopped using V-11.  *Id.*, ¶¶30, 51.

### C.     Defendants Begin to Reveal the Truth About the Trouble with V-11

After a self-imposed "quiet period," on November 8, 2007, defendants reported that Allscripts' 3Q07 financial results failed to meet Wall Street's revenue and earnings estimates.  ¶¶41, 44.  Defendants lowered the market's revenue expectations to $286-$288 million for 2007 and blamed the short fall on "near-term impact on revenue associated with the ramping up of resources" working on large implementations of V-11.  ¶46.  Even with the revenue shortfall and lowering of expectations, defendants reassured the market that "we continue to see a business that is positioned to grow revenue approximately 20% to 25%."  *Id.*

Analysts were curious about the cause of Allscripts' revenue shortfall and lowering of expectations and asked many questions trying to understand the factors that impacted Allscripts' business in a negative way during the quarter.  In response to a direct question concerning the

---

[4]      All references to Ex. 1 are to Exhibit 1 to the Complaint.

productivity of the staff implementing V-11, Davis told the market, ". . . We actually saw close to about 25% increase in the production of our resources in terms of overall billable hours in the quarter. We had anticipated that by virtue of a lot of resources being dedicated to Version 11 efforts earlier in the year and the like. So we absolutely saw a nice improvement in terms of overall productivity." ¶48. Tullman added – noting that "*this is really critical*" – "*we have more resources, training was successful*." *Id.* Defendants, however, knew otherwise. ¶¶72-73.

On the conference call, Davis also *specifically denied that there was a problem with meeting V-11 deployment schedules*, instead telling the market that defendants had made a conscious decision to direct resources to the largest implementations. ¶50. Defendants concealed the continued troubles with implementing V-11 that were being reported to them on a monthly basis, and which they knew specifically about from direct correspondence with customers like Tennessee Oncology, in response to these direct inquiries from the market. ¶¶67-69, 72-74.[5]

Then, on February 13, 2008, defendants reported Allscripts' financial results for 2007, which missed both analysts' expectations and the guidance that defendants had lowered in November 2007. ¶53. Despite defendants' earlier assertions that there were no implementation delays occurring at Allscripts (¶50), that Allscripts had seen "consistent trends" in implementation processes site to site (¶36), that a "tremendous amount of work" was done on the implementation processes to avoid problems (¶28), and that defendants "have clear visibility as to where we expect our revenue to come from" (¶35), defendants admitted that *Allscripts had no historical basis for estimating implementation times for V-11, or the revenue that the Company could plan to recognize during*

---

[5]     Despite defendants' continued deception, Allscripts' stock price fell $6.62 per share in after market trading on November 8, 2007, and closed down 19% on November 9, 2007. However, because defendants continued to conceal the troubles they were having with V-11, Allscripts' stock price remained inflated by the false and misleading information defendants fed into the market. ¶52.

*2007*.  ¶54.  Moreover, defendants admitted that they knew of the material revenue impact of the

failing V-11 deployments *in early November 2007*.  ¶55.

      The market was incensed by defendants' concealment.  Allscripts' stock price plummeted

nearly 27% on a huge volume of 15 million shares traded.  ¶56.  One analyst questioned whether

defendants had yet fully explained the troubles Allscripts was experiencing with V-11 noting, "***Our***

***primary concern here is that the company has yet to really come clean about the difficulties it is***

***experiencing with the upgrade cycle***."  ¶59.  Little more than a month later, on March 18, 2008,

Allscripts announced its intention to merge  with Misys plc. ("Misys"), with at least one analyst

noting that Allscripts' shareholders had to take a discount from Misys on the merger payment due to

the troubles with V-11.  ¶¶61-62.  Defendants' troubles with V-11 continued into 2008 with

defendants reporting on April 30, 2008, that the problems with V-11 implementations jeopardized

the 20-25% growth defendants had been anticipating for 2008.  ¶63.

## III.   THE COMPLAINT IN ALL RESPECTS SATISFIES THE PSLRA'S REQUIREMENTS

      As this Court's Order acknowledges, in evaluating defendants' motion, "the court must treat

the pleaded facts as true and 'draw all reasonable inferences in favor of the plaintiff.'"  *Makor Issues*

*& Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("*Tellabs III*"); Order at 12.

Additionally, the "courts must consider the complaint in its entirety" to determine if the claims are

properly stated.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("*Tellabs*

*II*").  Properly considered, the Complaint describes the falsity of defendants' statements and

omissions, and sets forth their scienter, in great detail.

- 10 -

**A.      The Complaint Properly Pleads the Falsity of Defendants' False and Misleading Statements and Omissions**

As the Court's Order indicates, plaintiffs are required to set forth the allegedly false and misleading statements, and the reasons they are false, in satisfaction of Fed. R. Civ. P. 9(b) and the PSLRA.  Order at 12.[6]  The Complaint in every respect meets the applicable pleading standards.

**1.      None of Defendants' False and Misleading Statements Are Mere "Puffery"**

Defendants erroneously contend that many of the statements alleged in the Complaint are nothing but immaterial, corporate puffery.  Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint (Dkt. No. 52) ("MTD") at 11-12, 16-20.[7]  Contrary to defendants' argument, these statements cannot be considered puffery or expressions of corporate optimism, even if some of the statements traversed into "'matters of opinion and hope.'"  *Jones v. Corus Bankshares, Inc.*, No. 09 C 1538, 2010 U.S. Dist. LEXIS 33579, at *33 (N.D. Ill. Apr. 6, 2010).  "The crux of materiality is whether, ***in context***, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company."  *Tellabs I*, 437 F.3d at 596.  As such, "statements of goals can, in context, be read by the investor to imply that the

---

[6]      To satisfy Rule 9(b), plaintiffs must plead the "'circumstances constituting fraud'" with particularity, *i.e.*, "the who, what, when, where, and how: the first paragraph of any newspaper story."  *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990); *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 971 (N.D. Ill. 2006).  In addition to these requirements, the PSLRA also demands that plaintiffs "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. §78u-4(b)(1)(B).

