UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PLUMBERS AND PIPEFITTERS LOCAL )
UNION NO. 630 PENSION-ANNUITY )
TRUST FUND, On Behalf of Itself and All )   No. 1:09-cv-04726
Others Similarly Situated, et al., )
Plaintiffs, )   Judge Ruben Castillo
)
vs. )
)
ALLSCRIPTS-MISYS HEALTHCARE )
SOLUTIONS, INC., et al., )
Defendants. )

**REPLY MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT**

Walter C. Carlson
James W. Ducayet
Victor D. Quintanilla
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois  60603
(312) 853-7000

ATTORNEYS FOR DEFENDANTS

Dated:  July 16, 2010

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ................................................................................................1

BACKGROUND ..................................................................................................2

ARGUMENT .......................................................................................................3

I.      PLAINTIFFS DO NOT ADEQUATELY ALLEGE THAT DEFENDANTS MADE
        ANY FALSE STATEMENTS...........................................................................3

        A.      Generalized Statements Of Optimism And Puffery Are Immaterial As A Matter
                of Law.............................................................................................................3

        B.      The Challenged Forward-Looking Statements Are Protected By The Reform
                Act's Safe Harbor..........................................................................................5

        C.      Plaintiffs Have Not Adequately Pleaded The Falsity Of The Challenged
                Present-Tense Statements About V-11..........................................................8

II.     PLAINTIFFS' ALLEGATIONS DO NOT GIVE RISE TO A STRONG INFERENCE
        OF *SCIENTER*. .........................................................................................12

        A.      Plaintiffs Do Not Allege A Motive To Commit Fraud. ........................................12

        B.      Plaintiffs Do Not Allege A Cogent Or Compelling Inference That The
                Defendants Acted With *Scienter*. ..........................................................12

III.    PLAINTIFFS FAIL TO STATE A CLAIM FOR CONTROL PERSON LIABILITY. ....15

CONCLUSION..................................................................................................15

# TABLE OF AUTHORITIES

CASES                                                                                          Page(s)

*Asher v. Baxter Int'l Inc.*,
   377 F.3d 727 (7th Cir. 2004) ...............................................................................6

*Car Carriers, Inc. v. Ford Motor Co.*,
   745 F.2d 1101 (7th Cir. 1984) .............................................................................8

*Desai v. Gen. Growth Properties*,
   654 F. Supp. 2d 836 (N.D. Ill. Sept. 17, 2009) .................................................6, 7

*ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)................................................................................9

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
   594 F.3d 783 (11th Cir. Jan. 19, 2010) ...............................................................7

*Friedman v. Rayovac Corp.*,
   295 F. Supp. 2d 957 (W.D. Wis. 2003) ..............................................................9

*Fulton County Employees' Ret. Sys. v. MGIC Inv. Corp.*,
   No. 08-C-0458, 2010 WL 601364 (E.D. Wis. Feb. 18, 2010)........................11, 15

*Gallagher v. Abbott Labs.*,
   269 F.3d 806 (7th Cir. 2001) ...............................................................................4

*In re Cutera*,
   --- F.3d ---, 2010 WL 2595281 (9th Cir. June 30, 2010) .......................................7

*In re Lattice Semiconductor Corp. Sec. Litig.*,
   No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262 (D. Or. Jan. 3, 2006) ................5

*In re Midway Games, Inc. Sec. Litig.*,
   332 F. Supp. 2d 1152 (N.D. Ill. 2004) .................................................................7

*In re Westell Techs., Inc. Sec. Litig.*,
   No. 00 C 6735, 2001 U.S. Dist. LEXIS 17867 (N.D. Ill. Oct. 30, 2001) ...............5

*In re World Access Sec. Litig.*,
   119 F. Supp. 2d 1348 (N.D. Ga. 2000) ................................................................5

*Jones v. Corus Bankshares, Inc.*,
   No. 09 C 1538, 2010 WL 1338070 (N.D. Ill. Apr. 6, 2010)...................................5

*Lindelow v. Hill*,
   No. 00 C 3727, 2001 U.S. Dist. LEXIS 10301 (N.D. Ill. July 20, 2001) ................5

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   437 F.3d 588 (7th Cir. 2006), *rev'd on other grounds*, 551 U.S. 308 (2007)
   ("*Tellabs I*") ................................................................................................................. passim

*Makor Issues v. Tellabs*,
   513 F.3d 702 (7th Cir. 2008) ("*Tellabs III*") .................................................13, 14

*Miller v. Champion Enters. Inc.*,
   346 F.3d 660 (6th Cir. 2003) ..........................................................................7

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management LLC*,
   595 F.3d 86 (2d Cir. 2010) ..............................................................................9

*Pugh v. Tribune Co.*,
   521 F.3d 686 (7th Cir. 2008) ...............................................................2, 12, 15

*Raab v. Gen. Physics Corp.*,
   4 F.3d 286 (4th Cir. 1993) ...............................................................................4

*Sandmire v. Alliant Energy Corp.*,
   296 F. Supp. 2d 950 (W.D. Wis. 2003) ..........................................................7

*Slayton v. American Exp. Co.*,
   604 F.3d 758 (2d Cir. 2010) ............................................................................7

*Stavros v. Exelon Corp.*,
   266 F. Supp. 833 (N.D. Ill. 2003) ...............................................................8, 15

*Tellabs v. Makor Issues*,
   551 U.S. 308 (2007) ("*Tellabs II*") ............................................................11, 12

*Zerger v. Midway Games, Inc.*,
   No. 07 C 3797, 2009 WL 3380653 (N.D. Ill. Oct. 19, 2009) ..........................13

STATUTES

15 U.S.C. § 78u-4(b)(1)(B) ..................................................................................3

15 U.S.C. § 78u-5(c)(1) .......................................................................................7

Defendants Allscripts-Misys Healthcare Solutions, Inc. ("Allscripts"), Glen E. Tullman, and William J. Davis ("Individual Defendants") (collectively, "Defendants") respectfully submit this reply memorandum in support of Defendants' Motion to Dismiss the Second Amended Complaint ("SAC").

