# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PLUMBERS AND PIPEFITTERS LOCAL )
UNION NO. 630 PENSION-ANNUITY )
TRUST FUND, on behalf of itself and all )
others similarly situated, )                    No. 09 C 4726
                           )
            Plaintiff, )                     Judge Ruben Castillo
                           )
      v. )
                           )
ALLSCRIPTS-MISYS HEALTHCARE )
SOLUTIONS, INC., et al., )
                           )
            Defendants. )

## MEMORANDUM OPINION AND ORDER

The Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Trust Fund

("Plaintiff" or the "Pension Fund") brings this putative class action on behalf of itself and those

who purchased Allscripts Healthcare Solutions, Inc. ("Allscripts" or the "Company")[1] common

stock between May 8, 2007 and February 13, 2008 (the "Class Period"). (R. 47, Second Am.

Compl.) In its complaint, Plaintiff alleges that Allscripts, William J. Davis ("Davis"), Allscripts'

Chief Financial Officer, and Glen E. Tullman ("Tullman"), Allscripts' Chief Executive Officer

and the Chairman of its Board (collectively, "Defendants"), violated the Securities Exchange Act

of 1934 (the "Exchange Act") and its implementing regulations. (*Id.*) Presently before the Court

is Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (R. 51,

Defs.' Mot.) For the reasons stated below, Defendants' motion is granted in part and denied in

---

[1] In October 2008, Allscripts merged with Misys Healthcare Systems, LLC and thus formed Allscripts-Misys Healthcare Solutions ("Allscripts-Misys"). (R. 47, Second Am. Compl. ¶ 16.) Though Allscripts is the entity involved in the allegations set forth in the complaint, Allscripts-Misys is named as a defendant in this action as a successor in interest. (*Id.*)

part.

## RELEVANT FACTS

### I.     Prior to Class Period Allegations

Allscripts develops and sells software applications to healthcare organizations. (R. 47, Second Am. Compl. ¶ 2.) According to the Company, more than 150,000 physicians, 700 hospitals, and nearly 7,000 post-acute and homecare organizations utilize Allscripts software applications. (*Id.*) Allscripts products include electronic health records ("EHR") systems and various other healthcare-related software applications. (*Id.*) In the years preceding the Class Period, Allscripts enjoyed profitable operations as a result of the market's embrace of its leading product: Touchworks Version 10.1.1. (*Id.* ¶ 19.) This version of Touchworks had been certified by the Commission for Healthcare Information Technology, a private-sector initiative that was recognized in the industry as the certification authority for EHR products. (*Id.*)

Touchworks Version 11, an upgrade to the successful Version 10.1.1, was originally scheduled for release in late 2006. (*See id.* ¶ 3.) Because of a several month delay, Version 11 was not released until May 2007. (*Id.* ¶¶ 3, 70.)

### II.    Class Period Allegations

#### A.     May 2007 statements

On May 8, 2007, Allscripts announced its financial results for the first quarter of the 2007 fiscal year. (*Id.* ¶ 24.) In its announcement, Allscripts noted that total revenue, revenue from software and related services, gross margin percentage, and net income all increased when compared to the same period in 2006. (*Id.*) Based on these results, Tullman stated the following: "[Allscripts'] revenue growth, visibility to sales opportunities and solid bottom-line performance

2

give us confidence in our ability to deliver solid results during the remainder of 2007." (*Id.*)

During a conference call with analysts that same day, Tullman announced Allscripts' intention to raise sales projections for the remainder of the 2007 fiscal year. (*Id.* ¶ 25.) As detailed by Davis, the Company stated that its clinical sales guidance would exceed $230 million, a $20 million increase over its prior projection; its previously-issued revenue projection of $300 million and earnings guidance were unchanged. (*Id.*) Also during this conference call, Tullman stated that Version 11 was the "the most tested product in [Allscripts'] history." (*Id.*) Additionally, Tullman made the following comment: "Market validation at [Version 11] is a transformational product has been overwhelming. [Version 11] will allow Allscripts to become what I call the Bloomberg of health care." (*Id.* ¶ 26.)

Plaintiff also highlights other portions of answers provided by Tullman and Davis (collectively, "Individual Defendants") in response to questions posed during this conference call. First, the Pension Fund questions the veracity of Davis' statement noting that there was "a very substantial amount of pent-up demand" for Version 11. (*Id.* ¶ 27.) Second, it objects to a response by Davis in which he indicates that the delay in Version 11's release did not arise out of development issues, but rather work related to software design. (*Id.*) Third, the Pension Fund challenges an answer provided by Tullman in which he states that Allscripts did not "expect issues to come up relative to the actual installation and – or conversion or transition to [Version 11]." (*Id.* ¶ 28.) Approximately two weeks after this conference call, Version 11's general release took place. (*Id.* ¶ 70.)

According to Plaintiff, the aforementioned statements, assurances, and projections made by Defendants in May 2007 were "materially false and misleading when made and failed to

3

disclose material information concerning Allscripts' business and business practices." (*Id.* ¶ 32.)
The crux of Plaintiff's challenge to these statements is the following: "based upon experience in
the limited 2006 [Version 11] implementations, Allscripts' management knew by the beginning
of the Class Period that the software was plagued by serious feature[], functionality and quality
problems. These problems caused Allscripts to experience greatly increased implementation
times on [Version 11] in the 2006 implementations as well as those implementations made
during the Class Period." (*Id.* ¶ 32(a).)

Because Allscripts recognized revenue derived from Version 11 sales as the software was
implemented,[2] these purported problems delayed the conversion of its sales backlog into revenue.
(*Id.*) Based on these alleged problems, Plaintiff claims that Davis and Tullman actually knew
their forecasts were false and misleading when made, as there was "no reasonable basis in fact"
for Allscripts' previously-issued revenue projection of $300 million. (*Id.* ¶ 32(e).) Plaintiff
alleges that the misleadingly rosy portrait painted by Defendants caused Allscripts stock to trade
at artificially inflated prices.[3] (*Id.* ¶ 33.)

**B.      August 2007 statements**

---

[2] During the relevant time period, Allscripts used a percentage-of-completion method of
revenue recognition. (R. 52, Defs.' Mot. to Dismiss, Ex. 2, Allscripts 2007 10K at 58.) Under
this method, Allscripts recognized revenue associated with its sales contracts as work on these
contracts progressed. (*Id.*)

[3] The Pension Fund claims it was injured by the allegedly artificially inflated price it paid
for Allscripts stock. (R. 47, Second Am. Compl. ¶ 102.) In doing so, it is proceeding on a fraud
on the market theory, which is "based on the hypothesis that, in an open and developed securities
market, the price of a company's stock is determined by the available material information
regarding the company and its business . . . . Misleading statements will therefore defraud
purchasers of stock even if the purchasers do not directly rely on the misstatements[.]" *Basic Inc.
v. Levinson*, 485 U.S. 224, 240 (1988) (internal quotation marks and citation omitted).

On August 7, 2007, Allscripts announced its financial results for the second quarter of the 2007 fiscal year. (*Id.* ¶ 34.) In a press release, Allscripts noted that total revenue, revenue from software and related services, and net income all increased when compared to the same period in 2006. (*Id.*) Tullman also stated that investments in new technology and aggressive hiring positioned the Company to capitalize on the significant market opportunity during the second half of the year. (*Id.*)

During a conference call that same day, Davis confirmed the revised clinical sales projections set forth in May 2007. (*Id.* ¶ 35.) In response to a question related to the drivers of the Company's overall revenue projection, Davis stated: "we have clear visibility as to where we expect our revenue to come from. It is a function of increased productivity in terms of the implementation resources on the Touchworks side . . . and incremental license opportunities[.]" (*Id.*) It is this claimed increased productivity, along with Allscripts' "sufficient backlog," which led Davis to believe in the feasibility of the Company achieving its 2007 revenue projection of $300 million. (*Id.*)

Plaintiff also highlights other portions of the Individual Defendants' responses to analyst questions during this conference call. First, in response to a question concerning implementation times for Version 11, Davis noted that implementation times were "roughly consistent with the past." (*Id.* ¶ 36.) Additionally, Plaintiff draws the Court's attention to the following response provided by Tullman after he was asked to describe some of the successes Allscripts' customers were seeing:

> We did in fact activate a number of other clients in the quarter. And specifically, we tried to make sure that we had a mixture so folks like Tennessee Oncology . . . came up and a number of others as well, we were looking at – [George Washington University Medical

Faculty Associates ("George Washington")] had on the order of 250 physicians. We are looking at a few thousand users probably by the end of August. That rollout is going very well.

(*Id.*)

Plaintiff alleges that the aforementioned representations made by Defendants in the August 2007 press release and conference call were "materially false and misleading when made and failed to disclose material information concerning Allscripts' business and business practices." (*Id.* ¶ 42.) As with its challenge to the representations made in May 2007, Plaintiff alleges that based on their experience with limited implementations of Version 11 in 2006, the Individual Defendants knew by the beginning of the Class Period that the software contained serious problems. (*Id.* ¶ 42(a).) These problems, it asserts, "delay[ed] the conversion of sales backlog into revenue." (*Id.*) Plaintiff contends that based on the information available to them, the Individual Defendants "actually knew that their forecasts were false and misleading when made as there was no reasonable probability that the forecasted levels of revenue and earnings growth would in fact be achieved." (*Id.* ¶ 42(e).) Taken together, Plaintiff claims that Defendants' August 2007 representations caused Allscripts stock to continue trading at artificially inflated prices. (*Id.* ¶ 43.)