[7]      As this Court has previously observed, "'[i]n general, the materiality of a statement or omission is a question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss.'"  *Takara*, 429 F. Supp. 2d at 976; *see also Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 735 (7th Cir. 2004) (determination of materiality was inappropriate on motion to dismiss).  This is because "materiality depends upon the facts" and "'the significance the reasonable investor would place on the withheld or misrepresented information.'"  *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006) ("*Tellabs I*").  A court will deem a fact to be material if there is a substantial likelihood that it would significantly alter the total mix of information available to a reasonable investor.  *Id.*

527481_2

company had a reasonable basis for its opinion," thus rendering them actionable.  *See Lindelow v.*

*Hill*, No. 00 C 3727, 2001 U.S. Dist. LEXIS 10301, at *11-*12 (N.D. Ill. July 20, 2001).   In

addition, statements of opinion are actionable if they are "so discordant with reality that they would

induce a reasonable investor to buy the stock at a higher price than it was worth ex ante."  *Eisenstadt*

*v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997)).

Here, the Complaint alleges that defendants made positive representations about Allscripts'

financial outlook and the launch of V-11 without having a reasonable basis to do so, while failing to

disclose adverse information that would have exposed the problems with the V-11 software and

implementation.  Defendants' repeated assurances that V-11 was functioning as intended, and their

flat denials that any implementation issues existed, made against the backdrop of their optimistic (yet

unattainable) financial estimates, imbued confidence in the market that defendants would convert the

sales bookings into revenue in line with their estimates.  In fact, each of the "puffing" statements

defendants list, aided their deception.[8]

For example, on May 8, 2007, defendants announced that during 1Q07 revenue increased

81% and that net income during the quarter almost tripled over the prior year.  ¶24.  Defendants used

that revenue and net income growth to support the statement: "Our revenue growth, visibility to sales

opportunities and solid bottom-line performance give us confidence in our ability to deliver solid

results during the remainder of 2007."  *Id.*; MTD, Ex. A.  That same day, defendants further boosted

investors' confidence in Allscripts' ability to meet its revenue goals by telling the market that V-11

was being overwhelmingly embraced by the market and likening V-11 to Bloomberg – one of the

---

[8]     Included in defendants' list is a quotation from ¶45 which reads: "Sales in our clinical software
businesses grew 77 percent over last year, confirming both the acceleration in the market and Allscripts
continuing leadership."  Plaintiffs do not allege this is a false statement.

most important and well-respected financial databases.  *Id.*  Considering that defendants used their report of fantastic financial success as a basis to support the challenged statements, these statements are not generalized, vague, optimistic statements.  This is information that an investor would deem material, because it directly related to Allscripts' ability to capitalize on its new flag-ship product, the success of which was crucial to the Company's attaining its publicly-disclosed financial projections.  *See, e.g.*, *In re Westell Techs., Inc. Sec. Litig.*, No. 00 C 6735, 2001 U.S. Dist. LEXIS 17867, at *26 (N.D. Ill. Oct. 30, 2001) (statements of corporate "optimism" were actionable where a company's executives made them while knowing that sales to a major customer would "drop precipitously"); *In re Lattice Semiconductor Corp. Sec. Litig.*, No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262, at *16 (D. Or. Jan. 3, 2006) (statements regarding customer enthusiasm for product were actionable because product was not performing well); *In re World Access Sec. Litig.*, 119 F. Supp. 2d 1348, 1354-55 (N.D. Ga. 2000) (statements made about success of products, when company was experiencing problems with the products, were actionable).

The other statements defendants challenge as immaterial are similarly predicated on positive factual information.  On August 7, 2007 after announcing "[r]ecord [r]evenue and [e]arnings [p]er [s]hare," defendants touted their "clear vision for integrating software," that the reported "record" financial performance "continue[d] to demonstrate our ability to deliver on that vision," and that because they were staffed for the growth they promised, Allscripts was "in position" to capitalize, as they had just demonstrated with their "record revenue and earnings per share" results in 2Q07, during the "industry's strongest sales period." ¶34; MTD, Ex. A.  In context, these statements were much more than corporate bandwagoning.  *In re Catalina Mktg. Corp. Sec. Litig.*, 390 F. Supp. 2d 1110, 1113 (M.D. Fla. 2005) (statements that "publicly touted new operations as a continuing source of rapid growth with knowledge that these operations would not yield revenue increases for some time, if ever," were actionable).

- 13 -

Indeed, the facts here are remarkably similar to those in *Tellabs I*, in which the Seventh Circuit held that misrepresentations regarding a product launch were sufficiently alleged to have been "material and false" when made. 437 F.3d at 598. There the company's CEO (Richard Notebaert) assured the market that the company was shipping its most important new product (the TITAN 6500), when, in fact, it was not in a position to do so:

> According to the complaint, the TITAN 6500 was not available for delivery until well after the class period ended. Yet on December 11, 2000, the first day of the class period, Tellabs flatly stated, "The TITAN 6500 system is available now." On March 8, 2001, Notebaert told analysts, "Interest in and demand for the 6500 continues to grow. . . . We continue to ship the . . . 6500 through the first quarter. We are satisfying very strong demand and growing customer demand." Again, on April 6, 2001, in response to an analyst's question whether Tellabs was still on track to recognize TITAN 6500 revenue in the second quarter, Notebaert stated, "we should hit our full manufacturing capacity in May or June to accommodate the demand we are seeing. Everything we can build, we are building and shipping. The demand is very strong."