## INTRODUCTION

Plaintiffs' Memorandum of Law In Opposition ("Opp.") represents a last-ditch effort to save their case through distortions of their own allegations and assertions that Defendants made statements that Defendants never made. Congress enacted the Private Securities Litigation Reform Act of 1995 ("Reform Act") to prevent claims like this from proceeding. Measured by the Reform Act's demanding requirements, the SAC must be dismissed, this time with prejudice.

*First*, Plaintiffs claim that the "only plausible inferences" that can be drawn from the SAC are that Defendants engaged in fraud. (Opp. at 2.) As discussed below, however, Plaintiffs' purported "inferences" ignore various allegations or documents cited in the SAC or in some instances, actually revise the allegations of the SAC itself.

*Second*, Plaintiffs fail to adequately allege any false or misleading statements. Instead, they point to vague puffery that is not actionable as a matter of law. Moreover, each of the challenged forward-looking statements was accompanied by meaningful cautionary language and is, therefore, protected by the statutory Safe Harbor provisions of the Reform Act. Although Plaintiffs attempt to downplay this language as "boilerplate," and try to defer the matter past the pleading stage, Defendants are entitled to the statutory protections enacted by Congress, particularly given that under Plaintiffs' own theory, the risk factors identified by Allscripts precisely anticipated what transpired.

*Third*, Plaintiffs have entirely failed to plead a "strong inference" of *scienter*. Plaintiffs attempt to dismiss as "irrelevant" their failure to allege any plausible motive for the purported

scheme. (Opp. at 29.)  This ignores settled Seventh Circuit law holding that the absence of such allegations undermines Plaintiffs' ability to establish the necessary "cogent and compelling" inference of fraud required by *Tellabs*.  *See Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008).  Nor do Plaintiffs' allegations regarding the Individual Defendants' purported "knowledge" of problems with V-11 establish a strong inference of *scienter*.  Indeed, nothing in the SAC demonstrates that Defendants believed their public statements were inaccurate.

For all of the reasons discussed below and in Defendants' Memorandum of Law ("Mem."), the SAC should be dismissed.

## BACKGROUND

As noted, Plaintiffs take considerable liberties with the allegations in the SAC, including attributing statements to Defendants that were never made, and claiming that allegations were supported by confidential sources when they were not.  Exhibit A ("Ex. A") sets forth a number of such examples, but several instances warrant brief mention.

*First*, Plaintiffs repeatedly assert that Allscripts had not resolved the known software issues identified in 2006 by the time that Allscripts launched V-11 in 2007.  In this regard, as Defendants previously explained, the SAC did not attribute to any source, including their confidential witnesses, the key allegation of the SAC—the allegation that, when launched, V-11 had "approximately 2,000 *known* bugs that made V-11 unstable, and in come cases unusable." (*See* Ex. A at 1; SAC ¶ 70; Mem. at 1-2.)  Remarkably, in their Opposition, Plaintiffs do not directly address this point.  Instead, they misleadingly attempt to attribute this statement to CW2 – but this is not what is alleged in the SAC.  (*Compare* Opp. at 25 *with* SAC ¶ 70.)

*Second*, Plaintiffs repeatedly mischaracterize what Defendants actually said in conference calls.  For instance, Plaintiffs assert that on the November 8, 2007 conference call, Davis "*specifically denied that there was a problem with meeting V-11 deployment schedules.*"  (Opp.

2

at 9) (emphasis in original).  But the SAC itself makes clear that what Mr. Davis actually said on

the call was not a "denial" at all, but rather was an *acknowledgement* that Allscripts would not

meet deployment schedules at various client sites, and a response to the specific question that

was posed  – *i.e.*, whether this delay was at the initiation of Allscripts or its clients.  (Ex. A at 7;

SAC ¶ 50.)

     *Third*, Plaintiffs repeatedly assert that Defendants "admitted" that, in early November

2007, Defendants knew that their guidance for the balance of 2007 was false.  (*See* Opp. at 9-

10, 21.)  Plaintiffs are wrong.  Their assertion is drawn entirely from an exchange in the February

2008 conference call and ignores both the question posed: "I was wondering . . . what really

changed in Q4 *between the time you gave guidance* [in November 2007] *and it actually*

*transpired*" and Mr. Davis's response: "[T]here was an impact further [] *beyond what even we*

*expected*, kind of in early November, relative to the V-11 expansion . . . ."  (Ex. A at 8; Mem. Ex.

7 at 15.)

## ARGUMENT

## I.  PLAINTIFFS DO NOT ADEQUATELY ALLEGE THAT DEFENDANTS MADE ANY FALSE STATEMENTS.

     To state a claim for securities fraud, Plaintiffs must allege, with particularity, the specific

statements at issue and the reasons why those statements are purportedly false and misleading.

*See* Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b)(1)(B).  Plaintiffs assert that "[t]he Complaint in

every respect meets" these heightened pleading standards.  (Opp. at 11.)  Plaintiffs are wrong.

### A.  Generalized Statements Of Optimism And Puffery Are Immaterial As A Matter of Law.

     Plaintiffs suggest that the Court cannot resolve whether the generalized optimistic and

puffing statements set forth in the SAC are actionable.  (Opp. at 11 n.7.)  Yet courts routinely

dismiss securities claims based on puffery, as Plaintiffs' own cases demonstrate.  *See, e.g.*,

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596-97 (7th Cir. 2006), *rev'd on other grounds*, 551 U.S. 308 (2007) ("*Tellabs I*").  Nor is it sufficient to claim that the challenged statements, while not themselves false, "imbued confidence" that Defendants could meet the financial projections.  (Opp. at 13.)  Rule 10b-5 prohibits the making of "any untrue statement of a material *fact*" or the omission of a "material *fact*" necessary under the circumstances to make the statement not misleading.  17 C.F.R. § 240.10b-5 (emphasis added).  Accordingly, the issue is whether, under the circumstances, a reasonable investor would rely on the statement as "reflecting a consequential fact about the company."  *Tellabs I*, 437 F.3d at 596.  Statements that merely amount to "vague aspiration or unspecific puffery" are not actionable precisely because a reasonable investor would not view them as conveying information about specific facts.  *Id.*; *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993) ("The whole discussion of growth is plainly by way of loose prediction, and . . . anything but definite.").  And in this regard, as Plaintiffs acknowledge, to the extent that these statements do reference specific facts, such as Allscripts' historical sales growth, Plaintiffs do not challenge the accuracy of those facts.  (*See* Opp. at 12 n.8) ("Plaintiffs do not allege [that Allscripts' sales did not grow at the level reported].");  *see also Gallagher v. Abbott Labs.*, 269 F.3d 806, 811 (7th Cir. 2001) ("As for White's statements . . . he said very little that was concrete (as opposed to puffery), and everything concrete was true . . . .").