### C.      November 2007 statements

Approximately three months later, on November 8, 2007, Allscripts announced its financial results for the third quarter of the 2007 fiscal year. (*Id.* ¶ 44.) In its press release, the Company noted that total revenue, revenue from software and related services, gross margin percentage, and net income all increased when compared to its results for the same period in 2006. (*Id.*) Despite these increases, Plaintiff notes that these results "widely missed analysts'

6

expectations." (*Id.* ¶ 45.) Also in this release, Allscripts lowered its 2007 revenue projections from $300 million to a range of $286 to $288 million. (*Id.* ¶ 44.)

During a conference call that same day, Davis and Tullman discussed these results with analysts. In addressing the lowered 2007 revenue projections, Davis noted that the Company needed to "recalibrate market expectations" as a result of the "near-term impact on revenue associated with the ramping up of resources" to some of its largest clients. (*Id.* ¶ 46.) Despite this downward revision of the Company's 2007 revenue expectations, Tullman was optimistic about Allscripts' future. Indeed, this optimism was apparently fueled by large agreements signed with the Columbia University Medical Center and the Lahey Clinic, which, according to Tullman, "raise[d] [Allscripts'] profile dramatically" and reenforced its "position as the number one provider for both large enterprise clients and multi-specialty groups." (*See id.* ¶¶ 45, 47.) In further touting the Company's efforts, Tullman also noted that Allscripts was "continuing to invest in systems to drive quality, service delivery and efficiency." (*Id.* ¶ 47.)

Also during this call, analysts questioned the "shortage in recognized revenue" and the effect implementation cycles were having on Allscripts' financial results. (*Id.* ¶ 48.) In response to an analyst question regarding the productivity of Allscripts' implementation staff in the third quarter of 2007, Davis stated:

> We actually saw close to about [a] 25% increase in the production of our resources in terms of overall billable hours in the quarter . . . So we absolutely saw a nice improvement in terms of overall productivity . . . So we absolutely are seeing the capability being there in terms of the production capacity to pull the [sales] backlog through[.]

(*Id.* ¶ 48.)

As a follow up to Davis' response, Tullman added that Allscripts "ha[d] more

resources" and that "training was successful." (*Id.* ¶ 48.) Tullman, in response to an analyst query regarding Version 11 success stories, also said:

> Relative to Version 11, we continue to see good progress there and rolling it out we see very strong demand, and again, in some respects the demand has outstripped what we expected because of the positive response and that means that we have taken our resources and deployed them to Version 11[.]

(*Id.* ¶ 49.)

Again, Plaintiff alleges that the aforementioned representations made by Defendants in November 2007 were "materially false and misleading when made and failed to disclose material information concerning Allscripts' business and business practices." (*Id.* ¶ 51.) As with the previously described challenges, Plaintiff avers that Allscripts' management knew by the beginning of the Class Period that Version 11 had serious defects. (*Id.* ¶ 51(a).) According to Plaintiff, these defects "greatly increased implementation times on [Version 11] in the 2006 implementations as well as those implementations made during the Class Period, thus delaying the conversion of sales backlog into revenue." (*Id.*) Additionally, Plaintiff avers that Allscripts was having implementation difficulties at Tennessee Oncology, one of its major clients. (*Id.* ¶¶ 51(e), 74.) Considering all of these alleged problems, Plaintiff contends that there was "no reasonable basis in fact" for Allscripts' revised revenue forecasts of $286 to $288 million. (*Id.* ¶ 51(f).) The Pension Fund claims that Defendants' August 2007 representations caused Allscripts stock to continue trading at artificially inflated levels. (*Id.* ¶ 52.)

### D.   February 2008 statements

On February 13, 2008, Allscripts reported its fiscal year 2007 financial results. (*Id.* ¶ 53.) Total revenue for 2007 was $281.9 million, compared to $228.0 million for 2006; net income

increased from $11.9 million to $20.6 million. (*Id.*) Allscripts' total revenue, however, fell short of its adjusted 2007 revenue prediction of $286 to $288 million.

As with prior releases of financial results, the Individual Defendants participated in a conference call with analysts that same day. (*Id.* ¶ 54.) Again, the issue of Version 11 implementation was the subject of analyst questions. According to Plaintiff, the Individual Defendants' answers to these questions raise doubts about their prior representations. (*See id.* ¶ 56.)

Plaintiff draws the Court's attention to two statements made by Davis during this conference call. First, after an analyst asked him a question regarding the average Version 11 time, Davis stated:

> What I would say is we don't quite yet have an average and part of the challenge, we have Version 11 across the 30 or so clients that we're implementing it. Some are new, some are larger, some are smaller. So, I'm not sure that we have an average time per [se], other than saying that to date, it's been larger, and part of that challenge has been that we may have Version 11 working perfectly at one site and we take it to a different sized site. And there are different training requirements, there are different implementation requirements and they may be using it or they may be using it in different specialties in a different fashion because of the flexibility. That's what's made it complex.

(*Id.* ¶ 54.)

Second, Plaintiff points to a statement made by Davis responding to another analyst question. This question, which sought to obtain information regarding Allscripts' "shortfall in revenue," was answered by Davis in the following manner:

> It really was two factors, as I hi[n]ted [in] my prepared remarks about, 2 million dollars of the shortfall can be directly attributed to the shortfall in bookings, and that would have been by virtue of hardware, being in that mix, which you tend – you're able to recognize more immediately. But there was an impact further [] beyond what even we expected, kind of in early November, relative to the [Version 11] expansion of project plans and I attempted to quantify that as about 2 ½ million dollars in the quarter, it was the combination of the two.

The [Version 11] implications, much greater impact on the bottom line . . . So much greater impact from the [Version 11] in terms of profitability.

(*Id.* ¶ 55.)

According to Plaintiff, these statements were "shocking revelations of the serious problems with Allscripts' business that had been previously misrepresented or concealed." (*Id.* ¶ 56.)

## III.   Scienter Allegations

In its complaint, Plaintiff also provides additional allegations which it claims supports the conclusion that Defendants "had actual knowledge of the falsity of the statements they made, or acted in reckless disregard of the truth or falsity of those statements." (*Id.* ¶ 65.)  To support this assertion, Plaintiff generally alleges that Tullman and Davis were charged with developing Allscripts' business strategy, overseeing the implementation and execution of that strategy, and communicating the results to investors. (*Id.* ¶ 66.)  In addition, the complaint also avers that Tullman and Davis "knew that conversion into revenue of tens of millions of dollars in sales backlog was dependant upon Allscripts' successful delivery of [Version 11]." (*Id.*)  Aside from these general allegations, Plaintiff also provides more detailed averments which are supported by information derived from various confidential witnesses ("CWs").  These more detailed allegations are related to Version 11's alleged bugs, implementation problems, and poor reception.

### A.   Bugs

According to a former Allscripts Vice-President of Information Technology ("CW1"), by late 2006, Defendants knew from monthly conference calls that Version 11 was "filled with

10

critical bugs." (*Id.* ¶ 69.) Because of these critical bugs and the general instability of the software, CW1 indicates that "it was decided in late 2006 that widespread release of [Version 11] would be delayed." (*Id.*)

Despite these known defects, Defendants did not run a "testing program" on Version 11 before the general release of the software. (*Id.* ¶ 70.) According to a former Allscripts Quality Assurance Analyst ("CW2"), the Company would typically run a testing program with chosen customers to test a new product, or a new version of an existing product, which would allow the Company to identify and fix bugs prior to its general release. (*Id.*) Because of difficulties securing a testing site, Allscripts was unable to run such a testing program. (*Id.*)

In addition to the information gathered from monthly conference calls, Davis and Tullman also had access to Allscripts' HP Mercury system which, according to CW2, was a database the development team used to identify, track, and manage software bugs. (*Id.* ¶ 71.) According to CW2, Davis and Tullman "could gain real[-]time answers to any question they had concerning the number of identified bugs, what problems to functionality the bugs caused[,] and whether bugs had been remedied by accessing the HP Mercury system." (*Id.*)

Bugs continued to appear in Version 11 after its May 2007 general release. Indeed, according to CW2, "hundreds of additional bugs were identified by implementation teams." (*Id.* ¶ 72.) Plaintiff alleges that Davis and Tullman were "kept apprised of the viability of the software and the status of the resolution of the identified bugs during [] monthly conference calls[.]" Eventually, according to CW1 and CW2, because of the vast number of bugs that needed fixes, Allscripts released subsequent versions of Version 11 after the Class Period which "incorporated wholesale changes to avoid the bugs identified in the original [Version 11] version

that defendants sold and attempted to implement during the class period." (*Id.* ¶ 73.)