*Id*. The court held that the statements rose above mere puffery because, in context, they gave the market confidence that the company was shipping its new core product, and investors had no reason to doubt the veracity of those representations. *See id*. at 597-98. So too here.

Defendants' report of "record revenue and earnings" served as the basis for their proclamations of continued success.  However, defendants failed to share with investors critical information concerning the problems with V-11 they had already experienced, and were continuing to experience, that cast serious doubt on the success defendants forcefully told investors was occurring, and would continue to occur in the future.  Thus, the statements alleged in the Complaint are much more than mere puffery or vague optimism, but rather were "reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading" and thus actionable.  *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991).

### 2. The Falsity of Each of Defendants' Present Tense Misrepresentations Are Properly Pleaded

Defendants' argument that plaintiffs have not pleaded that certain statements were false when made (MTD at 16), ignores the abundant and detailed allegations to the contrary. Plaintiffs allege that during the 2006 limited implementation of V-11, defendants learned that: (1) V-11's features, functionality and quality had major problems and was filled with critical bugs that jeopardized patient safety; (2) implementation took much longer than expected and resulted in the discovery of a high number of bugs; (3) when it did work, V-11 was not very efficient and caused doctors to spend a lot of extra time using the application; and, (4) because of the dissatisfaction expressed by customers, Allscripts' development team was working through each screen to reduce the time doctors needed to spend using the system. ¶¶68-69. Plaintiffs also allege that these factors precipitated the decision in late 2006 to delay the launch of V-11 and that ***these same problems continued to be reported to defendants throughout the Class Period***. ¶¶68-74.[9] These allegations are not "fraud by hindsight" as defendants contend. MTD at 16. "These allegations set forth in very clear and specific terms the information available to [defendants] and why, given [their] possession of this information, [defendants'] statements . . . were misleading." *Jones*, 2010 U.S. Dist. LEXIS 33579, at *13 (rejecting defendants' "'fraud by hindsight'" argument).

Defendants contend that Tullman's statement on May 8, 2007 that V-11 is "the most tested product in our history" was not false at the time it was made. MTD at 16. Defendants' argument fails because plaintiffs' allegations show that Tullman's statement was ***at best*** misleading and thus actionable.

---

[9] Moreover, plaintiffs allege that after discovering these fundamental problems with V-11 in 2006, in their rush to deliver the already long delayed V-11 to the market, defendants failed to conduct the testing program typically run at Allscripts to ensure that the problems discovered in the 2006 implementations had been successfully remedied before the product was launched in May 2007. ¶70.

Even with Allscripts' quality assurance group testing V-11, without the testing program – run at client sites and not in the controlled environment of Allscripts' quality assurance lab – defendants had no idea if known bugs had been remedied and patient safety was no longer in potential jeopardy, if there were new bugs as a result of the attempts to fix the ones already discovered, if the implementation problems experienced in the field had been corrected, or if V-11 was more efficient and user-friendly, and was rid of the functionality problems discovered in 2006 implementations. Indeed, defendants knew that V-11 was still unstable at the time Tullman made this statement because ***the same problems experienced in the 2006 implementations continued to be reported to defendants during the Class Period***. ¶¶68-74. While it may have been true that V-11 was "the most tested product in [Allscripts'] history" – ***it was so only because it did not work as intended and suffered from severe implementation problems***. ¶25. Tullman's statement, however, implied that because V-11 was heavily tested, it performed as intended and Allscripts did not expect any surprises with the functionality or implementation of the software. This was misleading and is actionable. *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) ("The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers."); *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 991 (W.D. Wis. 2003) ("'Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.'").

Likewise, Tullman's statement – in response to a direct question about V-11 implementation risks – that "we don't expect issues to come up relative to the actual installation and – or conversion or transition to the 11. We did a tremendous amount of work on that process to make sure that doesn't happen" (¶28), was also false when made and is in no way inconsistent with other allegations in the Complaint as defendants confusingly contend. MTD at 16-17. As described

- 16 -

above, defendants knew from the 2006 implementations, and the continuing problems being experienced in the field, that V-11 suffered from tremendous implementation issues that did delay, and would delay in the future, the conversion of bookings into revenue. Tullman's statement flatly contradicts what was known inside Allscripts about the V-11 implementation experience.  This statement too is properly alleged as false when made.  *Jones*, 2010 U.S. Dist. LEXIS 33579, at *13.

Plaintiffs have also adequately alleged the falsity of defendants' response to an analyst's question concerning the cause of the delay in launching V-11.  Defendants' attempt to re-write the challenged statement (MTD at 17) falls flat when the context is considered:

> [Analyst]: And finally just you talked about the V-11 release being pushed back four to six weeks with Steve Badger and his team providing a lot of the quality control of the product, are you suggesting that had any impact in the quarter?  Or will it have any impact in this upcoming quarter?
>
> \*      \*      \*
>
> <u>Bill Davis</u>: From a booking standpoint, you are right.  . . .  I think the issue was that we told folks they would be visiting live sites in the first quarter and we were off that by about four to six weeks given the size of the project, given how significant a change it is and capabilities. I think we were still pleased with where it came from. Interestingly, by the way, ***the delays in the project came not from development. They came from the fact that we did an awful lot of design work and that actually delayed the start of the development work***.