Thus, in *Tellabs I*, the Seventh Circuit dismissed a number of statements as inactionable puffery that are very similar to those at issue here.  *Compare, e.g.*, SAC ¶ 24 ("performance give[]s us confidence in our ability to deliver during the remainder of 2007"); *id.* ¶ 26 (V-11 will "provide physicians with a product they want to use and need to have"); *id.* ¶ 34 ("[w]e have a clear vision . . . and we continue to demonstrate our ability to deliver on that vision"); *id.* ("we

are in a position to capitalize on the significant market opportunity during the second half of the

year"); *id*. ¶ 45 (growth in sales confirms "acceleration in the market and Allscripts' continuing

leadership") *with Tellabs I*, 437 F.3d at 597 ("we feel very, very good about the robust growth

we're experiencing," and "demand for our core optical products . . . remains strong" were

inactionable puffery); *compare also* SAC ¶ 26 (market validation has been "overwhelming");

¶47 (new clients reinforce "our position as the number one provider") *with Tellabs I*, 437 F.3d at

597-98 ("[o]n the 6500, demand for that product is exceeding our expectations" was inactionable

puffery).  The same result is required here.[1]

## B.    The Challenged Forward-Looking Statements Are Protected By The Reform Act's Safe Harbor.

Plaintiffs concede that Allscripts' projections of sales, revenue, and earnings or

predictions about the deployment of V-11 are forward-looking within the Safe Harbor provisions

of the Reform Act.  (Opp. at 20.)  They offer three arguments, however, why the cautionary

language that accompanied those statements was purportedly not sufficiently "meaningful."

*First*, Plaintiffs argue that the question of whether cautionary statements are sufficiently

"meaningful" cannot be resolved on a motion to dismiss.  Plaintiffs make no effort, however, to

---

[1]  None of Plaintiffs' cases are to the contrary.  (*See* Opp. at 11-13.)  Those cases did not deal with generalized opinions or optimism about uncertain events, but with specific opinions that were directly connected to concrete facts that were themselves adequately alleged to be false.  *See, e.g.*, *Jones v. Corus Bankshares, Inc*., No. 09 C 1538, 2010 WL 1338070, at *10 (N.D. Ill. Apr. 6, 2010) (noting that alleged misstatement that balance sheet was "fortress-like" was used in an SEC Form 10-Q and that statement "might be viewed as reinforcing" other specific factual misstatements); *In re Westell Techs., Inc. Sec. Litig.*, No. 00 C 6735, 2001 U.S. Dist. LEXIS 17867, *7 (N.D. Ill. Oct. 30, 2001) ("'massive demand' from largest account," actionable where largest account had vastly curtailed orders); *In re Lattice Semiconductor Corp. Sec. Litig.*, No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262, at *16 (D. Or. Jan. 3, 2006) ("revenues grew nicely," actionable where contemporaneous conditions were otherwise); *In re World Access Sec. Litig.*, 119 F. Supp. 2d 1348, 1354-55 (N.D. Ga. 2000) ("tests results . . . have been quite encouraging," actionable where product was "a non-functional, incomplete proto-type"); *Lindelow v. Hill*, No. 00 C 3727, 2001 U.S. Dist. LEXIS 10301, *6 (N.D. Ill. July 20, 2001) ("We are very excited about, and are getting ready for, our controlled market launch of OneMedPlace.com" actionable where that system did not exist).  There are no comparable allegations here:  it is undisputed that Allscripts had record revenues in 2007 and its revenues increased from $228.0 million in 2006 to $281.9 million in 2007.  (2007 10-K at 30.)

distinguish the many cases that hold that where, as here, the risks that have been disclosed precisely anticipate the harm that plaintiffs claim was realized, the case can and should be dismissed.  (*See* Mem. at 14-16 (cases cited).)

*Second*, Plaintiffs argue that Allscripts' risk factors were not sufficiently specific.  But Plaintiffs ignore the specific language of the risk factors.  Allscripts specifically warned that its projections might vary if its products suffered "undetected errors or similar problems" and caused "elongated deployment and sales cycles." (SAC ¶ 87; 2006 10-K at 26.)  In fact, Allscripts identified the very harm that Plaintiffs claim caused the shortfall against earlier projections:  "errors in our software could result in . . . lost sales; delays in commercial release; . . . delays in or loss of market acceptance of our solutions; . . . unexpected expenses and diversion of resources to remedy errors." (*Id.*); *see generally Desai v. Gen. Growth Properties*, 654 F. Supp. 2d  836, 846 (N.D. Ill. Sept. 17, 2009) (where company "identified the exact risks that have been identified in Plaintiffs' Complaint . . . call[ing] those statements 'boilerplate' borders on the farcical.").  These risk factors were plainly more detailed than in *Tellabs* and *Asher*, each of which involved vague and generalized risks different from those alleged to have materialized. *See Tellabs I*, 437 F.3d at 599*; Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 730 (7th Cir. 2004).