## B. Implementation problems

In addition to problems with bugs, Plaintiff alleges that Defendants were aware of problems with Version 11's implementation. Plaintiff avers that during monthly conference calls, CW1 heard Allscripts' Chief Technology Officer, Stanley Crane ("Crane"), inform a group, which included Individual Defendants, the results of initial limited implementations of Version 11 at select customer sites made in 2006. (*Id.* ¶ 68.) According to CW1, Crane's presentations indicated that the implementation took much longer than expected and resulted in the discovery of a high number of bugs. (*Id.*) These 2006 implementations, Plaintiff alleges, "indicated that [Version 11's] features, functionality[,] and quality had major problems." (*Id.*)

CW1 presents additional information regarding implementation difficulties. According to CW1, Individual Defendants knew from monthly conference calls that because Version 11 was an almost entirely new application, there was no documentation from prior versions to aid the Client Services team in working through the encountered implementation problems. (*Id.* ¶ 74.) CW1, along with a former Allscripts Implementation Consultant ("CW3"), confirm that this added greatly to the implementation difficulties which, in turn, led to increased implementation times. (*Id.*) Plaintiff alleges that these increased implementation times were reported to Davis and Tullman before and during the Class Period. (*Id.*)

Along with the implementation difficulties created by a lack of documentation, Plaintiff alleges that Allscripts' Client Services team "was too inexperienced and under-trained to adequately handle the implementation questions coming from Allscripts' customers and the implementation teams in the field." (*Id.* ¶ 75.) According to a former Allscripts Implementation

Manager ("CW4"), as the implementation times began to expand, Defendants directed that more people be assigned to implement Version 11 in the field in an effort to improve implementation times and increase the amount of recognized revenue. (*Id.*) CW4 observed that these people were given minimal training, did not have good knowledge of the product, and could not answer customers' questions concerning software functionality and stability problems. (*Id.*)

In addition to the information provided at monthly conference calls, CW4 reports that Davis and Tullman "also had access to the Company's FastTrack system that was utilized by the [Version 11] implementation teams." (*Id.* ¶ 77.) According to CW4, FastTrack "kept track of all the active implementations, showed the dates for deliverable items for each implementation, the status of meeting the deadlines for each implementation, emails exchanged concerning each implementation[,] and the particular bugs identified in each particular implementation." (*Id.*)

## C.    Poor reception

The alleged bugs and implementation problems are not the only pieces of information Individual Defendants purportedly received about Version 11. According to Plaintiff, Individual Defendants "knew that at least one of Allscripts' major accounts was more than dissatisfied with [Version 11] and Allscripts' efforts to implement the software." (*Id.* ¶ 76.) As previously mentioned, Plaintiff claims that Tennessee Oncology was experiencing difficulties in implementing Version 11. (*Id.*) After receiving two letters from Tennessee Oncology's CEO, Dr. Charles McKay ("Dr. McKay"), Plaintiff alleges that Tullman responded by "acknowledging the problems with [Version 11], claiming that the software was now 'ready and tested' and would 'resolve' the issues Tennessee Oncology was experiencing." (*Id.*) Plaintiff avers that the implementation problems continued after Tullman's response and, as a result, Tennessee

Oncology sued Allscripts. (*Id.*, Ex. 1.)

In sum, Plaintiff alleges that Defendants' knowledge of the aforementioned problems with Version 11 rendered the previously-described representations and forecasts false or misleading.

## PROCEDURAL HISTORY

Plaintiff filed its original complaint on August 4, 2009, which it amended on November 25, 2009. (R. 1, Compl.; R. 25, Am. Compl.) In May 2010, Plaintiff filed its second amended complaint (the "complaint"). (R. 47, Second Am. Compl.) In Count I of the complaint, the Pension Fund alleges that Defendants either disseminated or approved the aforementioned "false statements . . . which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." (*Id.* ¶ 100.) As a result, it alleges that Defendants' statements and actions constituted a fraud on the market. (*Id.* ¶¶ 78-79, 102.) These actions, according to Plaintiff, constitute violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) ("Section 10(b)"), and Securities Exchange Commission Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5. (*Id.* ¶ 101.) In Count II, the Pension Fund avers that, "[b]y reason of their positions as officers and/or directors of Allscripts, and their ownership of Allscripts stock, the Individual Defendants had the power and authority to cause Allscripts to engage in the wrongful conduct" alleged, and thus violated Section 20(a) of the Exchange Act ("Section 20(a)"), 15 U.S.C. § 78t(a). (*Id.* ¶ 105.)

On January 11, 2010, Defendants filed a motion to dismiss, which was granted on April 13, 2010. *See Plumbers and Pipefitters Local Union No. 630 Pension-Annuity v. Allscripts-*

*Misys Healthcare Solutions, Inc.*, 707 F. Supp. 2d 774, 784 (N.D. Ill. 2010). After Plaintiff

amended its complaint, Defendants filed a second motion to dismiss on June 11, 2010. (R. 51,

Defs.' Mot.) In their supporting memorandum, Defendants provide five reasons to dismiss the

complaint. First, they argue that some of the challenged statements are immaterial as a matter of

law. (R. 52, Defs.' Mem. at 11-12.) Second, they maintain that certain forward-looking

statements and projections were accompanied by meaningful cautionary language and are

therefore protected by a statutory safe harbor. (*Id.* at 12-16.) Third, Defendants contend that

Plaintiff has not adequately pleaded that certain statements were false or misleading when made.

(*Id.* at 16-20.) Fourth, they submit that Plaintiff has failed to allege facts giving rise to the

required strong inference of scienter. (*Id.* at 20-29.) Lastly, Defendants assert that because

Plaintiff has failed to properly plead a Section 10(b) claim, its Section 20(a) claim also fails. (*Id.*

at 30.)

## LEGAL STANDARDS

A motion under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a

claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge

No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive a motion to dismiss for failure to state a

claim, the complaint must overcome "two easy-to-clear hurdles": (1) "the complaint must

describe the claim in sufficient detail to give the defendant fair notice of what the claim is and

the grounds on which it rests"; and (2) "its allegations must plausibly suggest that the plaintiff

has a right to relief, raising that possibility above a 'speculative level[.]'" *Tamayo v.

Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008). "Plausibility" in this context does not imply

that a court "should decide whose version to believe, or which version is more likely than not."

*Swanson v. Citibank, N.A.*, 514 F.3d 400, 404 (7th Cir. 2010). Rather, to survive a motion to dismiss under Rule 12(b)(6), the "plaintiff must give enough details about the subject-matter of the case to present a story that holds together." *Id.* In other words, "the court will ask itself *could* these things have happened, not *did* they happen." *Id.*

Plaintiff's allegations of securities fraud trigger Rule 9(b). Under Rule 9(b), a plaintiff must plead the "circumstances constituting fraud" with particularity. Fed. R. Civ. P. 9(b). These circumstances include "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech Fin. Servs.*, 536 F.3d 663, 668 (7th Cir. 2008) (citations and quotation omitted).

In addition to Rule 12(b)(6) and Rule 9(b), the sufficiency of a complaint presenting claims under Section 10(b) must also be evaluated according to the requirements set forth by the Private Securities Litigation Reform Act ("PSLRA"). *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007) (*"Tellabs II"*). Under the PSLRA's heightened pleading instructions, any private securities complaint alleging that the defendant made a false or misleading statement must: (1) specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. *Id.* The required state of mind in a Section 10(b) case is scienter, which means "knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (citing *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007)). A securities complaint will survive "only if a reasonable person

would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs II*, 551 U.S. at 324.

## ANALYSIS

The PSLRA requires that a complaint specify each statement alleged to have been misleading. *Id.* at 320. Here, based on the Court's reading of the complaint, Plaintiff appears to highlight twenty-one allegedly actionable statements. (*See* R. 47, Second Am. Compl.) These statements fall into three general categories: (1) optimistic statements about Allscripts and Version 11; (2) forward-looking statements and projections; and (3) present and past-tense statements about Allscripts and Version 11. With these categories and the aforementioned legal standards in mind, the Court proceeds to examining Defendants' arguments in favor of dismissal.

**I.      Count I: Section 10(b) and Rule 10b-5**

**A.      Optimistic statements about Allscripts and Version 11**

Section 10(b) forbids the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device in contravention of such rules and regulations as the [Securities and Exchange Commission ("SEC")] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements Section 10(b) by declaring it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made . . . not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim for a private cause of action under Rule 10b-5, a plaintiff must allege:

"(1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages." *Tricont'l Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007) (internal quotation marks and citation omitted).