¶27. Clearly, Davis was responding to a question about why the V-11 release was pushed back "four to six weeks," as was mentioned by Tullman earlier in the same conference call (¶25), and if that delay had a financial impact in 1Q07, rather than asking about the work with GW MFA as defendants' motion assumes.  MTD at 17.  Defendants' characterization of the meaning of this statement is a factual question that must wait to be resolved.  *Tellabs II*, 551 U.S. at 328 ("the case will fall within the jury's authority to . . . resolve any genuine issues of fact").  Regardless, plaintiffs allege that in late 2006 the decision was made to delay the V-11 launch because of the disastrous 2006 implementation experience.  ¶69.  Even if this meant more "design work" which delayed

- 17 -

"development work," defendants' omission of the fundamental problems they were experiencing with V-11, that caused a decision to be made six months earlier to delay its launch, misled the market. *Operating Local 649*, 595 F.3d at 92; *Friedman*, 295 F. Supp. 2d at 991.

Additionally, defendants completely side-step plaintiffs' allegation that they falsely told the market that V-11 implementation times were "roughly consistent in the past" and that Allscripts was experiencing "consistent trends relative to the deployment requirements." ¶36; MTD at 19 n.8. This is not surprising given that defendants knew from the 2006 implementations, and from continuing reports, that V-11 implementation times were much longer than Allscripts' past experience dictated at all times during the Class Period.[10] ¶¶68-69, 72-73. Indeed, defendants admitted this was the case at the end of the Class Period. ¶54. Defendants also knew that the personnel responsible for implementing V-11 were under-trained and ill-equipped to do so, adding substantial time to the implementation process. ¶¶72-73. Defendants also admitted, at the end of the Class Period, that the implementation requirements and experiences from site to site varied, making the process "complex" adding to the time it took to implement the software such that the Company brought in "process expertise, some black belts" to standardize the implementation process and give it "focus." ¶54.

Instead of focusing on the allegations against them, defendants concentrate their efforts on arguing the meaning of an answer to a direct question asking for an example of a V-11 implementation "success." ¶36. Tullman's citation of Tennessee Oncology as an example of a "success" story implementing V-11 (¶36) is flatly contradicted by plaintiffs' allegations of the continued reporting of implementation problems defendants received. ¶¶68-69, 72-73. Tennessee

---

[10]     Defendants contend that plaintiffs allege that as of August 2007, implementation times were not consistent with the past. MTD at 19 n.8. The Complaint's allegations dispel this notion. ¶28 (alleging defendants told market on May 8, 2007 no implementation issues because of "tremendous amount of work" done to avoid issues); ¶¶68, 72-74 (alleging defendants knew prior to and throughout the Class Period of implementation difficulties and delays).

Oncology was one of the original purchasers of V-11, and Allscripts had been struggling for years to get the system to work. ¶74.[11] It is implausible, assuming as the Court must that those allegations are true, that defendants first learned of any problems at Tennessee Oncology in September 2007 – especially given Tullman's description of Tennessee Oncology as the "largest oncology private practice in the country" and clearly an important client to Allscripts. ¶36. Moreover, given that less than one month later the troubles at Tennessee Oncology with Allscripts' failure over the previous *two years* to make V-11 work greatly escalated infers that Tullman was either misrepresenting the situation at Tennessee Oncology, or was recklessly using that customer's experience as an example of Allscripts' success not knowing whether that was in fact true. ¶74; Ex. 1, ¶¶37-51.[12]

Finally, defendants challenge several statements concerning "productivity." Defendants contend that plaintiffs have not alleged any facts showing these statements to be false. MTD at 18. Not so.

Defendants told the market on November 8, 2007 that Allscripts had missed its revenue expectations for 3Q07 and was lowering the revenue guidance for 2007. ¶44. While they coined this miss as a "near-term impact on revenue" while resources were being devoted to the largest implementations, they knew, as plaintiffs have alleged, that the implementation staff was under-

---

[11]    Over the course of two years, Tennessee Oncology paid nearly $900,000 for V-11, which did not work and could not be made to work despite Allscripts', and Tullman's, assurances that V-11 was a market ready product. Ex. 1, ¶¶15, 30-32.

[12]    That CW1 does not indicate that defendants specifically discussed the problems at Tennessee Oncology prior to August 2007 is of no moment. MTD at 18. CW1 *does* indicate that defendants heard about the widespread implementation issues with V-11 on a monthly basis. ¶¶67-69, 73-74. Tullman's use of Tennessee Oncology as an implementation success was at best reckless given the timing of Tennessee Oncology's letter and their regular receipt of information about V-11's problems. The facts in *Fulton County Employees' Ret. Sys. v. MGIC Inv. Corp.*, No. 08-C-0458, 2010 U.S. Dist. LEXIS 14037 (E.D. Wis. Feb. 18, 2010), on which defendants rely, are distinguishable because the confidential witness relied upon there did not indicate, at all, that the defendants were informed about the concealed facts. *Id.* at *57-*58. Plaintiffs' allegations also clearly set forth defendants' receipt of the concealed facts prior to their misstatement unlike in *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104 (N.D. Cal. 2009) which defendants also cite. MTD at 18.