*Third*, Plaintiffs confusingly argue that Allscripts' risk factors were not "meaningful" because — they contend — the Defendants knew that, throughout the Class Period, V-11 contained software bugs making V-11 unstable, jeopardizing patient safety, and rendering it not efficient or user friendly, or capable of being implemented in a timely manner.  (*See* Opp. at 22.) That is, Plaintiffs contend that Allscripts knew that it had already realized the risks that it identified.  Most importantly, however, Plaintiffs have set forth no well-pleaded allegation that the software issues identified and resolved during the development phase in 2006 persisted after

6

Allscripts launched V-11 or that Defendants actually knew that to be the case.  (*See* Ex. A at 4; Mem. at 23-29.)  To the extent that Allscripts identified software issues after the launch of V-11, those errors were exactly what Allscripts had warned about.  (2006 10-K at 13 ("It is possible that such errors may be found *after introduction* of new software or enhancements to existing software . . . .").)[2]

Moreover, Plaintiffs' argument is not supported by the text of the Safe Harbor.  Plaintiffs appear to have confused the different prongs of the Safe Harbor.  The Safe Harbor provides two separate and independent grounds for dismissal — (i) where a forward-looking statement is accompanied by meaningful cautionary language or (ii) if the forward-looking statement was not made with "actual knowledge" of its falsity.  15 U.S.C. § 78u-5(c)(1); (2).  Courts within the Seventh Circuit have consistently applied the Safe Harbor without regard to the state of mind of the speaker so long as the statement is accompanied by meaningful cautionary language.  *See Desai*, 654 F. Supp. 2d at 844 ("If a statement is accompanied by 'meaningful cautionary language,' the defendants' state of mind is irrelevant.") (*citing Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999)); *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1168 (N.D. Ill. 2004) (same); *Sandmire v. Alliant Energy Corp.*, 296 F. Supp. 2d 950, 958 (W.D. Wis. 2003) (same).  The same is true in other circuits.  *See In re Cutera*, --- F.3d ---, 2010 WL 2595281, at *6 (9th Cir. June 30, 2010); *Edward J. Goodman Life Income Trust v. Jabil Circuit,*

---

[2]  Plaintiffs also contend that the Defendants tempered their warnings with positive statements disclaiming the negative effects of software errors or lengthening implementation cycles.  (Opp. at 23.) This argument would, if accepted, undermine the entire purpose of the Safe Harbor, which is to permit Defendants to make positive statements provided that those statements are accompanied, as they are here, by meaningful cautionary statements.  Unsurprisingly, none of the cases Plaintiffs cite even involved the Safe Harbor at all.

*Inc.*, 594 F.3d 783, 795 (11th Cir. Jan. 19, 2010); *Miller v. Champion Enters. Inc.*, 346 F.3d 660, 672 (6th Cir. 2003).[3]

### C.   Plaintiffs Have Not Adequately Pleaded The Falsity Of The Challenged Present-Tense Statements About V-11.

The heightened pleading requirements of the Reform Act require Plaintiffs to "specify *each* statement alleged to have been misleading" along with "the reason or reasons why the statement is misleading." *See Stavros v. Exelon Corp.*, 266 F. Supp. 833, 841 (N.D. Ill. 2003). Notwithstanding Plaintiffs' claims to the contrary, the SAC does not sufficiently allege that any of the challenged present-tense statements were false or misleading when made.

*First,* Plaintiffs repeatedly assert that the "*same problems*" experienced in the 2006 implementations continued to be reported during the Class Period, (Opp. at 15, 16 (emphasis in original)), which Plaintiffs claim renders false or misleading Defendants' statements regarding V-11's functionality after Allscripts launched V-11 in May 2007. According to the SAC, "[a]t the time of its release, V-11 had approximately 2000 known bugs that made V-11 unstable and in some cases unusable." (SAC ¶ 70.) But as Defendants previously demonstrated, Plaintiffs' carefully-drawn complaint does not attribute this allegation to one of their confidential witnesses or to any other source. The allegation must therefore be disregarded. (*See* Mem. at 26; Mem. Op. and Order 16-17, Apr. 13, 2010 (Docket No. 41).) Rather than addressing this failure, Plaintiffs attempt to surreptitiously rewrite the SAC by attributing this critical allegation *to CW2*. (Ex. A at 1; Opp. at 25.) This is wholly improper, particularly given that Plaintiffs have already

---

[3]   *Slayton v. American Exp. Co.*, 604 F.3d 758 (2d Cir. 2010) is not to the contrary. In the first place, the Second Circuit did not reach the issue that Plaintiffs suggest was decided. *Id.* ("In this case, however, we need not decide that thorny issue . . . ."). Instead, the Second Circuit held that the risks that were disclosed were not the same as those that ended up materializing and that the warnings were vague, bolstered by the fact that the warnings did not change over time. 604 F.3d at 772-73. None of those factors is present here: as previously noted, here the warnings that were given precisely anticipated what eventually occurred, and, when circumstances changed in the third quarter of 2007, Allscripts revised its cautionary statements accordingly. (Mem. at 15-16.)

had two opportunities to amend their complaint.  *See, e.g.*, *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.")  Having set forth no well-pleaded allegation that purported critical software errors identified in 2006 went unremedied, there is no plausible basis for inferring from the SAC that the "same problems" identified in 2006 were unremedied when Allscripts launched V-11 in 2007.  Nor is there a basis to infer that statements praising V-11 in May 2007 were false or misleading when made, particularly given Allscripts' experience with GW MFA and other test sites discussed below.