Defendants contend that their optimistic statements about Allscripts and Version 11 are immaterial–and thus not actionable–as a matter of law. (R. 52, Defs.' Mem. at 11.) In their supporting memorandum, they correctly note that in certain situations, statements may be considered immaterial as a matter of law and therefore properly dismissed on a Rule 12(b)(6) motion. *E.g., In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004). To determine materiality, "it is necessary to examine 'the significance the reasonable investor would place on the withheld or misrepresented information.'" *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006) (quoting *Basic*, 485 U.S. at 240) ("*Tellabs I*") *vacated on other grounds and remanded, Tellabs II*, 551 U.S. at 329.[4] The Seventh Circuit has noted that, to be material, "there must be 'a substantial likelihood that a reasonable purchaser . . . of a security (1) would consider the fact important in deciding whether to buy . . . the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact.'" *Tellabs I*, 437 F.3d at 596. "The crux of materiality is whether, in

---

[4] The Supreme Court's decision vacating the judgment in *Tellabs I* did not address the Seventh Circuit's materiality holding. *See Tellabs II*, 551 U.S. 308 (2006). As such, the Court will consider *Tellabs I* as persuasive authority on the issue of materiality. *E.g., In re Taffi*, 68 F.3d 306, 310 (9th Cir. 1995) (following as persuasive authority a decision vacated by the Supreme Court on other grounds); *cf. In re Mem'l Hosp. of Iowa Cnty., Inc.*, 862 F.2d 1299, 1302 (7th Cir. 1988) (denying a motion to vacate a district court's opinion after settlement and stating that the persuasive force of an opinion remains after vacatur).

context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company. If the statement amounts to vague aspiration or unspecific puffery, it is not material." *Id.* (citing *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997) ("Mere sales puffery is not actionable under Rule 10b-5.")).

Other circuits have helped define the contours of the materiality requirement. For example, the Sixth Circuit has noted that "[c]ourts everywhere 'have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace–loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.'" *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570-71 (6th Cir. 2004) (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996)). Similarly, the Eight Circuit has held that immaterial statements "include vague, soft, puffing statements or obvious hyperbole." *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 897 (8th Cir. 2002) (citation omitted). Statements that are "mere puffing" or "corporate optimism" may be generalized statements of optimism that are not capable of objective verification. *Id.* (citing *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)). Put simply, courts have held that these types of statements are immaterial because reasonable investors rely on facts in determining the value of a security, not mere expressions of optimism from company officials. *See Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993).

In this case, the Court finds that the optimistic statements made by Individual Defendants about Allscripts and Version 11 are immaterial as a matter of law. For example, Tullman's

statements that Allscripts was "confiden[t] in [its] ability to deliver solid results," and was "in position to capitalize" on a significant market opportunity amount to nothing more than vacuous management speak; they are therefore not actionable. These statements are so general and devoid of any substantive content that they fail to communicate anything that would alter the total mix of information available to investors and the market. Other courts have found similarly empty statements to be immaterial as a matter of law. *See, e.g., Tellabs I*, 437 F.3d at 597 ("we feel very, very good about the robust growth we're experiencing" considered vague and thus not actionable); *Ind. State Dist. Council of Laborers and Hod Carriers Pension and Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 943-44 (6th Cir. 2009) ("[Defendant's] revenue and earnings growth outlook remains positive given our strong underlying fundamentals and our proven growth strategy[]" deemed immaterial). Additionally, optimistic rhetoric regarding Allscripts' "clear vision" lacks the requisite specificity, and is therefore also immaterial. *See Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995) (observing that a statement which lacks specificity is immaterial because it "contains no useful information upon which a reasonable investor would base a decision to invest).

The remaining optimistic statements about Allscripts and Version 11 also fail to cross the materiality threshold. Davis' statement regarding Version 11 and its contribution to helping Allscripts become the "Bloomberg of healthcare" is the type of banal corporate cheerleading that reasonable investors expect and disregard. Because this statement does not reflect a consequential fact about Allscripts, it is not actionable under the Exchange Act. Similarly, Tullman's statement about the Columbia and Lahey agreements reenforcing Allscripts' "position as the number one provider for both large enterprise clients and multi-specialty groups" is merely

20

another example of institutional chest-thumping, and is therefore also not actionable. *See, e.g.* *In re Ford Motor Co. Sec. Litig.*, 381 F.3d at 570-71 (finding that statements by defendant claiming that it was "a worldwide leader in automotive safety " and "is going to lead in corporate social responsibility" are immaterial). In sum, the Court finds that all of the optimistic statements about Allscripts and Version 11 are not actionable under the Exchange Act.

Plaintiff argues that these statements are material, and therefore actionable under the Exchange Act. According to Plaintiff, the optimistic statements about Allscripts and Version 11 are not "generalized, vague, optimistic statements" because they are predicated upon positive factual information.[5] (*See* R. 54, Pl.'s Mem. at 13.) Plaintiff fails, however, to provide any case law to support its claim that optimistic corporate statements become material when tied to positive factual information. (*See id.*) The case law relied upon by Plaintiff does not support this proposition, nor does it advance any other persuasive basis to consider the aforementioned optimistic statements material under the Exchange Act. *See, e.g., In re Lattice Semiconductor Corp. Sec. Litig.*, No. 04-1255-AA, 2006 WL 538756, at *16 (D. Or. Jan. 3, 2006) (inapposite as it does not discuss the materiality requirement); *In re Catalina Mkt. Corp. Sec. Litig.*, 390 F. Supp. 2d 1110, 1113 (M.D. Fla. 2005) (same); *In re World Access Sec. Litig.*, 119 F. Supp. 2d 1348, 1354-55 (N.D. Ga. 2000) (same).

Plaintiff's attempt to analogize the optimistic statements in this case to statements found

---

[5] Plaintiff also argues that "statements of opinion are actionable if they are so discordant with reality that they would induce a reasonable investor to buy the stock at a higher price than it was worth ex ante." (*Id.* at 12 (internal quotation marks and citation omitted).) This proposition is unpersuasive as it materially alters the legal proposition stated in the case Plaintiff relies upon. *See Eisenstadt*, 113 F.3d at 746 ("The question is whether [defendant] said things that were so discordant with reality that they would induce a reasonable investor to buy the stock at a higher price than it was worth ex ante."). The relied upon language in *Eisenstadt* says nothing about statements of opinion.

to be actionable in *Tellabs I* is also unavailing. According to Plaintiff, *Tellabs I* supports its

position because the statements at issue there "rose above mere puffery because, in context, they

gave the market confidence." (R. 54, Pl.'s Mem. at 14.) This contention is unpersuasive. The

referenced statements in *Tellabs I* were actionable not because they gave the market confidence,

but rather because they were properly pleaded to be false when made. *See* 437 F.3d at 598. Put

simply, the defendants in *Tellabs I* stated that one of its products, the TITAN 6500, was available

when, according to the complaint, it was not. *Id.* In finding these statements actionable, the

Seventh Circuit noted that they were "particular, specific, and, according to the complaint,

completely false." *Id.* Here, unlike in *Tellabs I*, the optimistic statements about Allscripts and

Version 11 are not falsifiable representations, but rather vague, optimistic statements. As such,

they are not actionable under the Exchange Act. Accordingly, the complaint is dismissed to the

extent it seeks to predicate liability on optimistic statements about Allscripts and Version 11.

## B.     Forward-looking statements

Next, Defendants argue that the challenged forward-looking statements and projections

made during the Class Period are not actionable because they are protected by the PSLRA's safe

harbor. (R. 52, Defs.' Mem. at 18.) To evaluate this contention, the Court must begin its

analysis with the relevant statutory language.

A defendant may not be held liable under the Exchange Act for any forward-looking

statement, whether written or oral, if (a) the forward-looking statement is identified as a forward-

looking statement and is accompanied by meaningful cautionary statements identifying important

factors that could cause actual results to differ materially from those in the forward-looking

statement; or (b) the plaintiff fails to prove that the forward-looking statement was made with

actual knowledge that the statement was false or misleading. 15 U.S.C. § 78u-5(c)(1). Because

Defendants in this case seek shelter under the safe harbor's first prong, (R. 52, Defs.' Mem. at

12), it will be the focus of the Court's analysis.

To consider the first prong, it is necessary to focus on what portion of the statutory

language is in contention. The parties do not dispute that the forward-looking statements set

forth in Appendix A are forward-looking within the meaning of the PSLRA. (*See* R. 54, Pl.'s

Mem. at 20.) Nor is it disputed that these forward-looking statements were accompanied by

cautionary language. (*See id.* at 21.) What is in contention is whether these cautionary

statements were meaningful, and thus enough to bring Defendants' forward-looking statements

within the protection provided by the PSLRA's safe harbor.

To be meaningful, cautionary statements must identify "important factors that could cause

actual results to differ materially from those in the forward-looking statement[.]" 15 U.S.C. §

78u-5(c)(1)(A)(i). The PSLRA "does not require the *most* helpful caution," nor does it require a

company to reveal in detail what could go wrong. *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734

(7th Cir. 2004). Rather, it is enough for the cautionary statements to point to the principal

contingencies that could cause actual results to depart from projections. *Id.* Such statements are

meaningful if they put an investor on notice of the danger of the investment in order for her to

make an intelligent decision about the investment according to her own preferences for risk and

reward. *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 843 (N.D. Ill. 2003) (citing *Harris v. Ivax

Corp.*, 182 F.3d 799, 807 (11th Cir. 1999)). Meaningful cautionary language "must therefore be

substantive and tailored to the specific predictions made in the allegedly misleading statement."

*Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 845 (N.D. Ill. 2009) (internal quotation

marks and citation omitted).