- 19 -

trained and ill-equipped to manage the complicated V-11 implementation process, and deal with the hundreds of new bugs that were being discovered in the field that prevented the system from being operationally stable.  ¶¶46, 71-73.  As a result, defendants received monthly reports indicating that implementation times were increasing and more hours were spent trying to make the product work as intended.  ¶74.[13]  These facts are consistent with defendants' statement that personnel increased their billings, however, defendants were careful *not to say* that the increased billings meant increased revenue recognized.  Indeed, just the opposite occurred as defendants reported on November 8, 2007, and again in 4Q07, when defendants reported that the Company did not meet its revenue goal and *admitted that they knew about the material impact on revenue because of V-11 implementation delays in early November 2007*.  ¶¶53-55.  Plaintiffs' allegations that defendants knew that the implementation teams were not able to satisfy the customers' desires, is entirely consistent with defendants' reporting of decreasing revenues.

### B.    The PSLRA's Safe Harbor Is Unavailable to Defendants

Plaintiffs have no quarrel with defendants' assertion that the revenue and growth forecasts plaintiffs have pled were false and misleading are forward-looking statements within the meaning of the PSLRA.  MTD, Ex. A (identifying those statements defendants argue are forward-looking in ¶¶25, 28, 35, 44-46).  However, those statements are not protected by the PSLRA's safe harbor as defendants contend because none of those statements was accompanied by the meaningful cautionary language required for those protections to apply.[14]

---

[13]      Plaintiffs' allegations that defendants were told that the implementation teams could not effectively manage their tasks (¶¶74-75) distinguishes this case from *In re HomeBanc Corp. Sec. Litig.*, No. 1:08-cv-1461-TCB, 2010 U.S. Dist. LEXIS 38548 (N.D. Ga. Apr. 13, 2010) which defendants cite and which did not contain like allegations.  MTD at 19.

[14]      As discussed in §III.C, the safe harbor is also inapplicable because plaintiffs have alleged that defendants made and reiterated the forecasts with actual knowledge they were false and unattainable.

- 20 -

The PSLRA's safe harbor does not apply to forward-looking statements unless those statements were "'"accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'"" *Tellabs I*, 437 F.3d at 598-99. As an initial matter, it is clear that the issue of whether cautionary language is sufficient is an intensive fact issue that is not resolvable on a motion to dismiss. "Exactly what constitutes 'meaningful cautionary language' is 'difficult if not impossible' to decipher, particularly 'at the pleading stage, before plaintiffs have access to discovery.'" *Selbst v. McDonald's Corp.*, No. 04 C 2422, 2005 U.S. Dist. LEXIS 23093, at *50 (N.D. Ill. Sept. 21, 2005) (quoting *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 729, 734 (7th Cir. 2004)).

The cautionary language cited by defendants is not sufficient to invoke the protection they seek.  MTD at 13.  Cautionary language accompanying forward-looking statements must be meaningful in nature, *i.e.*, "'substantive and tailored to the specific future projections, estimates or opinions that are alleged to be misleading.'" *Selbst*, 2005 U.S. Dist. LEXIS 23093, at *56.  In other words, it must "'mention[] those sources of variance that (at the time of the projection) were the principal or important risks.'" *Takara*, 429 F. Supp. 2d at 974 (quoting *Tellabs I*, 437 F.3d at 599).

Defendants' cautionary language did none of the above.  In fact, defendants' "cautionary language" listed general factors that would affect *any* company in their industry and is strikingly similar to the language found lacking in *Tellabs I*.[15]  *See* 437 F.3d at 599.  Noting that the risk factors' "generalized statements" encompassed the problems relating to the products at issue, the *Tellabs I* court held that the factors "also encompass a whole world of other possible contingencies"

---

[15]      In *Tellabs I*, the court considered the following cautionary language: "'Factors that might cause such a difference include, but are not limited to, risks associated with introducing new products, entering new markets, availability of resources, competitive response, and a downturn in the telecommunications industry.'"  437 F.3d at 599.  The "cautionary" language at issue here is similar.  *See* ¶¶85-89.

which rendered them too broad to address the specific risks that the company faced. *Id.* (holding "that Tellabs's warnings were not particularized enough for it to claim shelter under the PSLRA's safe harbor provision"). These risk factors touch upon so many product areas and general contingencies that they ostensibly cover any problem the Company could ever face. *Id.*

Indeed, defendants' "cautionary language" suffers a more fundamental flaw. While defendants vaguely warned of the ***possibility*** that certain risks could come to bear, those risks ***were already negatively impacting Allscripts' business results*** thus rendering defendants' "warnings" false and misleading, and meaningless to investors. What defendants already knew by the beginning of the Class Period, and what was continually reported to them during the Class Period, was that V-11 was unstable, jeopardized patient safety, was not efficient or user friendly, and could not be implemented in a timely manner. §§II.B, III.A-B. No warnings defendants have directed the Court to informed investors that Allscripts was ***then experiencing*** the negative effects the generalized warnings described. The safe harbor is not a game of "gotcha" and is not available when a cautionary statement misstates or omits historical facts.[16] *Slayton v. Am. Express Co.*, 604 F.3d 758, 770 (2d Cir. May 18, 2010) ("We agree with the SEC and the parties that cautionary language that is misleading in light of historical fact cannot be meaningful . . . ."); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 287 (5th Cir. 2009) (holding cautionary language meaningless where it omitted that adverse effects warned about already transpired); *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008) (same); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (safe harbor does

---

[16]    It is for these reasons that defendants' reliance on the case law supporting their argument that their safe harbor warnings were sufficient is misplaced. MTD at 15. In no case defendants cite did the courts determine the cautionary language was meaningful where the facts alleged showed those risks had already materialized.

not "serve if it is abused or gamed.  Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired").