*Second*, Plaintiffs do not contest that "V-11 was the most tested product in [Allscripts'] history."  (Opp. at 16.)  Nor could they.  Both the SAC and the documents incorporated therein demonstrate that Allscripts performed an extensive series of performance tests at GW MFA and 15-20 client sites before V-11 was placed into general release at its first national site, the GW MFA.  (Mem. at 4, 16-17.)  Instead, Plaintiffs essentially ask the Court to rewrite what was actually said and turn it into something that it was not – *i.e.*, a guarantee that there would not be "any surprises with the functionality or implementation of the software."  (Opp. at 16.)  Plaintiffs cannot misconstrue Defendants' statement in order to challenge it.  *See, e.g.*, *ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (statement that JPMAC had "risk management processes [that] are highly disciplined . . . did not, and could not, amount to a guarantee that its choices would prevent failures in its risk management practices".)[4]  And to the extent that Plaintiffs seek to challenge the statement as a

---

[4]  Plaintiffs' reliance on *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management LLC*, 595 F.3d 86, 92 (2d Cir. 2010) and *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 991 (W.D. Wis. 2003) is misplaced.  *Smith Barney* found a disclosure violation by a mutual fund manager relating to the compensation of a transfer agent in light of the heightened disclosure obligations owed by such fund managers.  595 F.3d at 93-94.  And in *Friedman*, the court held that historical sales and income figures, though literally not false, were actionable because they concealed the role that accounting gimmicks had

forward-looking statement of "expectations," it is protected by the Reform Act's Safe Harbor. *See supra* pp. 5-7.  The same is also true of the statement that "we don't expect issues to come up relative to the actual installation" of V-11 (*see* Opp. at 16-17), which is plainly a forward-looking statement, not a statement of present fact, and is protected by the Reform Act's Safe Harbor.  *See supra* pp. 5-7.

*Third*, Plaintiffs also contend that Defendants mischaracterize Mr. Davis' response to a question in May 2007 about the brief delay in launching V-11.  (Opp. at 17-18.)  But Plaintiffs' argument ignores what Mr. Davis was specifically referring to, which was Mr. Tullman's previous statement that work at GW MFA caused the four to six week delay.  (Ex. A at 5; Mem. Ex. 4 at 3 (noting that Allscripts "partnered with a key client [GW MFA] to conduct a significant amount of our quality control" and that this led to a push back of the market release date by four to six weeks.").)  Nor do Plaintiffs contest Mr. Davis' answer to the question that the delay at GW MFA would delay bookings in the first quarter.  Rather, Plaintiffs confusingly and repeatedly conflate this brief delay launching V-11 *at GW MFA* in May 2007 with Allscripts' earlier decision in 2006 to postpone the launch of V-11.  (*See* Opp. at 4, 17-18.)  That is not what Mr. Davis said.

*Fourth*, Plaintiffs contend that implementation times were not "roughly consistent with the past" and that Allscripts was not experiencing "consistent trends relative to the deployment requirements" *as of August 2007*.  (SAC ¶ 36; Opp. at 18.)  Plaintiffs wrongly suggest that Defendants "admitted" as much at the end of the Class Period.  (Ex. A at 6; Opp. at 18.)  But Defendants never admitted they knew in August 2007 that implementation times would not be consistent with past experience, and, notably, none of Plaintiffs' confidential witnesses suggests

---

played in artificially inflating those figures.  *Id.*  The *Friedman* court did not reinterpret historical statements into forward-looking guarantees, as Plaintiffs attempt to do here.  *Id.*

that they did.  (Ex. A at 8.)  Plaintiffs also allege that the undertraining of the personnel

responsible for implementing V-11 "add[ed] substantial time to the implementation process."

(Opp. at 18.)  But notably, the SAC does not allege that Defendants were ever advised that a

purported lack of training was "adding substantial time" to implementations as early as August

2007 – despite the fact that, by Plaintiffs' own description, these confidential witnesses

participated in the monthly calls during which such information supposedly would have been

conveyed.  Under these circumstances, Plaintiffs' arguments cannot be credited.  *Fulton County

Employees' Ret. Sys. v. MGIC Inv. Corp.,* No. 08-C-0458, 2010 WL 601364, at *17 (E.D. Wis.

Feb. 18, 2010) (fact that confidential source does not allege a material fact despite being in a

position to know reasonably suggests that the requested inference is not accurate).

　　　　*Finally*, as Defendants previously demonstrated (Mem. at 18), Plaintiffs have not pleaded

that Mr. Tullman's August 2007 statement about activating customers in the second quarter was

false or misleading when made.  Plaintiffs offer no basis to contradict that the rollout had

proceeded well during the second quarter or that a few thousand users were expected by the end

of August.  (*See id.* at 18-19.)  Instead, Plaintiffs wrongly attempt to infer falsity from a

subsequent dispute between Allscripts and TN Oncology.  The TN Oncology agreement,

however, involved a long-term software development contract regarding an EHR-system that

combined various aspects of TouchWorks EHR (not only V-11) with another oncology-specific

software solution, (*See* SAC Ex. 1 ¶ 19.)  As Defendants previously explained, Plaintiffs'

generalization of this situation as indicative of widespread problems with V-11 itself is not

justified.  (*See* Mem. at 28-29 (citing cases).)  Moreover, both the SAC and the TN Oncology

complaint allege only that Allscripts was notified of "problems" in September 11, 2007, *i.e.*,

after Mr. Tullman's August 2007 statement.  (*See* SAC ¶ 76; SAC Ex. 1 at ¶ 34.)

11

## II.     PLAINTIFFS' ALLEGATIONS DO NOT GIVE RISE TO A STRONG INFERENCE OF *SCIENTER*.

Apart from failing to plead a false statement, Plaintiffs' allegations simply do not plead a "cogent and compelling" inference that Defendants acted with *scienter*.  (Mem. at 20-30.)  This is a separate and independent basis for dismissal.  *See Tellabs v. Makor Issues*, 551 U.S. 308, 313  (2007) ("*Tellabs II*") (*citing* 15 U.S.C. § 78u-4(b)(2)).

### A.      Plaintiffs Do Not Allege A Motive To Commit Fraud.

As an initial matter, Plaintiffs concede that neither Messrs. Tullman nor Davis sold a single share of Allscripts' stock during the putative Class Period.  Plaintiffs offer a series of fanciful and speculative reasons why Defendants would not have sold stock, including, *inter alia*, attempting to avoid attention, to forestall a lawsuit like this one, or for "tax planning reasons." (Opp. at 29 n.22.)  But Plaintiffs offer no factual support for such rank conjecture, and the SAC pleads none.