Cautionary statements must be more than boilerplate and "should 'convey substantive information about factors that could cause results to differ materially from those projected in the forward-looking statements, such as, for example, information about the issuer's business.'" *Stavros*, 266 F. Supp. 2d at 843 (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 558-59 (6th Cir. 2001)); *see* H.R. Conf. Rep. 104-369, at 37 (1995). It is not sufficient that a statement warn of general risks applicable to any business; rather, the risks should be specifically tailored to the company's business. *Stavros*, 266 F. Supp. 2d at 843-44 (citation omitted).

In this case, the relevant cautionary statements are contained in Allscripts' 2006 10-K. These statements were incorporated by reference to apply to the challenged forward-looking statements and projections, (*e.g.*, R. 52, Defs.' Mem., Ex. 4 at 2), and can therefore be considered by the Court in determining whether the cautionary statements provided by Allscripts were meaningful.[6] *See Desai*, 654 F. Supp. 2d at 845 (finding that to determine whether a statement was accompanied by meaningful cautionary language, courts can consider cautionary statements that either accompanied the forward-looking statement or were incorporated by reference); *Stavros*, 266 F. Supp. 2d at 844 (considering cautionary statements contained not only in the documents containing the forward-looking statements at issue, but also in the defendant's filings with the SEC). The Court's analysis will therefore consider these cautionary statements in determining the applicability of the PSLRA's safe harbor.

---

[6] A court may take judicial notice of matters of public record without converting a 12(b)(6) motion into a motion for summary judgment. *Palay v. United States*, 349 F.3d 418, 425 n.5 (7th Cir. 2003). Specifically, "a court may take judicial notice of documents filed with the SEC for the purpose of showing what statements the documents contain[.]" *George v. Kraft Foods Global, Inc.*, 674 F. Supp. 2d 1031, 1043-44 (N.D. Ill. 2009) (internal quotation marks and citation omitted).

After reviewing Allscripts' 2006 10-K, the Court concludes that the cautionary statements Allscripts set forth in this SEC filing identify the principal contingencies that could have caused Allscripts' actual results to depart from its forward-looking statements and projections. In its 2006 10-K, Allscripts devoted over fifteen pages to identifying risks related to its business, industry, and common stock. (*See* R. 52, Defs.' Mem., Ex. 1 at 9-27.) These pages set forth a range of specific factors that could have caused a divergence between Allscripts' actual results and the expectations set by the challenged forward-looking statements. Specifically, this document not only identifies twenty-five separate business-specific risk factors, but also provides a brief descriptive account of these factors and their potential impact on Allscripts' business. (*See id.*)

For example, the 2006 10-K identifies and briefly discusses risks involving product introduction, intellectual property rights, governmental regulation, and failures to license third-party technologies. (*See id.*) While they certainly do not delve into minutiae, Allscripts' cautionary statements convey substantive, business-specific information that identifies important risk factors. Moreover, not only do these cautionary statements highlight numerous business-specific risk factors, but they also identify the very risk Plaintiffs allege led to Allscripts' underperformance: "products failing to perform properly due to undetected errors or similar problems." (*See id.* at 13.) Taken together, the cautionary statements provided by Allscripts point to the principal contingencies that could have caused Allscripts' actual results to depart from its projections. These statements are therefore properly considered to be meaningful under the PSLRA. This conclusion entitles the challenged forward-looking statements to shelter under the first prong of the PSLRA's safe harbor. *See* 15 U.S.C. § 78u-5(c)(1)(A)(i).

Plaintiff disagrees with this conclusion. In support of its position, Plaintiff provides two principal arguments. First, Plaintiff maintains that the cautionary statements were not specific enough to be properly considered meaningful. (R. 54, Pl.'s Mem. at 21-22.) As a point of reference, Plaintiff draws the Court's attention to the cautionary language found to be insufficient in *Tellabs I*. (*Id.*) This reliance on *Tellabs I*, however, is misplaced. In *Tellabs I*, the cautionary language consisted of a short paragraph which briefly identified five highly-generalized risk factors. *See Tellabs I*, 437 F.3d at 599. Here, in contrast, Allscripts not only identified twenty-five separate business-specific risk factors, but also provided a brief descriptive account of these factors and their potential impact on its business. (*See* R. 52, Defs.' Mem., Ex. 1 at 9-27.) *Tellabs I* therefore does not further Plaintiff's cause.

Contrary to Plaintiff's contention, the cautionary language in this case is specific and meaningful. Numerous decisions in other circuits and in this district have found similar cautionary language to be meaningful, and thus sufficient to bring certain forward-looking statements within the protection provided by the PSLRA's safe harbor. *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112-13 (9th Cir. 2010) (concluding that identifying various risk factors constituted meaningful cautionary language); *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 256-58 (3d Cir. 2009) (finding that SEC filings containing a detailed list of specific factors and uncertainties that could affect future economic performance contained meaningful cautionary language); *Desai*, 654 F. Supp. 2d at 845-47 (listing of principal contingencies which led to decline in stock price enough to trigger safe harbor); *In re Midway Games*, 332 F. Supp. 2d at 1166-67 (finding that pages of "highly specific cautionary statements" were meaningful);

*Stavros*, 266 F. Supp. 2d 833 ("exhaustive" list of risk factors enough to trigger safe harbor).[7]

Second, Plaintiff appears to argue that the cautionary statements were not meaningful because Defendants knew that the very risks they were warning about were actually taking place. (R. 54, Pl.'s Mem. at 22 ("[D]efendants' 'warnings' [were] false and misleading, and meaningless to investors.").) Specifically, Plaintiff seems to contend that while Defendants were warning about "products failing to perform properly due to undetected errors or similar problems," they knew Version 11 "was unstable, jeopardized patient safety, was not efficient or user friendly, and could not be implemented in a timely manner." (*Id.*) In short, Plaintiff argues that because Defendants knew that the identified risk factors were already occurring, the previously-described cautionary statements cannot be deemed meaningful.

The Court finds this argument unpersuasive. A plain reading of the statutory safe harbor language reveals that it contains two prongs which are joined by the disjunctive "or." *See* 15 U.S.C. § 78u-5(c)(1). To avoid liability based on forward-looking statements, a defendant therefore has two options that operate independent of one another. Under the first prong, the unambiguous terms of the statutory language limit the inquiry to (1) examining whether the challenged statements were identified as forward-looking; and (2) determining whether the

---

[7] Plaintiff also briefly argues that "the issue of whether cautionary language is sufficient is an intensive fact issue that is not resolvable on a motion to dismiss." (R. 54, Pl.'s Mem. at 21.) This argument fails to consider the many cases that have decided this issue on a motion to dismiss. *E.g.*, *In re Cutera*, 610 F.3d at 1112-13 (affirming Rule 12(b)(6) dismissal and district court's safe harbor analysis); *Avaya*, 564 F.3d at 257-58 (agreeing with district court's assessment at the Rule 12(b)(6) stage that the cautionary statements were meaningful). It also does not consider language in the PSLRA's legislative history which undermines its argument. *See* H.R. Conf. Rep. 104-369, at 38 (1995) ("The use of the words "meaningful" and "important factors" are [sic] intended to provide a standard for the types of cautionary statements upon which a court may, where appropriate, decide a motion to dismiss, without examining the state of mind of the defendant.").

forward-looking statements were accompanied by meaningful cautionary statements. *See id.*

Unlike the second prong of the safe harbor–which explicitly requires an inquiry into whether a

defendant actually knew that a forward-looking statement was false or misleading–the first prong

does not require any consideration of a defendant's state of mind. The Court rejects Plaintiff's

efforts to graft an additional requirement onto the safe harbor's first prong.

In addition to being supported by statutory language, the Court's rejection of Plaintiff's

argument is also buttressed by the PSLRA's legislative history. The Conference Report

accompanying the PSLRA states the following:

> The first prong of the safe harbor requires courts to examine *only* the cautionary statement
> accompanying the forward-looking statement. Courts should not examine the state of mind
> of the person making the statement.

H.R. Conf. Rep. 104-369, at 38 (1995) (emphasis added).

This portion of the PSLRA's legislative history suggests that the state of mind of the

person making the cautionary statement should not be examined under the first prong of the safe

harbor; rather, the inquiry should only be focused on the adequacy of the cautionary statements.[8]

*See Desai*, 654 F. Supp. 2d at 842-43. After examining the cautionary statements in this case, the

Court has concluded that they are meaningful. Nothing more is required by the PSLRA.

In summary, the Court finds that Allscripts' cautionary statements are meaningful, and

---

[8] Courts have also found that the state of mind of the individual making the forward-looking statement itself is also irrelevant in determining the applicability of the safe harbor's first prong. *E.g., In re Cutera*, 610 F.3d at 1112 (stating that "if a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable"); *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 795 (11th Cir. 2010) ("So long as the language accompanying the projections is meaningfully cautionary, the law requires us to be unconcerned with the speaker's state of mind at the time he makes the projections.").

therefore enough to bring Defendants' forward-looking statements within the protection provided by the PSLRA's safe harbor. Accordingly, the complaint is dismissed to the extent it seeks to base liability on Defendants' forward-looking statements and projections.