Moreover, throughout the Class Period, defendants tempered their warnings about "'undetected defects or errors'" in their products and how "'implementation cycles'" could effect Allscripts' operating results (MTD at 13) with positive statements ***disclaiming*** any negative effects from those factors.  For instance, during the May 8, 2007 conference call with analysts, while announcing the widespread launch of the long awaited V-11, Tullman told the market that V-11 was "the most tested product in our history," implying that defendants had satisfied themselves that no "undetected defects or errors" would hamper the product's acceptance in the market, and the resulting conversion of bookings into revenue. ¶25.  During this same conference call Tullman also dispelled any notion that the recognizing of revenue would be negatively effected by V-11 implementation problems when he told analysts that defendants did not expect implementation issues with V-11 because they "did a tremendous amount of work on that process to make sure that doesn't happen."  ¶28.  Likewise, on the August 7, 2007 conference call with analysts, defendants flatly denied that V-11 implementation times were having a negative effect on revenue recognition, proclaiming that they are "roughly consistent in the past" and that defendants were seeing "consistent trends relative to the deployment requirements."  ¶36.  Even after defendants lowered their revenue guidance in 3Q07, they continued to assure the market that all was under control again absolutely denying that Allscripts' lower revenue performance was the result of V-11 deployment delays or issues.[17]  ¶50.  Defendants argue that the safe harbor does not require "clairvoyance."

---

[17]     The fact that defendants revised the "safe harbor warning" in the November 8, 2007 press release is of no consequence.  MTD at 15.  Defendants already knew that the V-11 implementation delays and issues with the operability of V-11 caused the 3Q07 revenue miss and the resulting lowering of guidance – albeit by an

- 23 -

MTD at 14.  They are right, however, ***the safe harbor is not a shield for the defendants to use when they know the negative factors they warn of were already occurring*** and where they flatly deny Allscripts was experiencing the consequences of the risks they "warned" investors about. *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375 (1983) ("[t]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit"); *In re Next Level Sys. Sec. Litig.*, No. 97 C 7362, 1999 U.S. Dist. LEXIS 5653, at *20-*21 (N.D. Ill. Mar. 31, 1999) ("While it is true that, 'predictions of future performance are inevitably inaccurate,' if inaccurate when made, defendants may be held liable under §10(b) and Rule 10b-5.") (citing *Arazie v. Mullane*, 2 F.3d 1456, 1468 (7th Cir. 1993)).

For these reasons, the safe harbor is unavailable to defendants and does not protect them from liability for the false revenue and growth guidance they reiterated throughout the Class Period.

### C.      Plaintiffs' Allegations Raise a Strong Inference of Scienter

In the Seventh Circuit, a plaintiff may plead scienter by alleging facts which demonstrate that a defendant knowingly made a false statement (if that statement is forward-looking) or recklessly disregarded "a substantial risk that it was false," (if the statement if not forward-looking).  *Tellabs III*, 513 F.3d at 704.[18]  A court must consider the totality of the facts alleged to determine whether they give rise to "an inference of scienter ***at least as likely as*** any plausible opposing inference."

---

insufficient amount, but when bluntly asked if V-11 implementation issues caused the miss and revision, ***defendants unequivocally denied that to be the case***.  ¶50.

[18]      In this context, recklessness is defined as "'an extreme departure from the standards of ordinary care, [] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"  *Tellabs I*, 437 F.3d at 600.

- 24 -

*Tellabs II*, 551 U.S. at 328 (emphasis in original).  As set forth below, plaintiffs more than satisfy these standards.

###        1.        The Complaint Alleges a Strong Inference of Conscious Disregard or Recklessness

As described throughout this memorandum, and in great detail in the Complaint, plaintiffs allege equivocally that defendants knew long before the Class Period of the fundamental flaws with V-11's functionality and stability, and with the Company's inability to implement it at their customer sites.[19]  CW1 (who reported directly to Davis) and CW2 confirm that defendants learned about the problems with V-11 on monthly conference calls in which CW2's boss – Stanley Crane – detailed the problems with the software and its implementation.  ¶¶67-69.  CW1 confirms that defendants first learned of specific, substantial problems with V-11 after limited implementation of it in 2006.  ¶68.  CW2, who headed the team testing V-11, confirmed that V-11 did not work and was undergoing heavy testing until just before its May 2007 launch date.  ¶¶69-70.  At that time, according to CW2, V-11 suffered from approximately 2000 known bugs that made it unstable and unusable.  ¶70.  Moreover, according to CW2 and CW3, hundreds of additional bugs were identified by the implementation teams after the general release of V-11.  ¶72.  Critically, both CW1 and CW2 confirm that during the Class Period defendants received continued reports of substantial functionality and implementation problems with V-11, including being kept apprised of the viability of the software and the status of the resolution of identified bugs, during the monthly conference calls.  ¶¶73-74.  Defendants utterly ignore these allegations in arguing that defendants were not told during the Class Period that V-11 continued to suffer from the same problems identified during the 2006 implementation.  MTD at 23, 25-26.

_____

[19]        Despite defendants' implication to the contrary, circumstantial evidence of scienter is "more than sufficient."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983).