To be sure, the Supreme Court has held that Plaintiffs are not absolutely required to plead insider trades to establish *scienter*, *Tellabs*, 551 U.S. at 325.  But Plaintiffs' argument that their failure to do so is "irrelevant" (Opp. at 29) misunderstands the post-*Tellabs II* caselaw in the Seventh Circuit.  As both *Higginbotham* and *Pugh* hold, it is exceedingly difficult to find the required strong inference of *scienter* where there are no stock sales by those supposedly "in the know."  *Higginbotham*, 495 F.3d at 759; *see also Pugh*, 521 F.3d at 695 ("[T]he fact that the defendants are not alleged to have sold the stock at the inflated prices meant that they stood to lose a lot of money if the value of Tribune's stock fell.").  So too here.  Plaintiffs' failure to allege any motive for the "scheme" means that their proffered inference of *scienter* is neither cogent nor compelling; it is nonsensical.

### B.      Plaintiffs Do Not Allege A Cogent Or Compelling Inference That The Defendants Acted With *Scienter*.

Rather than setting forth factual allegations from which *scienter* may plausibly and permissibly be inferred, Plaintiffs attempt to create an illusion of *scienter* by rewriting the SAC in their Opposition and offering a litany of mischaracterized or new allegations.  (*See* Opp. at 25-28.)  Plaintiffs, for example, claim that V-11's bugs "were causing critical errors that put patient safety at risk and caused the software to not work at all, *and those issues persisted throughout the Class Period*."  (Opp. at 26 (emphasis added).)  Plaintiffs do not provide a citation to the SAC for this assertion — and the SAC contains none.  (Ex. A at 3.)  Similarly, Plaintiffs assert that CW2 "confirmed that V-11 did not work."  (Opp. at 25).  The SAC, however, contains no such allegation, whether from CW2 or from any other confidential witness.  (Ex. A at 2.)[5] Further, as noted, Plaintiffs surreptitiously attempt to attribute their allegation that V-11 suffered from 2000 known bugs making it unstable and unusable to CW2.  But this is contrary to the SAC.  *See supra* p. 8.  (Ex. A at 1.)

Plaintiffs also argue that "it is incredible to suggest that defendants did not know of, or were unaware, of the significant problems with its product."  (Opp. at 26.)  This appears to be an effort to invoke the so-called "core products" presumption that some courts have used to infer that an executive was knowledgeable about problems with an important product.  (*See, e.g.*, Opp. 32 n.21 (citing cases).)  But such a presumption necessarily assumes the existence of the underlying problems that the executives are "presumed" to know.  *See Zerger v. Midway Games, Inc.*, No. 07 C 3797, 2009 WL 3380653, at *10 (N.D. Ill. Oct. 19, 2009) ("Even assuming *arguendo* that [the core operations] theory is viable in this circuit, it speaks only to the question of *who* can be credited with knowledge . . . ; it leaves open the question of *when* anybody knew anything.") (emphasis in original).  For instance, in *Tellabs III*, the plaintiffs provided detailed

---

[5] In the paragraph cited by the Plaintiffs, CW2 alleges that Allscripts did not run its typical "testing program" for V-11.  (SAC ¶ 70.)  As previously noted, however, Plaintiffs do not dispute that V-11 was extensively tested at GW MFA as well as tested at 15 to 20 other client sites prior to launch.  (Mem. at 4.)

allegations, corroborated by multiple confidential sources that demand for the company's core products had fallen dramatically.  *See Makor Issues v. Tellabs*, 513 F.3d 702 (7th Cir. 2008) ("*Tellabs III*").  Under such circumstances, the issue was not whether the plaintiffs had pleaded the existence of facts at variance with the public statements, but rather, whether the company's CEO was aware of such facts when he made the statements.  *Id.* at 709.

That is simply not the situation here.  As set forth above, the SAC does not contain any sufficient allegation to support a claim that any of the "bugs" were so serious and significant that they called Allscripts' guidance and other statements into question.  Plaintiffs attempt to argue that Defendants had "access" to information about known bugs, and that a direct report of Mr. Tullman, Laurie McGraw, attended "daily meetings with the development and quality assurance teams where they discussed the bugs being worked on and which of those bugs were 'critical' and need to be immediately fixed." (Opp. at 27.)  But the SAC does *not* allege that Allscripts' quality assurance processes were not working, or that the bugs that were identified as "critical" were not being promptly identified and fixed.  In fact, the SAC affirmatively alleges the opposite.  (*See* Ex. A at 4; SAC ¶ 72 (alleging that Allscripts employed quality-assurance and development teams who held *daily* one process meetings to prioritize bugs as critical, major, and minor and which promptly fixed critical bugs, "*usually within one week of identification*" and remedied the other bugs with service packs, bug fixes, and design changes) (emphasis added).)  The mere existence of bugs, along with a process to resolve them, does not create a "cogent and compelling" inference of fraud.   (*See* Mem. at 24-27.)

Nor can the TN Oncology situation establish *scienter* for statements made in May and August 2007.  As the Defendants have previously noted, Allscripts did not receive TN Oncology's letter until September 2007.  (*See* Ex. A at 9.)  The allegations, therefore, provide no

basis for inferring *scienter* with respect to statements made prior to that date—nor can the "core products" inference be employed to attach liability in hindsight.  (Mem. at 27-28.)  The fact that neither CW1 nor CW2 alleged that senior management had discussed TN Oncology's concerns prior to receiving the September letter, when both were purportedly in a position to know whether this occurred, makes the inference that the Defendants knew about TN Oncology's problems before September 2007 neither cogent nor compelling.  *See Fulton County Employees' Ret. Sys.*, 2010 WL 601364, at \*17.[6]  Moreover, as Defendants previously demonstrated; it is not proper to infer that problems with one customer were widespread and rampant, particularly in light of the customized software at issue.  (*See* Mem. at 27-29 (citing cases).)[7]

## III.   PLAINTIFFS FAIL TO STATE A CLAIM FOR CONTROL PERSON LIABILITY.

Because the Complaint fails to establish a primary violation of the federal securities laws against any of the Defendants, Count II must be dismissed as well.  *See Pugh*, 521 F.3d at 693.