## C.     Falsity of present and past-tense statements

The PSLRA requires plaintiffs to not only "specify each statement alleged to have been misleading," but also specify "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). "By requiring specificity, [the PSLRA] prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). This particularized explanation must indicate "why the alleged misstatements would have been false or misleading at the several points in time in which it is alleged they were made." *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1083 (8th Cir. 2005); *see In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) ("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events.").

Defendants contend that various statements made by Tullman and Davis regarding Version 11 testing, deployment, and demand, along with statements about Allscripts, were not properly alleged to have been false or misleading when made. (*See* R. 52, Defs.' Mem. at 16-20.) As a result, Defendants argue that these statements fail to satisfy the PSLRA's pleading requirements. (*See id.*) In evaluating this contention, the Court will address the adequacy of Plaintiff's present and past-tense allegations regarding Version 11 and Allscripts thematically.

29

### 1.    Testing

Defendants argue that two statements regarding Version 11 testing have not been adequately pleaded.  First, Defendants argue that Tullman's statement indicating that Version 11 "is the most tested product in our history" is not actionable because it is neither false nor misleading.  (*See id.* at 16-17.)  In response, Plaintiff does not appear to contend that this statement was false when made.  (*See* R. 54, Pl.'s Mem. at 15-16.)  Rather, it argues that the statement was misleading because it "implied that because [Version 11] was heavily tested, it performed as intended and Allscripts did not expect any surprises with the functionality or implementation of the software."  (*Id.* at 16.)

As Plaintiff suggests, statements that are technically true can still be misleading. *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 991 (W.D. Wis. 2003).  Through their context and manner of presentation, these statements–though literally true–can mislead investors.  *See McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).  Even a statement which is literally true, if susceptible to quite another interpretation by a reasonable investor, may properly be considered misleading.  *See id.*  In determining whether a statement is false or misleading, the relevant question a court must answer is "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Tellabs I*, 437 F.3d at 595.

The Court finds that Tullman's statement noting that Version 11 is "the most tested product" in Allscripts' history is not properly alleged to have been misleading when made.  The statement's context makes this clear:

> For the first time we partnered with a key client to conduct a significant amount of our quality control and end used verification.  We also gave them final sign off and they

reviewed, tested and documented close to 100 processes before the final okay. This is the most tested product in our history.

(R. 52, Defs.' Mem., Ex. 4 at 3.)

In this portion of the May 2007 conference call, Tullman was describing implementation efforts at George Washington. (*See id.*) Taken in context, the challenged statement is merely an assertion of historical fact contained in a portion of a conference call describing other statements whose literal veracity is not challenged. While in a different context this statement could have been misleading, in its actual context a reasonable investor would not arrive at the conclusion Plaintiff proposes: that this statement misled investors to believe that Version 11 would not encounter any problems. As such, the Court concludes that this statement has not been properly alleged to have been misleading when made.

Second, Defendants argue that the following statement was not properly alleged to have been false when made: "[W]e did a tremendous amount of work on [the installation] process to make sure that [installation] problems [do not] happen." (R. 52, Defs.' Mem. at 16-17.) Plaintiff, on the other hand, argues that the falsity of this statement was properly alleged because Defendants "knew from the 2006 implementations, and the continuing problems being experienced in the field, that [Version 11] suffered from tremendous implementation issues that did delay, and would delay in the future, the conversion of bookings into revenue." (R. 54, Pl.'s Mem. at 16-17.)

Defendant is correct in arguing that this statement has not been properly alleged to have been false when made. A proper analysis of this statement requires recognizing that it contains two separate assertions: (1) a historical factual claim regarding the amount of work done ("[W]e did a tremendous amount of work on [the installation] process"); and (2) a representation

31

regarding the reason why Allscripts performed this work (". . . to make sure that [installation] problems [do not] happen."). Contrary to what Plaintiff argues, the properly pleaded allegations regarding the alleged implementation problems do not render either assertion false.

This statement has, however, been properly pleaded as misleading when made. In context, it is evident that this statement was made in direct response to an analyst's question regarding technology risks in installing Version 11. (*See* R. 52, Defs.' Mem., Ex. 4 at 21.) At the time this statement was made in May 2007, Plaintiff alleges that Allscripts was experiencing problems installing Version 11. (*See* R. 47, Second Am. Compl. ¶¶ 32, 74-76.) For example, Plaintiff avers that implementation difficulties with Version 11 increased because there was no documentation from prior versions to help Allscripts' Client Services team work through implementation problems. (*See id.* ¶ 74.) In his response to this question, Tullman did not mention any risks that were contributing to the alleged problems that were encountered in implementing Version 11. (*See* R. 52, Defs.' Mem., Ex. 4 at 21.) Instead, despite the alleged installation problems Allscripts was experiencing with Version 11, he mentioned the "tremendous amount of work" that was performed on the installation process to make sure that installation problems did not occur. (*See id.*) Read in context, Tullman's statement may have misled a reasonable investor into developing an overly rosy picture of the risks and the resulting problems Allscripts was facing in implementing Version 11. This statement, therefore, has been properly pleaded as misleading when made.

### 2. Deployment

Defendants also argue that three statements regarding Version 11's deployment were also not properly pleaded as false or misleading when made. (R. 52, Defs.' Mem. at 23-24.) First,

32

they argue that the following statement was not properly pleaded: "Interestingly, by the way, the delays in the project came not from development. They came from the fact that we did an awful lot of design work and that actually delayed the start of the development work." (*Id.*)

The Court disagrees with Defendants' contention. At best, this statement could have been misleading. Like many of the comments made during Allscripts' conference calls, the context this statement finds itself in contains ambiguities. Read in this context, this statement can reasonably be interpreted as suggesting that the delay in releasing Version 11 was merely the product of additional design work. (*See* R. 52, Defs.' Mem., Ex. 4 at 3, 17.) In its complaint, however, Plaintiff alleges that the delay in Version 11's release was not caused by additional design work, but rather by "critical bugs" and the "general instability of the software." (*See* R. 47, Second Am. Compl. ¶ 69.) Because the allegations in the complaint appear to conflict with the representation contained in the challenged statement, the Court finds that this statement has been properly pleaded to be misleading when made.

Second, Defendants argue that the following statement made by Tullman in August 2007 was not properly pleaded: "We are looking at a few thousand users probably by the end of August. That rollout is going very well." (R. 52, Defs.' Mem. at 18.) As with some other challenged statements, the precise meaning of this statement is unclear. It was made in response to an analyst question seeking information about what customers had been activated in the second quarter of 2007 and the "highlights [of] some of the successes" Allscripts' customers were seeing. (*Id.*, Ex. 5 at 11.) In response to this query, Tullman specifically named Tennessee Oncology and said "That rollout is going well." (*Id.*) To determine whether it has been properly pleaded, the Court must examine this statement's context.

The Court finds that this statement has been properly pleaded as misleading when made. In the context in which this statement was made, Tullman appeared to have been using Tennessee Oncology to illustrate some of the successes Allscripts' clients were having with Version 11. (*See* R. 52, Defs.' Mem., Ex. 5 at 11.) In reality, Plaintiff alleges, Tennessee Oncology was not experiencing much success with Version 11; the complaint and its incorporated exhibits allege that Allscripts failed to provide Tennessee Oncology with a functioning program by August 2007.[9] (*See* R. 47, Second Am. Compl. ¶ 76; Ex. 1 ¶¶ 15, 26-27, 32.) Indeed, the allegations suggest that by August 2007, the completion of Version 11's implementation at Tennessee Oncology was well past due. (*See id.*) While the precise meaning of portions of this statement is unclear, what is clear is that a reasonable investor could have been misled by this statement. It has therefore been properly pleaded as misleading when made.[10]

Third, Defendants also argue that a statement made by Tullman on August 7, 2007 was not adequately pleaded to be false or misleading when made. (R. 52, Defs.' Mem. at 19 n.8.) On a conference call that day, an analyst asked Davis the following question: "[H]as there been any change in sort of your implementation times [?] Have they changed at all in the quarter or are they roughly consistent in the past?" (*See id.*, Ex. 5 at 11.) In response, Davis stated:

They [are] roughly consistent with the past. We had some I think many on the call are aware.

---

[9] The Court may properly consider exhibits attached to a complaint and incorporated by reference when ruling on a motion to dismiss. *See Tellabs II*, 551 U.S. at 322.

[10] Defendants' reliance on *Fulton County Employees' Retirement System v. MGIC Investment Corp.*, No. 08 C 0458, 2010 WL 601364, at *17 (E.D. Wis. Feb. 18, 2010) is unpersuasive. The portion of *Fulton County* they rely upon does not examine whether a statement has been properly pleaded as misleading. *See id.* Instead, it analyzes whether the PSLRA's scienter requirement was satisfied. *Id.* Contrary to what Defendants may suggest, in determining whether a statement is misleading no inquiry into the speaker's statement of mind is required.

We had a very concerted effort in and around the George Washington implementation. They really played a unique role in aiding us in the quality assurance process. There was incremental effort associated with that. As we had subsequently rolled out additional sites, we [have] seen consistent trends relative to the deployment requirements on those upgrade processes.