Instead, defendants brush off these allegations by arguing that all new software technologies have "bugs." MTD at 24-25. However, plaintiffs do not merely allege that there were "bugs" with V-11 but that those bugs were causing critical errors that put patient safety at risk and caused the software to not work at all, that those issues persisted throughout the Class Period, and that defendants were fully informed about these issues. ¶¶66-77. Plaintiffs have alleged what defendants' own case citations require, *i.e.*, "that Defendants knew the difficulties to . . . technological development were insurmountable or particularly significant." MTD at 25 n.10 (citing *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 884 (D. Minn. 2007), *aff'd*, 527 F.3d 749 (8th Cir. Minn. 2008).[20]

Indeed, given the prominence of the Company's plans to develop V-11 as an improvement to its highly regarded predecessor, it is incredible to suggest that defendants did not know of the significant problems with the product. That the industry projected that demand for products like V-11 would run dry within five years due to market saturation, makes it all the more incredible that defendants did not know of V-11's fundamental problems. ¶¶20-21.[21] In fact, it would be ***utterly***

---

[20]     *See also In re Siebel Sys., Inc. Sec. Litig.*, No. C 04-0983 CRB, 2005 WL 3555718, at *4 (N.D. Cal. Dec. 28, 2005) (requiring allegations that problems were of "such magnitude that it would make their positive statements false); *In re Read-Rite Corp.*, No. C-03-03148 RMW, 2004 WL 2125883, at *4 (N.D. Cal. Sept. 22, 2004) (same).

[21]     Defendants' refusal to acknowledge that these facts contribute to a strong inference of scienter also runs contrary to a wealth of authority in this Circuit. *See, e.g., Jones*, 2010 U.S. Dist. LEXIS 33579, at * 40 ("officers of a company can be assumed to know of facts critical to a business's core operations or to an important transaction that would affect the company's performance"); *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 850 (N.D. Ill. 2003) (holding that a strong inference of scienter can be inferred by pleading "key officers knew of facts critical to a business's core operations"); *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (holding that "[o]fficers of a company can be assumed to know of facts 'critical to a business's core operations or to an important transaction that would affect a company's performance'"); *Selbst*, 2005 U.S. Dist. LEXIS 23093, at *61(holding that "'high-level [] managers . . . may be presumed to have been aware of [] problems' at their company") (quoting *Danis v. USN Commc'ns, Inc.*, 73 F. Supp. 2d 923, 938-39 (N.D. Ill. 1999)) (in which the court imputed knowledge or reckless disregard of pervasive problems affecting core operations to executives).

*implausible* for the highest-level executives at Allscripts – CEO (Tullman) and CFO (Davis) – not to have known that the development and implementation of V-11 was plagued by significant problems, particularly when they were regularly making public statements regarding V-11 and Allscripts' positive experience with it.  As the Seventh Circuit asked in *Tellabs III*: "Is it conceivable that [the CEO] was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company?  It is conceivable, yes, ***but it is exceedingly unlikely***."  513 F.3d at 711; *see also Desai v. Gen. Growth Props.*, 654 F. Supp. 2d 836, 860 (N.D. Ill. 2009) (noting that a strong inference of scienter may be credited "where 'it is almost inconceivable'" that an individual defendant would be unaware of the matter at issue).  The same conclusion can be drawn here.

Not only were defendants being told at least monthly that V-11 was continuing to have major problems consistent with the results of the 2006 implementations, but defendants themselves had ready access to information about the known bugs, new ones that continually were discovered, if those bugs were critical to V-11's functionality, what stage of resolution the development and quality assurance teams were at in remedying the problems, as well as real-time updates on the V-11 implementations underway, including access to the email exchanges from the field personnel documenting problems encountered implementing the product.  ¶¶70-71, 73.  Plaintiffs allege that not only did defendants have access to these databases, but that Tullman's direct report, President of Strategic Accounts Laurie McGraw, attended ***daily*** meetings with CW2 and the development and quality assurance teams where they discussed the bugs being worked on and which of those bugs were "critical" and needed to be immediately fixed.  ¶70.  These facts also contribute to a strong inference of scienter.  *See In re Motorola Sec. Litig.*, No. 03 C 287, 2004 U.S. Dist. LEXIS 18250, at *92 (N.D. Ill. Sept. 10, 2004) (holding that defendants' "access to information contradicting their public statements" supports a finding that they "'knew or, more importantly, should have known that

- 27 -

they were misrepresenting material facts related to the corporation'") (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)); *In re Ulta Salon, Cosmetics & Fragrance, Inc.*, 604 F. Supp. 2d 1188, 1196-97 (N.D. Ill. 2009) (holding that allegations that defendants had access to crucial information about a company's troubles was more cogent and compelling than an inference that they were "essentially clueless as to the major problems existing within the company").

Defendants' contention that plaintiffs' allegations concerning Tennessee Oncology are fraud by "hindsight," misses the mark.  MTD at 28.  As discussed at length in §III.A.2, Tullman's use of Tennessee Oncology as an example of a V-11 implementation "success" was either knowingly false, given the ***two years*** Allscripts had spent unsuccessfully implementing V-11 for that customer, or made recklessly not knowing if the success claim was true.  In any event, even after defendants were informed by this major customer that V-11 was not working and could not be made to work, defendants flatly denied that they were having any implementation problems or delays that were impacting the conversion of bookings into revenue.  ¶50.  Given the totality of plaintiffs' allegations that defendants were informed of widespread V-11 implementation problems throughout the Class Period, the specific example of those very problems that Tennessee Oncology provides does not stand alone and does not require the Court to make an improper extrapolation about the troubles at Allscripts as defendants argue.  MTD at 28-29.

Because the totality of the Complaint's allegations sufficiently plead the scienter of both Tullman and Davis, Allscripts' scienter is also sufficiently stated.  *Takara*, 429 F. Supp. 2d at 980 (holding that "where a corporate agent is acting within the scope of his position, such as CEO, his alleged knowledge of the falsity of his statements can be imputed to the corporation") (citing *Tellabs I*, 437 F.3d at 603).