## CONCLUSION

For all of the foregoing reasons, and for the reasons set forth in Defendants' moving brief, the SAC should be dismissed with prejudice.  *See, e.g.*, *Pugh*, 521 F.3d at 698; *Stavros*, 266 F. Supp. 2d at 852.

Dated:  July 16, 2010                    Respectfully submitted,

                                         By: _/s/_James W. Ducayet  ___
                                         One of the Attorneys for Defendants

---

[6]  Plaintiffs attempt to distinguish *Fulton County* by arguing that CW1 indicated "that defendants heard about widespread implementation issues with V-11 on a monthly basis."  (Opp. at 19 n. 11.)  This is pure fabrication.  In the Complaint, CW1 alleges only that Defendants "heard" about widespread implementation issues in *2006*, not 2007.  (SAC ¶¶ 68-69.)

[7]  Given that the SAC has not sufficiently pleaded a strong inference of *scienter* against Messrs. Tullman or Davis, the SAC cannot establish a strong inference of *scienter* on behalf of Allscripts itself.  *See Pugh*, 521 F.3d at 697.

EXHIBIT A

**EXHIBIT A**
**PLAINTIFFS' MISCHARACTERIZATIONS OF THE**
**SAC AND ALLEGED MISSTATEMENTS**

| | **PLAINTIFFS' ARGUMENTS** | **ACTUAL STATEMENTS/ALLEGATIONS** |
|---|---|---|
| **1.** | **CW2 stated that V-11 was unstable and unusable as of May 2007:**<br><br>"At that time, according to CW2, V-11 suffered from approximately 2000 known bugs that made it unstable and unusable."  (Opp. at 25 (citing SAC ¶ 70).) | The SAC does not attribute this allegation to any source.  (SAC ¶ 70.) |
| **2.** | **V-11 "did not work":**<br><br>"CW2, who headed the team testing V-11, confirmed that V-11 did not work . . . ."  (Opp. at 25 (citing SAC ¶¶ 69-70).) | The SAC contains no such allegation.  (*See* SAC ¶¶ 66-77.) |
| **3.** | **Bugs that put patient safety at risk persisted throughout the Class Period:**<br><br>"However, plaintiffs do not merely allege that there were 'bugs' with V-11 but that those bugs were causing critical errors that put patient safety at risk and . . . that those issues persisted throughout the Class Period . . . ."  (Opp. at 26 (citing SAC ¶¶ 66-77).) | The SAC contains no allegation that "critical errors that put patient safety at risk . . . persisted throughout the Class Period."  (*See* SAC ¶¶ 66-77.) |
| **4.** | **The *same* problems plaguing V-11 in 2006 continued to be reported to the Defendants throughout the Class Period:**<br><br>"[T]he truth was that defendants did not satisfy themselves that the problems discovered in the 2006 implementations had been fixed with the additional work in early 2007, instead misleading the market that V-11 was heavily tested, that it functioned as intended and did not suffer from implementation issues."  (Opp. at 5-6.)<br><br>"Plaintiffs also allege that these factors precipitated the decision in late 2006 to delay the launch of V-11 and that these same problems continued to be reported to defendants throughout the Class Period. (Opp. at 15 (citing SAC ¶¶ 68-74).) | **Problems were fixed as they occurred:**<br><br>"CW2 headed a team that executed tests on V-11 against product requirements.  These tests included manual and automated  execution of V-11 features.  *CW2's team identified bugs in the software and submitted the bugs to the Development Team to be fixed.  CW2's teams would re-test V-11 for the bug once the fix was incorporated*."  (SAC ¶ 69.)<br><br>"[D]efendants also had access to Allscripts' HP Mercury system which CW2 described as a database that the development team used to keep track of all the bugs that were identified, and manage their resolution.  CW2's team prioritized |

| | | |
|---|---|---|
| | "Even with Allscripts' quality assurance group testing V-11, without the testing program – run at client sites and not in the controlled environment of Allscripts' quality assurance lab – defendants had no idea if known bugs had been remedied and patient safety was no longer in potential jeopardy, if there were new bugs as a result of the attempts to fix the ones already discovered, if the implementation problems experienced in the field had been corrected, or if V-11 was more efficient and user-friendly, and was rid of the functionality problems discovered in 2006 implementations." (Opp. at 16.)<br><br>"Indeed, defendants knew that V-11 was still unstable at the time Tullman made this statement because the same problems experienced in the 2006 implementations continued to be reported to defendants during the Class Period." (Opp. at 16 (citing SAC ¶¶ 68-74).) | the bugs as critical, major and minor. Daily "one process" meetings were held to determine which bugs were critical bugs. The development and quality assurance groups, including CW2, participated in these, as did President of Strategic Accounts Laurie McGraw who was very involved in the development, testing and implementation of V-11, and reported to defendant Tullman. ***According to CW2, critical bugs were referred to as "hot fixes" and were fixed, tested and released by the quality assurance group usually within one week of their identification. Bugs categorized as major or minor were not addressed as quickly but instead were remedied by "service packs," bug fixes and design changes, which, according to CW2, were tested by CW2's team.***" (SAC ¶ 71.)<br><br>"*Indeed, after the May 2007 launch of V-11, CW2 reports that the quality assurance group continually tested the 'fixes' for the bugs that had been identified before the product was released, as well as those bugs that were discovered by the implementation teams.*" (SAC ¶ 73 (emphasis added).) |
| **5.** | **Four-to-six week delay in launch was not because of work at GW MFA:**<br><br>"When asked by an analyst if the delay in the launch of V-11 had any impact on 1Q07, Davis responded that, 'the delays in the project came not from development. They came from the fact that we did an awful lot of design work and that actually delayed the start of the development work.'" (Opp. at 4 (citing SAC ¶ 27).)<br><br>Clearly, Davis was responding to a question about why the V-11 release was pushed back "four to six weeks," as was mentioned by Tullman earlier in the conference call, and if that delay had a financial impact in 1Q07, rather than asking about the work with GW MFA as defendants' motion assumes. (Opp. at 17.) | **Delay was due to work at GW MFA:**<br><br>Glen Tullman<br>And I want to extend a special thank you to George Washington CEO, Steve Badger and their CIO . . . and the rest of the GW team. For the first time we partnered with a key client to conduct a significant amount of our quality control and end user verification. We also gave them final sign off and they reviewed, tested and documented close to 100 processes before the final okay. This is the most tested product in our history. While we push back [sic] the market release date by four to six weeks, the time invested was well worth it. (Allscripts Q1 2007 Conference Call Transcript (cited at Mem. Ex. 4).) |
| **6.** | **Defendants admit they had no basis for estimating implementation times in August 2007:** | **Defendants state only that there is no *average* implementation time:**<br><br>Sean Wieland<br>A couple questions on version 11. What's the |