(*Id.*)

According to Defendants, the allegations in the complaint do not suggest that Davis' claim regarding second quarter implementation times was false in August 2007. (R. 52, Defs.' Mem. at 19 n.8.) The Court agrees. The asserted facts Plaintiff relies upon–implementation problems during 2006 and the Class Period, along with allegations of ill-prepared implementation personnel–do not render Davis' statement regarding changes in implementation times during the second quarter of 2007 false. Stated differently, these allegations do not affirmatively establish that the relationship between the implementation times in the second quarter and prior quarters was not what Davis represented during the conference call.

Read in its proper context, the Court also concludes that this statement was not misleading when made in August 2007. In the complaint, Plaintiff alleges that Allscripts encountered increased implementation times throughout the Class Period. (*See* R. 47, Second Am. Compl. ¶ 74.) The Court finds that Davis' statement would have been misleading if it led reasonable investors into believing that implementation times during the second quarter were consistent with past experience when, in reality, they were not. Plaintiff fails to point to any portion of the complaint suggesting that the problems encountered in the second quarter of 2007 were any worse than those encountered in prior quarters. (*See* R. 54, Pl.'s Mem. at 18.) As a result, the Court finds that this statement has not been pleaded to have been misleading when made. Because its false or misleading nature has not been properly pleaded, this statement is not

actionable.

### 3. Demand

Defendants also argue that two statements regarding Version 11 demand are not actionable because they were not adequately pleaded. First, they contend that Davis' May 2007 statement indicating that there was a "very substantial amount of pent-up demand" for Version 11 has not been alleged to have been false or misleading when made. (R. 52, Defs.' Mem. at 19 n.8.) The Court agrees. While the complaint contains allegations regarding issues with Version 11 implementation, bugs, and Tennessee Oncology, it does not allege that these issues had an adverse impact on Version 11 demand. (*See, e.g.*, R. 47, Second Am. Compl. ¶¶ 65-77.) Plaintiff has therefore failed to allege that this statement was false when made. The allegations in the complaint also fail to provide a basis for concluding that this statement was somehow misleading.[11] The statement is therefore not actionable under the Exchange Act.

Second, Defendants suggest that a statement made by Tullman in November 2007 was also inadequately pleaded. This statement, which mentions the "good progress" and the "very strong demand" Allscripts was experiencing with Version 11, (*See* R. 52, Defs.' Mem., Ex. 6 at 10), is, for the reasons described in the previous paragraph, not actionable to the extent it relates to Version 11 demand. Additionally, it is also not actionable to the extent it states that Allscripts was experiencing "good progress." As evident by the phrasing of the preceding question, it was already known that Allscripts was experiencing delays in implementing certain clients. (*See id.*)

---

[11] For these same reasons, Tullman's May 8, 2007 statement regarding Version 11's market validation has not been properly pleaded as false or misleading when made. While there are certainly allegations regarding problems implementing Version 11, Plaintiff presents no allegations which suggest that market validation for Version 11 was not what Tullman stated it was. (*See* R. 47, Second Am. Compl. ¶ 32.) This statement is therefore not actionable.

Plaintiff's allegations do not suggest that in November 2007 Allscripts was not experiencing "good progress" in dealing with some of the implementation delays that were already known to the market. (*See* R. 47, Second Am. Compl. ¶¶ 51, 65-77.) Because this portion of the statement has also not been properly pleaded to be false or misleading when made, the entire statement is not actionable.

### 4. Allscripts

Defendants also claim that another statement made in November 2007 was not properly pleaded to be false or misleading when made. (R. 52, Defs.' Mem. at 18.) In response to an analyst question regarding the productivity of implementation staff during the third quarter of 2007, Davis stated the following:

> We actually saw close to about 25% increase in the production of our resources in terms of overall billable hours in the quarter. We had anticipated that by virtue of a lot of resources being dedicated to Version 11 efforts earlier in the year and the like. So we absolutely saw a nice improvement in terms of overall productivity. The challenge is we tried to highlight in terms of that conversion into revenue was where those efforts were focused on in terms of ramp-up of some of our larger customers and given the long duration and the overall number of hours involved in those implementations, what that translated into overall revenue. So we absolutely are seeing the capability being there in terms of the production capacity to pull the backlog through, but also recognizing that we were moving large customers into production at the same time.

(*Id.*, Ex. 6 at 7-8.)

Plaintiff asserts that this statement has been properly pleaded to be false because Defendants allegedly knew "that the [Version 11] implementation staff was under-trained and ill-equipped to manage the complicated [Version 11] implementation process, and deal with the hundred of new bugs that were being discovered in the field that prevented the system from being operationally stable." (R. 54, Pl.'s Mem. at 19-20.) As a result, Plaintiff claims that Defendants "received monthly reports indicating that implementation times were increasing and more hours

37

were spent trying to make the product work as intended." (*Id.* at 20.)

Contrary to what Plaintiff asserts, the actual allegations in the complaint do not render this statement false, nor do they suggest that it was misleading when made in November 2007. In the complaint, Plaintiff presents a general, undifferentiated account of increased implementation times along with allegations about the increased number of individuals Allscripts was sending out into the field to implement Version 11. (*See* R. 47, Second Am. Compl. ¶¶ 51, 74-75.) Plaintiff does not, however, provide allegations suggesting that the productivity of Allscripts' employees in the third quarter of 2007 did not, as Davis stated, improve. (*See id.*) Further, Plaintiff does not specify any other relevant allegations in the complaint which render other portions of this statement false or misleading when made. (*See* R. 54, Pl.'s Mem. at 19-20.) As such, the Court finds that this statement has not been properly pleaded.

Two other challenged statements about Allscripts remain: (1) Tullman stating that Allscripts was "continuing to invest in systems to drive quality, service delivery and efficiency"; and (2) Tullman's claim that Allscripts had "more resources" and that "training was successful." (R. 52, Defs.' Mem., Ex. 6 at 4, 8.) Again, the Court concludes that the allegations about implementation issues and software bugs do not falsify either of these two representations. The Court also finds that these allegations do not suggest that these two statements were misleading when made. They are therefore not actionable.

At this point, only three potentially actionable statements remain: (1) Tullman's May 8, 2007 statement mentioning the "tremendous amount of work" that was done on the Version 11 installation process; (2) Davis' May 8, 2007 statement communicating that the "delays in the project" came from design, not development, work; and (3) Tullman's August 7, 2007 statement

38

mentioning how well a particular rollout was progressing. To survive Defendants' motion to dismiss, these statements must overcome one additional obstacle: the PSLRA's scienter requirement.

### D. Scienter

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In *Tellabs II*, the Supreme Court set forth three prescriptions courts must consider in determining whether a strong inference of scienter has been properly pleaded in a Section 10(b) action. First, when faced with a Rule 12(b)(6) motion, courts must accept all factual allegations as true. *Tellabs II*, 551 U.S. at 322. Second, courts must consider a complaint in its entirety; indeed, the relevant inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23. Third, in determining whether the pleaded facts give rise to a strong inference of scienter, courts must take into account plausible opposing inferences. *Id.* In doing so, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. *Id.* at 323-24. The inference that the defendant acted with scienter need not be irrefutable or even the most plausible of competing inferences, but it must be more than merely reasonable or permissible. *Id.* at 324. It must be cogent and compelling, and thus strong in light of other explanations. *Id.* A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

Scienter is defined as "knowledge of the statement's falsity or reckless disregard of a

substantial risk that the statement is false." *Pugh*, 521 F.3d at 693. Recklessness can be defined as "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) (internal quotation marks and citations omitted) ("*Tellabs III*"). With these definitions and the Supreme Court's prescriptions in mind, the Court proceeds to examine whether the remaining statements clear this final hurdle.

As described above, the Pension Fund has presented various allegations which it claims support an inference of scienter. (*See* R. 42, Second Am. Compl. ¶¶ 66-77.) These allegations can be placed into five categories: (1) Tullman and Davis' high-level positions at Allscripts (*id.* ¶ 66.); (2) information allegedly obtained by Davis and Tullman during monthly conference calls (*id.* ¶¶ 67-69, 73-74); (3) access to the HP Mercury and FastTrack systems (*id.* ¶¶ 71, 77); (4) alleged problems with Tennessee Oncology (*id.* ¶ 76.); and (5) the absence of a pre-release testing program, along with difficulties Allscripts encountered with Version 11 (*id.* ¶¶ 70, 72-73, 75). According to Plaintiff, these allegations support an inference that Defendants fraudulently misrepresented the state of affairs at Allscripts. (*See id.* ¶¶ 66-77.) Defendants, on the other hand, provided an alternate, nonculpable inference: "that the Individual Defendants provided investors with timely information and estimates based on the best information available to them." (R. 52, Defs.' Mem. at 21.) Because the complaint must "state with particularity facts giving rise to a strong inference" of scienter for each statement alleged to have violated the Exchange Act, 15 U.S.C. § 78u-4(b)(2)(A), the Court will analyze each of the remaining three statements to determine whether the inference of scienter is cogent and at least as compelling as any opposing

inference one could draw from the allegations. In doing so, the Court will consider these five categories of allegations.