- 28 -

### 2.     Defendants' Lack of Insider Trading Does Not Negate Scienter

Defendants pin their hopes of dismissal, in part, on their lack of insider trading of Allscripts stock during the Class Period.  MTD at 21-22.  However, the Supreme Court specifically rejected the notion that "motive" allegations are necessary to adequately allege scienter and agreed with the Seventh Circuit "that the absence of a motive allegation is not fatal," noting that "the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint."  *Tellabs II*, 551 U.S. at 325.  Long before *Tellabs II*, this Court noted that the type of pleaded facts are immaterial as long as their amalgam gives "rise to 'a strong inference' of scienter."  *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 823 (N.D. Ill. 2000).

While defendants agree that plaintiffs "are not absolutely required to plead motive to establish scienter," they nevertheless argue that plaintiffs' Complaint fails without such allegations.[22]  MTD at 21.  As described above and in §§II, III.A, the whole of the Complaint paints a cogent and compelling picture of defendants' knowledge of the substantial V-11 troubles and their concealment of that information from the market.[23]  The absence of insider trading is irrelevant to that conclusion.  *Jones*, 2010 U.S. Dist. LEXIS 33579, at *29 (rejecting argument that lack of insider sales refutes an inference of scienter where the complaint alleged defendants were provided with information that

---

[22]     There are many reasons, other than that defendants were not misleading the market as they contend, that can be attributed to defendants' non-selling.  For instance, perhaps defendants did not want to draw attention to themselves.  Perhaps defendants did not want to increase their exposure to a shareholder suit.  Perhaps defendants had tax planning reasons for not selling their stock.  Perhaps they owned options and those options were under-water, *i.e.*, the exercise price was more than the market value, and they could not sell them.  Resolution of these factual issues is premature, as is defendants' assertion that the lack of selling is "significant."  MTD at 22; *Tellabs II*, 551 U.S. at 328 (reiterating that it is the province of the jury to resolve questions of fact and weigh credibility).  *See also Gosselin v. First Trust Advisors L.P.*, No. 08 C 5213, 2009 U.S. Dist. LEXIS 117737, at *20-*21 (N.D. Ill. Dec. 17, 2009) (noting that whether or not motive is necessary for scienter inference is a question of fact).

[23]     It is for this reason that this case is distinguishable from both *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007) and *Pugh v. Tribune Co.*, 521 F.3d 686 (7th Cir. 2008), cited by defendants (MTD at 22), which lacked detailed allegations attributing knowledge of the concealed facts to the defendants.

contradicted their public statements); *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 279-80 (3d Cir. 2009) (finding the complaint adequately alleged scienter for certain statements despite holding that "defendants' stock transactions do not significantly enhance the inference of scienter"); *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 691 (6th Cir. 2004) ("we have never held that the absence of insider trading defeats an inference of scienter").

> ### D.     Control Person Liability Is Properly Alleged

Section 20(a) of "[t]he Exchange Act imposes liability not only on the person who actually commits the securities law violation, but also on the persons who 'directly or indirectly' control the violator." *Takara*, 429 F. Supp. 2d at 983 (quoting 15 U.S.C. §78t(a)).  As CEO and CFO, and the primary spokespeople for Allscripts, there can be no serious debate about whether Tullman and Davis controlled the Company.  As discussed above, plaintiffs have more than adequately alleged each defendant's primary violation of the federal securities laws.  Accordingly, each defendant's control person liability has also been sufficiently stated.

## IV.     CONCLUSION

For the above reasons, the Complaint in every respect meets the PSLRA pleading requirements, thus defendants' motion should be denied.

DATED:  July 2, 2010                          Respectfully submitted,

                                              ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                              DEBRA J. WYMAN


                                              _____s/ Debra J. Wyman_____
                                              DEBRA J. WYMAN

                                              655 West Broadway, Suite 1900
                                              San Diego, CA  92101
                                              Telephone:  619/231-1058
                                              619/231-7423 (fax)

- 30 -

Lead Counsel for Plaintiffs

MILLER LAW LLC
MARVIN MILLER
LORI A. FANNING
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone:  312/332-3400
312/676-2676  (fax)

Liaison Counsel

SUGARMAN & SUSSKIND
HOWARD S. SUSSKIND
100 Miracle Mile, Suite 300
Coral Gables, FL  33134
Telephone:  305/529-2801
305/447-8115 (fax)

Additional Counsel for Plaintiff

527481_2

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 2, 2010, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system which will send notification of such filing to the e-mail addresses

denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the

foregoing document or paper via the United States Postal Service to the non-CM/ECF participants

indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on July 2, 2010.

s/ Debra J. Wyman
DEBRA J. WYMAN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:debraw@rgrdlaw.com

527481_2

# Mailing Information for a Case 1:09-cv-04726

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Walter C. Carlson**
  wcarlson@sidley.com,efilingnotice@sidley.com

- **James Wallace Ducayet**
  jducayet@sidley.com,efilingnotice@sidley.com

- **Lori Ann Fanning**
  LFanning@MillerLawLLC.com,MMiller@MillerLawLLC.com,JRamirez@millerlawllc.com

- **Marvin Alan Miller**
  Mmiller@millerlawllc.com,LFanning@millerlawllc.com,KPulido@millerlawllc.com,JRamirez@millerlawllc.com

- **Brian O O'Mara**
  briano@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Victor David Quintanilla**
  vquintanilla@sidley.com,efilingnotice@sidley.com

- **Debra J. Wyman**
  debraw@rgrdlaw.com,stremblay@rgrdlaw.com,e_file_sd@rgrdlaw.com,nhorstman@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing. You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)