| | | |
|---|---|---|
| | "Defendants admitted that Allscripts had no historical basis for estimating implementation times for V-11 . . . ."  (Opp. at 9-10 (citing SAC ¶ 54).) | average Version 11 implementation time right now? And then what's the plan to get it down and where do you see it settling? <br><br> Bill Davis <br> What I would say is **we don't quite yet have an average** and part of the challenge, we have Version 11 across the 30 or so clients that we're implementing it. Some are new, some are larger, some are smaller. So, I'm not sure that we have an average time per say, other than saying that to date, it's been larger, and part of that challenge has been that we may have Version 11 working perfectly at one site and we take it to a different sized site.  (Allscripts Q4 2007 Conference Call Transcript (cited at SAC ¶ 54; Mem. Ex. 7) (emphasis added).) |
| 7. | **Defendants refuse to admit that there was a problem meeting deployment schedules:** <br><br> "On the conference call, Davis also specifically denied that there was a problem with meeting V-11 deployment schedules, instead telling the market that defendants had made a conscious decision to direct resources to the largest implementations." (Opp. at 9 (citing SAC ¶ 50).) <br><br> "In any event, even after defendants were informed by this major customer that V-11 was not working and could not be made to work, defendants flatly denied that they were having any implementation problems or delays that were impacting the conversion of bookings into revenue."  (Opp. at 28 (citing SAC ¶ 50).) | **Defendants acknowledged that there were implementation problems:** <br><br> Richard Close <br> Okay, and then with respect to I guess the third quarter revenue, I know everyone we seem to go around and around on this, but I would suspect that you weren't really anticipating much revenue contribution from the Columbia and Lahey wins, so when did you just come to the realization that some of your existing customers weren't going to be deploying on schedule and if you were to break it down, how much do you think it's internally and Allscripts implementation situation or how much the clients are actually putting the brakes on a little bit? <br><br> Bill Davis <br> I guess I would characterize it a little differently in that it was a conscious decision on our part to redirect resources and/or allow some of these larger ramp-ups to consume those resources as opposed to it being kind of opportunistic by virtue of some of our customers stopping or delaying. We don't mean to convey that sentiment because that's not what's occurring, so that was a consideration.  (Allscripts Q3 2007 Conference Call Transcript (cited at SAC ¶ 50; Mem. Ex. 6).) |
| 8. | **Defendants admit that they knew their November guidance was false when made:** <br><br> "[D]efendants . . . admitted that they knew about | **Q4 impact was beyond what the Defendants expected:** <br><br> Bret Jones |

| | | |
|---|---|---|
| | the material impact on revenue because of V-11 implementation delays in early November 2007." (Opp. at 20 (citing SAC ¶¶ 53-55).)<br><br>"Moreover, defendants admitted that they knew of the material revenue impact of the failing V-11 deployments in early November 2007."  (Opp. at 10 (citing SAC ¶ 55).) | Good Evening.  I was wondering if you could speak a little bit to what really changed in Q4 ***between the time you gave guidance and it actually transpired***. . . . Was the shortfall in revenue simply due to bookings?<br><br>Bill Davis<br>It really was two factors, as I hilted my prepared remarks about, 2 million dollars of the shortfall can be directly attributed to the shortfall in bookings, and that would have been by virtue of hardware, being in that mix, which you tend -- you're able to recognize more immediately. ***But there was an impact further impact beyond what even we expected***, kind of in early November, relative to the V-11 expansion of project plans and I attempted to quantify that as about 2 1/2 million dollars in the quarter, it was the combination of the two.  (Allscripts Q4 2007 Conference Call Transcript (cited at SAC ¶ 55; Mem. Ex. 7) (emphasis added).) |
| **9.** | **Defendants were told of problems at TN Oncology:**<br><br>"In fact, defendants knew from their monthly conference calls that the rollout at Tennessee Oncology was going poorly."  (Opp. at 7.) | The SAC contains no such allegation.  (*See* SAC ¶¶ 66-77.) |

## CERTIFICATE OF SERVICE

I, James W. Ducayet, an attorney, certify that on July 16, 2010, I electronically filed a copy of the foregoing with the Clerk of the Court using the Court's CM/ECF system which will send notification of the filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 16, 2010.

/s/ James W. Ducayet
One of the Attorneys for Defendants

Walter C. Carlson
James W. Ducayet
Victor D. Quintanilla
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

**ECF**   Civil ▾   Criminal ▾   Query   Reports ▾   Utilities ▾   Search ▾   ❓

Logout ▾

# Mailing Information for a Case 1:09-cv-04726

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Walter C. Carlson**
  wcarlson@sidley.com,efilingnotice@sidley.com

- **James Wallace Ducayet**
  jducayet@sidley.com,efilingnotice@sidley.com

- **Lori Ann Fanning**
  LFanning@MillerLawLLC.com,MMiller@MillerLawLLC.com,JRamirez@millerlawllc.com

- **Marvin Alan Miller**
  Mmiller@millerlawllc.com,LFanning@millerlawllc.com,KPulido@millerlawllc.com,JRamirez@millerlawllc.cc

- **Brian O O'Mara**
  briano@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Victor David Quintanilla**
  vquintanilla@sidley.com,efilingnotice@sidley.com

- **Debra J. Wyman**
  debraw@rgrdlaw.com,stremblay@rgrdlaw.com,e_file_sd@rgrdlaw.com,nhorstman@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your