### A.    Tullman's May 8, 2007 statement

Collectively, Plaintiff's allegations give rise to a strong inference of scienter for this statement. Initially, the Court must note that Plaintiff's allegation that Tullman and Davis were top executives charged with overseeing and executing Allscripts' business strategy is unhelpful. Conclusory allegations regarding an executive's position within the corporate hierarchy do not satisfy the PSLRA's particularity requirement, and therefore contribute very little, if anything, to a strong inference of scienter. *See, e.g. In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 932 (S.D. Ind. 2008) ("Plaintiffs may not meet their burden based merely on Individual Defendants' corporate positions within the firm.") (citing *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 995 (W.D. Wis. 2003)).

The monthly conference calls, however, do contribute to a strong inference of scienter. Earlier, the Court found that Tullman's May 8 statement was potentially actionable because it suggested a misleadingly sunny account of the risks involved with implementing Version 11. To fully satisfy the PSLRA's pleading requirements, Plaintiff must also provide sufficient allegations to support a strong inference that this statement was made with scienter. The monthly conference calls Tullman allegedly participated in, the Court finds, reasonably lead to such an inference.

Made in direct response to an analyst question regarding technology risks in installing Version 11, Tullman's statement communicated that Allscripts had performed a "tremendous amount of work" on the installation process to make sure that implementation problems did not

happen. In its complaint, the Pension Fund alleges that by May 2007, Allscripts had already experienced (and was experiencing) "implementation difficulties" with Version 11 that were reported to Tullman during monthly conference calls. (*See* R. 47, Second Am. Compl. ¶¶ 67, 74-75.) Taken as true and considered in the context of the entire complaint, Plaintiff's allegations suggest that Tullman spoke with a reckless disregard of a substantial risk that his statement would mislead investors into developing an overly rosy picture of the risks Allscripts faced in implementing Version 11. The Court concludes that his alleged knowledge of these implementation problems in May 2007 help create a strong inference of scienter.

Plaintiff also seems to suggest that access to the HP Mercury and FastTrack systems contributes to a strong inference of scienter. (*See id.* ¶¶ 71,77.) This suggestion is unpersuasive. As has been mentioned before, the PSLRA requires particularity. Mere access to sources of information–without any allegations regarding if, when, and how defendants actually accessed this information–is not enough to contribute to a strong inference of scienter. *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004) (stating that fraudulent intent cannot be inferred merely from access to information). Access to the HP Mercury and FastTrack systems therefore does not contribute to a strong inference of scienter.

In *Tellabs II*, the Supreme Court made clear that a court reviewing the adequacy of a complaint under the PSLRA must conduct a holistic review of its allegations. 551 U.S. at 325. After considering all of the allegations in the complaint, the Court finds that the scienter requirement has been met for this statement. Read in the context of the entire complaint, the allegations of monthly meetings where Tullman received information about implementation difficulties throughout the Class Period create an inference of scienter that is at least as

compelling as Defendants' nonculpable inference. Indeed, as mentioned above, these allegations suggest that Tullman spoke with a reckless disregard of a substantial risk that his statement would mislead the market. Because Plaintiff has alleged facts giving rise to a strong inference that Tullman acted with scienter, this statement has cleared the PSLRA's final hurdle.

Defendants contend that a strong inference of scienter cannot be found in this case because Plaintiff has failed to plead a motive for making misleading statements. (*See* R. 52, Defs.' Mem. at 21-22.) Relying on the Seventh Circuit's decisions in *Higginbotham* and *Pugh*, Defendants assert that "absent a concrete motive, it is difficult to find an inference of scienter that is either cogent or compelling and that the absence of stock sales by those supposedly 'in the know' implies that the [c]omplaint lacks the required 'strong' inference of scienter." (*Id.*) The Court finds that this contention overreads both decisions. As the Supreme Court noted in *Tellabs II*, "the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." 551 U.S. at 325. The absence of a motive allegation, it also stated, "is not fatal." *Id.* Defendants' attempt to place a higher presumptive weight on the absence of motive allegations conflicts with the context-specific inquiry outlined by the Supreme Court in *Tellabs II*. Further, contrary to Defendants' contention, the Seventh Circuit's post-*Tellabs II* decisions have not assigned a special significance to the absence of motive allegations. *See Tellabs III*, 513 F.3d at 710.

A conclusion that a strong inference of scienter exists will "ultimately rest not on the presence or absence of certain types of allegations[,] but on the practical judgment about whether, accepting the whole factual picture painted by the [complaint], it is at least as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269. Based on the totality of the

allegations presently before the Court, such an inference has been created, and the absence of a motive allegation does not unsettle that determination. Accordingly, Tullman's May 8, 2007 statement mentioning the "tremendous amount of work" that was done on the Version 11 installation process survives Defendants' motion to dismiss.

## B.     Davis' May 8, 2007 statement

Davis' May 8, 2007 statement also survives Defendants' motion to dismiss. Here again, a strong inference of scienter is created by the monthly conference calls in which Davis allegedly participated. According to the complaint, by late 2006 Davis "knew from these monthly conference calls that [Version 11] was filled with critical bugs–problems that could impact patient safety." (R. 47, Second Am. Compl. ¶ 69.) It further avers that "[b]ecause of these critical bugs, and the general instability of the software, CW1 indicated it was decided in late 2006 that widespread release of [Version 11] would be delayed." (*Id.*) Davis' May 8th statement, however, presents a much different explanation for this delay. According to Davis, this delay was the product of innocuously-labeled "design work," not problems with the software. (*See* R. 52, Defs.' Mem., Ex. 4 at 17.) Read in the context of the entire factual portrait painted by the complaint, the divergence between these two explanations strongly suggests that when Davis made this statement, he recklessly disregarded a substantial risk that his words could mislead investors. The Court therefore finds that Plaintiff's proposed inference of scienter is cogent and at least as compelling as Defendants' opposing inference. Accordingly, the Court

concludes that this statement also clears the PSLRA's final hurdle.[12]

### C. Tullman's August 7, 2007 statement

Finally, the Court must consider whether Tullman's August 7th statement has been adequately pleaded. Unfortunately for Plaintiff, it has not. In the complaint, Plaintiff alleges that because of the serious ongoing problems Allscripts was experiencing implementing Version 11, Dr. McKay wrote a letter on September 11, 2007 to Allscripts senior management to notify them of these problems. (*See* R. 47, Second Am. Compl. ¶ 76.) The timing of this letter poses problems for Plaintiff's efforts to create a strong inference of scienter for a statement made a month earlier. While on August 7, 2007 Tullman did make a statement which could have reasonably been interpreted as creating a misleading impression about the progress of Version 11's implementation at Tennessee Oncology, Plaintiff fails to provide particularized allegations suggesting that Tullman either knew his statement was misleading or recklessly disregarded a substantial risk that it was misleading at the time it was made. (*See id.* ¶¶ 65-77.) Under the PSLRA, such an omission counts against concluding that the allegations in the complaint establish a strong inference of scienter. *See Tellabs II*, 551 U.S. at 326 ("We agree that omissions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"). While courts must normally draw reasonable inferences in favor of the non-moving party on a motion to dismiss, "the PSLRA 'establishes a more stringent rule for inferences

---

[12] Defendants suggest that the delay referred to in this statement is a delay at George Washington, not a delay in Version 11's general release. (*See* R. 55, Defs.' Reply at 10.) Based on the Court's reading of the transcript of the May 8th conference call, it is evident that what the individuals on the conference call were discussing was a previously mentioned "four to six week[]" delay in the market release of Version 11–not a delay at George Washington. (*See* R. 52, Defs.' Mem., Ex. 4 at 3, 17.)

involving scienter' because the PSLRA requires particular allegations giving rise to a strong inference of scienter.'" *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). In the absence of any other allegations in the complaint which support an inference of scienter, the Court finds that Plaintiff's proposed culpable inference is less compelling than Defendants' nonculpable inference. This statement therefore fails to satisfy the PSLRA's pleading requirements.

## II.    Count II: Section 20(a)

Section 20(a) provides a basis for holding individuals liable for acts of securities fraud if they control other individuals or businesses that violate the securities laws. 15 U.S.C. § 78t. To state a claim under Section 20(a), "a plaintiff must first adequately plead a primary violation of securities laws[.]" *Pugh*, 521 F.3d at 693. Here, Plaintiff has adequately pleaded a primary violation of Section 10(b). As such, Plaintiff's Section 20(a) claim survives to the extent it is predicated on the two statements that have satisfied the PSLRA's pleading requirements.

## CONCLUSION

Having carefully reviewed the allegations in the complaint, the Court DENIES Defendants' motion to dismiss Counts I and II to the extent they are based on the two May 8, 2007 statements that have been properly pleaded. Defendants' motion to dismiss is GRANTED with respect to the remaining challenged statements in the complaint. The parties are directed to reevaluate their settlement positions in light of this opinion and to fully exhaust all efforts to settle this case. The parties shall appear for a status on March 30 at 9:45 a.m. to set a firm litigation schedule for the remaining allegations in this lawsuit. The parties are free to proceed with discovery. All discovery must be completed by December 8, 2011.

Entered:

Judge Ruben Castillo
United States District Court

**Dated:** March 8, 2011